019

ONTROLADORA MINERA MÉXICO, S.A. de C.V., en su sede en Avenida Baja California

10, Colonia Roma Sur 06760 Ciudad de México, México.

17.    El demandado AMERICAS MINING CORPORATION ("AMC") está

constituida en el Estado de Delaware y mantiene su sede en 2575 East Camelback Road,

Phoenix, Arizona, 85016. AMC es una sociedad subsidiaria totalmente la propiedad del

demandado GRUPO MÉXICO.

18.    El demandado JP MORGAN CHASE & COMPANY antes conocido como

CHASE MANHATTAN BANK ("Chase") es una corporación de Delaware con su sede

corporativa ubicada en la Ciudad de Nueva York, Nueva York. Chase Manhattan Bank es una

compañía "sucesoria" de JP Morgan Chase & Co.

19.    El demandado ERNST & YOUNG, LLP y el demandado ERNST & YOUNG

CORPORATE FINANCE, LLC (colectivamente "Ernst & Young") son compañías de

responsabilidad limitada y empresas de contabilidad con oficinas mundiales incluyendo oficinas

en la Ciudad de Nueva York, Nueva York.

20.    Los demandados CREDIT SUISSE FIRST BOSTON, INC., una Corporación de

Delaware, CREDIT SUISSE FIRST BOSTON, LLC, una Compañía de Responsabilidad

limitada de Delaware y CREDIT SUISSE FIRST BOSTON (USA), INC., una Corporación de

Delaware (colectivamente "CSFB") sirvieron como asesor financiero a la Junta Directiva de

ASARCO en el momento de la compra apalancada y un prestador comercial que endosó

económicamente la compra apalancada y sacó provecho de la transacción. CSFB hace negocios

en todo el mundo pero lleva a cabo negocios con regularidad en la Ciudad de Nueva York y el

Estado de Nueva York. La sede corporativa de cada entidad CSFB es Eleven (Once) Madison

Avenue, Nueva York N.Y. 10010-3629.

020

21. El demandado GERMAN LARREA MOTA-VELASCO era el Presidente y Primer Mandatario de ASARCO desde noviembre de 1999 y en la fecha de la transferencia de SCC a AMC. Igualmente era Presidente de la Junta Directiva de SPCC y Primer Mandatario y Presidente de la Junta Directiva de GRUPO MÉXICO, y él debe un deber fiduciario a los acreedores de ASARCO, incluyendo a los demandantes. Se puede notificar al Sr. Mota-Velasco de actos procésales conforme al Convenio Relativo a la Notificación o Traslado en el Extranjero de Documentos Judiciales y Extrajudiciales en Materia Civil o Comercial (el Convenio de La Haya) proporcionando la Citación y Demanda en forma debida a la Autoridad Central Mexicana, se efectuará la notificación formal del Sr. Mota-Velasco en su domicilio comercial en Avenida Baja California 200, Colonia Roma Sur 06760 Ciudad de México, México.

22. El demandado OSCAR GONZÁLES ROCHA fue un Director de ASARCO en la fecha de la transferencia de SPCC a AMC. En aquel entonces también era Presidente, Director General y Primer Oficial Operativo de SPCC, y él debe un deber fiduciario a los acreedores de ASARCO, incluyendo a los demandantes. Se puede notificar al Sr. Rocha de actos procésales en su domicilio comercial en su sede en 2575 East Camelback Road, Phoenix, Arizona.

## GRUPO DE DEMANDANTES

23. El Grupo de Demandantes se define como: Todas las personas expuestas a, o quienes inhalaban, ingerían, o de otra manera absorbían asbesto o productos conteniendo asbesto durante el curso de su empleo, durante proyectos laborales no ocupacionales (incluyendo pero sin limitarse a, arreglos o reparaciones de automóvil y casa, mantenimiento y remodelación) y/o en otras maneras, que eran fabricados, vendidos, distribuidos o instalados directamente o indirectamente por ASARCO, Inc. y sufren de o sufrirán de enfermedades relacionadas con el asbesto. Todos los miembros del Grupo de Demandantes son acreedores no garantizados de ASARCO, con derecho a

7

021

una sentencia contra los Demandados y el Grupo de Demandados quienes mediante actos intencionales y negligentes, fraudulentamente cedieron y/o facilitaron la cesión de los activos principales de ASARCO que legítimamente debieran estar disponibles para compensar al Grupo de Demandantes por lesiones y daños resultando de la conducta dañosa de ASARCO.

## GRUPO DE DEMANDADOS

24.     El Grupo de Demandados se define como todos los demandados nombrados quienes participaron en y beneficiaron de la liquidación de los activos principales de ASARCO.

## ANTECEDENTES DE LOS ALEGATOS

## ASARCO ANTES DE LA COMPRA APALANCADA

25.     Antes de la compra apalancada de ASARCO por GRUPO MÉXICO, las declaraciones financieras de ASARCO, registradas públicamente, representaron a ASARCO como una corporación solvente, internacional, con acciones cambiadas públicamente, que se cotiza en la Bolsa de Valores de Nueva York con más de cuatro millares de millones de dólares en activos y una relación baja de deuda a activo.

