IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ASARCO LLC and SOUTHERN PERU HOLDINGS, LLC,<br><br>Plaintiffs,<br>v.<br><br>AMERICAS MINING CORPORATION,<br><br>Defendant. | § § § § § § § § § § § § | Civil Action No. 1:07-cv-00018<br><br>(prior Adversary No. 07-2009) |

### ASARCO LLC AND SOUTHERN PERU HOLDINGS, LLC'S
### FIRST AMENDED COMPLAINT

ASARCO LLC ("ASARCO") and Southern Peru Holdings, LLC ("Southern Peru Holdings"), a wholly-owned subsidiary of ASARCO, respectfully file this First Amended Complaint and show the Court the following:

#### INTRODUCTION

1.  ASARCO seeks to avoid the fraudulent transfer on or about March 31, 2003 of its 54.2% ownership interest in Southern Peru Copper Corporation, now known as Southern Copper Corporation ("SPCC"), to its parent, Americas Mining Corporation ("AMC"), the wholly-owned subsidiary of Grupo Mexico, S.A. de C.V. ("Grupo Mexico"). ASARCO seeks to recover 54.2% of the outstanding shares of SPCC at the time of the final judgment in this action, or the value thereof, plus dividends, as well as other relief. On information and belief, the approximate amount of these dividends paid from March 31, 2003 to the date of this First Amended Complaint is $844,700,000.

2.  This case involves four related corporations: (1) Grupo Mexico; (2) AMC, a wholly-owned subsidiary of Grupo Mexico; (3) ASARCO, a wholly-owned subsidiary of AMC;

1

and (4) Southern Peru Holdings, a wholly-owned subsidiary of ASARCO.

3. Grupo Mexico is a Mexican corporation. Before Grupo Mexico formed AMC in October 2000, ASARCO was a wholly-owned subsidiary of Grupo Mexico. As the parent of AMC, Grupo Mexico devised, effected, and benefited from the fraudulent transfer of ASARCO's 54.2% ownership interest in SPCC to AMC. Although Grupo Mexico is not currently a defendant in this action, as described below, ASARCO is taking steps in a New York state court and through the federal court in the Southern District of New York to bring Grupo Mexico before this Court to hold it liable for its wrongful conduct.

4. Defendant AMC is a wholly-owned subsidiary of Grupo Mexico. Grupo Mexico formed AMC in October 2000 as a sham to perpetrate a fraud on ASARCO and ASARCO's creditors, namely, the transfer of ASARCO's 54.2% ownership interest in SPCC to AMC. AMC is a mere instrumentality, agent, and alter ego of Grupo Mexico. The two corporations operate as a single-business enterprise.

5. Plaintiff ASARCO is a wholly-owned subsidiary of AMC. ASARCO was formerly known as ASARCO, Inc. ASARCO, Inc. became ASARCO LLC in 2005.

6. At the time of the transfer of ASARCO's 54.2% ownership interest in SPCC to AMC in 2003, ASARCO held its shares in SPCC through Southern Peru Holdings Corporation, one of its wholly-owned subsidiaries and which became Southern Peru Holdings, LLC in 2005. Grupo Mexico directed the formation of Southern Peru Holdings in November 1999 when it acquired ASARCO. Before that time, SPCC was a partially-owned (54.2%) subsidiary of ASARCO. Southern Peru Holdings was formed as a sham to perpetrate a fraud on ASARCO's creditors, namely, the transfer of ASARCO's 54.2% ownership interest in SPCC to AMC. Southern Peru Holdings had no business other than owning the SPCC shares, and was, for all

purposes, a mere instrumentality, agent, and alter ego of ASARCO. ASARCO and Southern Peru Holdings operated as a single-business enterprise. All actions relating to the SPCC transfer were taken by ASARCO, and the substance of the transaction was a transfer from ASARCO to AMC. Southern Peru Holdings is a party-plaintiff to this action to avoid question or concern relating to the joinder of necessary parties.

