SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PHILLIP NELSON BURNS, MIRJANA
PAVKOVICH, Administrator of the Estate of
Rade Pavkovich, Deceased, and WARREN
ELMER HALFPAP,

               Plaintiff(s),

-against-

GRUPO MEXICO S. A. de C.V., a Mexican
Corporation, SOUTHERN PERU HOLDINGS
CORPORATION, a Delaware Corporation, SPHC
II Incorporated, a Delaware Corporation, GRUPO
MINERO MEXICO INTERNACIONAL, S. A.
DE C.V., a Mexican Corporation, MEXICANA
de COBRE, S.A. de C.V. a Mexican Corporation,
CONTROLADORA MINERA MEXICO, S.A. de
C.V., a Mexican Corporation, JP MORGAN
CHASE & COMPANY f/k/a CHASE
MANHATTAN BANK & TRUST COMPANY,
a Delaware Corporation, AMERICAS MINING
CORPORATION, a Delaware Corporation,
ERNST & YOUNG LLP, ERNST & YOUNG
CORPORATE FINANCE, LLC, GERMAN
LARREA MOTA-VELASCO, Officer and
Director of ASARCO, Inc., OSCAR GONZALEZ
ROCHA Officer and Director of ASARCO, Inc.,
CREDIT SUISSE FIRST BOSTON, INC.,
CREDIT SUISSE FIRST BOSTON, LLC and
CREDIT SUISSE FIRST BOSTON (USA), INC.

               Defendant(s)

Index No.: 04/114728

**FIRST AMENDED
VERIFIED COMPLAINT**

Plaintiffs, by their attorneys, WEITZ & LUXENBERG, P.C. and BARON & BUDD, P.C. for their suit against Defendants respectfully allege as follows:

**PRELIMINARY STATEMENT**

1.     This case concerns the acquisition and systematic liquidation of a multi-billion

dollar, one hundred year old, U.S. Corporation for the benefit of foreign investors and to the detriment of resident creditors. The companies and assets which made up Asarco Incorporated ("ASARCO") were raided, sold for profit and transferred beyond the direct reach of individuals ASARCO injured and owes compensation.

2. This action arises under the New York Fraudulent Conveyance Act, DEBT. & CRED. § 270 *et. seq.* and the common law of New York concerning fraud. Plaintiffs all have claims against ASARCO for personal injuries related to asbestos exposure, and are all creditors of ASARCO.

## JURISDICTION, VENUE & CHOICE OF LAW

3. Jurisdiction and venue are proper in the State of New York and New York County pursuant to N.Y. C.P.L.R. art. 5 § 503. New York State Law governs plaintiffs' claims for relief.

4. The parties and the principal transfers complained of herein all have a significant connection with this jurisdiction. At the time of the Leveraged Buyout ("LBO"), ASARCO's corporate headquarters was located in New York City. The corporate headquarters of defendant JP Morgan Chase & Company f/k/a Chase Manhattan Bank & Trust Co. ("Chase") is located in New York City.

5. All defendants are authorized to transact business in the state and/or have contracted to supply goods and services within the state. All defendant corporations and business entities have committed tortious acts within the state of New York.

6. ASARCO, defendant Grupo Mexico S.A. de C.V. ("GRUPO MEXICO"), defendant Americas Mining Corporation ("AMC") and defendant CHASE have all contractually

2

any right they might have had to contest the jurisdiction of this Court relating to the ances contested herein. Further, these defendants have designated within those same that New York State Law governs principal transactions involved in the LBO.

7. Defendant Ernst & Young, LLP and Ernst & Young Corporate Finance LLC regularly conduct business in this state and county.

8. Defendants Credit Suisse First Boston, Inc., Credit Suisse First Boston, LLC and Credit Suisse First Boston (USA) Inc.'s (collectively "CSFB") principal offices are located in New York City, New York.

