175

...Attorney(s) within 20 days after the service of this summons, exclusive of the day

...within 30 days after the service is complete if this summons is not personally delivered

...the State of New York); and in case of your failure to appear or answer, judgment will

...against you by default for the relief demanded in the Complaint.

...York, New York
...anuary 7, 2005

**WEITZ & LUXENBERG, P.C.**
A New York Professional Corporation
180 Maiden Lane
New York, NY 10038
(212)558-5500
FAX (212)344-5461

By: _____
        Gary Klein, Esq.

**BARON & BUDD**
**A PROFESSIONAL CORPORATION**
Allan B. Rich, Esq.
The Centrum, Suite 1100
3102 Oak Lawn Avenue
Dallas, Texas 75219
(214) 521-3605
FAX: (214) 520-1181

SEE RIDER ATTACHED

FILED
2/7/05
COUNTY CLERK
NEW YORK COUNTY

№ 193017

STATE OF NEW YORK,
COUNTY OF NEW YORK, SS:
I, NORMAN GOODMAN,
COUNTY CLERK AND CLERK
OF THE SUPREME COURT,
NEW YORK COUNTY,
DO HEREBY CERTIFY ON

MAR 28 2005

THAT I HAVE COMPARED THIS
COPY WITH THE ORIGINAL
FILED IN MY OFFICE ON

2/7/05

AND THAT THE SAME IS A
CORRECT TRANSCRIPT
THEREFROM AND OF THE
WHOLE OF SUCH ORIGINAL.
IN WITNESS WHEREOF,
I HAVE HEREUNTO SET MY
HAND AND AFFIXED MY
OFFICIAL SEAL.

COUNTY CLERK AND CLERK OF THE
SUPREME COURT, NEW YORK COUNTY.
FACSIMILE SIGNATURE USED
PURSUANT TO SEC. 903,
COUNTY LAW.

FEE PAID

176

...COURT OF THE STATE OF NEW YORK
...OF NEW YORK

...NELSON BURNS, MIRJANA
...VICH, Administrator of the Estate of
...ovich, Deceased, and WARREN
...HALFPAP,

        Plaintiff(s),

...-against-

...MEXICO S. A. de C.V., a Mexican
...SOUTHERN PERU HOLDINGS
...RATION, a Delaware Corporation, SPHC
...ted, a Delaware Corporation, GRUPO
...MEXICO INTERNACIONAL, S. A.
...Mexican Corporation, MEXICANA
...RES.A. de C.V. a Mexican Corporation,
...OLADORA MINERA MEXICO, S.A. de
...Mexican Corporation, JP MORGAN
... COMPANY f/k/a CHASE
...TAN BANK & TRUST COMPANY,
...Corporation, AMERICAS MINING
...ORATION, a Delaware Corporation,
...& YOUNG LLP, ERNST & YOUNG
...RATE FINANCE, LLC, GERMAN
...EA MOTA-VELASCO, Officer and
...of ASARCO, Inc., OSCAR GONZALEZ
...Officer and Director of ASARCO, Inc.,
...T SUISSE FIRST BOSTON, INC.,
...T SUISSE FIRST BOSTON, LLC and
...T SUISSE FIRST BOSTON (USA), INC.

        Defendant(s)

Index No.: 04/114728

**FIRST AMENDED
VERIFIED COMPLAINT**

...ff, by their attorneys, WEITZ & LUXENBERG, P.C. and BARON & BUDD, P.C. for

...ed against Defendants respectfully allege as follows:

## PRELIMINARY STATEMENT

1.   This case concerns the acquisition and systematic liquidation of a multi-billion

1

177

hundred year old, U.S. Corporation for the benefit of foreign investors and to the

resident creditors.  The companies and assets which made up Asarco Incorporated

(ACO)) were raided, sold for profit and transferred beyond the direct reach of individuals

injured and owes compensation.

This action arises under the New York Fraudulent Conveyance Act, DEBT. &

170 *et seq.* and the common law of New York concerning fraud.  Plaintiffs all have

against ASARCO for personal injuries related to asbestos exposure, and are all creditors

## JURISDICTION, VENUE & CHOICE OF LAW

Jurisdiction and venue are proper in the State of New York and New York County

N.Y. C.P. L. R. art. 5 § 503.   New York State Law governs plaintiffs' claims for

The parties and the principal transfers complained of herein all have a significant

with this jurisdiction.  At the time of the Leveraged Buyout ("LBO"), ASARCO's

headquarters was located in New York City.  The corporate headquarters of defendant

Chase & Company f/k/a Chase Manhattan Bank & Trust Co. ("Chase") is located in

ork City.

All defendants are authorized to transact business in the state and/or have

in supply goods and services within the state.  All defendant corporations and business

have committed tortious acts within the state of New York.

ASARCO, defendant Grupo Mexico S.A. de C.V. ("GRUPO MEXICO"),

Americas Mining Corporation ("AMC") and defendant CHASE have all contractually

2

178

...ey might have had to contest the jurisdiction of this Court relating to the ...ted herein. Further, these defendants have designated within those same New York State Law governs principal transactions involved in the LBO.

