30.    If an Annual Budget accepted by the Trustee designates EPA as the Performing Entity for Environmental Response work at a Site, the Trustee shall transfer the amount budgeted for that work from the Environmental Trust to a special account established by EPA for that Site within the Hazardous Substances Superfund without the need for the filing of a Claim. The Trustee shall make the transfer, in accordance with instructions provided by EPA, by the later of (a) ten days after the Trustee's acceptance of the Annual Budget designating EPA as the Performing Party, or (b) ten days after receipt of the payment under Note B being allocated in that Annual Budget. EPA may utilize the transferred funds only to pay for performance or oversight of the work specified for the relevant Site in the Annual Budget. Within 60 days after completion of that work, EPA shall submit a report to the Trustee documenting the work performed and the costs incurred for the work. EPA shall provide the same degree of documentation as required in Paragraph 28, and the process of reviewing, challenging and approving such submissions shall be the same as set forth in Paragraph 28. If the United States has expended less than the full amount transferred to it under this Paragraph for performance or oversight of the Environmental Response work specified in the Annual Budget, it shall return the excess proceeds to the Trust. If the Trustee, after review of EPA's report, determines that EPA expended less than the full amount transferred on performance or oversight of the work specified in the Annual Budget and has not returned the excess proceeds to the Trust, the Trustee shall so notify EPA and shall request repayment of the amount not expended on that work. EPA shall have thirty days either to challenge the Trustee's determination by petition to this Court or to pay the amount requested to the Trustee for redeposit into the Environmental Trust Account. If the Trustee's determination is upheld in whole or in part, EPA shall, within thirty days, pay the amount determined to be payable to the Trustee for redeposit into the Environmental Trust.

31.    Any Claim or portion thereof not paid solely because there was insufficient money in the Environmental Trust or because it exceeded the amount budgeted in the Annual Budget for any calendar year may be considered for inclusion in the Annual Budget for the following calendar year.

CONFIDENTIAL

GM_BURNS_010155

1    32.    Any portion of the Environmental Trust not expended in a given year shall be

2 available to pay Environmental Response Costs in the following calendar year.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22

CONFIDENTIAL

GM_BURNS_010156

# X. Covenants of the United States

## Temporary Deferral of Existing Environmental Obligations

33.    The United States agrees that the total annual Environmental Response Costs that the United States shall require ASARCO to incur or pay during calendar years 2003 through 2005 pursuant to any consent decree or administrative order, including but not limited to those listed in Paragraphs C, D, or E, over and above the Environmental Response Costs designated for funding by the Environmental Trust during those calendar years pursuant to Section VIII of this Consent Decree, shall not exceed the following limits:

Calendar Year 2003 - $2 million;

Calendar Year 2004 - $2.5 million; and

Calendar Year 2005 - $3 million.

Subject to the reservation of rights set forth in Section XII, the United States agrees

a.    not to seek judicial enforcement against ASARCO of any consent decree or administrative order, and

b.    not to seek judicial enforcement to recover costs of Environmental Response work incurred by the United States prior to February 1, 2003,

to the extent that such enforcement would require ASARCO to incur or pay Environmental Response Costs during calendar years 2003 through 2005 in excess of the limits prescribed in this Paragraph, provided that ASARCO remains in compliance with all obligations imposed under the terms and conditions of this Consent Decree and all agreements or schedules arising thereunder, and provided that the payments to be made under Note B as assured by the Guaranty are not in default. Costs incurred by ASARCO in connection with Environmental Response other than such Environmental Response as the United States directs ASARCO to perform shall not be included for purposes of calculating credit towards the annual limits prescribed in this Paragraph. In calculating Environmental Response Costs for purposes of the limits established in this Paragraph only, ASARCO may include internal costs that are incurred in lieu of costs that otherwise would have been expended for an outside contractor for performance of the same Environmental Response work. Such costs

23

may be included only if ASARCO and the United States agree in advance on the scope of the work by ASARCO employees to be included in such credit and the specific amount to be credited.

Other Covenants and Agreements

34.    Any payments actually made to the United States from the Environmental Trust for a particular Site shall be credited by the United States to the appropriate account for that Site. Environmental Response work performed at a Site that is funded by monies credited to the appropriate account for that Site under this Paragraph shall reduce the liability of ASARCO and any other potentially responsible parties at that Site in accordance with applicable law. The United States covenants and agrees not to seek reimbursement from ASARCO of any amounts credited to a Site account pursuant to this Paragraph.

35.    The United States covenants and agrees not to seek from ASARCO stipulated or statutory penalties based on any failure of ASARCO to comply fully with any requirement to perform Environmental Response work or any requirement under an existing CERCLA or RCRA consent decree or administrative order that requires ASARCO to provide financial assurance for Environmental Response work to be performed under that decree or order, where such noncompliance has occurred between December 1997 and the date of entry of this Consent Decree.

36.    The United States covenants and agrees not to seek from ASARCO stipulated or statutory penalties based on any failure of ASARCO to comply fully with any requirement under an existing CERCLA or RCRA consent decree or administrative order that requires ASARCO to provide financial assurance for Environmental Response work to be performed under that decree or order, where such noncompliance occurs during calendar years 2003, 2004 and 2005, provided that ASARCO remains in compliance with all obligations imposed under the terms and conditions of this Consent Decree and all agreements or schedules arising thereunder, and provided that the payments to be made under Note B as assured by the Guaranty are not in default. However, nothing in this Paragraph limits the rights of the United States to seek information about ASARCO's financial status.

24

CONFIDENTIAL                    GM_BURNS_010158

37.  Effective upon the occurrence of all events required to occur on or before the Closing Date, as set forth in Paragraph 6, and not before such time, the United States covenants not to sue and agrees not to pursue all of its Environmental Response Costs incurred prior to February 1, 2003, for: (a) the Circle Smelting Non-Time Critical Removal Site; (b) the Globe Plant Site; and (c) the Murray Smelter Consent Decree - Relevant Section. In addition, the United States covenants not to sue and agrees not to pursue $2 million of its response costs incurred prior to February 1, 2003, for the Commencement Bay Nearshore/Tideflats Superfund Site - Relevant Operable Units.

38.  Effective upon the occurrence of all events required to occur on or before the Closing Date, as set forth in Paragraph 6, and not before such time, the United States covenants not to sue and agrees not to pursue any legal challenge to the transfer of the Defendants' ownership interest in SPCC stock based on a claim that the transfer was not for sufficient value received or based on any other claim alleged in the Complaint. Furthermore, as provided in Paragraph 7, the Stipulation shall be deemed terminated upon the occurrence of all events required to occur on or before the Closing Date as set out in Paragraph 6, subject to the reopener provisions of Paragraph 46.

## XI.  COVENANTS OF ASARCO, SPHC, AMC AND GRUPO MEXICO

39.  ASARCO, SPHC, AMC, and Grupo Mexico agree not to assert any claims or causes of action against the United States, or its contractors or employees, in connection with the matters addressed by or work performed under this Consent Decree, including but not limited to:

a.  any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law, for Environmental Response Costs paid by the Environmental Trust or for costs subject to the United States' covenant not to sue set forth in Paragraph 37;

25

GM_BURNS_010159

b.    any claims arising out of the work performed under any Annual Budget for which a Claim is paid by the Environmental Trust; and

c.    any claims arising out of the United States' challenge to ASARCO/SPHC's transfer of its ownership interest in SPCC stock once such transfer is completed.

40.    ASARCO, SPHC, AMC, and Grupo Mexico agree not to assert any claim or defense against the United States in any subsequent administrative or judicial proceeding initiated by EPA, DOI or USDA, or by the United States on behalf of EPA, DOI or USDA, for injunctive relief, recovery of response costs, or other appropriate relief relating to matters within the scope of this Consent Decree, based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised in the subsequent proceeding were or should have been brought in this proceeding.

## XII. RESERVATION OF RIGHTS

41.    The United States reserves, and this Consent Decree is without prejudice to, all rights against ASARCO/SPHC with respect to all matters not expressly included within the covenants and agreements of the United States set forth in Section X, including but not limited to the right to file and enforce liens authorized under applicable environmental statutes and the right to pursue enforcement action against ASARCO, with respect to:

a.    liability of ASARCO under CERCLA, RCRA, the Clean Water Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., and any other environmental statute or the regulations promulgated thereunder;

b.    liability of ASARCO under any existing consent decrees or administrative orders, including but not limited to those listed in Paragraphs C, D, or E;

c.    liability for response actions and costs incurred or to be incurred by the United States;

d.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

26

CONFIDENTIAL                                          GM_BURNS_010160

e.    liability for unlawful transfers of corporate assets or other prohibited transactions regardless of whether such transactions are related to obligations within the scope of this Consent Decree, except as provided by Paragraph 38, and

f.    liability for failure of ASARCO to meet a requirement of this Consent Decree.

42.    Notwithstanding any other provision of this Consent Decree, the United States reserves all rights against ASARCO with respect to criminal liability.

