SPCC also operates sulphuric acid production plants, from the capture of 30% of the sulphur anhydride emission. In 1999, SPCC produced 315,555 tons of sulphuric acid. Part of the acid that is produced is used by SPCC to leach the ore at its SX-EW plant, the remainder is sold in local markets. This plant produced during 1999 and the first six months of 2000, 287,730 and 128,267 tons of copper blister, respectively.

*The Ilo Refinery*

The Ilo refinery is located 6.4 kilometers north of Ilo, and it was built in 1975. The refinery has communication with the Ilo smelting plant by a 10 kilometer railroad track. SPCC recently completed an expansion of the refinery, which increased its annual capacity to 246,000 metric tons of copper. All the copper blister processed at the refinery comes from the SPCC smelting plant.

The refinery consists of an anode plant, an electrolytic plant and a precious metals refinery plant. It also has various auxiliary facilities, including a desalination plant and a small diesel-motor power plant. The refinery produces high quality (Grade A) copper cathodes, which have a registered trademark at LME. The refinery also produces gold, silver, selenium and nickel sulphate as by-products.

In May, 1994, SPCC acquired the Ilo refinery from a Government entity and through a public bidding process called for the privatization of the Ilo refinery. Substantially all the income of the refinery before its purchase by SPCC came from refining fees under a contract entered into between the Government entity and SPCC, the conditions of which were determined by said Government entity.

The operating costs incurred by SPCC at the Ilo refinery are lower than the refining costs SPCC previously had to pay for the refining of its copper blister into copper cathodes. The purchase of the Ilo refinery has allowed SPCC to integrate its operations, from the mining of copper ore to the production of refined copper, and thus reduce its cash costs. In 1999, the refinery produced 250,717 tons of copper cathodes, and during the first six months of 2000, 126,987 tons of copper cathodes.

Following is a summary of ore properties:

**GRUPO MEXICO, S.A. DE C.V.**
**Capacity Utilization in 2000**
**( TONS)**

| FACILITY | UNIT | PRODUCT | CAPACITY | % UTILIZATION | USEFUL LIFE |
|---|---|---|---|---|---|
| Mine/Concentrator | Mexcobre | Extraction and milling ore | 32,400,000 | 100% | 24 |
| Molybdenum Plant | Mexcobre | Molybdenum | 720,000 | 100% | 31 |
| Smelting | Mexcobre | Anodes | 360,000 | 85% | 39 |
| Sulfuric Acid Plant | Mexcobre | Sufuric acid | 1,565,520 | 56% | 20 |
| SX/EW Plant | Mexcobre | Cathodes | 21,900 | 100% | 36 |
| Copper Refinery | Mexcobre | Cathodes | 300,000 | 87% | 47 |
| Copper Rod Plant | Mexcobre | Copper Rod | 150,000 | 88% | 46 |
| Precious Metals Plant | Mexcobre | Anode slimes | 2,800 | 53% | 50 |
| Lime Plant | Mexcobre | Quicklime | 122,400 | 98% | 32 |
| Smelting | Immsa San Luis Potosí | Blister | 230,000 | 61% | 19 |
| Electrolytic Zinc Refinery | Immsa San Luis Potosí | Zinc | 100,000 | 99% | 35 |
| | | Cadmium | 600 | 89% | 35 |
| | | Sulfúric Acid | 175,000 | 93% | 35 |
| Coke Plant | Immsa Nueva Rosita | Coke | 120,000 | 76% | 13 |
| Coal Mine | | Coal | 1,018,000 | 100% | 29 |
| Mine/Concentrator | Immsa Charcas | Extraction and milling ore | 1,476,000 | 97% | 5 |
| Mine/Concentrator | Immsa Taxco | Extraction and milling ore | 1,079,100 | 30% | 2 |

77

Pg. 80 of 142

| | | | | | |
|---|---|---|---|---|---|
| Mine/Concentrator | Immsa Santa Eulalia | Extraction and milling ore | 262,400 | 100% | 11 |
| Mine/Concentrator | Immsa Rosario | Extraction and milling ore | 196,800 | 96% | 2 |
| Mine/Concentrator | Immsa San Martin | Extraction and milling ore | 2,230,400 | 67% | 6 |
| Mine/Concentrator | Immsa Santa Barbara | Extraction and milling ore | 1,574,400 | 100% | 16 |
| Mine/Concentrator | Immsa Velardeña | Extraction and milling ore | 278,800 | 100% | 5 |
| Mine/Concentrator | Mexcananea | Extraction and milling ore | 29,200,000 | 72% | 98 |
| SX/EW Plant | Mexcananea | Cathodes | 34,200 | 99% | 38 |
| Mine/Concentrator | Asarco Mission, Az. | Extraction and milling ore | 21,900,000 | 100% | 20 |
| Mine/Concentrator | Asarco Ray, Az. | Extraction and milling ore | 21,900,000 | 100% | 41 |
| Smelting | Asarco Hyden, Az. | Anodes | 200,000 | 100% | 24 |
| SX/EW Plant | Asarco Ray, Az. | Cathodes | 46,300 | 100% | 41 |
| SX/EW Plant | Asarco Silver Bell, Az. | Cathodes | 20,000 | 100% | 14 |
| Sulfuric Acid Plant | Asarco Ray, Az. | Sulfuric Acid | 650,000 | 100% | 24 |
| Copper Refinery | Asarco Amarillo, Tx. | Cathodes | 500,000 | 64% | 29 |
| Copper Rod Plant | Asarco Amarillo, Tx. | Copper Rods | 245,000 | 84% | 29 |
| Copper Cake Plant | Asarco Amarillo, Tx. | Cakes | 130,000 | 44% | 29 |
| Nickel Plant | Asarco Amarillo, Tx. | Metallic Nickel | 710 | 62% | 29 |
| Precious Metals Plant | Asarco Amarillo, Tx. | Anode slimes | 2,582 | 86% | 29 |
| Globe Plant | Asarco Omaha, Ne. | Litargirium | 635 | 100% | 11 |
| | | Bismuth oxide | 19 | 100% | 11 |
| | | Bismuth alloys | 86 | 100% | 11 |
| | | Lead for assays | 17 | 100% | 11 |
| Encycle Plant | Asarco Corpus C., Tx. | Nickel | 544 | 100% | 11 |
| Mine/Concentrator | Asarco Tennessee | Extraction and milling ore | 2,500,000 | 100% | 14 |
| Lead Plant | Asarco East Helena, Mo. | Bullion Lead | 72,000 | 100% | 15 |
| Mine/Concentrator | SPCC, Cuajone, Peru | Extraction and milling ore | 31,581,000 | 94% | 39 |
| Mine/Concentrator | SPCC, Toquepala, Peru | Extraction and milling ore | 16,480,200 | 95% | 40 |
| Molybdenum Plant | SPCC, Cuajone, Peru | Molybdenum | 871,200 | 70% | 39 |
| Molybdenum Plant | SPCC, Toquepala, Peru | Molybdenum | 399,300 | 100% | 40 |
| SX/EW Plant | SPCC, Toquepala, Peru | Cathodes | 56,250 | 100% | 37 |
| Smelting | SPCC, Ilo, Peru | Blister | 300,000 | 86% | 40 |
| Sulfuric Acid Plant | SPCC, Ilo, Peru | Sulfuric Acid | 330,000 | 88% | 30 |
| Copper Refinery | SPCC, Ilo, Peru | Cathodes | 246,000 | 100% | 30 |
| Precious Metal Plant | SPCC, Ilo, Peru | Anode Slimes | 240,000 | 100% | 30 |

### 2. Concessions and Railroad Properties

Upon payment of the last installment of the purchase price for the shares of FPN (now Ferromex) in February 1998, GFM received the North Pacific Railroad (FPN) Concession and the Ojinaga-Topolobampo Railroad Concession, and acquired 25% interest in the Valle of Mexico Terminal (TFVM). In September 1999, Ferromex paid Ps. 20.5 million for the Concession to operate the Nogales-Nacozari Short Line.