26.     Sin embargo, los Demandados, incluyendo a los Oficiales y Directores de ASARCO, estaban conscientes de reclamos múltiples contra la compañía por limpieza de contaminación del medio ambiente referente a las operaciones mineras y de fundición de ASARCO en los Estados Unidos y miles de reclamos por lesión personal relacionados con asbesto siendo el resultado de la operación de las propias facilidades de ASARCO y las de dos sociedades subsidiarias de ASARCO, Capco Pipe Company (distribuidor y

022

fabricante de productos de asbesto) y Lac d'Amiante du Québec (LAQ) (operación minera de asbesto).

27.    Tomando en cuenta estos reclamos actuales y anticipados de los acreedores, ASARCO era insolvente o enfrentaba la insolvencia antes de la compra apalancada.

28.    Los Directores de ASARCO decidieron vender la compañía. Los Directores, todos accionistas de ASARCO y personas claves de la compañía con acceso a información que no es de conocimiento público, recibieron y aceptaron ofertas públicas para la adquisición de acciones de Phelps Dodge Corporation y del demandado GRUPO MÉXICO.

29.    La venta de ASARCO y la liquidación de los activos principales de la compañía antes del cierre de sus reclamos ambientales, incluyendo los reclamos de asbesto, y sus otros reclamos anticipados de acreedores no garantizados, ilegalmente favorecía a los accionistas a costa de los acreedores, incluyendo a los Demandantes.

**B.    VISIÓN GENERAL DE LA OFERTA PÚBLICA PARA LA ADQUISICIÓN DE ACCIONES DE GRUPO MÉXICO Y PLAN INTEGRADO DE LIQUIDACIÓN**

30.    GRUPO MÉXICO ofreció comprar las acciones de ASARCO en dinero efectivo mediante una compra apalancada. La oferta pública para la adquisición de acciones de GRUPO MÉXICO constó de $29.75 por acción, la garantía de un préstamo de Chase y otros prestadores incluyendo a CSFB a ASARCO para volver a comprar sus propias acciones y la asunción de "deuda corporativa pre-existente" de $1.2 millares de millones de dólares. Sin embargo, la propuesta de GRUPO MÉXICO en realidad no concernió el pago de toda la "deuda corporativa pre-existente" de ASARCO.

023

31.    Entonces GRUPO MÉXICO forzaría a ASARCO hacerse responsable por el préstamo a Chase y los otros prestadores, obligando a ASARCO (en vez de GRUPO MÉXICO) pagar por su propia compra por GRUPO MÉXICO.  Así que ASARCO se forzó repagar los préstamos hechos a GRUPO MÉXICO por desmontarse mediante la venta de sus propios activos.

32.    En cuanto a la "deuda corporativa pre-existente", la mayoría de la deuda no era debida ni garantizada por ASARCO.  Esta deuda era de SPCC y originó de un proyecto de expansión de las operaciones mineras de cobre de SPCC.  No obstante, basado en información y entendimiento, GRUPO MÉXICO además requirió que los activos de ASARCO sean liquidados para pagar la deuda de SPCC.  Finalmente, habiendo usado sus propios activos para pagar la deuda de SPCC, ASARCO transfirió sus acciones de SPCC a GRUPO MÉXICO por irrazonablemente poca recompensa.

## C.    PASO 1: LA COMPRA Y PRIVATIZACIÓN DE ASARCO POR GRUPO MÉXICO

33.    En noviembre de 1999, GRUPO MÉXICO compró a ASARCO en una adquisición de "ruptura" en donde los activos no mineros de ASARCO se vendieron para financiar la compra.

34.    La adquisición de ASARCO por GRUPO MÉXICO se llevó a cabo mediante la redención / recompra  de las acciones de ASARCO.  Antes de su oferta pública para la adquisición de acciones, GRUPO MÉXICO, mediante una sociedad subsidiaria, adquirió un poco más de 9% de las acciones comunes en circulación de ASARCO y era el accionista mayor de la compañía. Como ASARCO volvió a comprar sus propias acciones, el interés de titularidad de GRUPO MÉXICO en ASARCO aumentó.

024

35.    En unión con la adquisición, GRUPO MÉXICO causó a ASARCO fusionar con una sociedad subsidiaria de fusión de GRUPO MÉXICO, con "ASARCO" siendo el sobreviviente. Luego las acciones de ASARCO de GRUPO MÉXICO se transfirieron a otra compañía tenedora de valores de otras empresas, el demandado Americas Mining Corporation (AMC).

36.    Después de la redención / recompra de acciones de los otros accionistas de ASARCO, GRUPO MÉXICO privatizó a ASARCO en anticipación de liquidar sus activos no mineros.    ASARCO ya no era una compañía cotizada en la Bolsa de Valores de Nueva York, y ASARCO ya no tenía que publicar sus informes financieros.

37.    En una serie de transacciones relacionadas, integradas y diseñadas, GRUPO MÉXICO adquirió a ASARCO por medio de una compra apalancada por menos de recompensa justa, sin buena fe y en derogación de los derechos de los acreedores, incluyendo a los demandantes.

38.    Los costos de adquisición de GRUPO MÉXICO para la compra de ASARCO se pagaron con dinero pedido prestado por ASARCO.  En noviembre de 1999, GRUPO MÉXICO negoció con Chase para financiamiento para redimir las acciones de ASARCO.

39.    Para pagar los costos iniciales de adquisición, GRUPO MÉXICO causó a ASARCO (mediante la sociedad subsidiaria de fusión de GRUPO MÉXICO) pedir prestado ochocientos diecisiete millones de dólares  ($817,000,000) ("préstamo de adquisición") del demandado Chase.