7. The transfer of ASARCO's 54.2% ownership interest in SPCC to AMC occurred on or about March 31, 2003, when ASARCO was insolvent and subject to AMC and Grupo Mexico's complete control. At Grupo Mexico and AMC's direction, there was no effort to market the SPCC shares to an unrelated person or entity. No investment bank was hired, and no inquiries were made to potential third-party purchasers who would have paid ASARCO more (and in cash) for the SPCC shares than the price dictated by Grupo Mexico and AMC. Instead, Grupo Mexico and AMC forced ASARCO into a related-party transaction with the actual intent to hinder, delay, and defraud ASARCO's creditors over the objection of independent directors who resigned shortly before the transfer. In addition, AMC did not pay fair consideration or reasonably equivalent value for the SPCC shares at a time when ASARCO was insolvent and unable to pay its debts as they became due.

8. The transfer of ASARCO's 54.2% ownership interest in SPCC to AMC should be avoided under 11 U.S.C. § 544, and, pursuant to 11 U.S.C. § 550, ASARCO should be entitled to recover, for the benefit of its bankruptcy estate, 54.2% of the outstanding shares of SPCC at the time of the final judgment in this action, the dividends paid by SPCC that ASARCO would have received but for the transfer in 2003, and such other relief as the Court deems just. ASARCO has both contingent and liquidated creditors. At least some of these creditors have allowable claims and could avoid the transfer of the SPCC shares. Among these potential creditors are

environmental claimants, asbestos claimants, and various commercial creditors.

### JURISDICTION, VENUE, AND PROCEDURAL HISTORY

9.      On August 9, 2005 (the "Petition Date"), ASARCO filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Bankruptcy Court"). Prior to that date, on April 11, 2005, five of ASARCO's wholly-owned direct or indirect subsidiaries filed their voluntary petitions for relief under the Bankruptcy Code in the Bankruptcy Court. Since that time, several of ASARCO's other wholly-owned direct or indirect subsidiaries filed similar petitions for relief in the Bankruptcy Court. Southern Peru Holdings filed its voluntary petition for relief in the Bankruptcy Court on December 12, 2006.

10.     With the exception of Encycle/Texas, Inc., ASARCO and all of its subsidiaries that have filed for bankruptcy relief remain in possession of their property and are operating their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

11.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

12.     Venue for this adversary proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1409.

### PARTIES

13.     Plaintiff ASARCO is a Delaware Limited Liability Company and a debtor in chapter 11 bankruptcy proceedings.

14.     Plaintiff Southern Peru Holdings is a Delaware Limited Liability Company and a debtor in chapter 11 bankruptcy proceedings.

15.     Defendant AMC is a Delaware corporation with its principal place of business in

4

Phoenix, Arizona. AMC has been served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, and has appeared and answered ASARCO's Original Complaint in this action.

### BACKGROUND FACTS

16. Grupo Mexico purchased ASARCO's stock in a leveraged buyout in 1999 in order to obtain control of ASARCO's 54.2% ownership interest in SPCC. Grupo Mexico structured the leveraged buyout so that ASARCO assumed huge amounts of debt. ASARCO was left inadequately capitalized to conduct its business.

17. Grupo Mexico replaced ASARCO's entire board of directors and installed new executive management at ASARCO. Between 1999 and 2005, Grupo Mexico officers and directors dominated AMC's and ASARCO's boards and offices. While Grupo Mexico individuals occupied different positions at AMC and ASARCO at various points in time, Grupo Mexico individuals held key positions at AMC and ASARCO from 1999 to 2005. German Larrea served as Grupo Mexico's, AMC's, and ASARCO's Chairman and CEO. Genaro Larrea served as a Managing Director of Grupo Mexico; Director, President, and Chief Commercial Officer of AMC; and Director of ASARCO. Daniel Tellechea served as a Managing Director and Chief Financial Officer of Grupo Mexico; Director, Executive Vice President, and Chief Financial Officer of AMC; and Director and Chief Financial Officer of ASARCO. As the following chart illustrates, Grupo Mexico and AMC dominated and controlled ASARCO's board of directors and senior management:

| Entity/Individual | Grupo Mexico | AMC | ASARCO |
|---|---|---|---|
| German Larrea | Chairman of the Board; Chief Executive Officer | Chairman of the Board; Chief Executive Officer; President | Chairman of the Board; Chief Executive Officer (until resignation right after SPCC transfer) |
| Genaro Larrea | Vice Chairman; Director; Commercial President | Director; President; Chief Commercial Officer | Director (until resignation right after SPCC transaction); Vice President; President (2001-2003) |
| Daniel Tellechea | Managing Director; Alternate Director; Director; Chief Financial Officer; Administration and Finance President | Director; Executive Vice President; Chief Financial Officer | Vice President; Treasurer; Chief Financial Officer; President (2003-2005); Chairman of the Board (August 2003-2005) |
| Xavier Garcia | Director | Director; President | Director (until resignation right after SPCC transaction); President/Chief Operating Officer (1999-2001) |
| Oscar Gonzalez | Alternate Director | Director; President | Director (until resignation right after SPCC transaction) |
| Alfredo Casar | Managing Director; Alternate Director | Director | Director (until resignation right after SPCC transaction) |