9. The State of New York has the most significant interest in the outcome of this litigation.

### Plaintiffs

10. Plaintiffs are present unsecured creditors of ASARCO whose claims have not been satisfied. Plaintiffs are persons who were injured by ASARCO and whose tort claims were both filed and unfiled against ASARCO at the time of the fraudulent conveyance(s) at issue. Plaintiffs all have "claims" against ASARCO and are therefore "creditors" as that term is defined under the New York Fraudulent Conveyance Act ("the Act"), N. Y. DEBT & CRED. § 270.

11. The Plaintiffs are by name and citizenship: PHILLIP NELSON BURNS, a citizen of the State of Arizona; MIRJANA PAVKOVICH, Administrator of the Estate of Rade Pavkovich, Deceased, a citizen of the State of Arizona; and WARREN ELMER HALFPAP, a citizen of the State of New York.

### Defendants

12. Defendant GRUPO MEXICO S. A. de C.V. ("GRUPO MEXICO") is a Mexican Corporation. GRUPO MEXICO may be served with process pursuant to the Convention on the

Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the Hague Convention) by providing the Summons and Complaint in proper form to the Mexican Central Authority, which will provide formal service upon GRUPO MEXICO S.A. DE C.V., at its headquarters at Avenue Baja California 200, Colonia Roma Sur, 06760, Mexico City, Mexico. References herein to "GRUPO MEXICO" include GRUPO MEXICO S.A. de C.V. and its subsidiaries and affiliates, defendants Americas Mining Corporation ("AMC"), Controladora Minera Mexico, S.A. de C.V. ("CMM"), Grupo Mexico Minera Mexico Internacional, S.A. de C.V. ("GMMI") and Mexicana de Cobre S.A. de C.V.

13. Defendants SOUTHERN PERU HOLDINGS CORPORATION ("SPHC") and SPHC II Incorporated are incorporated in the State of Delaware and maintain their corporate headquarters at 2575 East Camelback Road, Phoenix Arizona, 85016. The registered service agent for both SPHC and SPHC II is the Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801. SPHC is a holding company and was formed as a wholly owned subsidiary of ASARCO to facilitate the transfer of ASARCO's interest in Southern Peru Copper Corporation ("SPCC") to defendant GRUPO MEXICO and/or its affiliates.

14. Defendant GRUPO MEXICO MINERO MEXICO INTERNACIONAL, S.A. DE C.V. ("GMMI") is a Mexican corporation. GMMI may be served with process pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the Hague Convention) by providing the Summons and Complaint in proper form to the Mexican Central Authority, which will provide formal service upon GRUPO MEXICO MINERO MEXICO INTERNACIONAL, S.A. DE C.V., at its headquarters at Avenue Baja California 200, Colonia Roma Sur 06760 Mexico City, Mexico.

15. Defendant MEXICANA de COBRE S.A. de C.V. is a Mexican corporation.

4

MEXICANA de COBRE S.A. de C.V. may be served with process pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the Hague Convention) by providing the Summons and Complaint in proper form to the Mexican Central Authority, which will provide formal service upon MEXICANA de COBRE S.A. de C.V., at Kilometro 21 Carretera Nacozari Agua Prieta, 84346, Nacozari de Garcia, Sonora, Mexico.

16. Defendant CONTROLADORA MINERA MEXICO, S.A. de C.V. ("CMM") a Mexican Corporation may be served with process pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the Hague Convention) by providing the Summons and Complaint in proper form to the Mexican Central Authority, which will provide formal service upon CONTROLADORA MINERA MEXICO, S.A. de C.V., at its headquarters at Avenue Baja California 200, Colonia Roma Sur 06760 Mexico City, Mexico.

17. Defendant AMERICAS MINING CORPORATION ("AMC") is incorporated in the State of Delaware and maintains its principal place of business at 2575 East Camelback Road, Phoenix, Arizona, 85016. AMC is a wholly owned subsidiary of defendant GRUPO MEXICO.