Defendant Ernst & Young, LLP and Ernst & Young Corporate Finance LLC ...business in this state and county.

Defendants Credit Suisse First Boston, Inc., Credit Suisse First Boston, LLC and ...Boston (USA) Inc.'s (collectively "CSFB") principal offices are located in ...New York.

The State of New York has the most significant interest in the outcome of this

### Plaintiffs

Plaintiffs are present unsecured creditors of ASARCO whose claims have not ...Plaintiffs are persons who were injured by ASARCO and whose tort claims were ...nified against ASARCO at the time of the fraudulent conveyance(s) at issue.

..."claims" against ASARCO and are therefore "creditors" as that term is defined ...Fraudulent Conveyance Act ("the Act"), N. Y. DEBT & CRED. § 270.

...Plaintiffs are by name and citizenship: PHILLIP NELSON BURNS, a citizen ...rizona; MIRJANA PAVKOVICH, Administrator of the Estate of Rade ...a citizen of the State of Arizona; and WARREN ELMER HALFPAP, a ...te of New York.

### Defendants

Defendant GRUPO MEXICO S. A. de C.V. ("GRUPO MEXICO") is a Mexican ...RUPO MEXICO may be served with process pursuant to the Convention on the

3

...Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the Convention) by providing the Summons and Complaint in proper form to the Mexican ...Authority, which will provide formal service upon GRUPO MEXICO S.A. DE C.V., at ...quarters at Avenue Baja California 200, Colonia Roma Sur, 06760, Mexico City, Mexico.

...ences herein to "GRUPO MEXICO" include GRUPO MEXICO S.A. de C.V. and its ...es and affiliates, defendants Americas Mining Corporation ("AMC"), Controladora ...Mexico, S.A. de C.V. ("CMM"), Grupo Mexico Minera Mexico Internacional, S.A. de ...MMI") and Mexicana de Cobre S.A. de C.V.

...13.   Defendants SOUTHERN PERU HOLDINGS CORPORATION ("SPHC") and ...II incorporated are incorporated in the State of Delaware and maintain their corporate ...ters at 2575 East Camelback Road, Phoenix, Arizona, 85016.  The registered service ...for both SPHC and SPHC II  is the Corporation Trust Center, 1209 Orange Street, ...ton, Delaware, 19801.  SPHC is a holding company and was formed as a wholly owned ...ary of ASARCO to facilitate the transfer of ASARCO's interest in Southern Peru Copper ...ation ("SPCC") to defendant GRUPO MEXICO and/or its affiliates.

...14.   Defendant GRUPO MEXICO MINERO MEXICO INTERNACIONAL, S.A. DE ...GMMI") is a Mexican corporation. GMMI may be served with process pursuant to the ...tion on the Service Abroad of Judicial and Extrajudicial Documents in Civil or ...cial Matters (the Hague Convention) by providing the Summons and Complaint in ...form to the Mexican Central Authority, which will provide formal service upon GRUPO ...CO MINERO MEXICO INTERNACIONAL, S.A. DE C.V., at its headquarters at Avenue ...lifornia 200, Colonia Roma Sur 06760 Mexico City, Mexico.

...15.   Defendant  MEXICANA de COBRE S.A. de C.V. is a Mexican corporation.

180

...ANA de COBRE S.A. de C.V. may be served with process pursuant to the Convention ...ervice Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ...e Convention) by providing the Summons and Complaint in proper form to the ...Central Authority, which will provide formal service upon MEXICANA de COBRE ...C.V., at Kilometro 21 Carretera Nacozari Agua Prieta, 84346, Nacozari de Garcia, ...Mexico.

...16. Defendant CONTROLADORA MINERA MEXICO, S.A. de C.V. ...a Mexican Corporation may be served with process pursuant to the Convention on ...ervice Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the ...Convention) by providing the Summons and Complaint in proper form to the Mexican ...Authority, which will provide formal service upon CONTROLADORA MINERA ...ICO, S.A. de C.V., at its headquarters at Avenue Baja California 200, Colonia Roma ...6760 Mexico City, Mexico.

...17. Defendant AMERICAS MINING CORPORATION ("AMC") is incorporated in ...ate of Delaware and maintains its principal place of business at 2575 East Camelback ...Phoenix, Arizona, 85016.  AMC is a wholly owned subsidiary of defendant GRUPO ...ICO.

...18. Defendant JP MORGAN CHASE & COMPANY f/k/a CHASE MANHATTAN ...("Chase") is a Delaware Corporations whose corporate headquarters are located in New ...City, New York.  Chase Manhattan Bank is a "legacy" company of JP Morgan Chase & Co.

...19. Defendant ERNST & YOUNG, LLP and Defendant ERNST & YOUNG ...ORATE FINANCE, LLC (collectively "Ernst & Young") are limited liability companies

5

181

ing firms with worldwide offices including offices in New York City, New York.