## XIII. RELATIONSHIP TO EXISTING CONSENT DECREES AND ORDERS

43.    Nothing in this Consent Decree shall be deemed to modify any existing consent decree or administrative order.  If the Parties conclude that the schedule for work or payments set forth in an existing consent decree or administrative order should be modified because (a) the work and/or payments were due during the period covered by the United States' agreement in Paragraph 33 to forbear from enforcement of existing consent decrees and administrative orders and were covered by that agreement, and (b) the work was not required in the pertinent Annual Budget(s) under this Consent Decree, the Parties shall seek in good faith to modify the schedule set forth in the relevant consent decree or administrative order to take into account the period in which the United States agreed to forbear from enforcement.  Where the consent of other parties to the consent decree or administrative order is required to accomplish a modification, the Parties shall jointly seek to obtain such consent.  Nothing in this Paragraph affects any requirement for court approval or public notice and comment that may apply to a proposed modification to an existing consent decree or administrative order on consent.

## XIV. EFFECT OF NONCOMPLIANCE

44.    The transfer conditions set forth in Paragraph 6 are necessary and material components of the agreement embodied in this Consent Decree and are a condition precedent to all other covenants and agreements set forth in this Consent Decree.  Should the transfer of ASARCO/SPHC's ownership interest in SPCC stock fail to occur by June 1, 2003, such failure shall constitute a material breach of this Consent Decree.  In the event of such

27

material breach, (i) this Consent Decree shall become null and void in its entirety, including all agreements and covenants set forth in this Consent Decree, (ii) the Stipulation shall remain in full effect, and (iii) the United States may seek to avail itself of any other remedies available by law or equity. The June 1, 2003 deadline may be extended by the mutual written agreement of all signatories to this Consent Decree.

45.    Should ASARCO/SPHC transfer its ownership in SPCC stock in a manner that fails to conform fully and completely with all conditions identified in Paragraph 6, such failure shall constitute a material breach of this Consent Decree.  In the event of such material breach, (i) the covenants of the United States as set forth in Section X of this Consent Decree shall become null and void; (ii) the United States in its discretion may declare this Consent Decree null and void in its entirety by written notice to ASARCO/SPHC; (iii) the Stipulation shall remain in full effect; and (iv) the United States may seek to avail itself of any other remedies for such breach that are available by law or equity.

46.    Should the transfer of ASARCO/SPHC's ownership in SPCC stock be subsequently completely unwound, invalidated, or nullified pursuant to a judgment issued by a court of competent jurisdiction, (i) this Consent Decree shall become null and void in its entirety, including all agreements and covenants set forth in this Consent Decree, except that the covenants of ASARCO, SPHC, AMC and Grupo Mexico set forth in Paragraphs 39.b, 39.c, and 40 shall remain in valid and in full effect; (ii) the Stipulation shall be reopened and shall be in full effect; and (iii) the United States may seek to avail itself of any other remedies available by law or equity.

47.    Should the assignment of Note B and/or the Guaranty to the Environmental Trust be unwound, set aside or otherwise be rendered unavailable for use by the Environmental Trust in the manner set forth in Sections VII and VIII, the United States may declare any or all agreements and covenants set forth in Paragraphs 33 through 37 null and void.

48.    Except as provided below, upon ASARCO's failure or inability to successfully contract for or perform the Environmental Response work at any Site for which ASARCO

28

is designated a Performing Entity in any Annual Budget, the United States may upon written notice to ASARCO and the Trustee (i) withdraw its covenant set forth in Paragraph 33 of this Consent Decree with respect to such Site, (ii) terminate ASARCO' right to participate in the performance of Environmental Response work under the terms of Section VII at such Site, (iii) terminate ASARCO's right to seek payment of Claims under the terms of Section IX with respect to such Site, and (iv) assume the performance of any Environmental Response work assigned to ASARCO at such Site by any Annual Budget or amendment and the right to submit Claims for such work.  In the event that ASARCO's failure or inability to successfully contract for or perform the Environmental Response work at any Site for which ASARCO is designated a Performing Entity in any Annual Budget is caused by a Force Majeure, this Paragraph shall not apply to such nonperformance.

49.    The actions of the United States under this Section are subject to the right of ASARCO to seek review by this Court of any such action within fifteen days of service of any notification prescribed by this Section. In any such proceeding, ASARCO shall have the burden of establishing by clear and convincing evidence that such action is improper.

## XV. APPENDICES

50.    The following appendices are attached and incorporated into this Consent Decree:

Appendix A is Note A ($123 million promissory note issued by AMC to SPHC).

Appendix B is Note B ($100 million promissory note issued by AMC to SPHC).

Appendix C is the Agreement of Sale.

Appendix D is the Guaranty Agreement.

Appendix E is the irrevocable assignment by SPHC of Notes A and B and the Guaranty to ASARCO.

Appendix F is the Trust Agreement.

Appendix G is the Security Agreement between ASARCO and the United States.

Appendix H is the irrevocable assignment by ASARCO of Note B and the Guaranty to the Environmental Trust.

29

GM_BURNS_010163

Appendix I contains the documents supporting ASARCO's assertion that the transfer of its ownership interest in SPCC as structured in Paragraph 6 provides ASARCO and SPHC with reasonably equivalent value in return for the transfer of the SPCC shares.

## XVI. ADDITIONAL PROVISIONS

51.    Except as expressly stated herein, nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a signatory to this Consent Decree.

52.    This Consent Decree does not provide ASARCO with protection against contribution claims by third parties relating to Environmental Response at any Site.

53.    Notwithstanding anything to the contrary in this Consent Decree, nothing in this Consent Decree releases or nullifies ASARCO's liability to any non-federal governmental entity under police and regulatory statutes or regulations, or alters or nullifies any non-federal governmental entity's police and regulatory authority and discretion to require ASARCO's compliance with applicable law.

54.    Whenever, under the terms of this Consent Decree, written notice is required to be given, or a report or other document is required to be served or provided by one Party to another, it shall be directed to the individuals at the addresses specified below via U.S. mail or overnight mail, unless those individuals or their successors give notice of a change of address to the other parties in writing. All notices and submissions shall be considered effective upon receipt, unless otherwise provided.

As to the United States:

To the Department of Justice:

        For Overnight Mail:
        Environmental Enforcement Section
        Environment & Natural Resources Division
        U.S. Department of Justice
        1425 New York Ave. NW
        Washington, DC 20005
        Ref. DOJ File No. 90-11-3-128/5

        For Regular Mail:
        Environmental Enforcement Section
        Environment & Natural Resources Division
        U.S. Department of Justice

30

GM_BURNS_010164

P.O. Box 7611, Ben Franklin Station
Washington, DC 20044
Ref. DOJ File No. 90-11-3-128/5

To the Environmental Protection Agency:

For Overnight Mail:
Office of Site Remediation Enforcement
Regional Support Division
Environmental Protection Agency
Ariel Rios Building South, Room 4202
1200 Pennsylvania Avenue, N.W.
Washington , D.C. 20460

For Regular Mail
Office of Site Remediation Enforcement
Regional Support Division (MC 2272A)
Environmental Protection Agency
Ariel Rios Building South,
1200 Pennsylvania Avenue, N.W.
Washington , D.C. 20460

To the Department of the Interior:

Regional Solicitor
U.S. Department of the Interior
500 NE Multnomah, Suite 607
Portland, Oregon 97232

To the Department of Agriculture:

USDA Office of General Counsel
740 Simms St., Room 309
Golden, CO 80401

As to ASARCO:

DOUGLAS McALLISTER
ASARCO Incorporated
2575 E. Camelback Road
Suite 500
Phoenix, AZ 85016-4240
(602) 977-6507

An address for the Trustee shall be provided upon the establishment of the Trust and the identification of the Trustee.

55.    This Consent Decree may not be modified without the prior written consent of the Parties hereto or their successors in interest and the approval of the Court, except that Appendices F and G (including attachments) may be modified according to their terms and conditions without court approval.

31

02/03/03  MON 13:58 FAX 202 514 2583        ENRD                                    @002
02/03/2003 MON 10:33  FAX

56.     This Consent Decree may be delivered by courier, mail, or facsimile.  It may be executed in counterparts, each of which shall be deemed to be an original, and all of such counterparts taken together shall be deemed to constitute one and the same agreement.

57.     The undersigned representatives of a Party to this Consent Decree certify that they are fully authorized to enter into this Consent Decree and to execute and legally bind such Party to this Consent Decree.

58.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the parties with respect to the settlement embodied in the Consent Decree.   The parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Consent Decree.

59.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment in this action between and among the United States and the Defendants.