In August 1999, Grupo México transferred to Ferromex, with SCT's authorization, all of its rights and obligations under the Nacozari Concession pursuant to an Assignment of Rights Agreement. Under the agreement the obligations assumed by Ferromex included payment of Ps. 20.5 million to the Mexican Federal Government, the settlement price to be paid for the concession previously offered by GMEXICO, such payment was executed at the time the concession was received.

The concessions grant Ferromex the right to use, exploit, and operate general means of railroad communication that apply to the respective rail lines, railroads, rights of way, traffic control centers, railroad signaling operations and

corresponding publicly-owned property ("the Concession Assets" as a whole) for rendering public freight and passenger transportation services and auxiliary services (freight terminals, railroad equipment, supply centers, maintenance shops, and transfers and decanting), for a 50-year term, renewable on its expiration date for a second 50-year term. The concessions grant Ferromex the exclusive right to render cargo service for a period of 30 years, except for the rights of way and hauling rights, from the effective date of each of the concessions. At the end of the concessions, whatever the cause may be, the railroad and the concession assets will be reversed in favor of the Mexican Nation in good operating conditions, according to the respective official standards at no cost to the Mexican Federal Government.

The operations of the Railroad, the use of the Concession Assets and the rendering of the freight transportation and auxiliary services are subject to applicable Mexican laws and any applicable international treaties. The concessions permit Ferromex to modify the Concession Assets only for the updating, reconstruction, preservation, upgrading or maintenance of the Railroad, and any improvements to the Railroad will become the property of the Mexican Federal Government. Ferromex is not liable for damage to the environment attributable to FNM operations prior to the grant of the concessions. *See "Environmental Regulations."*

Under the concessions, Ferromex must provide certain public services such as railroad transportation service to isolated communities, the transport of water to certain communities; mail delivery; and the transportation of persons and equipment for rescue operations or of the armed forces. The concessions also require Ferromex to meet the goals and investment commitments provided for under its Business Plan, which must be updated every five years, and to maintain liability insurance.

Under each of the concessions, Ferromex may freely determine the tariffs charged for its services, subject to the registration requirements under the Railroad Law and its Regulations.

Generally, Ferromex is the holder of the land its concessions relate to, (land is owned by the Mexican Federal Government) under the frame of its concessions' agreements. Ferromex's main offices are in Mexico City, and the Company has five principal divisions as follows: Guadalajara, Hermosillo, Chihuahua, Monterrey-Ferromex, and Centro-Mexico.

*Description of Properties.*

Ferromex's properties include the concession of the railroad transportation track, which consists of trunk and secondary lines, sidings and yard trackage; track rights of way and related bridges and tunnels; traffic control and dispatching centers; switching and signaling equipment; repair, maintenance, switching, freight transfer and supply yards, and terminal facilities and station houses and all fixtures related thereto; the rolling stock related to freight and passenger services and track maintenance; machinery and equipment used for reapair, maintenance and supply operations; corporate offices; and communications and information technology. ("Ferromex owned assets"). Under the terms of the concessions, all modifications and improvements to the Concession Assets immediately become part of the Concession Assets. At the end of the concession, all the Concession Assets will be returned to the Mexican Federal Government and they must be in good operating condition, reasonable wear and tear expected.

**Track and rights of way.** Ferromex's route system represents approximately 61% of the trunk lines (4,318 kilometers) is formed of high caliber elastic track over concrete ties, and 39% of trunk lines (2,760 kilometers) consisting of classic track over wood ties. Approximately three-fourths of the trunk system (5,309 kilometers) can accommodate 120 gross tons per four-axeled car. This trackage is located in Ferromex's most heavily traveled A, I, R and T lines. Approximately one quarter of the trunk system (1,769 kilometers) can bear maximum car weights of 110 tons per car. There are 3,701 bridges and 140 tunnels on the Ferromex route system. Except for 35 tunnels located on the T-line between Guadalajara and Tepic and 88 tunnels on the Ojinaga-Topolobampo line between Chihuahua and Agua Caliente, all of the other route system's tunnels have been improved to accommodate double-stack intermodal traffic. The secondary lines of the railroad (680 kilometers) are generally composed of classic track on wood ties and can accommodate up to 100 tons per freight car.

**Workshops, Yards and Sidings.** In 1999, Ferromex had eight facilities or workshops for the repair or maintenance of its 499 locomotives. In Guadalajara, Mazatlán Torreón, Chihuahua, and Acámbaro scheduled maintenance is performed in addition to spot maintenance duties; in the last three facilities repairs and maintenance are performed by third parties. Corrective maintenance is performed in Irapuato, Benjamín Hill and Nogales. In September 1999 Ferromex started construction of a new maintenance and repair workshop in Guadalajara that will be the principal maintenance facility for the 50 General Electric AC locomotives acquired in 1999 and the principal major

79

Page 82 of 142

repair workshop for the entire fleet. This facility, which is expected to be equipped with the most updated equipment, is scheduled to start operations in December 2000.

In 1999 Ferromex had 26 facilities (in repairing tracks and inspection yards) for the repair and maintenance of freight cars, as shown in the table below. The most important are those in Guadalajara, which will be the main repair shop in the system; Irapuato, currently remodeling; Ciudad Juárez and Nogales which remodelation is scheduled in the Installations Master Plan for the year 2000, and Hermosillo and Piedras Negras for the year 2001.



Ferromex currently has 19 depots for the supply of fuel and sand, as shown in the list below. During the next 18 months, Ferromex intends to close 8 of these facilities and modernize others, the most important being located in Nogales, where a new facility will start up operations in December, 2000, in Guadalajara, where a new facility is under construction to support the opertaions of the new repair shop, Irapuato and Mazatlan.

FUEL AND SAND DEPOT YARDS

1. Mexicali
2. Nogales
3. Cd. Juárez
4. Chihuahua
5. San Rafael
6. Sufragio
7. Los Mochis
8. Torreón
9. Mazatlán
10. Tepic
11. Irapuato
12. Guadalajara
13. Altamira
14. Cd.Frontera
15. Monterrey*
16. Manzanillo
17. Aguscalientes*
18. Valle de México*
19. Colima

\* These are not Ferromex property.