025

40.    Chase también estableció y sindicó un crédito renovable de cuatrocientos cincuenta millones de dólares ($450,000,000) para ASARCO lo cual aumentó los deberes y servicio de la deuda de la compañía.

41.    Como colateral, ASARCO prendó su interés de titularidad en SPCC, Enthone-OMI, Inc. y compañías relacionadas (colectivamente "Enthone") y American Limestone Company y compañías relacionadas (colectivamente "American Limestone"). (SPCC, Enthone y American Limestone se mencionan colectivamente aquí en esto como "activos principales de ASARCO").  Como parte de la adquisición de GRUPO MÉXICO y en anticipación de la transferencia a GRUPO MÉXICO, ASARCO colocó sus acciones de SPCC en una sociedad subsidiaria totalmente su propiedad y compañía tenedora de valores de otras empresas, Southern Peru Holding Corporation ("SPHC"). En el momento de la adquisición, ASARCO estuvo en poder de aproximadamente 54.2 % de las acciones con derecho de voto de SPCC.

42.    Chase y los otros bancos participantes esperaron recibir pago, y fueron pagados, como prestadores de prioridad, de los beneficios de la venta de la división de especialidad química (Enthone) de ASARCO y la división de conglomerados (American Limestone) de ASARCO y los beneficios de la venta de las acciones de SPCC de ASARCO.

43.    El demandado Chase sabía que estaba proporcionando la deuda de rango superior necesaria para adquirir y liquidar los activos principales de ASARCO, y sabía o debiera haber sabido que ASARCO ya era insolvente por las responsabilidades ambientales y de asbesto o se volvería insolvente o sin capital suficiente continuar operaciones comerciales normales como el resultado de estas cesiones.

44. Chase sabía que los pendientes acreedores ambientales y de lesión personal no garantizados de ASARCO no estarían satisfechos bajo la liquidación prevista.

45. Las recitaciones dentro del acuerdo del préstamo declaran que el propósito principal del préstamo de adquisición era volver a comprar las acciones de ASARCO de sus accionistas. Chase sabía que los beneficios del préstamo no se acumularían al beneficio de ASARCO o sus acreedores y así representaba una ganancia de capital irrazonablemente pequeña por el gravamen. Chase sabía que los beneficios del préstamo iban a ser usados para el beneficio de terceros, GRUPO MÉXICO, AMC y los accionistas anteriores de ASARCO, quienes eran "personas claves de la compañía con acceso a información que no es de conocimiento público" en la transacción.

**D.   PASO 2: LA LIQUIDACIÓN DE LOS ACTIVOS PRINCIPALES DE ASARCO**

46. Después de la adquisición, GRUPO MÉXICO mudó la sede corporativa de ASARCO desde Nueva York a Phoenix, Arizona, donde ASARCO compartió oficinas con AMC y SPHC. GRUPO MÉXICO reemplazó a los Oficiales y Directores de ASARCO con designados de su propia Junta. ASARCO se hizo una sociedad subsidiaria totalmente la propiedad de AMC. Después de la adquisición, ASARCO perdió su identidad distinta y se controla totalmente por GRUPO MÉXICO y/o sus afiliados.

47. GRUPO MÉXICO forzó a ASARCO vender sus activos para pagar los costos de adquisición de GRUPO MÉXICO. A la indicación de GRUPO MÉXICO, aproximadamente $17 millones del equipo comercial de ASARCO se vendió en subasta.

48. A la indicación de GRUPO MÉXICO y según el acuerdo con Chase, ASARCO vendió su lucrativa división de especialidad química (Enthone) por quinientos tres millones de dólares ($503,000,000). Ahora Enthone es parte de Cookson Electronics

13

027

WB Materials and Chemistry, una división de Cookson Group plc, una compañía

británica.

49.    A la indicación de GRUPO MÉXICO y según el acuerdo con Chase,

ASARCO vendió su lucrativa división de conglomerados (American Limestone) a Rinker

Materials Corporation antes conocido como CSR America, Inc., por doscientos once

millones de dólares ($211,000,000).

50.    Los beneficios de estas ventas no se acumularon al beneficio de ASARCO

ni sus acreedores ya que este dinero se aplicó a la deuda de adquisición y solamente

benefició a Chase, GRUPO MÉXICO y los accionistas anteriores de ASARCO haciendo

caso omiso de los reclamantes ambientales y de asbesto existentes y futuros. Estas cesiones

por menos de recompensa justa, se hicieron sin buena fe, crearon o aumentaron la

insolvencia e insuficiencia de capital de ASARCO y fueron en derogación de los derechos

de los acreedores incluyendo los derechos de los demandantes.

51.    A la indicación de GRUPO MÉXICO, los activos de ASARCO fueron

desviados al perjuicio de los acreedores de ASARCO. Los beneficios del acuerdo

concerniente al litigio con los aseguradores de responsabilidad en exceso de ASARCO no

fueron segregados ni mantenidos para pagar los reclamos conocidos de responsabilidad

relacionados con la cobertura de seguros. Como prueba clara del plan integrado liquidar a

ASARCO al perjuicio de los acreedores no garantizados, los beneficios futuros del acuerdo

de seguros se vendieron a descuento grande, y el dinero en efectivo se transfirió a la cuenta

operativa de ASARCO y se gastó.