18.   At the time of the SPCC transfer, ASARCO's entire board of directors consisted of individuals affiliated with Grupo Mexico and AMC. The entire board of directors resigned shortly after the SPCC transfer.

19.   German Larrea, Chairman and CEO of Grupo Mexico, serves as Chairman and CEO of every significant company owned directly or indirectly by Grupo Mexico. The only exception is ASARCO, from whose board he resigned after transferring ASARCO's interest in SPCC to AMC.

20.   After Grupo Mexico's leveraged buyout of ASARCO in 1999, Grupo Mexico immediately directed the sale of ASARCO's chemical and aggregates subsidiaries, OMI/Enthone

and American Limestone, respectively. Unaffected by the cyclical copper markets, these subsidiaries had been a consistent source of revenue for ASARCO. Without these stabilizing revenues, ASARCO's lack of adequate capitalization became even more apparent.

21.     The proceeds of the OMI/Enthone and American Limestone sales were used to pay $817 million of acquisition debt that Grupo Mexico had guaranteed. Those funds could have been used to sustain ASARCO.

22.     Shortly after Grupo Mexico's leveraged buyout of ASARCO in 1999, Grupo Mexico began implementing its plan to transfer ASARCO's 54.2% ownership interest in SPCC to a new Grupo Mexico subsidiary. To this end, Grupo Mexico formed AMC in October 2000. Grupo Mexico's goal in forming AMC and orchestrating the sale of ASARCO's interest in SPCC to AMC was to remove ASARCO's most valuable asset from the reach of ASARCO's creditors. Grupo Mexico's aim was to pay as little as possible for ASARCO's interest in SPCC and then try to prop up ASARCO to outlast the statute of limitations for a fraudulent transfer action.

23.     In 2000, Grupo Mexico hired PricewaterhouseCoopers ("PWC") to conduct an appraisal of certain tangible assets of ASARCO and its subsidiaries. The September 2000 appraisal performed by PWC stated that ASARCO's 54.2% ownership interest in SPCC was worth $978,586,000.00.

24.     Grupo Mexico and AMC were not about to pay $978,586,000.00 for the SPCC shares. Grupo Mexico and AMC wanted to pay substantially less to transfer the SPCC shares from ASARCO to AMC, but they were justifiably concerned about a fraudulent transfer claim being brought by ASARCO's creditors. Accordingly, Grupo Mexico and AMC directed ASARCO to retain Houlihan Lokey Howard & Zukin ("Houlihan Lokey") to provide a new

valuation of ASARCO's interest in SPCC and an opinion as to whether ASARCO would be rendered insolvent if it transferred the SPCC shares to AMC for the consideration Grupo Mexico and AMC wanted to pay for the shares. Grupo Mexico and AMC's aim in directing the retention of Houlihan Lokey was to pay as little as possible for ASARCO's interest in SPCC. Daniel Tellechea, Grupo Mexico's and AMC's CFO, effectively asked Houlihan Lokey, "What is the least we can pay?"

25. Intent on obtaining a lower valuation of ASARCO's interest in SPCC, Grupo Mexico and AMC had another "opinion" by June 2001—only months after PWC had valued ASARCO's majority ownership interest in SPCC at close to $1 billion. Houlihan Lokey stated that consideration totaling $720 million for the SPCC shares would be "fair to [ASARCO] from a financial point of view." Houlihan Lokey also opined that ASARCO would be able to pay its debts as they became due if it transferred the SPCC shares for such consideration.

26. Shortly after Houlihan Lokey rendered its opinion, the United States Department of Justice (the "DOJ") learned of Grupo Mexico and AMC's intent to cause ASARCO to transfer its most valuable asset to AMC. The DOJ began questioning Grupo Mexico and AMC's plans. In mid-2001, the DOJ requested and obtained a copy of the Houlihan Lokey opinion, and quickly presented ASARCO with more than a dozen questions challenging the opinion's general conclusions.