18. Defendant JP MORGAN CHASE & COMPANY f/k/a CHASE MANHATTAN BANK ("Chase") is a Delaware Corporations whose corporate headquarters are located in New York City, New York. Chase Manhattan Bank is a "legacy" company of JP Morgan Chase & Co.

19. Defendant ERNST & YOUNG, LLP and Defendant ERNST & YOUNG CORPORATE FINANCE, LLC (collectively "Ernst & Young") are limited liability companies

5

and accounting firms with worldwide offices including offices in New York City, New York.

20. Defendants CREDIT SUISSE FIRST BOSTON, INC., a Delaware Corporation, CREDIT SUISSE FIRST BOSTON, LLC a Delaware Limited Liability Company and CREDIT SUISSE FIRST BOSTON (USA), INC. a Delaware Corporation (collectively "CSFB") served as financial advisor to ASARCO's Board of Directors at the time of the LBO and a commercial lender who financially backed the LBO and profited from the transaction. CSFB does business worldwide but regularly conducts business in New York City and the State of New York. The principal corporate office of each CSFB entity is Eleven Madison Avenue, New York N.Y. 10010-3629.

21. Defendant GERMAN LARREA MOTA-VELASCO was the Chairman and Chief Executive Officer of ASARCO from November 1999 and at the date of the transfer of SPCC to AMC. He was also Chairman of the Board of SPCC and Chief Executive Officer and Chairman of the Board of GRUPO MEXICO, and he owes a fiduciary duty to ASARCO's creditors, including plaintiffs. Mr. Mota-Velasco may be served with process pursuant to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the Hague Convention) by providing the Summons and Complaint in proper form to the Mexican Central Authority, which will provide formal service upon Mr. Mota-Velasco at his place of business at Avenue Baja California 200, Colonia Roma Sur 06760 Mexico City, Mexico.

22. Defendant OSCAR GONZALEZ ROCHA was a Director of ASARCO at the date of the transfer of SPCC to AMC. At that time he was also President, General Director and Chief Operating Officer of SPCC, and he owes a fiduciary duty to ASARCO's creditors, including plaintiffs. Mr. Rocha may be served with process at his place of business at its

principal place of business at 2575 East Camelback Road, Phoenix, Arizona.

## BACKGROUND ALLEGATIONS

1. **ASARCO BEFORE THE LEVERAGED BUYOUT**

23. Prior to the leveraged buyout of ASARCO by GRUPO MEXICO, ASARCO's publically filed financial statements portrayed ASARCO as a solvent, international, publicly traded corporation, listed on the New York Stock Exchange with more than four billion dollars in assets and a low debt to asset ratio.

24. However, the Defendants, including the Officers and Directors of ASARCO, were aware of multiple claims against the company for environmental cleanup relating to ASARCO's mining and smelting operations in the United States and thousands of asbestos related personal injury claims stemming from the operation of ASARCO's own facilities and those of two of ASARCO's subsidiaries Capco Pipe Company (asbestos product manufacturer and distributor) and Lac d' Amiante du Quebec (LAQ) (asbestos mining operation).

25. Taking these present and anticipated creditor claims into account, ASARCO was insolvent or facing insolvency prior to the LBO.

26. ASARCO's Directors decided to sell the company. The Directors, all insiders and shareholders of ASARCO, entertained and accepted tender offers from Phelps Dodge Corporation and defendant GRUPO MEXICO.

27. The sale of ASARCO and the liquidation of the company's principal assets prior to the settlement of its environmental claims, including asbestos claims, and its other anticipated unsecured creditor claims, unlawfully favored shareholders at the expense of creditors including Plaintiffs.