Defendants CREDIT SUISSE FIRST BOSTON, INC., a Delaware Corporation, SUISSE FIRST BOSTON, LLC a Delaware Limited Liability Company and CREDIT FIRST BOSTON (USA), INC. a Delaware Corporation (collectively "CSFB") served as advisor to ASARCO's Board of Directors at the time of the LBO and a commercial financially backed the LBO and profited from the transaction. CSFB does business but regularly conducts business in New York City and the State of New York. The corporate office of each CSFB entity is Eleven Madison Avenue, New York N.Y.

Defendant GERMAN LARREA MOTA-VELASCO was the Chairman and Chief Officer of ASARCO from November 1999 and at the date of the transfer of SPCC to was also Chairman of the Board of SPCC and Chief Executive Officer and Chairman of GRUPO MEXICO, and he owes a fiduciary duty to ASARCO's creditors, Plaintiffs. Mr. Mota-Velasco may be served with process pursuant to the Convention Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters Convention) by providing the Summons and Complaint in proper form to the Central Authority, which will provide formal service upon Mr. Mota-Velasco at his business at Avenue Baja California 200, Colonia Roma Sur 06760 Mexico City,

Defendant OSCAR GONZALEZ ROCHA was a Director of ASARCO at the transfer of SPCC to AMC. At that time he was also President, General Director and Prime Officer of SPCC, and he owes a fiduciary duty to ASARCO's creditors, Plaintiffs. Mr. Rocha may be served with process at his place of business at its

6

place of business at 2575 East Camelback Road, Phoenix, Arizona.  **182**

## BACKGROUND ALLEGATIONS

### ASARCO BEFORE THE LEVERAGED BUYOUT

Prior to the leveraged buyout of ASARCO by GRUPO MEXICO, ASARCO's

filed financial statements portrayed ASARCO as a solvent, international, publicly

corporation, listed on the New York Stock Exchange with more than four billion dollars in

and a low debt to asset ratio.

However, the Defendants, including the Officers and Directors of ASARCO, were

of multiple claims against the company for environmental cleanup relating to ASARCO's

and smelting operations in the United States and thousands of asbestos related personal

claims stemming from the operation of ASARCO's own facilities and those of two of

CO's subsidiaries Capco Pipe Company (asbestos product manufacturer and distributor)

and Amiante du Quebec (LAQ) (asbestos mining operation).

Taking these present and anticipated creditor claims into account, ASARCO was

or facing insolvency prior to the LBO.

ASARCO's Directors decided to sell the company. The Directors, all insiders and

olders of ASARCO, entertained and accepted tender offers from Phelps Dodge

and defendant GRUPO MEXICO.

The sale of ASARCO and the liquidation of the company's principal assets prior

ient of its environmental claims, including asbestos claims, and its other anticipated

creditor claims, unlawfully favored shareholders at the expense of creditors including

## OVERVIEW OF GRUPO MEXICO'S TENDER
## OFFER AND INTEGRATED PLAN OF LIQUIDATION

183

GRUPO MEXICO offered to purchase ASARCO's stock for cash through a

buyout. GRUPO MEXICO's tender offer consisted of $29.75 per share, a guarantee of

from Chase and other lenders including CSFB to ASARCO to repurchase its own stock

assumption of $1.2 billion dollars in "pre-existing corporate debt." GRUPO MEXICO's

did not, however, involve actually paying off all of ASARCO's "pre-existing corporate

GRUPO MEXICO would then force ASARCO to become responsible for the loan

and the other lenders, requiring ASARCO (rather than GRUPO MEXICO) to pay for its

through by GRUPO MEXICO. ASARCO was thus forced to repay the loans made to

MEXICO by cannibalizing itself through the sale of its own assets.

As for the "pre-existing corporate debt" most of the debt was not owed or

by ASARCO. This debt was SPCC's, and it arose out of an expansion project of

copper mining operations. Nevertheless, upon information and belief, GRUPO

MEXICO also required that assets of ASARCO be liquidated to pay down SPCC's debt.

having used its own assets to pay down SPCC's debt, ASARCO transferred its SPCC

GRUPO MEXICO for unreasonably small consideration.

## STEP 1: GRUPO MEXICO'S PURCHASE AND PRIVATIZATION OF ASARCO

In November 1999, GRUPO MEXICO purchased ASARCO in a "bust up"

wherein the non-mining assets of ASARCO were sold to finance the purchase.

The acquisition of ASARCO by GRUPO MEXICO was accomplished through the

share repurchase of ASARCO's stock. Prior to its tender offer, GRUPO MEXICO,

8

subsidiary, acquired slightly more than 9% of the outstanding ASARCO common **184** and was the company's largest, single shareholder. As ASARCO repurchased its own stock, GRUPO MEXICO's ownership interest in ASARCO increased.