SO ORDERED:

FEBRUARY 2, 2003
Date

HON. ROBERT C. BROOMFIELD
Judge
United States District Court
District of Arizona

32

CONFIDENTIAL

GM_BURNS_010166

01/30/03  THU 14:04 FAX 202 514 2583        ENRD                                    ☒002
JAN.29.2003  3:39PM  US ATTORNEY·CIVIL

1   THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States v.*
2   *ASARCO, et al.*

3   FOR THE UNITED STATES:          U.S. Department of Justice
4                                   Environment and Natural Resources
                                    Division
5

6

7   *Kelly A. Johnson*
    KELLY A. JOHNSON
8   Principal Deputy Assistant Attorney General

9

10

11  JOHN C. CRUDEN
    Deputy Assistant Attorney General
12

13

14  DAVID L. DAIN
    STEVEN A. KELLER
15  KIM J. SABO
    Trial Attorneys
16  Environmental Enforcement Section
    Environment and Natural Resources
17              Division
    Ben Franklin Station
18  P.O. Box 7611
    Washington, D.C. 20044
19  (202) 514-3644

20  SUE KLEIN
    Assistant United States Attorney
21  40 N. Central Avenue, Suite 1200
    Phoenix, Arizona 85004
22  (602) 514-7740

23

24

25

26

27

28

                                    33

CONFIDENTIAL                                          GM_BURNS_010167

1   THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States v.*
    *ASARCO, et al.*

2

3                                          U.S. Environmental Protection Agency

4

5                                          JOHN PETER SUAREZ
                                           Assistant Administrator
6                                          Office of Enforcement and Compliance Assurance

7

8   Of Counsel:

9   CARA STEINER-RILEY
    U.S. Environmental Protection Agency

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                           34

CONFIDENTIAL                    GM_BURNS_010168

JAN-28-2003  15:03    FROM-                                    T-960   P.003/006   F-826

1  THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States v.*
   *ASARCO, et al.*

2

3  FOR ASARCO INCORPORATED:

4

5

6  _____

7

8

9  DOUGLAS E. McALLISTER
   Vice President, General Counsel & Secretary

10  ASARCO Incorporated

11  2575 E. Camelback Road
    Suite 500

12  Phoenix, AZ 85016-4240
    (602) 977-6507

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35

CONFIDENTIAL                    GM_BURNS_010169

1  THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States v.*
2  *ASARCO, et al.*

3  FOR SOUTHERN PERU HOLDINGS CORPORATION:

4

5

6  ERNESTO DURAN TRINIDAD
7  CORPORATE CONTROLLER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36

CONFIDENTIAL                          GM_BURNS_010170

JAN-28-2003  15:03    FROM-                                    T-960  P.005/006  F-826

THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States v. ASARCO, et al.*

FOR AMERICAS MINING CORPORATION:
Solely with respect to its obligations as defined in Paragraph 3

HECTOR GARCIA DE QUEVEDO
MANAGING DIRECTOR

37

CONFIDENTIAL

GM_BURNS_010171

JAN-28-2003  15:03    FROM-                                    T-960  P.006/006  F-826

1  THE UNDERSIGNED PARTIES enter into this Consent Decree in the matter of *United States v.*
   *ASARCO, et al.*
2
3  FOR GRUPO MEXICO S.A. de C.V.:
   Solely with respect to its obligations as defined in Paragraph 3
4
5
6  _____
7  DANIEL TELLECHEA
8  MANAGING DIRECTOR
9
10 _____
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                              38

CONFIDENTIAL                                    GM_BURNS_010172

Consent Decree Appendix A

## AMERICAS MINING CORPORATION

### PROMISSORY NOTE DUE OCTOBER 31, 2009

$123,250,000.00                                     [New York, New York]
                                                    [January __, 2003]

FOR VALUE RECEIVED, AMERICAS MINING CORPORATION, a Delaware corporation ("Maker"), unconditionally promises to pay to SOUTHERN PERU HOLDINGS CORPORATION, a Delaware corporation ("Payee"), and its successors and permitted assigns, in the manner and at the place hereinafter provided, the principal amount of One Hundred Twenty-Three Million, Two Hundred Fifty Thousand and No/100 U.S. Dollars ($123,250,000.00) in seven consecutive annual installments, consisting of $17,607,143.00 each, on October 31 of each year, commencing October 31, 2003 and ending October 31, 2009; *provided* that the last such installment shall be in the amount necessary to pay this Note in full.

Maker also promises to pay interest on the unpaid principal amount hereof from the date hereof, or from the most recent date to which interest has been paid, until paid in full at a rate per annum equal to 7%; *provided* that any principal amount not paid when due and, to the extent permitted by applicable law, any interest not paid when due, in each case whether at stated maturity, by acceleration or otherwise (both before as well as after judgment), shall bear interest payable upon demand at a rate that is 2% per annum in excess of the rate of interest otherwise payable under this Note. Interest on this Note shall be payable in arrears on each date on which an installment of principal is due and payable hereunder, upon any prepayment of this Note (to the extent accrued on the amount being prepaid) and at maturity. All computations of interest shall be made by Payee on the basis of a 365-day year, for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

1.  **Payments**. All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds, without set-off, counterclaim or deduction of any kind, at such place as Payee or its successors or permitted assigns may direct from time to time. Whenever any payment on this Note is stated to be due on a day that is not a Business Day (capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 7 below), such payment shall instead be made on the next Business Day, and such extension of time shall be included in the computation of interest payable on this Note.

2.  **Prepayments**. Maker shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part, without premium or penalty. Each prepayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid to the date of prepayment.

3.  **Reference Agreement**. Maker and Payee are parties to that certain Stock Purchase Agreement dated as of [January __, 2003] (the "Stock Purchase Agreement") with SPHC II Incorporated and ASARCO Incorporated ("Asarco"), pursuant to which Payee will sell

5310476v10

to Maker 43,348,949 shares of Class A Common Stock of Southern Peru Copper Corporation. In partial consideration for such sale, Maker has agreed to issue this Note to Payee. This Note is being delivered pursuant to the Stock Purchase Agreement.

4. **Representations and Warranties**. Maker hereby represents and warrants to Payee that:

(a) it is a duly organized and validly existing corporation in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority to own and operate its properties, to transact the business in which it is now engaged and to execute and deliver this Note;

(b) this Note constitutes the duly authorized, legally valid and binding obligation of Maker, enforceable against Maker in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(c) all consents and grants of approval required to have been granted by any Person in connection with the execution, delivery and performance of this Note have been granted, are in full force and effect, and are non-appealable;

(d) there is no pending or threatened action, suit, litigation, investigation, arbitration or other proceeding involving or affecting Maker or any of its properties or assets which could reasonably be expected to materially and adversely affect Maker's ability to execute, deliver and perform its obligations under this Note; and

(e) the execution, delivery and performance by Maker of this Note do not and will not (i) violate any law, governmental rule or regulation, court order, writ, injunction or agreement to which it is subject or by which its properties are bound or the charter documents or bylaws of Maker or (ii) result in the creation of any lien or other encumbrance with respect to the property of Maker.

5. **Events of Default**. The occurrence of any of the following events shall constitute an "**Event of Default**":

(a) failure of Maker to pay any principal, interest or other amount due under this Note within 30 days after the date when due, whether at stated maturity, by acceleration or otherwise; or

(b) entry of any order, judgment or decree against Maker decreeing the dissolution of Maker; or

(c) (i) entry by a court having jurisdiction in the premises of a decree or order for relief in respect of Maker in an involuntary case under Title 11 of the United States Code entitled "Bankruptcy" (as now and hereinafter in effect, or any successor thereto, the "Bankruptcy Code") or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed; or grant of any other similar relief under any applicable federal or state law; or (ii) commencement of an involuntary case against Maker under any

5310476 v 0

CONFIDENTIAL

GM_BURNS_010174

applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or entry of a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Maker or over all or a substantial part of its property; or the involuntary appointment of an interim receiver, trustee or other custodian of Maker for all or a substantial part of its property; or issuance of a warrant of attachment, execution or similar process against any substantial part of the property of Maker; and, in the case of any event described in this clause (ii), the continuance of such event for 60 days unless dismissed, bonded or discharged; or

(d) entry of an order for relief with respect to Maker or commencement by Maker of a voluntary case under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or consent by Maker to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law; or consent by Maker to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or assignment made by Maker for the benefit of creditors; or any inability or failure, or admission in writing of any inability or failure, by Maker to pay its debts as such debts become due; or any adoption by the Board of Directors of Maker (or any committee thereof) of any resolution or other authorization of action to approve any of the foregoing.

6.  **Remedies**. Upon the occurrence of any Event of Default specified in Section 5(b), 5(c) or 5(d) above, the principal amount of this Note together with accrued interest thereon shall become immediately due and payable, without presentment, demand, notice, protest or other requirements of any kind (all of which are hereby expressly waived by Maker). Upon the occurrence and during the continuance of any other Event of Default Payee may, by written notice to Maker, declare the principal amount of this Note together with accrued interest thereon to be due and payable, and the principal amount of this Note together with such interest shall thereupon immediately become due and payable without presentment, further demand or notice, protest or other requirements of any kind (all of which are hereby expressly waived by Maker).

7.  **Definitions**. The following terms used in this Note shall have the following meanings:

"**Business Day**" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of Arizona or the Federal District of Mexico or any other day on which banking institutions located in the State of Arizona or the Federal District of Mexico are authorized or required by law or other governmental action to close.

"**Event of Default**" means any of the events set forth in Section 5.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, bank, trust or other enterprise, whether or not a legal entity, or any government or political subdivision or any agency, department or instrumentality thereof.