As of December 31, 1999 and June 30, 2000, Ferromex had a total of 443 kilometers of switching, freight loading, train-formation and transfer yards and 237 kilometers of rail sidings, the primary purpose of which is to facilitate passage of trains in Ferromex's one-track system.

Stations. As shown in the table below, as of June, 2000 Ferromex has 100 stations, 71 of which are commercial stations which render services directly to the public under the control of a station chief, 29 are operating stations that provide train orders for purposes of traffic control or managing operations in important yards, 11 of which carry out dual functions.

| COMMERCIAL STATIONS | | OPERATING STATIONS |
|---|---|---|
| 1. Mexicali, B.C. | 37. Silao, Gto. | 1. Victoria, B.C. |
| 2. Caborca, Son. | 38. Alzada, Col. | 2. B. Hill, Son. |
| 3. Nogales, Son. | 39. Colima, Col. | 3. Imuris, Son. |
| 4. Hermosillo, Son | 40. Calera, Col. | 4. Carbo, Son. |
| 5. Cd. Industrial, Son | 41. Manzanillo, Col. | 5. Ortíz, Son. |
| 6. Guaymas, Son. | 42. Viborillas, Qro. | 6. Vicam, Son. |
| 7. Cd. Obregón, Son. | 43. Bojay, Qro. | 7. Luis, Son. |
| 8. Navojoa, Son. | 44. Huichapan, Hgo. | 8. Naranjo, Sin. |
| 9. Empalme, Son. | 45. Apaxco, Hgo. | 9. Caimanera, Sin. |
| 10. Francisco, Sin. | 46. Aguascalientes, Ags. | 10. Quila, Sin. |
| 11. Guasave, Sin. | 47. Víctor Rosales, Zac. | 11. La Cruz, Sin. |
| 12. Sufragio, Sin. | 48. Altamira, Tamps. | 12. Rosario, Sin. |
| 13. Guamúchil, Sin. | 49. Jiménez,Chih. | 13. Loreto, Sin. |
| 14. Culiacán, Sin. | 50. Camargo, Chih. | 14. Ocotlán, Jal. |
| 15. Mazatlán, Sin. | 51. Salamayuca, Chih. | 15. Catarina, Jal. |
| 16. Los Mochis, Sin* | 52. Chihuahua, Chih. | 16. Atenquique, Jal. |
| 17. Ing. Heriberto V., Sin*. | 53. Cd. Juárez, Chih. | 17. Jala, Col. |
| | 54. Ojinaga, Chih.* | 18. Rafael S Mtz., Zac. |
| 18. Jiquilpan, Sin.* | 55. Anahuac, Chih.* | 19. Cd. Madero, Tamps. |
| 19. Acaponeta, Nay. | 56. Bauchivo, Chih* | 20. Delicias, Chih.* |
| 20. Tepic, Nay. | 57. Casa Colorada, Chih.* | 21. Sufragio Chp, Sin. |
| 21. Valle Verde, Nay. | 58. Creel, Chih.* | 22. San Juanito, Chih. |
| 22. S. De Los L., Jal. | 59. La Junta, Chih.* | 23. Pitorreal, Chih. |

81

| 23. Guadalajara, Jal. | 60. Tabaloapa, Chih* | 24. San Rafael, Chih. |
| 24. La Junta, Jal. | 61. Gómez Palacio, Dgo. | 25. Temoris, Chih. |
| 25. El Castillo, Jal. | 62. Gregorio G., Dgo. | 26. Escalón, Chih. |
| 26. La Barca, Jal. | 63. Torreón, Coah. | 27. Bermejeo, Dgo. |
| 27. Zapotiltic, Jal. | 64. Madero, Coah. | 28. San Pedro, Coah. |
| 28. Cd. Guzmán, Jal. | 65. Piedras Negras, Coah. | 29. Paredón, Coah. |
| 29. La Piedad, Gto. | 66. Rojas, Coah. | |
| 30. Pénjamo, Gto. | 67. Cd. Frontera, Coah. | |
| 31. Irapuato, Gto. | 68. Barroteram, Coah. | |
| 32. Salamanca, Gto. | 69. Monterrey, N.L. | |
| 33. Celaya, Gto. | 70. P.C. Morales, N.L. | |
| 34. León, Gto. | 71. Miramar, Tamps. | |
| 35. Esqueda, Son. | | |
| 36. Huehuetoca, Méx. | | |

\* Dual functions (commercial and operating)

**Divisional Offices.** Each of Ferromex's five operating divisions has a central management office from which divisional railroad operations are managed. Ferromex plans to renovate the facilities in Hermosillo, Chihuahua, and Guadalajara, where part of the improvements to the passenger terminal will house/ the new divisional office. All improvements, renovations and fixtures will be subject to the Pacifico Norte Concession. The offices for the Monterrey-Ferromex and Centro-Mexico divisions under long .term leasing contracts.

For its corporate offices Ferromex has occupied, since 1998, rented facilities in Mexico City with a five-year leasing contract.

**Telecommunications Equipment.** Ferromex's railroad telecommunications infrastructure includes a radio (microwave) telecommunications system covering approximately 63% of its route system and a fixed line system covering the remainder, primarily along the lines in Sonora, Sinaloa, and Baja California. During the second half of 1999, Ferromex invested in new technology that will extend its radio telecommunications network to the entire route system, incorporate satellite transmission capacity into the network in order to change to digital transmission capacity. In the year 2000, Ferromex plans to integrate a traffic control system to this network.

**Locomotives and rolling stock.** As of June 30 2000, Ferromex has 499 locomotives, including fifty GE4400 locomotives purchased during 1999. The table below shows the average age and model of the locomotive fleet. Ferromex's rolling stock consists of a total of 11,437 freight cars, 10,537 used for commercial service and 900 to give support to freight operations. A fleet of 35 cars, 15 of first-class, 10 second class and the remaining ten of other different types for its passenger service operations, among Ferromex's total fleet. Ferromex has purchased 12 additional first-class cars to be put in service on its Tequila Express and Chepe lines

**Average age and model of the Ferromex locomotive fleet**

| Number of Locomotives | Make | Horse Power | Average age | Models |
|---|---|---|---|---|
| 15 | EMD[1] | 1,200 | 47.0 | SW-100 |
| 5 | EMD | 1,310 | 42.0 | G-12 |
| 18 | EMD | 1,500 | 27.0 | SW-1504 |
| 52 | EMD | 2,000 | 30.2 | GP-38 y GP-38-2 |
| 162 | EMD | 3,000 | 19.1 | GP-40-2 y SD-40-2 |
| 1 | ALCO | 1,800 | 37.0 | RSD-12 |
| 1 | MLW[2] | 2,000 | 24.0 | M-420-TR |
| 3 | MLW | 2,400 | 18.0 | M-424 |

| | | | | |
|---|---|---|---|---|
| 1 | MLW | 3,000 | 7.0 | M-630 |
| 4 | GE[(3)] | 2,250 | 19.0 | B-23-7 |
| 184 | GE | 3,000 | 13.4 | C-30-7, C-30 SUPER-7R y C-30 SUPER-7MP |
| 3 | GE | 3,600 | 21.0 | C-36-7 |
| 50 | GE | 4,400 | 1.0 | AC-4400 CW |
| 499 | | | | |

(1) Electromotive Division, a division of General Motors.
(2) Bombardier.
(3) General Electric.