52.    En 2003, a la indicación de GRUPO MÉXICO y según el acuerdo con

Chase, el interés de ASARCO en SPCC se transfirió a AMC, otra sociedad subsidiaria

14

028

totalmente la propiedad de GRUPO MÉXICO. Como contraprestación de esta cesión, GRUPO MÉXICO pagó a Chase y al sindicato de bancos, de parte de ASARCO, cuatrocientos cincuenta millones de dólares ($450,000,000) en reembolso de préstamos surgiendo de la adquisición, "perdonó" cierta deuda entre compañías a AMC y/o sus sociedades subsidiarias incluyendo a Mexicana de Cobre, S.A. de C.V. y acordó pagar doscientos cuarenta y tres millones de dólares ($243,000,000) en alguna fecha futura. Parte de este último pago pueda acumular al beneficio de los acreedores no garantizados de ASARCO (principalmente como parte de un acuerdo con los Estados Unidos sobre algunos reclamos ambientales) pero representa una cantidad mucho menos que un equivalente justo por los activos.

**ASARCO ACCIONADO POR CESIÓN FRAUDULENTA POR EL GOBIERNO DE LOS ESTADOS UNIDOS**

53.    Después de que la transferencia de los activos restantes más valiosos de ASARCO (las acciones de SPCC mantenidas por SPHC) fuese propuesta, los Estados Unidos (un acreedor no garantizado con reclamos ambientales) inició una acción judicial contra ASARCO por cesión fraudulenta. *(Los Estados Unidos de América contra Asarco Inc. y Southern Peru Holdings Corporation, CO2-5401 FDB* (Distrito Occidental de Washington) (más tarde transferido al Tribunal de Distrito de los Estados Unidos para el Distrito de Arizona y numerado de nuevo como Caso No. CV 02-2079-PHX-RCB).

54.    Durante el curso del litigio del Gobierno, ASARCO confesaba que ya no podía pagar sus deudas al vencerse.

55.    Los Estados Unidos finalmente resolvió sus reclamos contra ASARCO y SPHC por cien millones de dólares ($100,000,000), una cantidad mucho menos de la responsabilidad debida en los reclamos ambientales recién vencidos, y retiró su objeción a

15

029

la transferencia. Este acuerdo no proporcionó beneficios ni protecciones en absoluto para los otros acreedores no garantizados de ASARCO, incluyendo a los demandantes.

56. Basado en información y entendimiento, los Estados Unidos resolvió barato su reclamo porque las acciones de SPCC ya estaban gravadas por el préstamo de adquisición del demandado Chase, los activos de ASARCO ya estaban reducidos por la venta de Enthone y American Limestone, la capitalización de ASARCO era demasiada escasa para continuar muchas de sus operaciones comerciales y por las tergiversaciones financieras de ASARCO, GRUPO MÉXICO y el demandado Ernst & Young en cuanto al valor del interés de ASARCO en SPCC.

57. La transferencia del interés de ASARCO en SPCC se facilitó por el demandado Ernst & Young quien imprudentemente y a sabiendas dio una opinión subvalorando este activo. Como el resultado directo de las tergiversaciones de Ernst & Young, los derechos de los demandantes fueron minados.

## ASARCO DESPUÉS DE LA COMPRA APALANCADA Y RELACIONADAS VENTAS DE ACTIVOS

58. Después de las cesiones descritas aquí en esto, ASARCO quedó como esqueleto insolvente. El valor vendible actual de los activos de ASARCO es menos de la cantidad necesitada pagar las responsabilidades probables de la corporación, incluyendo los reclamos de lesión personal de los demandantes. ASARCO falta recursos suficientes pagar oportunamente a sus acreedores, incluyendo a los demandantes. La capitalización de ASARCO es demasiada escasa para continuar las operaciones comerciales mantenidas antes de la venta de SPCC. Despojado de sus activos de más valor, ASARCO está al borde de presentar una solicitud para protección de insolvencia.

16

030

59.   Un resultado justo para los demandantes, cuyos reclamos contra ASARCO permanecen insatisfechos, requiera que las transacciones precedentes sean vistas como parte de un plan integrado, completado en un plazo de menos de cinco años, resultando en cesiones que son fraudulentas a los demandantes.

## PRIMER DERECHO DE ACCIÓN DE LOS DEMANDANTES
### *(Fraude Implícito – Cesión Resultando en Insolvencia)*

60.   Los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-59 y para su Primer Derecho de Acción declaran como sigue:

61.   ASARCO debe una "deuda" a los demandantes según ese término se define bajo el Acto de Cesión Fraudulenta de Nueva York ("el Acto"). *N.Y. DEBT. & CRED. § 270.*

62.   La venta de ASARCO a GRUPO MÉXICO en noviembre de 1999 por y por medio de una compra apalancada es una "cesión" según ese término se define bajo el Acto. *N.Y. DEBT. & CRED. § 270.*

63.   El gravamen de los intereses de ASARCO en Enthone, American Limestone y SPCC en fomento de la compra apalancada de GRUPO MÉXICO de ASARCO, es una "cesión" de la propiedad de ASARCO (el deudor) dentro del significado del Acto. *N.Y. DEBT. & CRED. § 270.*

64.   La venta en subasta de cierto equipo comercial de ASARCO, es una "cesión" de la propiedad de ASARCO (el deudor) dentro del significado del Acto. *N.Y. DEBT. & CRED. § 270.*