27. Despite the DOJ's oversight and ASARCO's continued financial deterioration, Grupo Mexico and AMC did not even want to pay $720 million for the SPCC shares. In late 2001, Grupo Mexico and AMC proposed restructuring ASARCO's finances by having AMC purchase the SPCC shares from ASARCO for $100 million and assumption of $350 million of ASARCO's debt—a package worth, at most, $450 million for the same asset that PWC had

8

valued at close to $1 billion.

28. As Grupo Mexico and AMC implemented their plan, ASARCO's desperation for cash increased throughout 2000 and 2001. Unable to pay its debts as they became due, ASARCO began selling assets. Real estate was sold. Haul trucks, conveyor systems, and other equipment were sold, often to Grupo Mexico and AMC affiliates. This equipment was literally irreplaceable at the time. For example, there was a waitlist to acquire new haul trucks. These were not the actions one would expect of a mining company that was intending to continue operations for more than a few years.

29. ASARCO also began to monetize insurance policies covering its environmental liabilities and the toxic tort/asbestos liabilities of its subsidiaries, even though its in-house counsel repeatedly advised against this practice. ASARCO did not use the funds it received from monetizing these insurance policies solely to settle environmental and asbestos claims and to pay defense costs. Instead, ASARCO used substantial portions of these funds for current operations, such as making payroll, leaving ASARCO and its subsidiaries unprotected against future environmental and asbestos claims.

30. Compounding the bad decision to monetize the insurance policies, ASARCO repeatedly monetized the policies for much less than they were worth—a sign of Grupo Mexico, AMC, and ASARCO's desperation and disregard for ASARCO's long-term viability and the claims of potential environmental and asbestos claimants. For example, ASARCO settled its environmental and asbestos coverage with The Hartford Insurance Group in March 2001. Hartford agreed to make two payments over time. Later that year, ASARCO, in need of immediate cash, offered to discount the second payment, and Hartford paid the reduced amount in 2001. ASARCO did the same thing in 2003 with respect to payments due under a 2001

environmental settlement with AIG. Similarly, ASARCO discounted the second payment under its 2002 settlement with Prudential to collect those funds in 2003. Again, this is not what one would expect of a mining company that was trying to do anything other than survive the limitations period for a contemplated fraudulent transfer.

31. By late 2001, ASARCO began making plans for a possible chapter 11 bankruptcy. Sidley Austin Brown & Wood LLP, counsel to Grupo Mexico, AMC, and ASARCO, communicated with ASARCO to obtain information "in the event circumstances change[d]" and ASARCO had to file for an emergency chapter 11 proceeding.

32. In December 2001, despite ASARCO's liquidity crisis, Grupo Mexico and AMC directed ASARCO to redeem $50 million of bonds at par. ASARCO did not have funds available to redeem the bonds, so AMC provided ASARCO a $42 million "advance" on its purchase of ASARCO's interest in SPCC. On information and belief, this advance redeemed bonds held by Grupo Mexico, its principals, affiliates, or friends of Grupo Mexico's principals who had purchased these ASARCO bonds at deep discounts.

33. Having spent what little cash it had on hand to redeem bonds, ASARCO grew more insolvent in 2002. In March 2002, the DOJ deposed James O'Neil, ASARCO's Vice President of Finance and Administration. O'Neil acknowledged that ASARCO's financial condition was "distressed," that it was "in default on most of [its] major loans," and that it was "over-leveraged and [had] a liquidity problem." O'Neil testified that ASARCO was in arrears $138 million, and that the only way ASARCO would not operate with negative cash for 2002 would be if ASARCO could sell enough of its assets. Rather than contribute additional equity to ASARCO or allow an auction of the SPCC shares owned by ASARCO, Grupo Mexico and AMC continued to plan a related-party sale of those shares from ASARCO to AMC at

significantly less than fair consideration or reasonably equivalent value.

34. By April 2002, realizing that they would have to pay more than $450 million for the SPCC stock, Grupo Mexico and AMC began planning to pay $600 million to ASARCO for its interest in SPCC. This consideration was still well below the value of the SPCC shares owned by ASARCO. Moreover, even at this price, ASARCO would receive little to no cash for operations: $450 million would be used to pay ASARCO's credit facility, which was guaranteed by Grupo Mexico as part of Grupo Mexico's leveraged buyout of ASARCO in 1999; $42 million would be credited against the December 2001 advance from AMC that ASARCO used to pay bonds; and Grupo Mexico and AMC were requiring that $100 million of a $108 million receivable be set aside to pay bonds coming due in 2003. Even after this contemplated transaction, ASARCO would be forced to continue its self-cannibalization to try to continue operations.