B.  **OVERVIEW OF GRUPO MEXICO'S TENDER OFFER AND INTEGRATED PLAN OF LIQUIDATION**

28.     GRUPO MEXICO offered to purchase ASARCO's stock for cash through a leveraged buyout. GRUPO MEXICO's tender offer consisted of $29.75 per share, a guarantee of a loan from Chase and other lenders including CSFB to ASARCO to repurchase its own stock and assumption of $1.2 billion dollars in "pre-existing corporate debt." GRUPO MEXICO's proposal did not, however, involve actually paying-off all of ASARCO's "pre-existing corporate debt."

29.     GRUPO MEXICO would then force ASARCO to become responsible for the loan to Chase and the other lenders, requiring ASARCO (rather than GRUPO MEXICO) to pay for its own buyout by GRUPO MEXICO. ASARCO was thus forced to repay the loans made to GRUPO MEXICO by cannibalizing itself through the sale of its own assets.

30.     As for the "pre-existing corporate debt" most of the debt was not owed or guaranteed by ASARCO. This debt was SPCC's, and it arose out of an expansion project of SPCC's copper mining operations. Nevertheless, upon information and belief, GRUPO MEXICO also required that assets of ASARCO be liquidated to pay down SPCC's debt. Eventually, having used its own assets to pay down SPCC's debt, ASARCO transferred its SPCC stock to GRUPO MEXICO for unreasonably small consideration.

C.  **STEP 1: GRUPO MEXICO'S PURCHASE AND PRIVATIZATION OF ASARCO**

31.     In November 1999, GRUPO MEXICO purchased ASARCO in a "bust up" acquisition wherein the non-mining assets of ASARCO were sold to finance the purchase.

32.     The acquisition of ASARCO by GRUPO MEXICO was accomplished through the redemption/share repurchase of ASARCO's stock. Prior to its tender offer, GRUPO MEXICO,

8

through a subsidiary, acquired slightly more than 9% of the outstanding ASARCO common shares and was the company's largest, single shareholder. As ASARCO repurchased its own shares, GRUPO MEXICO's ownership interest in ASARCO increased.

33. In connection with the acquisition, GRUPO MEXICO caused ASARCO to merge with a GRUPO MEXICO merger subsidiary with "ASARCO" being the survivor. GRUPO MEXICO's ASARCO stock was then transferred to another holding company, defendant Americas Mining Corporation (AMC).

34. After redemption/share repurchase of the other ASARCO shareholders, GRUPO MEXICO privatized ASARCO in anticipation of liquidating its non-mining assets. ASARCO was de-listed from the New York Stock Exchange, and ASARCO was no longer required to publish its financial reports.

35. In a series of related, integrated and designed transactions, GRUPO MEXICO acquired ASARCO by means of a leveraged buyout for less than fair consideration, without good faith and in derogation of creditors' rights, including plaintiffs'.

36. GRUPO MEXICO's acquisition costs for the purchase of ASARCO were paid with money borrowed by ASARCO. In November 1999, GRUPO MEXICO negotiated with Chase for financing to redeem ASARCO's stock.

37. To pay initial acquisition costs, GRUPO MEXICO caused ASARCO (through the GRUPO MEXICO merger subsidiary) to borrow eight hundred seventeen million dollars ($817,000,000) ("acquisition loan") from defendant Chase.

38. Chase also set up and syndicated a four hundred fifty million dollar ($450,000,000) revolving line of credit for ASARCO which added to the company's debt load and debt service.

39. As collateral, ASARCO pledged its ownership interest in SPCC, Enthone-OMI, Inc. and related companies (collectively "Enthone") and American Limestone Company and related companies (collectively "American Limestone"). (SPCC, Enthone and American Limestone are collectively referred to herein as "ASARCO's principal assets"). As a part of GRUPO MEXICO's acquisition and in anticipation of transfer to GRUPO MEXICO, ASARCO placed its SPCC stock in a wholly owned subsidiary and holding company, Southern Peru Holding Corporation ("SPHC"). At the time of acquisition, ASARCO owned approximately 54.2 % of the voting stock of SPCC.