33. In connection with the acquisition, GRUPO MEXICO caused ASARCO to merge with GRUPO MEXICO merger subsidiary with "ASARCO" being the survivor. GRUPO MEXICO's ASARCO stock was then transferred to another holding company, defendant Americas Mining Corporation (AMC).

34. After redemption/share repurchase of the other ASARCO shareholders, GRUPO MEXICO privatized ASARCO in anticipation of liquidating its non-mining assets. ASARCO was delisted from the New York Stock Exchange, and ASARCO was no longer required to file its financial reports.

35. In a series of related, integrated and designed transactions, GRUPO MEXICO acquired ASARCO by means of a leveraged buyout for less than fair consideration, without good faith and in derogation of creditors' rights, including plaintiffs'.

36. GRUPO MEXICO's acquisition costs for the purchase of ASARCO were paid with money borrowed by ASARCO. In November 1999, GRUPO MEXICO negotiated with Chase for financing to redeem ASARCO's stock.

37. To pay initial acquisition costs, GRUPO MEXICO caused ASARCO (through the GRUPO MEXICO merger subsidiary) to borrow eight hundred seventeen million dollars ($817,000,000) ("acquisition loan") from defendant Chase.

38. Chase also set up and syndicated a four hundred fifty million dollar ($450,000,000) revolving line of credit for ASARCO which added to the company's debt load and service.

9

185

As collateral, ASARCO pledged its ownership interest in SPCC, Enthone-OMI, affiliated companies (collectively "Enthone") and American Limestone Company and companies (collectively "American Limestone") (SPCC, Enthone and American are collectively referred to herein as "ASARCO's principal assets"). As a part of GO MEXICO's acquisition and in anticipation of transfer to GRUPO MEXICO, ASARCO SPCC stock in a wholly owned subsidiary and holding company, Southern Peru Corporation ("SPHC"). At the time of acquisition, ASARCO owned approximately of the voting stock of SPCC.

Chase and the other participating banks expected to be paid, and were paid, as lenders, out of the proceeds of the sale of ASARCO's speciality chemical division and ASARCO's aggregates division (American Limestone) and the proceeds of the ASARCO's SPCC stock.

Defendant Chase knew it was providing the senior debt necessary to acquire and ASARCO's principal assets, and knew or should have known that ASARCO was insolvent because of environmental and asbestos liabilities and/or would be rendered without sufficient capital to continue normal business operations as a result of these

Chase knew that ASARCO's outstanding unsecured environmental and personal creditors would not be satisfied under the planned liquidation.

The recitals within the loan agreement state that the principal purpose of the loan was to repurchase ASARCO's stock from its shareholders. Chase knew the of the loan would not accrue to the benefit of ASARCO or its creditors and thus unreasonably small return of capital for the encumbrance. Chase knew that the loan

10

186

were to be used for the benefit of third parties, GRUPO MEXICO, AMC and the shareholders of ASARCO, who were "insiders" to the transaction.

**STEP 2: THE LIQUIDATION OF ASARCO'S PRINCIPAL ASSETS**

44. After the acquisition, GRUPO MEXICO moved ASARCO's corporate offices from New York to Phoenix, Arizona, where ASARCO shared office space with ASPHC. GRUPO MEXICO replaced ASARCO's Officers and Directors with those from its own Board. ASARCO became a wholly owed subsidiary of AMC. After that, ASARCO lost its separate identity and is totally controlled by GRUPO MEXICO and affiliates.

45. GRUPO MEXICO forced ASARCO to sell its assets to pay GRUPO MEXICO'S debts. At GRUPO MEXICO's direction, approximately $17 million of ASARCO's equipment was sold at auction.

46. At GRUPO MEXICO's direction and as had been agreed by Chase, ASARCO profitable speciality chemical division (Enthone) for five hundred three million dollars ($503,000,000). Enthone is now part of Cookson Electronics PWB Materials and Chemistry, a of Cookson Group plc, a British company.

47. At GRUPO MEXICO's direction and as had been agreed by Chase, ASARCO profitable aggregates division (American Limestone) to Rinker Materials Corporation (RMR America), Inc. for two hundred eleven million dollars ($211,000,000).

48. The proceeds of these sales did not accrue to the benefit of ASARCO or its creditors since these monies were applied to acquisition debt and only benefitted Chase, GRUPO MEXICO and ASARCO's former shareholders to the exclusion of existing and future environmental and asbestos claimants. These conveyances for less than fair consideration, were

11

good faith, created or added to ASARCO's insolvency and insufficiency of capital in derogation of creditors' rights including the rights of the plaintiffs.

At GRUPO MEXICO's direction, assets of ASARCO were redirected to the of ASARCO's creditors. Settlement proceeds relating to litigation with ASARCO's insurers were not segregated and held to pay the known liability claims to which coverage related. As clear evidence of the integrated plan to liquidate ASARCO to of unsecured creditors, the future proceeds of the insurance settlement were sold at count, and the cash was transferred to ASARCO's operating account and spent.