8.  **Miscellaneous**.

5310476v10

(a) All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, telecopied or delivered as follows: if to Maker, at 2575 East Camelback Road, Suite 500, Phoenix, AZ 85016, Attention: Chief Legal Officer; and if to Payee, at Baja California 200, Colonia Roma Sur, 06760 Mexico City, Mexico, Attention: Chief Legal Officer; or in each case at such other address as shall be designated by Payee or Maker. All such notices and communications shall, when mailed, telecopied or sent by overnight courier, be effective when deposited in the mails, delivered to the overnight courier, or sent by telecopier.

(b) Maker promises to pay all costs and expenses, including reasonable attorneys' fees, incurred in connection with the collection, interpretation and/or enforcement of this Note.

(c) No failure or delay on the part of Payee or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Maker and Payee shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that Payee would otherwise have. No notice to or demand on Maker in any case shall entitle Maker to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Payee to any other or further action in any circumstances without notice or demand.

(d) Maker and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e) If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f) THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF MAKER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

(g) ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST MAKER ARISING OUT OF OR RELATING TO THIS NOTE MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS NOTE MAKER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND

5310476v10

CONFIDENTIAL

IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS NOTE.  Maker hereby agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to Maker at its address set forth below its signature hereto, such service being hereby acknowledged by Maker to be sufficient for personal jurisdiction in any action against Maker in any such court and to be otherwise effective and binding service in every respect.  Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of Payee to bring proceedings against Maker in the courts of any other jurisdiction.

(h) MAKER AND, BY THEIR ACCEPTANCE OF THIS NOTE, PAYEE AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.

(i) Neither Payee nor any permitted transferee of this Note may assign, pledge, transfer or convey this Note to any Person without the prior written consent of Maker, and any attempt to so assign, pledge, transfer or convey this Note shall be null and void; *provided* that Payee (a) may assign all (but not less than all) of its interest in this Note to Asarco and (b) may grant a security interest in this Note to the Coeur d'Alene Tribe of Idaho to secure the obligations of Asarco under that certain Settlement Agreement between the Coeur d'Alene Tribe, ASARCO Incorporated and Southern Peru Holdings Corporation, dated January __, 2003.

5310476v10

CONFIDENTIAL

**IN WITNESS WHEREOF,** Maker has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

AMERICAS MINING CORPORATION

By: _____
Title: _____

5310476v10

CONFIDENTIAL                                                    GM_BURNS_010178

Consent Decree Appendix B

AMERICAS MINING CORPORATION

PROMISSORY NOTE DUE MAY 31, 2010

$100,000,000.00                                      [New York, New York]
                                                     [January __, 2003]

      FOR VALUE RECEIVED, AMERICAS MINING CORPORATION, a Delaware corporation ("Maker"), unconditionally promises to pay to SOUTHERN PERU HOLDINGS CORPORATION, a Delaware corporation ("Payee"), and its successors and permitted assigns, in the manner and at the place hereinafter provided, the principal amount of One Hundred Million and No/100 U.S. Dollars ($100,000,000.00) in eight consecutive annual installments, consisting of $12,500,000 each, on May 31 of each year, commencing May 31, 2003 and ending May 31, 2010; *provided* that the last such installment shall be in the amount necessary to pay this Note in full.

      Maker also promises to pay interest on the unpaid principal amount hereof from the date hereof, or from the most recent date to which interest has been paid, until paid in full at a rate per annum equal to 7%; *provided* that any principal amount not paid when due and, to the extent permitted by applicable law, any interest not paid when due, in each case whether at stated maturity, by acceleration or otherwise (both before as well as after judgment), shall bear interest payable upon demand at a rate that is 2% per annum in excess of the rate of interest otherwise payable under this Note. Interest on this Note shall be payable in arrears on each date on which an installment of principal is due and payable hereunder, upon any prepayment of this Note (to the extent accrued on the amount being prepaid) and at maturity. All computations of interest shall be made by Payee on the basis of a 365-day year, for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

      1. **Payments**. All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds, without set-off, counterclaim or deduction of any kind, at such place as Payee or its successors or permitted assigns may direct from time to time. Whenever any payment on this Note is stated to be due on a day that is not a Business Day (capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 7 below), such payment shall instead be made on the next Business Day, and such extension of time shall be included in the computation of interest payable on this Note.

      2. **Prepayments**. Maker shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part, without premium or penalty. Each prepayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid to the date of prepayment.

      3. **Reference Agreements**. Maker and Payee are parties to that certain Stock Purchase Agreement dated as of [January __, 2003] (the "Stock Purchase Agreement") with SPHC II Incorporated and ASARCO Incorporated ("Asarco"), pursuant to which Payee will sell

5310476v10

                                      GM_BURNS_010179

to Maker 43,348,949 shares of Class A Common Stock of Southern Peru Copper Corporation. In partial consideration for such sale, Maker has agreed to issue this Note to Payee. This Note is being delivered pursuant to the Stock Purchase Agreement. This Note is guarantied as provided in the Guaranty.

4. **Representations and Warranties**. Maker hereby represents and warrants to Payee that:

(a) it is a duly organized and validly existing corporation in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority to own and operate its properties, to transact the business in which it is now engaged and to execute and deliver this Note;

(b) this Note constitutes the duly authorized, legally valid and binding obligation of Maker, enforceable against Maker in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(c) all consents and grants of approval required to have been granted by any Person in connection with the execution, delivery and performance of this Note have been granted, are in full force and effect, and are non-appealable;

(d) there is no pending or threatened action, suit, litigation, investigation, arbitration or other proceeding involving or affecting Maker or any of its properties or assets which could reasonably be expected to materially and adversely affect Maker's ability to execute, deliver and perform its obligations under this Note; and

(e) the execution, delivery and performance by Maker of this Note do not and will not (i) violate any law, governmental rule or regulation, court order, writ, injunction or agreement to which it is subject or by which its properties are bound or the charter documents or bylaws of Maker or (ii) result in the creation of any lien or other encumbrance with respect to the property of Maker.

5. **Events of Default**. The occurrence of any of the following events shall constitute an "**Event of Default**":

(a) failure of Maker to pay any principal, interest or other amount due under this Note within 30 days after the date when due, whether at stated maturity, by acceleration or otherwise; or

(b) entry of any order, judgment or decree against Maker decreeing the dissolution of Maker; or

(c) (i) entry by a court having jurisdiction in the premises of a decree or order for relief in respect of Maker in an involuntary case under Title 11 of the United States Code entitled "Bankruptcy" (as now and hereinafter in effect, or any successor thereto, the "Bankruptcy Code") or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed; or grant of any other similar relief under any applicable

5310476v:0

federal or state law; or (ii) commencement of an involuntary case against Maker under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or entry of a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Maker or over all or a substantial part of its property; or the involuntary appointment of an interim receiver, trustee or other custodian of Maker for all or a substantial part of its property; or issuance of a warrant of attachment, execution or similar process against any substantial part of the property of Maker; and, in the case of any event described in this clause (ii), the continuance of such event for 60 days unless dismissed, bonded or discharged; or

(d) entry of an order for relief with respect to Maker or commencement by Maker of a voluntary case under the Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or consent by Maker to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law; or consent by Maker to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or assignment made by Maker for the benefit of creditors; or any inability or failure, or admission in writing of any inability or failure, by Maker to pay its debts as such debts become due; or any adoption by the Board of Directors of Maker (or any committee thereof) of any resolution or other authorization of action to approve any of the foregoing; or

(e) any event that causes the Guaranty to cease to be in full force or effect; or any declaration that the Guaranty is null or void or otherwise unenforceable in whole or in part; or any denial or disaffirmation by Guarantor of Guarantor's obligations under the Guaranty.

6. **Remedies**. Upon the occurrence of any Event of Default specified in Section 5(b), 5(c), 5(d) or 5(e) above, the principal amount of this Note together with accrued interest thereon shall become immediately due and payable, without presentment, demand, notice, protest or other requirements of any kind (all of which are hereby expressly waived by Maker). Upon the occurrence and during the continuance of any other Event of Default Payee may, by written notice to Maker, declare the principal amount of this Note together with accrued interest thereon to be due and payable, and the principal amount of this Note together with such interest shall thereupon immediately become due and payable without presentment, further demand or notice, protest or other requirements of any kind (all of which are hereby expressly waived by Maker).

7. **Definitions**. The following terms used in this Note shall have the following meanings:

"**Business Day**" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of Arizona or the Federal District of Mexico or any other day on which banking institutions located in the State of Arizona or the Federal District of Mexico are authorized or required by law or other governmental action to close.

"**Consent Decree**" means the Consent Decree, lodged on January [ ], 2003, with the United States District Court for the District of Arizona in the action styled *United States v. ASARCO, et al.*, No. CV-02-2079-PHX-RCB.

5310476v10

GM_BURNS_010181

"**Environmental Trust**" has the meaning assigned to that term in the Consent Decree.

"**Event of Default**" means any of the events set forth in Section 5.