Of 499 locomotives, 400 operate in the freight transportation, 4 in passenger service (including passenger/freight trains), a variable number of which are for back-up service, 88 for train yards and 7 are proposed for write-downs.

**RAILCARS**

Cars by type and age

| Type of car | 0-5 years | 6-10 years | 11-15 years | 16-20 years | 21-25 years | 26-30 years | Over 30 years | Total |
|---|---|---|---|---|---|---|---|---|
| Boxcars | -- | -- | -- | 38 | 151 | 1,454 | 2,079 | 3,722 |
| Gondola cars | -- | -- | -- | 1,458 | 481 | 1,326 | 2,021 | 5,286 |
| Hopper cars | -- | -- | -- | 789 | 157 | 380 | 63 | 1,389 |
| Tank cars | -- | -- | -- | 100 | 15 | 62 | -- | 177 |
| Flat cars | -- | -- | -- | 191 | 29 | 232 | 7 | 459 |
| Cabooses | -- | -- | -- | -- | -- | -- | 178 | 178 |
| Camper cars | -- | -- | -- | -- | 14 | 59 | 97 | 170 |
| Stock cars | -- | -- | -- | -- | -- | -- | 3 | 3 |
| Passenger cars | 47 | -- | -- | -- | -- | -- | -- | 47 |
| Special cars | 6 | -- | -- | -- | -- | -- | -- | 6 |
| **Total Cars** | | | | | | | | **11,437** |

The total car fleet includes 10,537 cars for commercial use (passengers and freight) and 900 for internal use (for transport of certain raw materials as well as for repair and maintenance of its infrastructure). The corresponding breakdown follows:

Cars for commercial and internal use

| Type of car | Comercial Use | Internal Use | Total |
|---|---|---|---|
| Boxcars | 3,627 | 95 | 3,722 |

83

Pg. 86 of 142

| | | | |
|---|---:|---:|---:|
| Gondola cars | 5,252 | 34 | 5,286 |
| Hopper cars | 1,103 | 286 | 1,389 |
| Tank cars | 83 | 94 | 177 |
| Flat cars | 427 | 32 | 459 |
| Cabooses | 36 | 11 | 47 |
| Camper cars | -- | 178 | 178 |
| Stock cars | -- | 170 | 170 |
| Passenger cars | 3 | -- | 3 |
| Special cars | 6 | 0 | 6 |
| **Total** | **10,537** | **900** | **11,437** |

3. *Development and Plans for Capital Expenditures*

*Mining Division*

GMEXICO made capital expenditures in the amount of Ps, 3,004.8. millions, Ps.1,966.4 millions and Ps. 2,329.0 millions in 1997, 1998, and 1999, respectively, and expects to make capital expenditures of approximately Ps. 5,452.8 million in the year 2000.

The principal projects for which GMEXICO has budgeted capital expenditures in 2000 and thereinafter are:

1. Expansion of the SX-EW plant at the Cananea Unit, to increase the existing copper cathode capacity from 34,200 metric tons per year to 55,800 in 2000 and 84,400 in 2003;

2. Construction of a new zinc refinery at the Immsa Unit, with a capacity of 110,000 metric tons per year of refined zinc, for which no specific timetable has been established yet:

3. Expansion of the copper smelter at the Mexcobre Unit to increase the existing anode capacity of 360,000 metric tons per year to 410,000 metric tons at the end of the year 2003 by means of the installation of a new central burner;

4. Modernization of SPCC's smelter;

5. New SX-EW plant at Cuajone Unit of SPCC; and

6. Expansion of the concentrator at the Toquepala Unit, of SPCC from 16,480,200 to 25,200,000 milled metric tons per year.

The tables below show GMEXICO's capital expenditures on the items specified for the first six months of the year 2000 and the principal capital expenditures budgeted for the period of July 2000 to 2001. GMEXICO's capital expenditures are basically in U.S. dollars and are regularly funded with their own resources generated by operations. The budgeted amount is shown in the table below. The current capital expenditures in the year 2000 are expressed in Mexican pesos in accordance with the presentation of GMEXICO's finanncial statements. Any future devaluation of the Mexican peso will increase the amount of future capital expenditures in terms of Mexican pesos.

**GMM:**

| | Capital Expenditures | | |
|---|---|---|---|
| | Accrued as of June 30, 2000 | 2000-2001 (estimated) (1) | Actual or estimated completion date |
| | (million of constant pesos as of 06-30-2000) | (million of US$) | |
| **New Projects** | | | |
| Immsa zinc refinery | Ps. 0.0 | 216.7 | 2003 |
| La Caridad precious metals refienry | 3.1 | 19.7 | 2000 |
| La Caridad dust treatment plant | 0.0 | 8.5 | 2000 |
| Total new projects | 3.1 | 244.9 | |
| **Capacity expansions** | | | |
| San Martin Unit | 7.3 | 7.8 | 2000 |
| Charcas Unit | 17.3 | 4.0 | 2002 |
| La Caridad copper smelter | 4.8 | 26.4 | Fourth quarter 2000 and third quarter 2000 |
| Cananea SX-EW plants | 66.0 | 25.0 | 2001 |
| Total capacity expansions | 95.4 | 63.2 | |
| **Equipment and machinery replacements** | | | |
| Investments in tailing dumps, water recovery and plant | 111.7 | 63.3 | |
| Other investments | 222.0 | 154.6 | |
| Total equipment and machinery replacements | 333.7 | 217.9 | |
| Total | 432.2 | 526.0 | |
| Less net value of withdrawals | 0.3 | | |
| Total net investments for 1999 | Ps. 431.9 | U.S.$ 526.0 | |

(1) From July, 2000 to December, 2001.

**Asarco:**

Asarco Inc., has budgeted capital expenditures for the year 2000 in the amount of U.S.$86.6 million, including U.S.$40.2 millon on investments in environmental remediation. As of June 30 2000, a total of U.S.$27.6 million have been invested.