65.   La transferencia del interés de titularidad de GRUPO MÉXICO en ASARCO (como fusionado con ASMEX) a AMC es una "cesión" de la propiedad de ASARCO (el deudor) dentro del significado del Acto. *N.Y. DEBT. & CRED. § 270.*

031

66.    La venta de Enthone, American Limestone y el interés de titularidad de ASARCO en SPCC ("los activos principales de ASARCO") por separado y respecto a un plan integrado de liquidación es/son "cesión(es)" de la propiedad de ASARCO (el deudor) dentro del significado del Acto. *N.Y. DEBT. & CRED. § 270.*

67.    La redención / recompra de las acciones de ASARCO de los Directores de ASARCO y otros accionistas es una "cesión" según ese término se define bajo el Acto. *N.Y. DEBT. & CRED. § 270.*

68.    Los demandantes tienen reclamos contra ASARCO por daños y perjuicios resultando de lesiones personales causadas por exposición a asbesto. Los demandantes son "acreedores" de ASARCO bajo el Acto. *N.Y. DEBT. & CRED. § 270.*

69.    ASARCO fue comprado por GRUPO MÉXICO, sus acciones redimidas, cierto equipo comercial suyo liquidado en subasta, y sus activos principales gravados y vendidos en un momento cuando ASARCO o era insolvente o se volvería insolvente como el resultado de la liquidación de sus activos.

70.    ASARCO recibió menos de recompensa justa por la redención / recompra de sus acciones y transferencia de interés controlador en la compañía a GRUPO MÉXICO Y AMC ya que los beneficios de la cesión se acumulaban al beneficio de terceros (GRUPO MÉXICO, AMC, los accionistas anteriores de ASARCO y Chase) y no al beneficio de ASARCO o sus acreedores.

71.    ASARCO recibió menos de recompensa justa por el gravamen de sus activos principales ya que los beneficios de la cesión se acumulaban al beneficio de terceros (GRUPO MÉXICO, AMC, los accionistas anteriores de ASARCO, Chase y CSFB y otros) y no al beneficio de ASARCO o sus acreedores.

032

72. ASARCO recibió menos de recompensa justa por la venta en subasta de cierto equipo comercial suyo y la venta de sus activos principales ya que los beneficios de estas cesiones se acumulaban al beneficio de terceros (GRUPO MÉXICO, AMC, los accionistas anteriores de ASARCO, Chase y CSFB) y no al beneficio de ASARCO o sus acreedores.

73. Los demandantes tienen derecho a una sentencia a su favor contra GRUPO MÉXICO y AMC declarando la cesión de ASARCO a GRUPO MÉXICO y AMC, el gravamen y venta del equipo comercial y activos principales de ASARCO y la redención / recompra de sus acciones ser individualmente y colectivamente fraudulentos en cuanto las deudas debidas a los demandantes conforme a *N.Y. DEBT. & CRED. § 273.* Los demandantes tienen derecho a remedios legales y equitativos apropiados en eso.

## SEGUNDO DERECHO DE ACCIÓN DE LOS DEMANDANTES
*(Fraude Implícito – Cesión Resultando en Insuficiencia de Capital)*

Los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-73 y para su Segundo Derecho de Acción declaran como sigue:

74. A la indicación de GRUPO MÉXICO y AMC, ASARCO redimió sus acciones y cedió cierto equipo comercial suyo y sus activos principales sin recompensa justa cuando ASARCO estuvo participando o al punto de participar en un negocio o transacción por lo cual la propiedad quedando en el poder de ASARCO después de la cesión representó irrazonablemente poca capital.

75. Los demandantes tienen derecho a una sentencia a su favor contra GRUPO MÉXICO y AMC declarando el gravamen y la cesión del equipo comercial y activos principales de ASARCO y la redención / recompra de las acciones de ASARCO, individualmente y colectivamente, fraudulentos en cuanto las Deudas debidas a los

033

demandantes conforme a *N.Y. DEBT. & CRED. § 274.* Los demandantes tienen derecho a remedios legales y equitativos apropiados en eso.

## TERCER DERECHO DE ACCIÓN DE LOS DEMANDANTES
### *(Fraude Efectivo: Cesión en Anticipación de Deudas)*

Los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-75 y para su Tercer Derecho de Acción declaran como sigue:

76.    En una serie de transacciones tomadas a la indicación de GRUPO MÉXICO AMC, ASARCO fue vendido a GRUPO MÉXICO y transferido a AMC, las acciones de ASARCO redimidas y el equipo comercial y activos principales de ASARCO gravados y/o vendidos por menos de recompensa justa, con la intención o creencia que ASARCO contraería deudas fuera de su capacidad pagar al vencerse.

77.    GRUPO MÉXICO y AMC estaban conscientes de los reclamos de los demandantes (y otros ambientales) contra ASARCO antes de las cesiones aquí mencionadas, y estos demandados sabían que estos reclamos quedarían insatisfechos bajo plan integrado de liquidación.

78.    Los demandantes tienen derecho a una sentencia a su favor contra GRUPO MÉXICO y AMC declarando la venta de ASARCO a GRUPO MÉXICO, la transferencia ASARCO a AMC, la redención / recompra de las acciones de ASARCO y el gravamen cesión del equipo comercial y/o activos principales de ASARCO ser fraudulentos a las deudas debidas a los demandantes conforme a *N.Y. DEBT. & CRED. § 275.* Los demandantes tienen derecho a remedios legales y equitativos apropiados en eso.