35. Grupo Mexico and AMC directed ASARCO to retain Houlihan Lokey again to provide fairness and solvency opinions, as Houlihan Lokey had done in 2001. Houlihan Lokey refused to provide a solvency opinion.

36. Unsatisfied with Houlihan Lokey, Grupo Mexico and AMC directed ASARCO to engage yet another financial firm, Ernst & Young Corporate Finance ("EYCF"). Grupo Mexico and AMC hoped that EYCF would be a more cooperative partner and would provide the opinions that Grupo Mexico and AMC could use to defend the related-party sale of ASARCO's interest in SPCC to its parent, AMC. At the same time, ASARCO retained restructuring/bankruptcy counsel, Squire Sanders & Dempsey L.L.P. ("Squire Sanders"). ASARCO and AMC first met with EYCF and Squire Sanders in June 2002.

37. Squire Sanders recommended that ASARCO appoint independent directors in an

effort to obtain the protection of the business judgment rule for the related-party sale of its interest in SPCC to its parent, AMC. Genaro Larrea, who was a director of Grupo Mexico, AMC, and ASARCO, sought permission for the appointment from German Larrea, who was Grupo Mexico's, AMC's, and ASARCO's Chairman and CEO. In a memorandum to German Larrea, Genaro Larrea asked permission to appoint two or three directors to look after ASARCO's interests, although they would be "controlled by Grupo." Grupo Mexico agreed to AMC's appointment of Jock Patton and Al Frei, who served on ASARCO's restructuring committee along with Genaro Larrea.

38. ASARCO's advisors recommended that ASARCO expose the SPCC shares to the marketplace and attract all-cash bids. ASARCO, at the direction of Grupo Mexico and AMC, refused to do so.

39. ASARCO's restructuring counsel, Squire Sanders, also advised that it would be best for ASARCO and its creditors if ASARCO went into bankruptcy and used its majority ownership interest in SPCC as collateral for DIP financing, while awaiting the return of copper prices. EYCF gave the same advice. Both were ignored.

40. Grupo Mexico and AMC's decision to ignore this advice and to force ASARCO to sell its interest in SPCC to AMC was driven, in part, by concern that SPCC was going to end up in the hands of ASARCO's asbestos creditors. ASARCO faced alleged liability for the asbestos claims against its subsidiaries LAQ, an asbestos fiber mining company, and CAPCO, a cement asbestos pipe manufacturer. Tens of thousands of claims had been filed against LAQ and CAPCO, and many of the claimants alleged that ASARCO was responsible for their personal injuries. The amount of LAQ's and CAPCO's liability could be hundreds of millions of dollars.

41. In August 2002, the DOJ filed suit to enjoin ASARCO's transfer of the SPCC

shares. The DOJ alleged that ASARCO was insolvent and that it was "aggressively liquidating all non-essential assets to address its debt situation." The DOJ further alleged that ASARCO had to lay off workers, cease work required by a consent decree, and reduce operations because of an inability to buy fuel for haul trucks. At Grupo Mexico and AMC's direction, ASARCO eventually settled that lawsuit by agreeing that $100 million from the proceeds of the SPCC sale would fund an environmental trust. None of the $100 million would go to ASARCO. No prospective environmental claims were released. Rather, the primary consideration to ASARCO was a "temporary deferral" of environmental claims. Grupo Mexico, AMC, and ASARCO evidently believed that this "temporary deferral" might be sufficient to enable Grupo Mexico and AMC to survive many, if not all, of the statutes of limitations for fraudulent transfer claims.

42. The settlement with the DOJ would allow the transfer of ASARCO's majority ownership interest in SPCC to go through based on the following consideration to be paid by AMC: $500 million in cash; a $100 million note to fund the environmental trust; a $123 million note from AMC to ASARCO, paid over 7 years; and forgiveness of $42 million of intercompany debt. The $42 million that AMC had "advanced" to ASARCO in December 2001 to allow ASARCO to redeem bonds had converted into a note.