40. Chase and the other participating banks expected to be paid, and were paid, as priority lenders, out of the proceeds of the sale of ASARCO's speciality chemical division (Enthone) and ASARCO's aggregates division (American Limestone) and the proceeds of the sale of ASARCO's SPCC stock.

41. Defendant Chase knew it was providing the senior debt necessary to acquire and liquidate ASARCO's principal assets, and knew or should have known that ASARCO was already insolvent because of environmental and asbestos liabilities and/or would be rendered insolvent or without sufficient capital to continue normal business operations as a result of these conveyances.

42. Chase knew that ASARCO's outstanding unsecured environmental and personal injury creditors would not be satisfied under the planned liquidation.

43. The recitals within the loan agreement state that the principal purpose of the acquisition loan was to repurchase ASARCO's stock from its shareholders. Chase knew the proceeds of the loan would not accrue to the benefit of ASARCO or its creditors and thus represented unreasonably small return of capital for the encumbrance. Chase knew that the loan

proceeds were to be used for the benefit of third parties, GRUPO MEXICO, AMC and the former shareholders of ASARCO, who were "insiders" to the transaction.

### D.  STEP 2: THE LIQUIDATION OF ASARCO'S PRINCIPAL ASSETS

44.  After the acquisition, GRUPO MEXICO moved ASARCO's corporate headquarters from New York to Phoenix, Arizona, where ASARCO shared office space with AMC and SPHC. GRUPO MEXICO replaced ASARCO's Officers and Directors with designees from its own Board. ASARCO became a wholly owed subsidiary of AMC. After acquisition, ASARCO lost its separate identity and is totally controlled by GRUPO MEXICO and/or its affiliates.

45.  GRUPO MEXICO forced ASARCO to sell its assets to pay GRUPO MEXICO'S acquisition costs. At GRUPO MEXICO's direction, approximately $17 million of ASARCO's business equipment was sold at auction.

46.  At GRUPO MEXICO's direction and as had been agreed by Chase, ASARCO sold its profitable speciality chemical division (Enthone) for five hundred three million dollars ($503,000,000). Enthone is now part of Cookson Electronics PWB Materials and Chemistry, a division of Cookson Group plc, a British company.

47.  At GRUPO MEXICO's direction and as had been agreed by Chase, ASARCO sold its profitable aggregates division (American Limestone) to Rinker Materials Corporation f/k/a CSR America, Inc. for two hundred eleven million dollars ($211,000,000).

48.  The proceeds of these sales did not accrue to the benefit of ASARCO or its creditors since these monies were applied to acquisition debt and only benefitted Chase, GRUPO MEXICO and ASARCO's former shareholders to the exclusion of existing and future environmental and asbestos claimants. These conveyances for less than fair consideration, were

made without good faith, created or added to ASARCO's insolvency and insufficiency of capital and were in derogation of creditors' rights including the rights of the plaintiffs.

49.  At GRUPO MEXICO's direction, assets of ASARCO were redirected to the detriment of ASARCO's creditors. Settlement proceeds relating to litigation with ASARCO's excess liability insurers were not segregated and held to pay the known liability claims to which the insurance coverage related. As clear evidence of the integrated plan to liquidate ASARCO to the detriment of unsecured creditors, the future proceeds of the insurance settlement were sold at heavy discount, and the cash was transferred to ASARCO's operating account and spent.

50.  In 2003, at GRUPO MEXICO's direction as had been agreed by Chase, ASARCO's interest in SPCC was transferred to AMC, another wholly owned subsidiary of GRUPO MEXICO. In consideration for this conveyance, GRUPO MEXICO paid Chase and the syndicate of banks, on behalf of ASARCO, four hundred fifty million dollars ($450,000,000) in repayment of loans arising out of the acquisition, "forgave" some inter-company debt to AMC and/or its subsidiaries including Mexicana de Cobre, S.A. de C.V. and agreed to pay two hundred forty three million dollars ($243,000,000) at some future date. Part of this last payment may accrue to the benefit ASARCO's unsecured creditors (principally as part of a settlement agreement with the United States on some environmental claims) but it represents an amount far less than a fair equivalent for the asset.