In 2003, at GRUPO MEXICO's direction as had been agreed by Chase, interest in SPCC was transferred to AMC, another wholly owned subsidiary of MEXICO. In consideration for this conveyance, GRUPO MEXICO paid Chase and the banks, on behalf of ASARCO four hundred fifty million dollars ($450,000,000) in of loans arising out of the acquisition, "forgave" some inter-company debt to AMC subsidiaries including Mexicana de Cobre, S.A. de C.V. and agreed to pay two forty three million dollars ($243,000,000) at some future date. Part of this last payment to the benefit ASARCO's unsecured creditors (principally as part of a settlement with the United States on some environmental claims) but it represents an amount far a fair equivalent for the asset.

**ASARCO SUED FOR FRAUDULENT CONVEYANCE BY THE UNITED STATES GOVERNMENT**

After the transfer of ASARCO's most valuable remaining asset (the SPCC stock HC) was proposed, the United States (an unsecured creditor with environmental based brought suit against ASARCO for fraudulent conveyance. (*United States of America v.*

12

and *Southern Peru Holdings Corporation, CO2-5401 FDB* (W. D.Wash.) (later

to the United States District Court for the District of Arizona and renumbered as

CV 02-2079-PHX-RCB).

**188**

During the course of the Government litigation, ASARCO admitted it was no

to pay its debts as they matured.

The United States eventually settled its claims against ASARCO and SPHC for

million dollars ($100,000,000), an amount far less than the liability owed on just

environmental claims, and withdrew its objection to the transfer. This settlement

benefits or protections whatsoever for ASARCO's other unsecured creditors

plaintiffs.

Upon information and belief, the United States settled its claim cheaply because

was already encumbered by the acquisition loan from defendant Chase,

assets had already been depleted by the sale of Enthone and American Limestone,

was too thinly capitalized to continue many of its business operations and because of

misrepresentations of ASARCO, GRUPO MEXICO and defendant Ernst & Young as **to**

ASARCO's interest in SPCC.

The transfer of ASARCO's interest in SPCC was facilitated by defendant Ernst **&**

recklessly and knowingly provided an opinion undervaluing this asset. As a direct

misrepresentations of Ernst & Young, plaintiffs' rights were undermined.

**ASARCO AFTER THE LBO AND RELATED ASSET SALES**

After the conveyances described herein, ASARCO was left an insolvent shell.

salable value of ASARCO's assets is less than the amount required to pay the

probable liabilities, including the personal injury claims of plaintiffs. ASARCO

13

...cient resources to timely pay its creditors, including plaintiffs.  ASARCO is too thinly

...to continue the business operations it maintained prior to the sale of SPCC.  Stripped

...valuable assets, ASARCO is on the verge of filing for Bankruptcy protection.

...  A just outcome for plaintiffs, whose claims against ASARCO remain unsatisfied,

...the foregoing transactions be viewed as part of an integrated plan, executed in a

...than five years,  resulting in conveyances which are fraudulent to plaintiffs.

### PLAINTIFFS' FIRST CLAIM FOR RELIEF
*(Constructive Fraud - Conveyance Resulting in Insolvency)*

...  Plaintiffs re-adopt and re-allege the allegations contained in paragraphs 1-57 and

...Claim for Relief state as follows:

...  ASARCO owes a  "debt" to plaintiffs as that term is defined under the New York

...Conveyance Act ("the Act").  N. Y. DEBT. & CRED. § 270.

...  The sale of ASARCO to GRUPO MEXICO in November 1999 by and through a

...buyout is a "conveyance" as that term is defined under the Act.  N. Y. DEBT. & CRED.

...  The encumbrance of ASARCO's interests in Enthone, American Limestone and

...in furtherance of the GRUPO MEXICO LBO of ASARCO, is a "conveyance" of

...CO's (the debtor's) property within the meaning of the Act.  N. Y. DEBT. & CRED. § 270.

...  The sale at auction certain of ASARCO's business equipment is a "conveyance"

...ARCO's (the debtor's) property within the meaning of the Act.  N. Y. DEBT. & CRED. §

...  The transfer of GRUPO MEXICO's ownership interest in ASARCO (as merged

...SMEX) to AMC is a "conveyance" of  ASARCO's (the debtor's) property within the

14

190

of the Act. N. Y. DEBT. & CRED. § 270.

The sale of Enthone, American Limestone and ASARCO's ownership interest in ASARCO's principal assets") separately and in connection with an integrated plan of are "conveyance(s)" of ASARCO's (the debtor's) property within the meaning of N. Y. DEBT. & CRED. § 270.

The redemption/share repurchase of ASARCO's stock from ASARCO's Directors shareholders is a "conveyance" as that term is defined under the Act. N. Y. DEBT. & 270.

Plaintiffs have claims against ASARCO for damages resulting from personal occasioned by exposure to asbestos. Plaintiffs are "creditors" of ASARCO under the N. Y. DEBT. & CRED. § 270.