"**Guarantor**" means Grupo México, S.A. de C.V., a *sociedad anónima de capital variable* organized under the laws of Mexico.

"**Guaranty**" means the Guaranty dated as of [January __, 2003] by Guarantor in favor of Payee, as the same may be amended, supplemented or otherwise modified from time to time.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, bank, trust or other enterprise, whether or not a legal entity, or any government or political subdivision or any agency, department or instrumentality thereof.

8.  **Miscellaneous**.

(a)  All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, telecopied or delivered as follows: if to Maker, at 2575 East Camelback Road, Suite 500, Phoenix, AZ 85016, Attention: Chief Legal Officer; and if to Payee, at Baja California 200, Colonia Roma Sur, 06760 Mexico City, Mexico, Attention: Chief Legal Officer; or in each case at such other address as shall be designated by Payee or Maker or their successors and permitted assigns. All such notices and communications shall, when mailed, telecopied or sent by overnight courier, be effective when deposited in the mails, delivered to the overnight courier, or sent by telecopier.

(b)  Maker promises to pay all costs and expenses, including reasonable attorneys' fees, incurred in connection with the collection, interpretation and/or enforcement of this Note.

(c)  No failure or delay on the part of Payee or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Maker and Payee shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that Payee would otherwise have. No notice to or demand on Maker in any case shall entitle Maker to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Payee to any other or further action in any circumstances without notice or demand.

(d)  Maker and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)  If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining

5310476v10

CONFIDENTIAL    GM_BURNS_010182

provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)  THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF MAKER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

(g)  ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST MAKER ARISING OUT OF OR RELATING TO THIS NOTE MAY BE BROUGHT (I) IN THE ACTION STYLED UNITED STATES V. ASARCO, INC. AND SOUTHERN PERU HOLDINGS CORPORATION, NO. CIV-02-2079-PHX-RCB IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF ARIZONA OR (II) IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS NOTE MAKER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS NOTE.  Maker hereby agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to Maker at its address set forth below its signature hereto, such service being hereby acknowledged by Maker to be sufficient for personal jurisdiction in any action against Maker in any such court and to be otherwise effective and binding service in every respect.  Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of Payee to bring proceedings against Maker in the courts of any other jurisdiction.

(h)  MAKER AND, BY THEIR ACCEPTANCE OF THIS NOTE, PAYEE AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.

(i)  Neither Payee nor any permitted transferee of this Note may assign, pledge, transfer or convey this Note to any Person without the prior written consent of Maker, and any attempt to so assign, pledge, transfer or convey this Note shall be null and void; *provided* that (x) Payee may assign all (but not less than all) of its interest in this Note to Asarco and (y) upon such assignment, Asarco may (A) grant a security interest in this Note in favor of the United States and (B) assign all (but not less than all) of its interest in this Note, subject to the security interest referred to in the immediately preceding clause (A), to the trustee of the Environmental Trust.

53:0476v10

CONFIDENTIAL                                          GM_BURNS_010183

**IN WITNESS WHEREOF,** Maker has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

AMERICAS MINING CORPORATION

By: _____

Title: _____

5310476v10

CONFIDENTIAL

GM_BURNS_010184

*Consent Decree Appendix C*

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**") is entered into as of January [ ], 2003 among Americas Mining Corporation, a Delaware corporation (the "**Purchaser**"), SPHC II Incorporated ("**SPHC II**"), a Delaware corporation wholly-owned by the Purchaser, Southern Peru Holdings Corporation, a Delaware corporation (the "**Seller**"), and ASARCO Incorporated, a New Jersey corporation (the "**Parent**").

WHEREAS, the Seller desires to sell, and the Parent desires the Seller to sell, to the Purchaser 43,348,949 shares of Class A Common Stock, par value $0.01 per share (the "**Shares**"), of Southern Peru Copper Corporation, a Delaware corporation ("**SPCC**"); and

WHEREAS, the Purchaser desires to purchase the Shares, upon the terms and conditions herein specified;

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual promises herein contained, the parties hereby agree as follows:

1.      Purchase and Sale of the Shares.

(a)    Subject to the terms and conditions of this Agreement, at the Closing (as defined below), the Seller shall, and the Parent shall cause the Seller to, sell, convey, assign, transfer and deliver to the Purchaser the Shares, free and clear of all Encumbrances (as defined below), and

(b)    Subject to the terms and conditions of this Agreement, in consideration of the aforesaid sale, conveyance, assignment, transfer and delivery to the Purchaser of the Shares, the Purchaser shall make payment in the amount of $765.0 million for the Shares as follows:

(i)    $500 million in cash, subject to Section 1(c);

(ii)    a promissory note of the Purchaser in the principal amount of $123.25 million, which shall be paid in seven equal principal installments of $17,607,143.00, payable on each October 31 beginning October 31, 2003, plus accumulated interest at the rate of 7% per annum, substantially in the form attached hereto as Appendix A ("**Note A**");

(iii)    a promissory note of the Purchaser in the principal amount of $100 million, which shall be paid in eight equal principal installments of $12.5 million, payable on each May 31 beginning May 31, 2003, plus accumulated interest at the rate of 7% per annum, substantially in the form attached hereto as Appendix B ("**Note B**"), the performance of such note by the Purchaser to be guaranteed by Grupo México,

5297019v16

GM_BURNS_010185

S.A. de C.V., a Mexican corporation ("**Grupo Mexico**"); and

(iv)     the cancellation, at the direction and request of the Seller, by the Purchaser and/or its subsidiaries of the $41.75 million principal amount of debt owed to them by the Parent and/or the Seller and any amount owed to the Purchaser by the Parent pursuant to Section 1(c) (collectively, the "**Intercompany Debt**").

(c)     Anything contained herein to the contrary notwithstanding, in the event that the Amended Stipulation among the United States, the Seller and the Parent lodged with the Court (as defined below) on October 11, 2002, and entered on the docket October 16, 2002, and all prior stipulations among the United States, the Seller and the Parent in this matter (the "**Stipulation**") is not terminated on or before January 31, 2003, the Purchaser may loan the Parent $50 million (the "**Bridge Loan**") solely for the purpose of satisfying, in part, the payment due to the holders of Parent bonds that mature on February 3, 2003. If such loan is made, (i) the amount of cash payment referred to in Section 1(b)(i) and payable as provided in Section 2(c)(i) shall be reduced to $450 million and (ii) such Bridge Loan shall be added to the Intercompany Debt that is cancelled as provided in Section 1(b)(iv) of this Agreement.

2.     The Closing.

(a)     The sale and transfer of the Shares by the Seller to the Purchaser shall take place at a closing (the "**Closing**") to be held at the offices of Sidley Austin Brown & Wood LLP, 787 Seventh Avenue, New York, New York 10019 one Business Day (as defined below) following the satisfaction and/or waiver of all conditions to close set forth in Section 6 of this Agreement, or such other date as may be mutually agreed upon by the Purchaser and the Seller (the "**Closing Date**"). All such documents and funds to be delivered at the Closing shall be deemed delivered simultaneously, and upon such delivery the sale of the Shares shall be final and irrevocable. As used herein, the term "**Business Day**" shall mean a day other than Saturday, Sunday or any other day on which commercial banks in New York, New York are authorized or required by law to close.

(b)     At the Closing, the Seller shall, and the Parent shall cause the Seller to, deliver to the Purchaser

(i)     a certificate or certificates representing the Shares, each such certificate to be duly and validly endorsed in favor of the Purchaser (or in blank, sufficient to enable the Purchaser to register the Shares in the name of the Purchaser or its designee) or accompanied by a separate stock power duly and validly executed by such Shareholder and otherwise sufficient to vest in Purchaser or its designee good and marketable title to such Shares

2

5297019v16

CONFIDENTIAL

GM_BURNS_010186

    (ii)    a copy of the Consent Decree lodged with the United States District Court for the District of Arizona (the "**Court**") on January ___, 2003 (the "**Consent Decree**"), attached hereto as Appendix C; and

    (iii)    such other documents as are required to be delivered by the Seller to the Purchaser at or prior to the Closing in connection with the transactions contemplated hereby.

(c)    At the Closing, the Purchaser shall deliver to the Seller

    (i)    $500 million, subject to Section 1(c), in immediately available funds by wire transfer to an account designated by the Seller in writing no later than three business days prior to the Closing Date;

    (ii)    Note A and Note B duly and validly executed by the Purchaser;

    (iii)    a guaranty agreement substantially in the form attached hereto as Appendix D (the "**Guaranty**") guaranteeing the Purchaser's performance under Note B, duly and validly executed by Grupo Mexico;

    (iv)    such document or documents as may be necessary to evidence the cancellation by the Purchaser and/or its subsidiaries of all of the Intercompany Debt, substantially in the form attached hereto as Appendix E (the "**Cancellation Documentation**"); and

    (v)    an Assignment and Assumption Agreement substantially in the form attached hereto as Appendix F (the "**Assignment and Assumption Agreement**"), duly and validly executed by the Purchaser assuming all of the Seller's rights and obligations under the Agreement Among Certain Stockholders of SPCC, dated as of January 2, 1996, as amended on June 11, 2001 and as may be amended from time to time thereafter (the "**Stockholders' Agreement**").