**SPCC:**

| | Capital Expenditures | | |
|---|---|---|---|
| | Accrued as of June 30, 2000 | 2000-2001 (estimated) (1) | Actual or estimated completion date |
| | (millions of US$) | (millions of US$) | |
| **Expansion projects** | | | |
| Ilo smelter modernization | U.S.$2.9 | U.S.$245.2 | 2004 |
| Toquepala concentrator expansion | 4.5 | 124.5 | 2002 |
| Rio Torata control program | 24.4 | 15.3 | 2001 |
| Toquepala SX-EW Plant Expansion - Phase two | 2.6 | 20.9 | 2001 |
| Cuajone SX-EW Plant Expansion | - | 40.0 | 2001 |
| Cuajone Mine-Concentrator Expansion | 2.8 | 9.5 | 2000 |
| Limes and coke Plant | - | 9.0 | 2000 |

85

Pg 88 of 142

| | | |
|---|---|---|
| Total capacity expansion | 37.2 | 464.4 |
| **Equipment and machinery replacements (1)** | | |
| Investments in warehouses, auxiliary plants and maintenance | 2.1 | 22.1 |
| Other investments | 17.0 | 101.7 |
| Total equipment and machinery replacements | 19.1 | 123.8 |
| **Total** | U.S.$56.3 | U.S.$588.2 |

(1) From July, 2000 to December 2001.

*Railroad Division*

During 1998, Ferromex invested approximately Ps. 940.6 million in infrastructure, telecommunications and reconstruction of tracks. During 1999, Ferromex invested a total of Ps. 2,551.1 million, which were applied to the acquisition of 50 General Electric locomotives and mostly to renovation of infrastructure. As of June 30, 2000, Ferromex has made investments for a total of Ps. 525.0 million. Ferromex expects to make capital expenditures of approximately Ps. 1,475.3 million for the year 2000.

Ferromex's main capital investment plans beginning in February 1998 with its acquisition and up to the year 2002 are to renovate tracks and yards, to acquire new motor and tractive equipment as well as to improve and automatize traffic control and to acquire modern systems of communication and administration which will have a total value of approximately U.S.$830 million dollars, U.S.$525 million dollars of which have been invested up to June 30, 2000. The greater part of these investments have taken place and GMEXICO management expects to continue using resources generated by its own operations and does not expect these expenditures to affect future dividends paid when their shareholders decide to carry them out.

4. **Suppliers**

*Mining Division*

GMEXICO has undertaken a program to reduce excess spare parts inventories and to coordinate purchasing functions. Inventory reduction strategies include a consignment system for suppliers and a coding system for spare parts to permit inventory transfers among operating units. Reduced import duties under the NAFTA have increased the number of suppliers from which GMEXICO may purchase equipment and supplies.

5. **Reserves**

GMEXICO estimates ore reserves at each and every one of its units as of January 1 of each year. The ore reserves estimates shown below were prepared by GMEXICO Engineering staff, using evaluation methods generally used in the international mining industry, including standard methods of mapping, drilling, sampling, assaying and modeling. The reserves may not conform to the geological, metallurgic or other kinds of expectations and the volume and grade of the recovered ore may be below the expected levels. Lower market prices, increased production costs, reduced recovery rates and other factors may render proven and probable reserves unattractive from an economic point of view to exploit and give rise to a revision of reserve estimates from time to time. The reserves reported herein are not indicative of future operating results.

The terms "reserves", "proven reserves", "probable reserves", "dilution", "total leaching" "total metal recoverable" and "total mill recovery", used in the tables below are defined in section "*General Information - Glossary of Terms and Definitions*" herein.

GMEXICO expects that the adverse effects of the metal low prices in its reserve estimates will be overcome by the results of new exploration programs and by the decrease in the estimated operating costs as a result attributable to a continuous vertical integration of GMEXICO.

**Exploration and Ore Reserves**

Open-Pit

| Interest % | Mine | Millons of Tons. | Copper grade (%) | Molybdenum grade (%) | Years Operating |
|---|---|---|---|---|---|
| 100.0 | Cananea | | | | |
| | Flotation | 2,850.3 | 0.59 | - | 98 |
| | Leachable | 2,937.1 | 0.23 | - | 84 |
| 100.0 | La Caridad | | | | |
| | Flotation | 790.2 | 0.40 | 0.02 | 24 |
| | Leachable | 518.3 | 0.20 | - | 11 |
| 54.2 | Toquepala – Perú | | | | |
| | Flotation | 691.9 | 0.74 | 0.03 | 40 |
| | Leachable | 1,732.3 | 0.20 | - | 69 |
| 54.2 | Cuajone – Perú | | | | |
| | Flotation | 1,242.2 | 0.64 | 0.02 | 39 |
| | Leachable | 62.0 | 0.49 | - | 29 |
| 100.0 | Ray – E.U.A. | | | | |
| | Flotación | 846.7 | 0.60 | - | 41 |
| | Lixiviable | 142.0 | 0.45 | - | 14 |
| 100.0 | Mission – E.U.A. | | | | |
| | Flotation | 430.6 | 0.71 | - | 20 |
| 75.0 | Silver Bell – E.U.A. | | | | |
| | Leachable | 145.1 | 0.38 | - | 20 |
| 49.9 | Montana Resources E.U.A. | | | | |
| | Flotation | 393.3 | 0.35 | 0.03 | 26 |

Underground Mines

| Interest (%) | Mines | Millons of Tons. | Copper grade (%) | Zinc Grade (%) | Lead grade (%) | Gold Grs./Ton | Gold Grs./Ton | Years Operating |
|---|---|---|---|---|---|---|---|---|
| 100.0 | IMMSA-México | 100.0 | 0.45 | 3.98 | 1.23 | 0.15 | 103 | 15 |
| 100.0 | Tennessee-E.U.A. | 28.2 | - | 2.88 | - | - | - | 14 |

The reserve estimation above takes in condieration the estimated dilution (extraction loss) aplying the law of the minerals of the mines, a factor derived form the historic differences on the law mine concentrator.

6.  *Exploration*

GMEXICO carries out exploration programs at each of its mines, in order to locate new ore reserves to substitute the extracted minerals in its mining operations. The size of the mineral deposits at Cananea and La Caridad, has allowed GMEXICO to attain this objective at said mines without considerable expenses, and GMEXICO expects this situation to continue during the life of each of said mines. GMEXICO considers that the exploration budgets of the Immsa Units are also sufficient to reach this goal under the present foreseeable circumstances.

87

Pg. 90 f 142

In addition to the exploratory drilling programs at the already existing mines in operation, GMEXICO is at this time conducting explorations in Mexico to locate ore reserves in 42 other sites. In particular, GMEXICO has identified important copper and gold deposits at El Arco, located in the State of Baja California. Preliminary research at El Arco indicates that the deposit contains approximately 846 million metric tons of sulphide mineral with an average grade of 0.51% copper and 0.14 grams of gold per metric ton, and 170 million metric tons of leachable ore with an average grade of 0.456%.

GMEXICO spent approximately Ps. 189.0 million in exploration programs in 1997, Ps. 252.9 million in 1998 and Ps 304.9 million in 1999, and it has budgeted Ps. 310.9 million for 2000.