## CUARTO DERECHO DE ACCIÓN DE LOS DEMANDANTES
*Fraude Efectivo: Cesión con Intención de Frustrar Reclamos de Acreedores/Conspiración)*

20

034

los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-78 y para su Cuarto Derecho de Acción declaran como sigue:

79. La redención / recompra de las acciones de ASARCO y la venta y liquidación de ASARCO por medio de la compra apalancada se tomaron mediante un plan integrado y diseño orquestado por el demandado GRUPO MÉXICO y cumplido con la complicidad de otros, incluyendo a AMC, Chase y CSFB.

80. La redención / recompra de las acciones de ASARCO y liquidación de los activos de ASARCO ocurrieron cuando:

a. ASARCO era insolvente y/o con el conocimiento de que las transferencias, (individualmente y/o colectivamente) resultarían en la insolvencia de ASARCO;

GRUPO MÉXICO, AMC y Chase estaban conscientes del litigio pendiente contra ASARCO por reclamos ambientales y reclamos de lesión personal relacionados con exposición a asbesto que habían hecho o harían la compañía insolvente;

c. ASARCO faltaba medios financieros adecuados cumplir con sus deudas al vencerse;

d. Los activos transferidos eran los activos principales de la corporación y constituían la mayoría de los activos de la compañía en valor;

e. Las transferencias se hicieron por menos de recompensa justa;

f. Las transferencia(s) beneficiaron a personas claves de la compañía con acceso a información que no es de conocimiento público incluyendo a los Directores de ASARCO y otros accionistas anteriores, GRUPO MÉXICO y AMC a costa de los acreedores no garantizados incluyendo a los demandantes.

81. La redención / recompra de las acciones y liquidación de los activos de ASARCO se diseñó despojar la compañía de activos antes de que los reclamos de acreedores no garantizados se vencieran; la redención / recompra de las acciones de

035

ASARCO y la venta y liquidación del equipo comercial y activos principales de ASARCO se tomaron con la intención de estorbar, retrasar o defraudar a los acreedores.

82.    Los demandantes tienen derecho a una sentencia a su favor contra GRUPO MÉXICO, AMC, Chase y CSFB declarando la venta de ASARCO a GRUPO MÉXICO y AMC, la redención / recompra de las acciones de ASARCO y el gravamen y cesión del equipo comercial y activos principales de ASARCO ser fraudulentos conforme a *N.Y. DEBT & CRED. § 276.* Los demandantes tienen derecho a remedios legales y equitativos apropiados en eso.

83.    Ya que estas transferencias eran cesiones fraudulentas, cometidas con la intención real de defraudar a los acreedores, se deben recuperar daños punitivos de los demandados, solidariamente, en una cantidad no menos de tres veces los daños y perjuicios efectivos.

## QUINTO DERECHO DE ACCIÓN DE LOS DEMANDANTES
*(Cesión Fraudulenta: Responsabilidad del Cesionario Chase y CSFB)*

Los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-83 y para su Quinto Derecho de Acción declaran como sigue:

84.    El demandado Chase es el cesionario quien proporcionó la deuda de nivel superior necesaria para llevar a cabo la compra apalancada.

85.    El demandado CSFB proporcionó consejo financiero a la Junta Directiva de ASARCO en el momento de la fusión y participó con otros bancos en financiar la compra apalancada.

86.    Chase y CSFB sabían que la compra apalancada iba a ser una adquisición de "ruptura" con los activos de ASARCO a ser cedidos de ASARCO por menos de compensa justa ya que los beneficios de estas transferencias no beneficiarían a ASARCO

ni sus a

ASARC

8

compra

concomi

adquisic

8

irrazonal

tradicion

8

cuando A

fuera de s

9(

estorbar,

91

"cesión"

*DEBT. &*

92

Chase, CS

limitarse a

del préstan

ASARCO

ASARCO

036

ni sus acreedores sino en cambio acumularían a terceros/los accionistas anteriores de ASARCO, GRUPO MÉXICO y AMC.

87.    Chase y CSFB sabían que ASARCO era insolvente un poco antes de la compra apalancada o que se volvería insolvente como el resultado de las cesiones concomitantes a la compra apalancada y/o el servicio de la deuda impuesto para la adquisición y préstamos operativos a ASARCO.

88.    Chase y CSFB sabían que ASARCO iba a ser liquidado y quedaría con irrazonablemente pequeños recursos de capital para continuar sus operaciones comerciales tradicionales.

89.    Chase y CSFB sabían que ASARCO iba a ser liquidado en un momento cuando ASARCO, GRUPO MÉXICO y AMC pensaban que ASARCO contraería deudas fuera de su capacidad pagar al vencerse.

90.    Chase y CSFB sabían que el plan de liquidación se tomó con la intención de estorbar, retrasar y/o defraudar a los acreedores.