43. Although the proposed consideration for ASARCO's interest in SPCC was said to have a value of $765 million (without discounting to present value the $123 million note, which would be paid to ASARCO over 7 years), after the funds were applied at Grupo Mexico and AMC's direction, ASARCO would not receive a nickel of immediately available funds to continue operations. $450 million would go to retire the credit facility guaranteed by Grupo Mexico as part of the 1999 leveraged buyout; $100 million was earmarked for the environmental trust; $42 million was, in fact, forgiveness of intercompany debt and would yield no cash; and

the AMC note would be payable over 7 years, with the first payment committed to pay interest on bonds. At Grupo Mexico and AMC's direction, ASARCO was going to use the remaining $50 million, as well as $50 million raised from monetizing insurance policies, to retire ASARCO's $100 million 7 3/8% bonds due in 2003 (the "Yankee Bonds") at par with interest.

44. At least as early as October 2002, ASARCO was informed by EYCF that paying the Yankee Bonds, as required by Grupo Mexico and AMC, would result in ASARCO having a projected negative cash balance of $158 million in December 2003. This projection understated the deficit facing ASARCO. The cost of production (converting ore in the ground into marketable copper) numbers provided to EYCF were low as a result of ASARCO's "high-grading" its mines. High-grading mines by mining only the easily accessible ore bodies simply delays and makes much more difficult the inevitable stripping that is required to properly extract copper ore. ASARCO's normalized cost of production was significantly higher than the cost provided to EYCF. Had EYCF been provided with figures that reflected typical operations, the projected cash deficit would have been much larger.

45. Contrary to Grupo Mexico and AMC's design for ASARCO's new independent directors, Mr. Patton and Mr. Frei took their fiduciary responsibilities seriously. They would not agree to the sale of the SPCC shares, or to the structure of the transaction, unless they believed it was in ASARCO's best interest and in the best interest of ASARCO's creditors. They would not approve the SPCC sale unless they were provided with credible projections showing that ASARCO could survive. At each ASARCO restructuring committee meeting at which payment of the Yankee Bonds was discussed, the independent directors insisted, and the committee voted, that the proceeds of the SPCC sale could not be used to pay the Yankee Bonds until and unless the company received credible projections from EYCF that ASARCO could survive.

46. At the January 27, 2003 ASARCO restructuring committee meeting, EYCF reported that ASARCO would have significant 12-month cash-flow and working-capital deficits if it paid the Yankee Bonds. Squire Sanders advised the restructuring committee "that payment of the Yankee Bonds without a reasonable basis to conclude that [ASARCO] would be able to maintain its operations and satisfy its other payment obligations in accordance with their terms would not be consistent with the fiduciary obligations of the directors to preserve the assets of [ASARCO] for the benefit of all other similarly situated creditors." Genaro Larrea, Director of Grupo Mexico, Director of AMC, President of ASARCO, and member of the ASARCO restructuring committee, promised to get updated numbers to EYCF reflecting "improving copper prices." Not once was there an effort to obtain additional consideration for the SPCC shares based on these improving copper prices.

47. After the January 27, 2003 meeting, Genaro Larrea revealed that the owner of Inbursa, the Mexican bank providing financing to Grupo Mexico and AMC for the SPCC purchase, was requiring, *as a condition to lending funds to AMC*, that ASARCO pay the Yankee Bonds at par with interest. On information and belief, Inbursa is owned or controlled by Carlos Slim, a close associate of Grupo Mexico's principals. Genaro Larrea stated that Mr. Slim or his bank had been acquiring all or substantially all of the Yankee Bonds at deep discounts.

48. Genaro Larrea's disclosure prompted serious concerns. Members of ASARCO senior management whose service pre-dated Grupo Mexico's acquisition of ASARCO voiced their opposition to paying the Yankee Bonds because doing so would not make business sense from ASARCO's perspective. Genaro Larrea was also advised that the independent directors would not approve the SPCC transaction if the Yankee Bonds were to be paid.

49. At the January 29, 2003 ASARCO restructuring committee meeting, Squire

Sanders again advised the restructuring committee that ASARCO's directors had a duty to preserve the value of the corporation's assets for the benefit of all of its creditors, without reference to the conflicting interests of other parties. If payment of the Yankee Bonds jeopardized ASARCO's ability to continue its operations or meet its scheduled obligations based on credible projections, and essentially preferred one group of creditors over other similarly situated creditors, the directors and the company would have breached their duties. Such a breach would subject the SPCC sale to challenge as a related-party transaction. The restructuring committee charged EYCF with preparing cash-flow projections.