E.  **ASARCO SUED FOR FRAUDULENT CONVEYANCE BY THE UNITED STATES GOVERNMENT**

51.  After the transfer of ASARCO's most valuable remaining asset (the SPCC stock held by SPHC) was proposed, the United States (an unsecured creditor with environmental based claims) brought suit against ASARCO for fraudulent conveyance. (*United States of America v.*

12

*Asarco Inc. and Southern Peru Holdings Corporation*, CO2-5401 FDB (W. D.Wash.) (later transferred to the United States District Court for the District of Arizona and renumbered as Case No. CV 02-2079-PHX-RCB).

52. During the course of the Government litigation, ASARCO admitted it was no longer able to pay its debts as they matured.

53. The United States eventually settled its claims against ASARCO and SPHC for one hundred million dollars ($100,000,000), an amount far less than the liability owed on just matured environmental claims, and withdrew its objection to the transfer. This settlement provided no benefits or protections whatsoever for ASARCO's other unsecured creditors including plaintiffs.

54. Upon information and belief, the United States settled its claim cheaply because the SPCC stock was already encumbered by the acquisition loan from defendant Chase, ASARCO's assets had already been depleted by the sale of Enthone and American Limestone, ASARCO was too thinly capitalized to continue many of its business operations and because of financial misrepresentations of ASARCO, GRUPO MEXICO and defendant Ernst & Young as to the value of ASARCO's interest in SPCC.

55. The transfer of ASARCO's interest in SPCC was facilitated by defendant Ernst & Young who recklessly and knowingly provided an opinion undervaluing this asset. As a direct result of the misrepresentations of Ernst & Young, plaintiffs' rights were undermined.

F. **ASARCO AFTER THE LBO AND RELATED ASSET SALES**

56. After the conveyances described herein, ASARCO was left an insolvent shell. The present salable value of ASARCO's assets is less than the amount required to pay the corporation's probable liabilities, including the personal injury claims of plaintiffs. ASARCO

lacks sufficient resources to timely pay its creditors, including plaintiffs. ASARCO is too thinly capitalized to continue the business operations it maintained prior to the sale of SPCC. Stripped of its most valuable assets, ASARCO is on the verge of filing for Bankruptcy protection.

57. A just outcome for plaintiffs, whose claims against ASARCO remain unsatisfied, requires that the foregoing transactions be viewed as part of an integrated plan, executed in a period of less than five years, resulting in conveyances which are fraudulent to plaintiffs.

### PLAINTIFFS' FIRST CLAIM FOR RELIEF
*(Constructive Fraud -Conveyance Resulting in Insolvency)*

58. Plaintiffs re-adopt and re-allege the allegations contained in paragraphs 1-57 and for their First Claim for Relief state as follows:

59. ASARCO owes a "debt" to plaintiffs as that term is defined under the New York Fraudulent Conveyance Act ("the Act"). N. Y. DEBT. & CRED. § 270.

60. The sale of ASARCO to GRUPO MEXICO in November 1999 by and through a leveraged buyout is a "conveyance" as that term is defined under the Act. N. Y. DEBT. & CRED. § 270.

61. The encumbrance of ASARCO's interests in Enthone, American Limestone and SPCC in furtherance of the GRUPO MEXICO LBO of ASARCO, is a "conveyance" of ASARCO's (the debtor's) property within the meaning of the Act. N. Y. DEBT. & CRED. § 270.

62. The sale at auction certain of ASARCO's business equipment is a "conveyance" of ASARCO's (the debtor's) property within the meaning of the Act. N. Y. DEBT. & CRED. § 270.

63. The transfer of GRUPO MEXICO's ownership interest in ASARCO (as merged with ASMEX) to AMC is a "conveyance" of ASARCO's (the debtor's) property within the