ASARCO was purchased by GRUPO MEXICO, its stock was redeemed, certain business equipment was liquidated at auction and its principal assets encumbered and sold when ASARCO was either insolvent or would become insolvent as a result of the tion of its assets.

ASARCO received less than fair consideration for the redemption/share ase of its stock and transfer of controlling interest in the company to GRUPO MEXICO AMC since the proceeds of the conveyance accrued to the benefit of third parties (GRUPO CO, AMC, the former shareholders of ASARCO and Chase) and not to the benefit of CO or its creditors.

ASARCO received less than fair consideration for the encumbrance of its al assets since the proceeds of the conveyances accrued to the benefit of third parties O MEXICO, AMC, the former shareholders of ASARCO, Chase and CSFB and others)

15

the benefit of ASARCO or its creditors.

ASARCO received less than fair consideration for the sale of certain of its

equipment at auction and the sale of its principal assets since the proceeds of these

accrued to the benefit of third parties (GRUPO MEXICO, AMC, the former

of ASARCO, Chase and CSFB) and not to the benefit of ASARCO or its creditors.

Plaintiffs are entitled to judgment against GRUPO MEXICO and AMC declaring

of ASARCO to GRUPO MEXICO and AMC, the encumbrance and sale of

business equipment and principal assets and the redemption/share repurchase of its

individually and collectively fraudulent as to the debts owed plaintiffs pursuant to N.

CRED. §273. Plaintiffs are entitled to appropriate equitable and legal relief thereto.

### PLAINTIFFS' SECOND CLAIM FOR RELIEF
*(Constructive Fraud- Conveyance Resulting in Insufficiency of Capital)*

Plaintiffs re-adopt and re-allege the allegations contained in paragraphs 1-71 and for their

Claim for Relief state as follows:

At the direction of GRUPO MEXICO and AMC, ASARCO redeemed its stock

away certain of its business equipment and its principal assets without fair

when ASARCO was engaging or about to engage in a business or transaction for

property remaining in ASARCO's hands after the conveyance represented

small capital.

Plaintiffs are entitled to judgment against GRUPO MEXICO and AMC declaring

and conveyance of ASARCO's business equipment and principal assets and

share repurchase of ASARCO's stock individually and collectively, fraudulent as to

owed plaintiffs pursuant to N. Y. DEBT. & CRED. § 274. Plaintiffs are entitled to

16

equitable and legal relief thereto.

### PLAINTIFFS' THIRD CLAIM FOR RELIEF
*(Actual Fraud: Conveyance in Anticipation of Debts)*

Plaintiffs re-adopt and re-allege the allegations contained in paragraphs 1-73 and for their

Claim for Relief state as follows:

In a series of transactions undertaken at the direction of GRUPO MEXICO and ASARCO was sold to GRUPO MEXICO and transferred to AMC, ASARCO's stock was and ASARCO's business equipment and principal assets were encumbered and/or sold for unfair consideration, with the intent or belief that ASARCO would incur debts beyond its ability to pay as they mature.

GRUPO MEXICO and AMC were aware of plaintiffs' (and other, environmental) claims against ASARCO prior to the conveyances referenced herein, and these defendants knew claims would remain unsatisfied under the integrated plan of liquidation.

Plaintiffs are entitled to judgment against GRUPO MEXICO and AMC declaring sale of ASARCO to GRUPO MEXICO, the transfer of ASARCO to AMC, the redemption/share repurchase of ASARCO's stock and the encumbrance and conveyance of ASARCO's business equipment and/or principal assets to be fraudulent to the debts owed to plaintiffs pursuant to N.Y. DEBT. & CRED. § 275. Plaintiffs are entitled to appropriate equitable relief thereto.

### PLAINTIFFS' FOURTH CLAIM FOR RELIEF
*(Actual Fraud: Conveyance with Intent to Frustrate Creditor Claims/Conspiracy)*

Plaintiffs re-adopt and re-allege the allegations contained in paragraphs 1-76 and for their Claim for Relief state as follows:

The redemption/share repurchase of ASARCO's stock and the sale and liquidation

RCO through the LBO were undertaken through an integrated plan and design

by defendant GRUPO MEXICO and executed with the complicity of others,

AMC, Chase and CSFB.

193

The redemption/share repurchase of ASARCO' stock and liquidation of

assets occurred when:

ASARCO was insolvent and/or with the knowledge that the transfers,
(individually and/or collectively) would result in ASARCO's insolvency;

GRUPO MEXICO, AMC and Chase were aware of pending litigation against
ASARCO for environmental claims and personal injury claims related to asbestos
exposure which had rendered or would render the company insolvent;

ASARCO lacked adequate financial means to meet its debts as they matured;

The assets transferred were the principal assets of the corporation and made up the
majority of the company's assets in value;

The transfers were made for less than fair consideration;

The transfer(s) benefitted insiders including ASARCO's Directors and other
former shareholders, GRUPO MEXICO and AMC at the expense of unsecured
creditors including plaintiffs.