(d)    Upon the Closing, the Seller shall, and the Parent shall cause the Seller to:

    (i)    pay a dividend comprised of the cash received from the Purchaser pursuant to Section 2(c)(i) to the Parent immediately upon receipt thereof, and the Parent immediately thereupon shall use $450 million of such cash to pay or repay the outstanding indebtedness under the $450,000,000 Revolving Credit Agreement dated as of

3

5297019v16

CONFIDENTIAL

GM_BURNS_010187

December 21, 1999, as amended and extended, among the Parent, as Borrower; Grupo Mexico, as Guarantor; the Lenders party thereto and The Chase Manhattan Bank, as Administrative Agent; and

(ii)    irrevocably assign to the Parent any and all interest it has in Note B and the Guaranty pursuant to an Irrevocable Assignment and Acknowledgement of Assignment by and among the Parent, the Seller and the Purchaser (the "**Parent Assignment**"), substantially in the form attached hereto as Appendix G.

(e)    Effective upon Closing, the Parent shall irrevocably assign any and all interest it has in Note B and the Guaranty, pursuant to an Irrevocable Assignment and Acknowledgement of Assignment by and among the Parent, the Environmental Trust (as hereinafter defined), the Purchaser and Grupo Mexico (the "**Environmental Trust Assignment**"), substantially in the form attached hereto as Appendix H, to the ASARCO Trust (the "**Environmental Trust**") to be created pursuant to the Consent Decree and the Trust Agreement to be dated on or about the date the Consent Decree is entered by the Court.

(f)    Effective upon Closing, after the execution of the Parent Assignment and prior to the execution of the Environmental Trust Assignment, the Parent shall execute a Security Agreement (the "**Security Agreement**"), substantially in the form attached hereto as Appendix I, in favor of the United States, which provides the United States a security interest in Note B and the Guaranty to secure the reimbursement of Environmental Response Costs (as defined in the Consent Decree) at any or all of the Sites (as defined in the Consent Decree) and the costs of administration of the Environmental Trust.

(g)    Immediately upon receipt of the Shares, the Purchaser shall transfer the Shares to SPHC II, as a capital contribution, and SPHC II shall execute an Assignment and Assumption Agreement in form and substance substantially similar to the Assignment and Assumption Agreement.

3.    <u>Rights as a Holder of Shares</u>.  Except as otherwise provided herein, the Purchaser and, upon transfer, SPHC II shall exercise all rights and privileges and be subject to the restrictions of a holder of Shares as governed by the charter and by-laws of SPCC in effect from time to time (the "**Organizational Documents**") and the Stockholders' Agreement.

4.    <u>Representations and Warranties of the Parent and the Seller</u>.  The Parent and the Seller, jointly and severally, represent and warrant to the Purchaser as follows:

(a)    Except as set forth in Schedule 4(a) attached hereto, the Seller (i) is the sole record and beneficial owner of the Shares and does not own any other shares of Class A Common Stock or other securities issued by SPCC or any of its subsidiaries which are not listed on Schedule 4(a); and (ii) has good and marketable title to the Shares and the certificates representing the Shares, free and clear of any liens, charges, security interests, options, claims, mortgages, pledges, proxies, voting trusts or agreement, obligations, understandings or

5297019v16

CONFIDENTIAL

GM_BURNS_010188

arrangements or other restrictions on title or transfer of any nature (**"Encumbrances"**) whatsoever (other than under the Stockholders' Agreement).

(b)    The stock certificates, stock powers, endorsement, assignments and other instruments to be executed and delivered by the Seller to the Purchaser at the Closing will be valid and binding obligations of the Seller, enforceable in accordance with their respective terms, and will effectively vest in the Purchaser good, valid and marketable title to all the Shares and appurtenant rights to be transferred to the Purchaser pursuant to and as contemplated by this Agreement free and clear of all Encumbrances. Upon the sale to the Purchaser, the Shares will not be subject to any agreement, arrangement or understanding with respect to the voting, dividend rights or disposition of the Shares (other than this Agreement, the Organizational Documents and the Stockholders' Agreement).

(c)    The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

(d)    The Parent is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey.

(e)    Each of the Parent and the Seller has full corporate power and authority to execute and deliver this Agreement, and to consummate the transactions contemplated hereby. All corporate acts and other proceedings required to be taken by each of the Parent and the Seller to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken.

(f)    This Agreement has been duly executed and delivered by each of the Parent and the Seller and constitutes a legal, valid and binding obligation of each of the Parent and the Seller enforceable against each of the Parent and the Seller in accordance with its terms. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not (i) conflict with or result in any breach of any provision of the certificate of incorporation, the by-laws or similar organizational documents of the Parent, the Seller or any of their Significant Subsidiaries (as defined under Rule 1-02(w) of Regulation S-X of the Securities Act of 1933, as amended (the **"Securities Act"**); (ii) require any filing with, or permit, authorization, consent or approval of, any Governmental Authority (as defined below) or other Person (as defined below) (including consents from parties to loans, contracts, leases and other agreements to which the Parent, the Seller or any of their Significant Subsidiaries is a party); (iii) require any consent, approval or nature under, or result in a violation or breach of, or constitute (with or without due notice or the passage to time or both) a default (or give rise to any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any material agreement applicable to the Parent, the Seller or any of their Significant Subsidiaries; or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the Parent or the Seller or any of their properties or assets conflict with or result in any violation of or default under any material contract to which either the Parent, the Seller or any of their Significant Subsidiaries is a party. As used herein, the term **"Governmental Authority"** shall mean any nation, or government, or any state, regional, local or other political subdivision thereof. As used herein, the term **"Person"** shall mean an

5297019v16

CONFIDENTIAL

GM_BURNS_010189

individual, partnership, corporation, limited liability company, business trust, joint stock company, estate, trust, unincorporated association, joint venture, Governmental Authority or other entity, of whatever nature

(g)    The sale and transfer of the Shares contemplated hereby is necessary to eliminate the outstanding secured debt of the Parent that had originally been due and payable on November 10, 2002.

(h)    Upon the consummation of the transactions contemplated hereby, the Parent fully intends to continue its operations at least over the next 12 months following the transfer of the Shares.

(i)    The Parent fully intends to fulfill its environmental obligations to the United States, States, tribes and pursuant to all private party civil litigation settlements to the fullest extent of its capabilities.

(j)    The sale and transfer of the Shares contemplated by this Agreement provides reasonably equivalent value for the Shares. The Parent and the Seller have received an opinion, including the Valuation Report attached thereto relating to the valuation of the Shares, of Ernst & Young to that effect (the "**E&Y Opinion**"), a copy of which is attached hereto as Appendix J.

5.    <u>Representations and Warranties of the Purchaser</u>.    The Purchaser represents and warrants to the Seller as follows:

(a)    The Purchaser and, upon transfer, SPHC II is acquiring the Shares for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof in violation of the Securities Act.

(b)    The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

(c)    The Purchaser has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. All corporate acts and other proceedings required to be taken by the Purchaser to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken.

(d)    This Agreement has been duly executed and delivered by the Purchaser and constitutes a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not conflict with or result in any violation of or default under the Purchaser's organizational documents, or require any consent, approval or authorization of any Governmental Authority, which would prevent the consummation of the transactions contemplated hereby.

6

5297019v16

CONFIDENTIAL                                                    GM_BURNS_010190

6.    Conditions Precedent to Closing.

(a)    The obligation of the Purchaser to consummate the Closing is subject to the satisfaction or waiver by the Purchaser, on or prior to the Closing Date, of each of the following conditions:

(i)    The Seller shall have delivered the stock certificates and stock power referred to in Section 1(c).

(ii)    The Purchaser shall have secured funding on terms reasonably acceptable to the Purchaser to enable the Purchaser to fulfill its obligations hereunder.

(iii)    The Parent and the Seller shall have duly executed and delivered the Assignment and Assumption Agreement.

(iv)    The Parent and the Seller shall have duly executed and delivered the Parent Assignment.

(v)    The Parent shall have duly executed and delivered the Security Agreement.

(vi)    The Parent and the Seller shall have duly executed and delivered the Environmental Trust Assignment.

(vii)    The Consent Decree shall (i) have been entered by the Court in form and substance as provided in Appendix C or as otherwise approved by the Purchaser in its sole discretion and (ii) be in full force and effect and, in the sole discretion of the Purchaser, shall not have been stayed, modified, reversed or amended in any material manner subsequent to entry.

(viii)    The Purchaser shall have received the E&Y Opinion, including the Valuation Report attached thereto. The Purchaser shall have received a bring down of such E&Y Opinion and Valuation Report, which shall be dated as of a date on or reasonably prior to the Closing Date, at the sole discretion of the Purchaser.