The nature of metals exploration is highy speculative, involves many risks, and frequently is not successful. There can be no certainty that all the exploration efforts of GMEXICO will be successful. Once the mineralization is discovered, it may take several years after the intial drilling phases, before the exploitation can be conducted. During this time, the economic viability of production may undergo changes. Considerable expenses are required to determine the proven and the probable mineral reserves by drilling, to define the metallurgical process to extract the metals from the ore and, in the case of new properties, to build the mines and processing plants. As a result of these uncertainties, no guarantee can be given that the GMEXICO exploration programs shall turn out in an expansion or in the replacement of proven and probable ore reserves.

l) **Judicial, Administrative or Arbitration Proceedings**

GMEXICO is involved in several legal proceedings in the normal course of its operations; however, GMEXICO's management considers that any adverse court decision, individually or as a whole, regarding these proceedings is reasonably reserved in the amount of Ps. 1,066.7 million. The amount of this contingency reserve as of June 30, 2000, is represented by Ps. 1,066.7 million.

The main legal contingencies and proceedings are the following:

# MEXICO

*Mining Division*

Mexcobre is the owner of a piece of land located in the Municipality of Nacozari, Sonora (the "Mexcobre Land"), within which La Caridad mine is located. As a result of an expropriation proceeding conducted before the "SRA" (Ministry of Agrarian Reform), the Government of the State of Sonora acquired title of a 1,500 hectare piece of land adjacent to the Mexcobre Land, which belonged to a rural land owners group ("ejido") denominated Pilares de Nacozari (the "Ejido"). Later on, the Government of the State of Sonora entered into a sales contract with Mexcobre, by which the title on the expropriated area (the "Pilares Land") was transferred. In July, 1991, the Ejido filed *"amparo"* (injunction) proceedings before the First District Court in Hermosillo, Sonora, against the SRA, designating Mexcobre as a prejudiced party and alleging that the SRA had not complied with certain essential formalities in the expropriation proceedings, when taking the legal steps to obtain the Government Decree corresponding to the Pilares Land. Upon completion of all the aforementioned judicial proceedings, the Judicial Authority granted the Ejido the injunction, cancelling the expropriation Decree and ordering the SRA to give the Ejido possession of the Pilares Land. After all the ordinary legal recourses were exercised to obtain from the federal judicial authorities the revocation of the above mentioned Order, the SRA and Mexcobre have alleged before the Supreme Court of Justice of the Nation (SCJN) that, due to reasons that make it legally and materially impossible to comply with said Order, its revocation is justified. The SCJN is now studying the above mentioned allegations and, in accordance with the applicable provisions of the *"Amparo"* (injunction) Law, it is very likely that the SCJN will pass a final decision in this regard. The SRA and Mexcobre have well-founded and sufficient bases to expect, considering the evident reasons that make it legally and materially impossible for the SRA to comply with the Order to give back to the Ejido the possession of the Pilares Land, that the SCJN will pass a decision shortly, ordering an alternative way to comply, which will probably mean that Mexcobre is forced to substitute the compliance by the SRA of the revoked Order, by a pecuniary compensation for an amount which would not be relevant to Mexcobre or GMEXICO.

Mexicana de Cobre, S.A. de C.V., Mexicana de Cananea, S.A. de C.V. and Grupo México, S.A. de C.V., were served on September 13, 2000, of a process started by the Union of Mining, Metallurgical and Alike Workers of the Mexican Republic, claiming payment of up to $40 million U.S. dollars, alleging that such payment was part of the offer by means of which Mexicana de Cananea, S.A. de C.V. acquired in 1990 the assets of the bankruptcy of Compañía

88

Minera de Cananea, S.A. de C.V., at the judicial auction of such assets. This claim, was previously intended by the Union in accordance with a legal action started on 1991, which was disregarded by final judgment – *res judicata* – pronounced in the corresponding legal proceeding, which constitutes an absolute bar to a subsequent action involving the same claim. Therefore, Grupo México, S.A. de C.V. and its subsidiaries, consider that this new claim of the Union is contrary to law and they have already filed the corresponding exceptions and defenses.

*Railroad Division*

The Ferromex operations are subject to Mexican Federal and State legislation, and to environmental protection regulations. Under these laws, regulations concerning air, soil and water pollution, environmental impact, noise control and hazardous wastes, have been issued. The SEMARNAP (Ministry of Environmental Protection), may impose administrative and penal sanctions on companies that violate environmental laws, and it has the power to close down, totally or partially, the facilities where said provisions are violated.

The responsibility for soil, subsoil and water-bearing strata remediation of damages caused up to February 18, 1998 to the means of communication on which Ferromex now operates, corresponds to FNM (National Mexican Railroads) and, in a subsidiary way, to the Federal Government. Ferromex has already taken the necessary measures to prevent the pollution indicated in the environmental audits performed by FNM, which served as a basis for the preparation of certain agreements with PROFEPA (Federal Environment Protection Agency) to conduct, within a term of 3 years, 1,282 activities, starting in April, 1999, 575 of which have been carried out to this date. The estimated cost to complete these activities is U.S. $ 4 million.

**Litigation in the U.S.A.**

<u>Litigation on Environment and Related Matters</u>

In connection with the matters mentioned below, as well as with other closed plants and other sites where Asarco is working with federal and state agencies to solve environmental problems, Asarco funds losses when they are probable and can be estimated in a reasonable way. These provisions are adjusted as new information develops or changes in circumstances occur, and they have not been discounted from their present value. The environmental remediation cost recovery by insurance companies and third parties is recorded as an asset if recovery is considered probable.

As of December 31, 1999, the closed-down plants and environmental contingencies reserves, including the cost of claims in connection with mines and with active and closed properties, were U.S. $ 131.1 million. Asarco foresees that expenditures in connection with these reserves shall be made in the course of the following years. During the period from November 18 through December 31, 1999, the net cash expenditures charged against these reserves were U.S. $ 10.2 million.

During the period from November 18 through December 31, 1999, the effect of environmental matters and other charges for closed-down plants was U.S. $ 0.7 million.

In 1995, Asarco completed and filed before the DEW a feasibility and remediation study of the site of the old smelting plant Asarco had in Everett, Washington. In the beginning of 1997, the DEW issued an order addressed to Asarco, which forced it to conduct additional studies and other activities at said site. In 1999, Ecology issued a costly remediation plan, pointing out its intention to make Asarco conduct same or pay for its cost. Asarco refused, and in July 1998 it filed suit before the State Court of Thurston County, Washington, refuting, on the basis of constitutional and other provisions, the application of certain State environmental laws to the presumed obligation of Asarco to remediate or assume the costs of the remediation plan. As a result of the lawsuit, in December 1999, the Court determined that Asarco only had to pay for the remediation of the site of its old smelting plant, and that it was unconstitutional to apply State environmental laws to force Asarco to remediate the abutting properties. Ecology has expressed its intention to appeal.

Also in 1998, the County of Snohomish filed a lawsuit in the state court of Snohomish County, Washington, seeking damages for the cost of remediating certain county-owned property located near the former smelter site. This case has been removed by the ASARCO to federal court in Seattle.

On the other hand, in 1997, "class action" was filed against Asarco in Omaha, Nebraska, U.S.A., to obtain the payment of a damage compensation (including moral damage) and interest on the alleged pollution of properties, caused by the emissions of Asarco's plant in the City of Omaha. In May, 1999, the Nebraska, U.S.A. District Court rejected the action. The plaintiffs appealed the decision and filed a similar action before Nebraska State, U.S.A. District Court.