91.    El gravamen de los activos principales de ASARCO a favor de Chase es una "cesión" de la propiedad de ASARCO (el deudor) dentro del significado del Acto. *N.Y. DEBT. & CRED. § 270.*

92.    Pagos del préstamo relacionados con la compra apalancada recibidos por Chase, CSFB y otros bancos participantes bajo gravámenes de prioridad, incluyendo sin limitarse a los beneficios de la venta de los activos principales de ASARCO y otros pagos del préstamo hechos por ASARCO o por GRUPO MÉXICO (o sus afiliados) de parte de ASARCO (colectivamente "pagos del préstamo") son "cesiones" de la propiedad de ASARCO (el deudor) dentro del significado del Acto. *N.Y. DEBT. & CRED. § 270.*

037

93.    Los pagos del préstamo recibidos por Chase y CSFB no están protegidos de recuperación bajo *N.Y. DEBT. & CRED. 272(b)* ya que Chase y CSFB no actuaban en buena fe aquí en esto y/o la propiedad recibida por ASARCO de Chase y CSFB era desproporcionadamente pequeña cuando comparada con el valor de la obligación a Chase y CSFB.

94.    En derogación de los derechos de los acreedores, incluyendo a los demandantes, Chase y CSFB faltaron llevar a cabo una investigación financiera adecuada de la solvencia de ASARCO antes de prestar y/o haciendo más de mil millones de dólares ($1,000,000,000) a ASARCO y aceptando hipotecas gravando los activos principales de ASARCO y/o cerraron los ojos a la insolvencia de ASARCO.

95.    Chase y CSFB sabían o debieran haber sabido que como el resultado de la liquidación prevista de los activos principales de ASARCO

a.    El valor vendible justo de los activos restantes de ASARCO sería menos de las responsabilidades de ASARCO;

b.    Estas transferencias dejarían a ASARCO con una cantidad irrazonablemente pequeña de capital para el negocio al cual se dedicaba o tenía la intención de dedicarse en el futuro;

c.    ASARCO razonablemente no se podía esperar cumplir con sus obligaciones al vencerse.

96.    Chase y CSFB sabían o debieran haber sabido que el deudor era insolvente o se volvería insolvente por las transferencias o se volvería insolvente como el resultado del plan integrado de liquidación, que el servicio de la deuda impuesto por Chase y CSFB disminuiría más la capacidad de ASARCO pagar a los acreedores y que ASARCO no tenía perspectivas razonables de supervivencia.

24

038

97.    Chase y CSFB transfirieron fondos a ASARCO a cambio de un gravamen contra los activos principales de ASARCO y aceptaron pagos del préstamo por menos de recompensa justa con conocimiento real o imputable a una persona que la transacción aumentaría o resultaría en la insolvencia de ASARCO y fraude en los acreedores de ASARCO incluyendo a los demandantes.

98.    Los demandantes tienen derecho a una sentencia a su favor contra los demandados Chase y CSFB por el valor de la propiedad cedida y/o una sentencia declarando los pagos del préstamo concomitantes a la compra apalancada hechos por o de parte de ASARCO a Chase y CSFB ser fraudulentos en cuanto a las Deudas debidas a los demandantes conforme a *DEBT. & CRED. §§ 273, 274, 275 & 276.* Los demandantes tienen derecho a remedios legales y equitativos apropiados en eso.

**SEXTO DERECHO DE ACCIÓN DE LOS DEMANDANTES**
*(Cesión Fraudulenta: Beneficios de Seguros)*

Los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-98 y para su Sexto Derecho de Acción declaran como sigue:

99.    Todos los demandantes tienen "reclamos" contra ASARCO y por tanto son "acreedores" de ASARCO bajo el Acto. *N.Y. DEBT. & CRED. § 270.* ASARCO tiene responsabilidad a los demandantes y por tanto es un "deudor" conforme al Acto. *N.Y. DEBT. & CRED. § 270.*

100.   El descuento grande de los beneficios futuros de los seguros y la transferencia de dichos beneficios de seguros a la indicación de GRUPO MÉXICO o sus afiliados al fondo operativo general de ASARCO y el desembolso posterior de ese dinero son "cesiones" de la propiedad de ASARCO (el deudor) conforme al Acto.

039

101.    En el momento de la cesión de los beneficios de los seguros, ASARCO fue insolvente o se volvería insolvente como el resultado de la transferencia y/o plan integrado de liquidación.

102.    Como el resultado de la cesión de los beneficios de los seguros y/o el plan integrado de liquidación, ASARCO faltaba capital suficiente continuar sus operaciones comerciales tradicionales.

103.    La transferencia de los beneficios de los seguros ocurrió en un momento cuando ASARCO, GRUPO MÉXICO y los afiliados de GRUPO MÉXICO supieron o creyeron que ASARCO contraería deudas que no podría pagar al vencerse.

104.    La transferencia de los beneficios de los seguros se tomó con la intención de estorbar, retrasar o defraudar a los acreedores de ASARCO.

105.    Los demandantes tienen derecho a una sentencia a su favor contra ASARCO, GRUPO MÉXICO y sus afiliados declarando la cesión de los beneficios de los seguros ser fraudulenta en cuanto a las Deudas debidas a los demandantes conforme a *N.Y. DEBT. & CRED. §§ 273, 274, 275 & 276*.  Los demandantes tienen derecho a remedios legales y equitativos en eso.

## SÉPTIMO DERECHO DE ACCIÓN DE LOS DEMANDANTES
*(Cesión Fraudulenta: Transferencia a Entidades Claves con*
*Acceso a Información que no es de Conocimiento Público)*

Los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-105 y para su Séptimo Derecho de Acción declaran como sigue:

106.    GRUPO MÉXICO, AMC, GMMI, Mexicana de Cobre, S.A. de C.V., Controladora Minera México, S.A. de C.V. y ASARCO son compañías interrelacionadas,

040

afiliadas y "entidades claves con acceso a información que no es de conocimiento público" controladas por o propiedad de GRUPO MÉXICO.