50. The next day, on January 30, 2003, an ASARCO press release announced a settlement of the lawsuit brought by the DOJ to block the SPCC transfer. The settlement had been negotiated by Grupo Mexico, AMC, and ASARCO. The press release, which had not been reviewed or approved by the independent directors of ASARCO's restructuring committee, EYCF, or Squire Sanders, stated that the sale of SPCC would provide ASARCO with funds to pay $550 million in short-term debt. That $550 million was made up of the $450 million credit line and the Yankee Bonds. The press release claimed that ASARCO was "ready to move forward on a path that will bring Asarco to a position of financial stability."

51. The DOJ has stated to Judge Schmidt that it was unaware at the time of the settlement of much of the information in the Original Complaint and the Declaration of Douglas McAllister previously brought to this Court's attention. In a February 12, 2007 filing in ASARCO's bankruptcy proceeding, the DOJ stated, "What has become more clear with the recent filings of the Complaint [of ASARCO against AMC], the motion for a temporary restraining order ('TRO') and the Affidavit of Douglas McAllister, is that there are now very serious allegations about ASARCO's internal decision-making process and the pervasive degree

to which Grupo Mexico's [sic] improperly dominated control of ASARCO's decision-making process. Much of the information contained in the complaint and the submissions accompanying the TRO is new to the United States." At least part of what was unknown to the DOJ at the time it settled its lawsuit against ASARCO were the events that would transpire shortly thereafter.

52.    The first of these events occurred on February 3, 2003, soon after the DOJ settlement. On that date, EYCF provided ASARCO with an analysis of ASARCO's revised set of financial projections. EYCF informed ASARCO that the January 30, 2003 press release, in which ASARCO stated that it would pay the Yankee Bonds and continue its operations, was contrary to EYCF's analysis of ASARCO's revised financial projections. EYCF opined that ASARCO could not continue its operations without "significant cash infusions." One source of such cash infusions would be the $50 million of residual cash from the SPCC sale and the proceeds of the insurance policy monetization. EYCF concluded, however, that if those funds were used to pay the Yankee Bonds, as the press release indicated they would be, then ASARCO would face "a severe liquidity deficit and the possible inability to continue to fund its operations." EYCF asked ASARCO to correct the press release. That request was ignored.

53.    ASARCO's restructuring counsel, Squire Sanders, also leapt into action when the revised cash-flow projections were produced. On February 3, 2003, after the DOJ settlement, Squire Sanders advised the ASARCO restructuring committee in writing that:

    a.    ASARCO was within the zone of insolvency, if not actually insolvent;

    b.    ASARCO and its directors owed fiduciary duties to ASARCO's creditors;

    c.    Based on available financial information, it was "extremely difficult" to articulate a supportable business justification for paying the Yankee Bonds that would be consistent with ASARCO's fiduciary duties to all of its creditors;

    d.    The motivation for paying the Yankee Bonds seemed primarily related to AMC's interest in securing financing to purchase the SPCC shares; and

    e.    If payment of the Yankee Bonds jeopardized ASARCO's ability to meet its fiduciary duty to all of its creditors, ASARCO would risk a meaningful and credible challenge to the SPCC sale.

54. More advice from Squire Sanders followed two days later:

    a.    Inbursa's requirement that ASARCO pay the Yankee Bonds as a condition to providing financing to AMC presented risks to the entire SPCC transaction and significant potential personal liability to ASARCO's directors;

    b.    Where the interests of a controlling shareholder, such as AMC, conflict with the interests of a subsidiary corporation, such as ASARCO, and the interests of the subsidiary corporation's creditors, a related-party transaction between the controlling shareholder and the subsidiary corporation would be subject to the entire fairness standard rather than the business judgment rule;

    c.    The likelihood of a successful challenge to the SPCC sale would be significant if ASARCO was required to pay the Yankee Bonds so that AMC could obtain financing;

    d.    The independent directors would likely vote against the SPCC transfer if ASARCO was required to pay the Yankee Bonds as a condition to the transfer, giving ASARCO's creditors credible evidence that the independent directors believed the related-party transaction was not in the best interest of ASARCO and its creditors;