The redemption/share repurchase of stock and liquidation of ASARCO's assets

to strip the company of assets before unsecured creditor claims matured; the

ion/share repurchase of ASARCO' stock and the sale and liquidation of ASARCO's

equipment and principal assets was undertaken with the intent to hinder, delay or

itors.

Plaintiffs are entitled to judgment against GRUPO MEXICO, AMC, Chase and

ing the sale of ASARCO to GRUPO MEXICO and AMC, the redemption/share

of ASARCO's stock and the encumbrance and conveyance of ASARCO's business

and principal assets to be fraudulent pursuant to N.Y. DEBT. & CRED. § 276.

18

are entitled to appropriate equitable and legal relief thereto.

Because these transfers were fraudulent conveyances, committed with the actual to defraud creditors, punitive damages should be recovered from the defendants, jointly ally, in an amount not less than three-times actual damages.

### PLAINTIFFS' FIFTH CLAIM FOR RELIEF
*(Fraudulent Conveyance: Liability of Transferee Chase & CSFB)*

Plaintiffs re-adopt and re-allege the allegations contained in ¶'s 1–81 and for their Fifth for Relief state as follows:

Defendant Chase is the transferee who provided the senior layer of debt necessary the LBO.

Defendant CSFB provided financial advice to ASARCO's Board of Directors at of the merger and participated with other banks in financing the LBO.

Chase and CSFB knew the LBO was to be a "bust up" acquisition with the assets ARCO to be conveyed away from ASARCO for less than fair consideration since the of these transfers would not benefit ASARCO or its creditors but would instead accrue parties, ASARCO's former shareholders, GRUPO MEXICO and AMC.

Chase and CSFB knew ASARCO was insolvent just prior to the LBO or would be insolvent as a result of the conveyances attendant to the LBO and/or the debt service for the acquisition and operating loans to ASARCO.

Chase and CSFB knew ASARCO was to be liquidated and would be left with ably small capital resources to continue its traditional business operations.

Chase and CSFB knew ASARCO was to be liquidated at a time when ASARCO, MEXICO and AMC believed ASARCO would incur debts beyond its ability to pay as

Chase and CSFB knew the plan of liquidation was undertaken with the intent to **195** delay and/or defraud creditors.

The encumbrance of ASARCO's principal assets in favor of Chase is a [fraudulent conveya]nce" of ASARCO's (the debtor's) property within the meaning of the Act.  N. Y. DEBT. [& CRED.] § 270.

Loan payments relating to the LBO received by Chase, CSFB and other [lend]ing banks under priority liens, including but not limited to proceeds from the sale of [ASAR]CO's principal assets and other loan payments made by ASARCO or by GRUPO [MEXIC]O (or its affiliates) on behalf of ASARCO (collectively "loan payments")  are [convey]ances" of ASARCO's (the debtor's) property within the meaning of the Act.  N. Y. [DEBT. &] CRED. § 270.

The loan payments received by Chase and CSFB are not protected from recapture [N.Y.] DEBT & CRED. 272(b)  because Chase and CSFB did not act in good faith herein [and the] property received by ASARCO from Chase and CSFB was disproportionately small as [compared] with the value of the obligation to Chase and CSFB.

In derogation of creditor's rights, including plaintiffs, Chase and CSFB failed to [make an] adequate financial investigation of ASARCO's solvency before loaning and/or [providing] more than one billion (1,000,000,000) dollars to ASARCO and accepting mortgages [coverin]g ASARCO's principal assets and/or ignored ASARCO's insolvency.

Chase and CSFB knew or should have known that as a result of the planned [sale] of ASARCO's principal assets:

a.    The fair salable value of ASARCO's remaining assets would be less than

20

ASARCO's liabilities;

b.     These transfers would leave ASARCO with an unreasonably small amount of capital for the business in which it was engaged or proposed to engage in the future;

c.     ASARCO could not reasonably be expected to meet its obligations as the matured.

94.    Chase and CSFB knew or should have known that the debtor was insolvent or be rendered insolvent by the transfers or would be rendered insolvent as a result of the plan of liquidation, that the debt service imposed by Chase and CSFB would further ASARCO's ability to pay creditors and ASARCO has no reasonable prospects for

95.    Chase and CSFB transferred funds to ASARCO in exchange for a lien against principal assets and accepted loan payments for less than fair consideration with constructive knowledge that the transaction would increase or lead to ASARCO's and fraud on ASARCO's creditors including plaintiffs.

96.    Plaintiffs are entitled to judgment against defendant Chase and CSFB for the property conveyed and/or judgment declaring the loan payments attendant to the by or on behalf of ASARCO to Chase and CSFB to be fraudulent as to the Debts plaintiffs pursuant to DEBT. & CRED. §§ 273, 274, 275 & 276.  Plaintiffs are entitled to equitable and legal relief thereto.