(ix)    No action or proceeding shall be pending or threatened challenging or seeking to (x) restrain or prohibit the purchase and sale of the Shares, the terms of the Final Consent Decree or any of the other transactions contemplated hereby or thereby or (y) impose material limitations on the ability of the Purchaser effectively to exercise full rights of ownership of the Shares, including the right to vote the Shares, or there shall be any statute, rule, regulation, judgment, order or injunction enacted, entered, enforced, promulgated or deemed applicable to the transactions contemplated by the Agreement, or any other action shall be taken by any Governmental Authority that is reasonably likely to result, directly or indirectly, in any of the foregoing consequences.

5297019v16

CONFIDENTIAL

GM_BURNS_010191

(x)    All material consents of any Person necessary to the consummation of the Closing and the other transactions contemplated, including consents from parties to loans, contracts, leases or other agreements and consents from governmental agencies, whether federal, state or local shall have been obtained, and a copy of each such consent shall have been provided to the Purchaser at or prior to the Closing.

(xi)    All of the representations and warranties of the Parent and the Seller set forth in this Agreement that are qualified as to materiality shall be true and complete and any such representations and warranties that are not so qualified shall be true and complete in all material respects, in each case as of the date of this Agreement and as of the Closing Date.

(xii)    Neither the Parent nor the Seller shall have failed to perform in any material respect any material obligation or to comply in any material respect with any agreement or covenant of the Company to be performed or complied with by it under this Agreement.

The foregoing conditions are for the sole benefit of the Purchaser, may be waived by the Purchaser, in whole or in part, at any time and from time to time in the sole discretion of the Purchaser. The failure by the Purchaser at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

(b)    The obligation of the Seller to consummate the Closing is subject to the satisfaction or waiver by the Seller, at or prior to the Closing, of each of the following conditions:

(i)    The Purchaser shall have delivered $500 million in cash to the Seller, subject to Section 1(c), and shall have duly executed and delivered the Cancellation Documentation.

(ii)    The Purchaser shall have duly executed and delivered to the Seller Note A and Note B and Grupo Mexico shall have duly executed and delivered the Guaranty.

(iii)    The Purchaser shall have duly executed and delivered the Assignment and Assumption Agreement.

(iv)    The Consent Decree shall (i) have been entered by the Court in form and substance as provided in Appendix C or as otherwise approved by the Seller in its sole distretion and (ii) be in full force and effect and, in the sole discretion of the Seller, shall not have been stayed, modified, reversed or amended in any material manner subsequent to entry.

(v)    No action or proceeding shall be pending or threatened challenging or seeking to restrain or prohibit the purchase and sale of the Shares,

8

5297019v16

CONFIDENTIAL

GM_BURNS_010192

the terms of the Final Consent Decree or any of the other transactions contemplated hereby.

The foregoing conditions are for the sole benefit of the Seller, may be waived by the Seller, in whole or in part, at any time and from time to time in the sole discretion of the Seller. The failure by the Seller at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

7.    Covenants.

(a)    Payment of SPCC Dividend. If the Closing Date shall occur prior to receipt by the Parent of the dividend share based on its ownership of the Shares arising from SPCC operations during the Fourth Quarter of 2002 (the "**Fourth Quarter Dividend**"), then the Purchaser shall pay to the Parent any such Fourth Quarter Dividend that may be received with respect to the Shares.

(b)    Restrictions on Transfer; Legends. All certificates representing the Shares and, until such time as the Shares are sold in an offering which is registered under the Securities Act or SPCC shall have received an opinion of counsel satisfactory in form and content to SPCC that such registration is not required in connection with a resale (or subsequent resale) of the Shares, all certificates issued in transfer thereof or substitution therefor, shall, where applicable, have endorsed thereon the following (or substantially equivalent) legends:

(i)    "The securities represented by this certificate have not been registered under the Securities Act of 1933. The shares of Class A Common Stock represented by this certificate are subject to provisions contained in the Agreement Among Certain Stockholders of Southern Peru Copper Corporation dated as of January 2, 1996, as amended by a First Amendment thereto dated June 11, 2001, copies of which are on file in the office of the Secretary of Southern Peru Copper Corporation."

(ii)    Any legend required to be placed thereon by any applicable state securities law.

(iii)    The legend required by the Stockholders' Agreement that such Shares are subject to the Stockholders' Agreement.

(c)    Confidentiality. Except as otherwise provided herein, the Parent and the Seller shall, and the Parent shall cause the Seller and the consultants, advisors and representatives of itself and the Seller to treat after the date hereof as strictly confidential (unless compelled or threatened to be compelled to disclose by judicial or administrative process in writing, in which case the Parent and the Seller shall provide the Purchaser with copies of such written notice immediately upon receipt of such notice and shall allow the Purchaser reasonable opportunity to review such notice) all nonpublic, confidential or proprietary information concerning the Purchaser, SPCC or their respective affiliates, and the Parent and the Seller shall

9

CONFIDENTIAL

GM_BURNS_010193

not, and the Parent shall cause the Seller and the consultants, advisors and representatives of itself and the Seller not to, after the date hereof, use such information to the detriment of the Purchaser, SPCC or their respective affiliates.

(d)    <u>Subsequent Actions</u>.  If at any time after the Closing the Purchaser shall consider or be advised that any deeds, bills of sale, instruments of conveyance, assignments, assurances or any other actions or things are necessary or desirable (i) to vest, perfect or confirm ownership (of record or otherwise) in the Purchaser, its right, title or interest in, to or under any or all of the Shares, (ii) to vest, perfect or confirm ownership (of record or otherwise) in SPCC any of its rights properties or assets or (iii) otherwise to carry out this Agreement, the Parent and the Seller shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments and assurances and take and do all such other actions and things as may be requested by the Purchaser in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Purchaser or SPCC or otherwise to carry out this Agreement.

(e)    <u>Conduct</u>.  The Parent and the Seller agree that, from the date hereof until the Closing Date they shall not, and the Parent shall not permit the Seller or any of its other subsidiaries to, take any action that would impair materially its or their ability to consummate the transactions contemplated by this Agreement on a timely basis.

(f)    <u>Notices of Certain Events</u>.  The Parent and the Seller shall, and the Parent shall cause the Seller to, promptly notify the Purchaser of:

(i)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(ii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iii)    any actions, suits, claims, investigations or proceedings commenced or, to the knowledge of the Parent or the Seller, threatened against, relating to or involving or otherwise affecting the Parent, the Seller or any of its other subsidiaries that relate to the consummation of the transactions contemplated by this Agreement.

(g)    <u>Reasonable Best Efforts</u>.  Subject to the terms and conditions of this Agreement, the parties hereto shall, and the Parent will cause the Seller to, use its and their reasonable best efforts or take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate the transactions contemplated by this Agreement as promptly as practicable.  In furtherance and not in limitation of the foregoing, each of the parties hereto agrees to make all filings with all Governmental Authorities required to be made in connection with the transactions contemplated

5297019v16

CONFIDENTIAL

GM_BURNS_010194

hereby as promptly as practicable and to supply as promptly as practicable any additional information and documentary material that may be requested in connection therewith.

(h)    Certain Filings.    The parties hereto shall cooperate with one another (i) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement; and (ii) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

(i)    Public Announcements.    The parties hereto shall consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except as may be required by applicable law or any listing agreement with any applicable securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

8.    Termination    This Agreement may be terminated, and the transactions contemplated hereby abandoned, at any time prior to the Closing Date:

(a)    By the mutual written consent of the Purchaser and the Seller.

(b)    By the Purchaser if any Governmental Authority shall have issued an order, decree or ruling or taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable efforts to lift), which restrains, enjoins or otherwise prohibits the acquisition by the Purchaser of all the Shares.

(c)    By the Purchaser if the Closing has not been consummated on or before 30 days after entry of the Final Consent Decree.

9.    General Provisions.

(a)    No Assignments.    Except for a transfer by the Purchaser to a wholly owned subsidiary, none of the parties hereto shall transfer, assign or encumber any of its rights, privileges, duties or obligations under this Agreement without the prior written consent of each other party, and any attempt to so transfer, assign or encumber shall be void.

(b)    Notices.    All notices and other communications which are required or permitted to be given pursuant to the terms of this Agreement shall be in writing and shall be sufficiently given (i) if personally delivered, (ii) if sent by telex or facsimile, provided that a transmission confirmation is received by the sender (with a confirming copy sent by a leading international express courier), or (iii) upon receipt, if sent by registered or certified mail, postage paid return receipt requested, in any case addressed as follows:

11

52970191v16

CONFIDENTIAL

GM_BURNS_010195

If to the Purchaser, to:

Americas Mining Corporation
2575 East Camelback Road
Suite 500
Phoenix, Arizona 85016
Attention: Chief Legal Officer

If to SPHC II, to:

SPHC II Incorporated
Baja California 200
Colonia Roma Sur
06760 Mexico City, Mexico
Attention: Chief Legal Officer

If to the Seller, to:

Southern Peru Holdings Corporation
Baja California 200
Colonia Roma Sur
06760 Mexico City, Mexico
Attention: Chief Legal Officer

If to the Parent, to:

ASARCO Incorporated
2575 East Camelback Road
Suite 500
Phoenix, Arizona 85016
Attention: Chief Legal Officer

The address of a party, for the purposes of this Section 9(b), may be changed by giving written notice to the other parties of such change in the manner provided herein for giving notice. Unless and until such written notice is received, the addresses as provided herein shall be deemed to continue in effect for all purposes hereunder.