Also, in March, 1996, the U.S. Government instituted an action against Asarco and three other mining companies before The Boise District Court in Idaho, U.S.A., based on the 1980 Law denominated Comprehensive Environmental Response Compensation and Liability ("CERCLA" or "Superfund") and on the Clean Water Act, for alleged damages to the natural resources of the Coeur d'Alene river basin in Idaho, U.S.A. The Government holds that Asarco and the other three companies are liable for damages to naural resources on a 1,500 square mile area caused by mining and other related activities conducted by them since the middle of the XIXth Century to the middle of the sixties. The action also seeks that the defendants state that they are responsible for the restoration of the area. Based on the opinion of its external lawyers, Asarco considers that it has solid legal arguments to defend its interests in this case.

In 1996, the Court expressed its authorization to consolidate this case with a similar complaint previously filed by the Idaho, U.S.A. Coeur d'Alene Tribe. In 1998, the U.S. Environmental Protection Agency (EPA) started a resarch and fesibility study on the remediation of the Coeur d'Alene river basin. In 1997, the United States filed a motion to add to the lawsuit several companies, including certain subsidiaries of the Asarco. In 1998, the court rejected the goverment's position that its evaluation of injury and reestoration plan must be upheld unless the administrative record shows it to be arbitrary and capricious or otherwise not in accordance to law.

The EPA and other federal and state agencies sent notices to Asarco and some of its subsidiaries, pointing out that they, and in most cases a large number of third parties, are potentially liable for the remediation of the alleged emissions of hazardous substances in certain areas, according to CERCLA and other similar State laws. Asarco and some of its subsidiaries have also been sued in accordance with CERCLA or other State laws, seeking remediation of important damages. Asarco has started the remediation of some of the sites.

<u>Litigation in Connection with Company Products</u>

As of December 31, 1999, Asarco and two of its subsidiaries acted as defendants in 1,365 lawsuits filed by 6,129 primary plaintiffs and 963 secondary plaintiffs seeking the payment of a damage compensation (including moral damages) and interests in connection with personal injuries or death, presumably caused by asbestos exposure. Three of these lawsuits represent a class action, and two of them were presumably filed in the name of persons that are not known to have asbestos related injuries. The third lawsuit was supposedly filed in the name of individuals who sue both tobacco related and asbestos related entities, and who claim personal injury damages resulting from asbestos and cigarette smoke exposure. Asarco and some of its subsidiaries have also been sued for product liability involving other Asarco products, including metals.

In September 1999, Asarco was sued, together with 16 other defendants, in two complaints filed before the State Court of Maryland, U.S.A. One of the complaints was filed in the name of eight minor individuals allegedly having personal injuries due to exposure to lead contained in lead based paints and to lead tetraethyl present in gasoline. The plaintiffs seek a damage compensation (including moral damage) and interests. The other case involves a class action against the same defendants, filed in the name of family home owners and occupants who built in Maryland, U.S.A. before 1979. The plaintiffs seek the recovery of detection, monitoring and, if such is the case, removal expenses of lead base paint used in said houses, as well as the payment of damage compensation (including moral damage) and interests.

Asarco is the defendant in several lawsuits in the State of Arizona, U.S.A., of which the oldest dates back to 1975, which involve the U.S.A., the American Indian Reservations and other water users in Arizona who contest the right to the use of water by Asarco and numerous other individuals or entities, and in some of the cases they seek the payment of damages for the use of water and the alleged pollution of underground waters. Said lawsuits may affect the use of water at Asarco's facilities: the Ray complex, the Mission complex and other operations in the State of Arizona.

Asarco and some of its subsidiaries have been sued in Texas, U.S.A. in several lawsuits that seek an important indemnity compensation and puntive damages for personal injuries and property pollution allegedly caused by present

and past operations in the State of Texas and by the sale of products by Asarco and its subsidiaries. In most of the cases, other companies have also been sued.

In November 1999, an action was brought forth against Asarco before the Federal Court of the Southern District of New York by Cyprus, a subsidiary of PD. This action seeks the payment of damages of no less than U.S. $ 90 million, for the alleged breach of a merger agreement between Asarco and Cyprus.

In most of the cases, future expenditures in connection with environment issues cannot be determined with certainty, due to the fact that the investigations are at an initial stage, to the uncertainty in connection with the specific remediation methods and expenses, to the possible participation of other potentially liable parties, and to the constant change in environmental law and their interpretation. Also, it is not possible to determine with certainty the future litigation costs, due to the uncertainty of the results of the court proceedings. In the opinion of Asarco's management, the result of the aforementioned legal proceedings and environmental contingencies, and of other various litigations and proceedings in course, will not have important adverse effects on the financial situation of Asarco.

However, if it is possible that the aforementioned litigation and environmental contingencies may have an important effect on the quarterly or annual results, when same are resolved in future years. This opinion is based on considerations which include experiences as to judicial reductions and settlement agreements and remediation costs and terms. The financial viability of other potentially liable parties has been taken into account in the cases where it is relevant, and the potential recovery through insurance has not been considered where it is not probable.

m) **Shares representative of the Capital Stock**

As of December 31, 1999, the corporate capital of GMEXICO was represented by 630,000,000 Series "B", Class I, common registered shares, without a par value, representing the minimum fixed portion of the corporate capital.

On April 28, 2000, the General Ordinary Stockholders Meeting of GMEXICO resolved to increase the variable part of the corporate capital in the amount of Ps. 327,728,261.00, by means of the issuance of 70,000,000 common registered shares without a par value, of Series "B", Class II, which were offered to the present stockholders of GMEXICO, so that, in exercise of their preferential right, they would subscribe same within a maximum term of 30 days, and those shares that were not subscribed to within said period, would be kept in the Treasury of GMEXICO at the disposal of the Board of Directors, to be offered by the Board to third parties, to be used in future acquisitions, strategic mergers or for the purchase of assets, at a price of not less than Ps.50.00 per share. On May 31, 2000, 225,313 Series "B", Class II shares were subscribed to and paid for, in view of which, as of June 30, 2000, there are 69,774,687 Series "B", Class II shares in the Treasury of GMEXICO.

The Series "B" is composed of common shares with full voting rights, which shall at all times represent 100% of the total of the common shares with full voting rights. At least 51% of the shares of this Series shall at all times be subscribed to by individuals or entities that are considered as Mexican investors. *See. e) Applicable Legislation and Fiscal Scope/Tax Environmental-Railroad Division-General Matters of Regulatory Framework"*

The variable part of the corporate capital has a limit of up to ten times the amount of the minimum fixed part.