107.    Como parte de la recompensa alegada por la transferencia del interés de ASARCO en SPCC a GRUPO MÉXICO y sus afiliados, ASARCO alegadamente recibió perdón de deuda de una deuda antecedente entre compañías de afiliados de GRUPO MÉXICO incluyendo a AMC y/o Mexicana de Cobre S.A. de C.V.

108.    El perdón de la deuda entre compañías es una "cesión" dentro del significado del Acto. *N.Y. Debt. & Cred. § 270.*

109.    En el momento del perdón de la deuda, ASARCO o fue insolvente o vuelto insolvente como el resultado de la redención / recompra de sus acciones y la cesión de sus activos principales y/o el cumplimiento del plan integrado de liquidación.

110.    La cesión por un insolvente a un afiliado o entidad clave con acceso a información que no es de conocimiento público en satisfacción de una deuda antecedente falta buena fe y es implícitamente fraudulenta.

111.    Los demandantes tienen derecho a una sentencia a su favor contra ASARCO, GRUPO MÉXICO y MÉXICO DE COBRE S.A. de C.V. declarando la cesión de las acciones de SPCC a cambio de perdón de deuda ser fraudulenta en cuanto a las deudas debidas a los demandantes conforme a *N.Y. DEBT. & CRED. § 273.* Los demandantes tienen derecho a remedios legales y equitativos en eso.

## OCTAVO DERECHO DE ACCIÓN DE LOS DEMANDANTES
*(Tergiversación y Negligencia Profesional: En Cuanto al Demandado Ernst & Young)*

Los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-111 y para su Octavo Derecho de Acción declaran como sigue:

27

041

112.    Los demandados ERNST & YOUNG LLP y ERNST & YOUNG CORPORATE FINANCE LLC (colectivamente "Ernst & Young") se emplearon dar una opinión en cuanto al valor de 43,348,949 acciones de Acciones Comunes, Clase A, de Southern Peru Copper Company representando un 54.18% de las acciones con derecho de voto de esa corporación con acciones cambiadas públicamente, mantenidas por SPHC, una sociedad subsidiaria totalmente la propiedad de ASARCO ("interés de acciones").

113.    Ernst & Young expresó una valuación profesional con pleno conocimiento de que una clase limitada de terceros confiaría en su opinión y Ernst & Young debió un deber de cuidado a estos terceros, incluyendo al Departamento de Justicia de los Estados Unidos, los tribunales Federales de los Estados Unidos y los demandantes.

114.    La opinión de valuación de Ernst & Young dio la base principal al Tribunal Distrito de los Estados Unidos para el Distrito de Arizona aprobar la venta del interés de acciones a Grupo y/o su sociedad subsidiaria que era totalmente su propiedad, AMC, al perjuicio de los demandantes.

115.    Ernst & Young imprudentemente y a sabiendas y sin la competencia profesional requerida de una empresa de Contabilidad Pública Autorizada, vendió una carta opinión que falsamente representó que el valor justo del interés controlador de ASARCO en SPCC valía menos del valor contable de la porción de activos fundamentales de ASARCO en la compañía.

116.    Ernst & Young tenía un deber a los demandantes dar una opinión basándose conocimiento imparcial e independiente de la industria de cobre. A pesar de saber que comprador del interés de acciones era una persona o entidad clave con acceso a plena formación que no es de conocimiento público respecto a la compañía, las perspectivas de

28

042

la compañía y el mercado de cobre, Ernst & Young incumplió su deber a los demandantes por subvalorar el interés de acciones basándose en información proporcionada por el comprador, Grupo y/o entidades controladas por Grupo.

117.    Ernst & Young tenía un deber a los demandantes ser competente y dar una opinión en cuanto al valor de SPCC como empresa en marcha. Sin tomar en consideración la expansión en curso de las operaciones mineras de SPCC y el valor creciente de sus reservas de cobre en un mercado creciente de cobre, la valuación de Ernst & Young negligentemente refleja solamente información financiera pública e histórica.

118.    Ernst & Young incumplía su deber a los demandantes por faltar usar cuidado debido y la competencia profesional requerida de una empresa de Contabilidad Pública Autorizada y por dar una opinión que sabía, o debiera haber sabido, minimizaba gravemente el valor del interés de acciones, de ese modo permitiendo el interés de acciones venderse a Grupo por menos de recompensa justa y adecuada, poniendo el activo de más valor de ASARCO fuera del alcance directo de los acreedores.

119.    Los demandantes tienen derecho a una sentencia a su favor contra Ernst & Young por daños y perjuicios resultando de su tergiversación y negligencia profesional en cuanto al valor del interés de acciones.

## NOVENO DERECHO DE ACCIÓN DE LOS DEMANDANTES
*(Incumplimiento del Deber Fiduciario: Oficiales y Directores de ASARCO)*

Los demandantes adoptan de nuevo y alegan de nuevo los alegatos contenidos en los párrafos 1-119 y para su Noveno Derecho de Acción declaran como sigue:

120.    Los demandados GERMAN LARREA MOTA-VELASCO y OSCAR GONZALES ROCHA eran Oficiales y Directores de ASARCO (colectivamente