    e.    ASARCO's projected cash-flow deficits, when coupled with the $75 million in obligations that ASARCO had no present ability to satisfy, would make payment of the Yankee Bonds a preference of one group of creditors over other similarly situated creditors;

    f.    Regardless of whether the sale was for reasonably equivalent value, paying the Yankee Bonds could give creditors a credible basis to challenge the transaction under the actual intent to hinder, delay and defraud creditors standard;

    g.    One alternative would be to defer payment of the Yankee Bonds. If Inbursa was concerned that a default on the bonds would jeopardize the SPCC sale, ASARCO should be able to convince Inbursa that payment of the bonds would be a bigger threat. Squire Sanders recognized that if the requirement that ASARCO pay the Yankee Bonds was related to Inbursa's ownership of the bonds, convincing Inbursa to drop the requirement would be more difficult;

    h.    Squire Sanders concluded: "If the primary business objective[] of the parties [is] to implement the sale of the SPCC shares in such a manner

>that the transaction will withstand a challenge by Asarco's creditors, avoid the serious litigation described above, and attempt to preserve the viability of Asarco for all creditors, payment of the Yankee Bonds appears to be inconsistent with those objectives."

55. Squire Sanders sent another memorandum to the restructuring committee four days later on February 9, 2003, proposing that measures be taken to ensure that ASARCO did not face the projected cash-flow deficit. No such measures were ultimately taken to fill this "hole." In that memorandum, Squire Sanders opined that doing nothing to fill the cash-flow deficit "hole" would lead the independent directors to resign, and would cause the payment of the Yankee Bonds to "be viewed in retrospect as having been made for the sole purpose of buying time to preserve the SPCC sale for the benefit of AMC, which is not a legitimate basis for such a decision by the Asarco directors." Squire Sanders advised the ASARCO restructuring committee that failure to pay the Yankee Bonds when due would probably not lead the bondholders to force ASARCO into bankruptcy. Squire Sanders stated that bondholders are "rarely in a hurry" to force a chapter 11 bankruptcy, and that the Yankee Bondholders would likely first attempt to renegotiate their bond terms.

56. Despite all this advice, and without the approval of the ASARCO restructuring committee, which no longer met at Genaro Larrea's direction, Grupo Mexico and AMC caused ASARCO to send the Yankee Bondholders a notice on February 20, 2003 stating that ASARCO was going to use the proceeds of the SPCC sale to pay substantially all of ASARCO's indebtedness, including the principal and past due interest on the Yankee Bonds. At this time, the ASARCO restructuring committee had unanimously agreed that the Yankee Bonds would not be paid until credible projections showed that ASARCO could fund its ongoing operations. Genaro Larrea, ASARCO's President, had stated at a meeting of the restructuring committee that he joined in this decision. No such projections were ever presented to the restructuring

19

committee.

57.   On February 27, 2003, upon receiving a request to sign a board consent relating to the SPCC sale, independent director Jock Patton wrote to Genaro Larrea that it had been weeks since he and independent director Al Frei had been promised revised cash-flow projections. He reminded Genaro Larrea that at the last restructuring committee meeting, the committee had unanimously decided that there would be no payment on the Yankee Bonds until the committee had approved projections showing that there would be "equitable treatment of all creditors." Mr. Patton complained about the January 30, 2003 press release that stated the Yankee Bonds would be paid. He asked for an explanation if the release was not going to be corrected. Mr. Patton noted the following evidence of ASARCO's financial distress:

   a.   ASARCO's credit line was in default;

   b.   The Yankee Bonds were in default;

   c.   A partial list of other existing or imminent defaults accompanying the EYCF letter on February 3, 2002 showed an additional $75 million of debt;

   d.   Asbestos, remediation, and other claims were outstanding;

   e.   Given that the outside directors had not been paid in three months, it was fair to presume others had not been paid either.

58.   Mr. Patton explained succinctly:

> If this company cannot pay its financial obligations, either its parent should provide it with the necessary cash to do so or it should file Chapter 11 so that its affairs can be restructured in an orderly and supervised manner. Driving the company into the ground is both irresponsible and despicable.

59.   Mr. Patton also made it clear that any prior indication of approval of the SPCC sale was based on the understanding that the restructuring committee would receive credible cash-flow projections showing that ASARCO could continue operations. Mr. Patton expressed his view that ASARCO's viability was in jeopardy. He asked for additional information—the