### PLAINTIFFS' SIXTH CLAIM FOR RELIEF
#### (Fraudulent Conveyance: Insurance Proceeds)

Plaintiffs re-adopt and re-allege the allegations contained in ¶'s 1-96 and for their Sixth Relief state as follows:

Plaintiffs all have "claims" against ASARCO and are therefore "creditors" of **197** under the Act. N. Y. DEBT. & CRED. § 270 ASARCO is liable to plaintiffs and a "debtor" pursuant to the Act. N. Y. DEBT. & CRED. § 270.

The heavy discounting of future insurance proceeds and the transfer of said proceeds at the direction of GRUPO MEXICO or its affiliates to ASARCO's general fund and the subsequent disbursement of those monies are "conveyances" of (the debtor's) property pursuant to the Act.

At the time the insurance proceeds were conveyed, ASARCO was insolvent or rendered insolvent as a result of the transfer and/or the integrated plan of liquidation.

As a result of the conveyance of the insurance proceeds and/or the integrated plan ASARCO lacked sufficient capital to continue its traditional business operations.

The transfer of the insurance proceeds occurred at a time when ASARCO, MEXICO and GRUPO MEXICO's affiliates knew or believed ASARCO would incur that would be unable to pay as they matured.

The transfer of the insurance proceeds was undertaken with the intent to hinder, defraud ASARCO's creditors.

Plaintiffs are entitled to judgment against ASARCO, GRUPO MEXICO and its declaring the conveyance of the insurance proceeds to be fraudulent as to the Debts pursuant to N. Y. DEBT. & CRED. §§ 273, 274, 275 & 276. Plaintiffs are entitled and legal relief thereto.

### PLAINTIFFS' SEVENTH CLAIM FOR RELIEF
*(Fraudulent Conveyance: Transfer to Insiders)*

Plaintiffs re-adopt and re-allege the allegations contained in ¶'s 1-103 and for their

Claim for Relief state as follows:

104. GRUPO MEXICO, AMC, GMMI, Mexicana de Cobre, S.A. de C.V., Minera Mexico, S.A. de C.V. and ASARCO are all interrelated companies, and "insiders" owned or controlled by GRUPO MEXICO.

105. As part of the alleged consideration for the transfer of ASARCO's interest in GRUPO MEXICO and its affiliates, ASARCO allegedly received debt forgiveness of inter-company debt from affiliates of GRUPO MEXICO including AMC and/or de Cobre S.A. de C.V.

106. The forgiveness of inter-company debt is a "conveyance" within the meaning of N.Y. Debt. & Cred. §270.

107. At the time of the debt forgiveness, ASARCO was either insolvent or rendered as a result of redemption/share repurchase of its stock and the conveyance of its assets and/or the execution of the integrated plan of liquidation.

108. The conveyance by an insolvent to an affiliate or insider in satisfaction of an debt lacks good faith and is constructively fraudulent.

109. Plaintiffs are entitled to judgment against ASARCO, GRUPO MEXICO and de COBRE S.A. C.V. declaring the conveyance of the SPCC stock in exchange for forgiveness to be fraudulent as to debts owed plaintiffs pursuant to N. Y. DEBT & CRED. § Plaintiffs are entitled to legal and equitable relief thereto.

## PLAINTIFFS' EIGHTH CLAIM FOR RELIEF
*(Professional Negligence and Misrepresentation: As to Defendant Ernst & Young)*

Plaintiffs re-adopt and re-allege the allegations contained in ¶'s 1-109 and for their Eighth Relief state as follows:

23

196

110. Defendants ERNST & YOUNG LLP and ERNST & YOUNG CORPORATE FINANCE LLC (collectively "Ernst & Young") were engaged to provide an opinion as to the 130,948,949 shares of Class A Common Stock of Southern Peru Copper Company being 54.18% of the voting shares of that publically traded corporation which were held by a wholly owned subsidiary of ASARCO. ("stock interest").

111. Ernst & Young expressed a professional valuation with full knowledge that its opinion would be relied upon by a limited class of third parties to which Ernst & Young owed a duty including the United States Justice Department, The Federal Courts of the United States and plaintiffs.

112. The valuation opinion of Ernst & Young provided the principal basis for the United States District Court for the District of Arizona to approve the sale of the stock interest to Grupo and/or its wholly owned subsidiary AMC to the detriment of plaintiffs.

113. Ernest & Young recklessly and knowingly and without the professional competence required of a Certified Public Accounting firm sold an opinion letter, which falsely stated that the fair value of ASARCO's controlling interest in SPCC was worth less than the book value of ASARCO's share of the underlying assets of the company.

114. Ernst & Young had a duty to plaintiffs to issue an opinion based on impartial and independent knowledge of the copper industry. Despite knowing that the purchaser of the stock interest was an insider with full information regarding the company, the company's prospects and the copper market, Ernst & Young breached its duty to plaintiffs by undervaluing the stock based on information provided by the purchaser, Grupo and/or entities controlled by Grupo.

115. Ernst & Young had a duty to plaintiffs to be competent to issue an opinion as to

24