(c)    Choice of Law.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of New York.

(d)    Jurisdiction    The parties to this Agreement agree that any suit, action or proceeding arising out of, or with respect to, this Agreement or any judgment entered by any court in respect thereof may be brought (i) in the action styled United States v. ASARCO, Inc. and Southern Peru Holdings Corporation, No. CIV-02-2079-PHX-RCB in the Court or (ii) in the courts of the State of New York in New York County or in the U.S. District Court for the

12

CONFIDENTIAL    GM_BURNS_010196

Southern District of New York, and the parties hereto hereby irrevocably accept the non-exclusive personal jurisdiction of the Court or those courts for the purpose of any suit, action or proceeding. In addition, the parties hereto each hereby irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any judgment entered by any court in respect thereof brought in the Court or in any court of the State of New York in New York County or in the U.S. District Court for the Southern District of New York, and each hereby further irrevocably waives any claim that any suit, action or proceedings brought in the Court or any such other court has been brought in an inconvenient forum.

(e)    <u>Severability</u>.    The parties hereto agree that the terms and provisions in this Agreement are reasonable and shall be binding and enforceable in accordance with the terms hereof and, in any event, that the terms and provisions of this Agreement shall be enforced to the fullest extent permissible under law. In the event that any term or provision of this Agreement shall for any reason be adjudged to be unenforceable or invalid, then such unenforceable or invalid term or provision shall not affect the enforceability or validity of the remaining terms and provisions of this Agreement, and the parties hereto hereby agree to replace such unenforceable or invalid term or provision with an enforceable and valid arrangement which, in its effect, shall be as close as possible to the unenforceable or invalid term or provision.

(f)    <u>Counterparts</u>. This Agreement may be executed in two or more original or facsimile counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

(g)    <u>Modification, Amendment and Waiver; Benefit</u>. This Agreement may not be modified, amended, supplemented, canceled or discharged, except by written instrument executed by all parties. The failure or partial failure at any time to enforce or exercise any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of any party thereafter to enforce each and every provision hereof in accordance with its terms. No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

(h)    <u>Entire Agreement</u>. This Agreement, taken in conjunction with Note A, Note B, the Guaranty, the Cancellation Documentation, the Assignment and Assumption Agreement, the Parent Assignment, the Environmental Trust Assignment and the Stockholders' Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

(i)    <u>Headings</u>. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and do not constitute a part of this Agreement.

(j)    <u>Expenses</u>. Whether or not the sale and purchase of the Shares shall be consummated, each party hereto shall pay its own expenses incident to preparing for, entering into and carrying out this Agreement and the transactions contemplated hereby.

5297019v16

CONFIDENTIAL                                                          GM_BURNS_010197

(k)     <u>Survival of Representations and Warranties</u>.     Each of the representations and warranties of the Parent and Seller in this Agreement or in any schedule, instrument or other document delivered pursuant to this Agreement shall survive the Closing Date and shall continue in force thereafter.  The representations and warranties of the Purchaser shall not survive the Closing Date.

14

5297019v16

CONFIDENTIAL

GM_BURNS_010198

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers, partners or other representatives, thereunto duly authorized, all as of the day and year first above written.

AMERICAS MINING CORPORATION


By: _____
     Name:
     Title:

SPHC II INCORPORATED


By: _____
     Name:
     Title:

SOUTHERN PERU HOLDINGS CORPORATION


By: _____
     Name:
     Title:

ASARCO INCORPORATED


By: _____
     Name:
     Title:

5297019v16

CONFIDENTIAL                                    GM_BURNS_010199

Schedule 4(a)

**LIENS**

None

Schedule 4(a)-1

5297019v16

Appendix K-1

5297019v16

CONFIDENTIAL

GM_BURNS_010201

## GUARANTY

In order to induce Payee to accept the Note attached hereto as Exhibit A (the "Note"; terms defined therein and not otherwise defined herein being used herein as therein defined) as part of the consideration to be paid by Maker to Payee under the Stock Purchase Agreement, the undersigned ("Guarantor") hereby irrevocably and unconditionally guaranties, as primary obligor and not merely as surety, the due and punctual payment in full of all principal, interest and other amounts from time to time owing to Payee by Maker under the Note (the "Obligations") when the same shall become due, whether at stated maturity, by acceleration or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)). This Guaranty is a guaranty of payment when due and not of collectibility.

The obligations of Guarantor hereunder are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of Maker under the Note, or any substitution, release or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Guaranty that the obligations of Guarantor hereunder shall be absolute and unconditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of Guarantor hereunder, which shall remain absolute and unconditional as described above: (a) at any time or from time to time, without notice to Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived; or (b) the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under this Guaranty or any other agreement or instrument referred to herein shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with.

Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that Payee exhaust any right, power or remedy or proceed against Maker under this Guaranty, or against any other Person under any other guarantee of, or security for, any of the Obligations.

Guarantor hereby agrees that, until the payment and satisfaction in full of all Obligations, it shall not exercise any right or remedy arising by reason of any performance by it of its guaranty hereunder, whether by subrogation or otherwise, against Maker or any other guarantor of any of the Obligations or any security for any of the Obligations.

Any indebtedness of Maker now or hereafter held by Guarantor is hereby subordinated in right of payment to the Obligations, and any such indebtedness of Maker to Guarantor collected or received by Guarantor after an Event of Default has occurred and is

5310476v10

CONFIDENTIAL

GM_BURNS_010202

continuing shall be held in trust for Payee and shall forthwith be paid over to Payee to be credited and applied against the Obligations.

Guarantor agrees to pay, or cause to be paid, on demand, and to save Payee harmless against liability for, any and all costs and expenses (including reasonable fees and disbursements of counsel) incurred or expended by Payee in connection with the enforcement of or preservation of any rights under this Guaranty.

The rights, powers and remedies given to Payee by this Guaranty are cumulative and shall be in addition to and independent of all rights, powers and remedies given to Payee by virtue of any statute or rule of law or in the Note or any agreement between Guarantor and Payee or between Maker and Payee.  Any forbearance or failure to exercise, and any delay by Payee in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

Guarantor acknowledges and agrees that any interest on any portion of the Obligations which accrues after the commencement of any proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Maker (or, if interest on any portion of the Obligations ceases to accrue by operation of law by reason of the commencement of said proceeding, such interest as would have accrued on such portion of the Obligations if said proceeding had not been commenced) shall be included in the Obligations because it is the intention of Guarantor and Payee that the Obligations which are guarantied by Guarantor pursuant to this Guaranty should be determined without regard to any rule of law or order which may relieve Maker of any portion of such Obligations.

In the event that all or any portion of the Obligations are paid by Maker, the obligations of Guarantor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from Payee as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Obligations for all purposes under this Guaranty.

Guarantor hereby represents and warrants to Payee that:  (a) Guarantor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation; (b) Guarantor has the corporate power, authority and legal right to execute, deliver and perform this Guaranty and has taken all necessary corporate action to authorize its execution, delivery and performance of this Guaranty; (c) this Guaranty has been duly executed and delivered by a duly authorized officer of Guarantor, and this Guaranty constitutes the legally valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws or equitable principles relating to or limiting creditors' rights generally; and (d) the execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on Guarantor, or the certificate of incorporation or bylaws (or comparable organizational

5310476v10

CONFIDENTIAL                                                          GM_BURNS_010203

documents) of Guarantor or any agreement to which Guarantor is a party or by which Guarantor or any of its assets may be bound.

In case any provision in or obligation under this Guaranty shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF GUARANTOR AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

This Guaranty is a continuing guaranty and shall be binding upon Guarantor and its successors and assigns.  This Guaranty shall inure to the benefit of Payee and its permitted successors and assigns pursuant to Section 8(i) of the Note, including without limitation (x) ASARCO, (y) the United States, to the extent necessary in connection with the creation, perfection and enforcement of the security interest granted to it as contemplated by said Section 8(i), and (z) the trustee of the ASARCO Trust, in each case as contemplated by the terms of the Stock Purchase Agreement.

ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY BE BROUGHT (I) IN THE ACTION STYLED UNITED STATES V. ASARCO, INC. AND SOUTHERN PERU HOLDINGS CORPORATION, NO. CIV-02-2079-PHX-RCB IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF ARIZONA OR (II) IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS GUARANTY GUARANTOR ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS OR LACK OF PERSONAL JURISDICTION AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS GUARANTY.  Guarantor hereby agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to Guarantor at its address set forth below its signature hereto, such service being hereby acknowledged by Guarantor to be sufficient for personal jurisdiction in any action against Guarantor in any such court and to be otherwise effective and binding service in every respect.  Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of Payee to bring proceedings against Guarantor in the courts of any other jurisdiction.

GUARANTOR AND, BY THEIR ACCEPTANCE OF THE BENEFITS OF THIS GUARANTY, PAYEE AND ANY SUBSEQUENT HOLDER OF THE NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS

5310476v10