NGMEXICO corporate capital at the date of its incorporation was represented by 50,000 common nominative Series "B" Class I shares, by Extraordinary Shareholders Meeting dated September 12, 2000, a split of 250,000 shares representative of the minimum fixed capital stock of Nueva G. México at a ratio of 5 new shares per each share representative of the same. Likewise, it was approved to increase the capital stock in its minimum part in 630,225,313 common, nominative Series "B", Class I shares without expression of par value. The above in the understanding that the amount for contribution to the capital stock account amounted to $126,024,062.60. It was also approved to increase the capital stock in its variable part in the amount of $13,954,937.00 by the issuance of 69'774,687 new common, nominative, without par value Series "B", Class II, same which will be maintained in the treasury for future acquisitions, associations and future mergers or acquisition of assets or payment of debts in accordance with the terms and conditions timely determined by the Board of Directors.

n) **Dividends**

Dividend payments shall be made at the times and places determined by the Board of Directors of GMEXICO, and they shall be made known by notices published in a major-circulation newspaper of the corporate domicile in

Mexico City, Federal District. From the net profits of each corporate year shown in the Financial Statements duly approved by the General Ordinary Stockholders Meeting, once the necessary amounts: (i) to make payments or provisions for the payment of the corresponding taxes; (ii) for any reserves which are mandatory in accordance with law, and (iii) if such is the case, for the amortization of losses of previous years, the following applications shall be made:

I.      Five per cent of the net profits shall be set aside to constitute, increase or, if such is the case, replace the reserve fund, until said fund is equivalent to twenty per cent of the corporate capital.

II.     The amounts that the Stockholders Meeting may resolve to apply to create or increase general or special reserves, including, if such is the case, the reserve for acquisition of its own stock, as set forth in Section I of Article 14 Bis of the Securities Law, shall be set aside.

III.    The remainder shall be applied in accordance with the resolution of the Stockholders Meeting.

IV.     The surplus, if any, shall remeain at the disposal of the Stockholders Meeting or of the Board of Directors, if it is so authorized by the Stockholders Meeting. The Stockholders Meeting or, if such is the case, the Board of Directors, may apply the surplus as it may deem convenient to the interests of the Corporation or its stockholders.

Notwithstanding GMEXICO has consistently maintained its dividend payment policy, there is no stablished divided policy, reason by which the payment of the same may change in a future. The dividends decreed and paid for the 1997, 1998, 1999 and 2000 exercises are as follows:

At the General Ordinary Stocklhholders Meeting held on April 30, 1997, the stockholders approved the payment of a 26-cent cash dividend per share, equivalent to the amount of constant Ps. 270.1 millions.

At the General Ordinary Stockholders Meeting held on April 28, 1998, the stockholders approved the payment of a 40-cent cash dividend per share, equivalent to the sum of Ps. 340.6 millions.

At the General Ordinary Stockholders Meeting held on April 27, 1999, the stockholders approved the payment of a 45-cent cash dividend per share, equivalent to the sum of constant Ps. 314.1 millions.

At the General Ordinary Stockholders Meeting held on April 28, 2000, the stockholders approved the payment of a 45 cent cash dividend per share equivalent to the sum of Ps. 283.5 millions.

GMEXICO stockholders will receive dividend payment corresponding to voucher 7, which will be paid *ex cupom* on December 20, 2000.

3) Administration

a)      **Corporate By-Laws and Other Provisions**

Information is provided below in connection with the most relevant provisions of the By-Laws of NGMEXICO. The NGMEXICO By-Laws in force are recorded in the Public Registry of Commerce of the Federal District, under number 253,318, dated October 8, 1999. The information and the abridgement presented hereinbelow do not attempt to be complete, and they are subject to the provisions of the NGMEXICO By-Laws and the applicable laws.

*Incorporation*

NGMEXICO is a Mexican corporation and it was incorporated on September 3, 1999, by means of notarial deed number 56,551, executed before Notary Public No. 19 of the Federal District, Mr. Miguel Alessio Robles.

*Corporate Purposes*

The corporate purposes of NGMEXICO are the following:

a) To promote, charter, organize, exploit, acquire and have a participation in the corporate capital or the patrimony of all kinds of commercial or civil corporations, partnerships or enterprises, whether they may by industrial, commercial, service or any other kind, both national or foreign, as well as to participate in their administration or liquidation.

b) To acquire, under any legal title, shares, interests, participations or corporate parts of any kind of commercial or civil corporations, either by being part of their incorporation or by acquisition at a later time, as well as to sell, dispose of and negotiate said shares, interests and corporate parts, including any other security title.

c) To receive from other corporations or individuals, as well as to render to other corporations and individuals, any service which may be necessary for the attainment of their corporate purposes, such as, among others, legal, administrative, financial, treasury, auditing, marketing, balance and budget preparation, preparation of programs and manuals, analyses of operation results, productivity and potential financing report evaluation, preparation of studies on capital availability, technical assistance, advisory or consulting services.

d) To obtain, acquire, develop, commercialize, improve, use, grant and receive licenses or dispose of, under any legal title, any patents, trademarks, certificates of invention, trade names, utility models, industrial designs, industrial secrets and any other industrial property rights, as well as copyrights, options and preferential rights thereon, whether they are in Mexico or abroad.

e) To obtain all kinds of loans or credits, issue debentures, bonds, commercial paper or any other equivalent credit title or instrument, with or without the granting of a specific property guaranty by means of pledge, mortgage, trust or under any other legal title; as well as to grant any type of financing or loan to commercial or civil corporations, enterprises and institutions with which the corporation may have business relations or in which it may have a corporate interest, with or without the granting of any specific property or personal guaranties.

f) To grant and receive all kinds of personal and property guaranties and collaterals of obligations or credit instruments payable by corporations, partnerships and institutions in which the corporation may have an interest or participation, or with which the corporation may have business relations, acting as collateral and/or endorser and/or guarantor of said entities, or of any third party.

g) To execute, issue, draw and guarantee all kinds of credit instruments, as well as to accept and endorse same.

h) To carry out, supervise or contract, on its own account or on that of third parties, all kinds of constructions, buildings, real estate developments, land developments, office or commercial buildings and facilities.

i) To conduct, on its own account or on that of third parties, training and development programs, as well as research works.

j) To give or take in lease or in gratuitous use; to acquire, possess, exchange, dispose of, transfer or place liens on, all kinds chattels and real estate properties, as well as other personal or property rights on same, which may be necessary or convenient for its corporate purposes or for the operations or corporate purposes of the commercial or civil corporations, partnerships and institutions in which the Corporation may have an interest or participation of any nature.

k) To act as a commission agent, mediator, representative, distributor or intermediary of any individual or corporation.

l) To produce, transform, adapt, import, export and sell, under any title, machinery, spare parts, materials, raw materials, industrial products, goods and merchandise of all kinds.

m) In general, to enter into and perform all the acts, contracts and operations related, accessory or incidental thereto, which may be necessary or convenient for the attainment of the aforementioned purposes.

**Characteristics of the Series of Shares**

The shares that represent the corporate capital shall be composed of a single series "B" of free subscription shares, in accordance with the Foreign Investment Law, its regulations and other applicable legal provisions.

At least 51% (fifty-one per cent) of the common shares shall at all times be subscribed to by individuals or corporations considered as Mexican investors in accordance with the Foreign Investment Law and its regulations, and,