in any case, no more than 49% (forty-nine per cent) of said shares may be subscribed to or acquired freely or indistinctly by Mexican or foreign investors.

Each Series "B" common share with full voting rights shall confer the right to one vote at all the Stockholders Meetings.

## Stockholders Meetings

The general Stockholders Meetings shall be Extraordinary and Ordinary. Any other Stockholders Meetings shall be Special.

The following shall be considered General Extraordinary Stockholders Meetings :

(i) Those that are called to deal with all matters indicated in Article 182 of the General Law of Business Corporations

(ii) Those that are called to resolve on the cancellation of the registration of the corporate shares in the Securities Section of the National Registry of Securities and Brokers and in national or foreign stock markets where they are registered, except in quoting systems or other markets which are not organized as stock markets; and

(iii) Those that are called to resolve on the amendment of Clause Ten of the corporate By-Laws, which sets forth that all the other General Stockholders Meetings shall be Ordinary.

## Calls

The calls for the Stockholders Meetings shall by made by the Board of Directors, through the person designated for said purpose by the Board, or by the Statutory Inspector whenever he deems it convenient or when he may be required to do so by the provisions of the General Law of Commercial Corporations. In any case, the stockholders representing at least thirty-three per cent of the corporate capital, may request in writing to the Board of Directors or the Statutory Inspector, at any time, that either of them, indistinctly, issue a call for a General Stockholders Meeting, to discuss the matters specified by said stockholders at their request, on the understanding that, if the call is not made within a term of fifteen days from the date of the request, the call shall be made by a Civil or District Judge of the corporate domicile, at the request of stockholders representing the aforementioned 33%, who shall have to present their share certificates to that effect. In this case, said stockholders shall inform the Board of Directors and the Statutory Inspector of the corresponding judicial authorization, at least twenty-four hours before the date of publication of the call, in order to give validity to said call. Any stockholder of a single share may request that a General Stockholders Meeting be called for, in accordance with article one-hundred and eighty-five of the General Law of Business Corporations.

The calls for Stockholders Meetings shall be published in the official gazette of the corporate domicile or in one of the newspapers with the largest circulation of the corporate domicile, at least fifteen calendar days in advance to the date that is set for the Stockholders Meeting. The calls shall contain the agenda, and they shall be signed by the person or persons who make them, with the understanding that if they are made by the Board of Directors, the signature of the Secretary or the Alternate Secretary of said Board, or of the delegate designated for said purpose by the Board of Directors among its members, shall suffice. The Stockholders Meetings may be held without need of a previous call in case the totality of the shares that constitute the corporate capital are represented at the time of voting.

If at any Stockholders Meeting, whether it may be Ordinary, Extraordinary or Special, all the stockholders are present, said Meeting may resolve by unanimous vote on matters of any nature, even on those that are not included in the agenda.

## Rights of Attendance to the Stockholders Meetings

Only the stockholders who are registered in the Share Registration Book carried by the corporation shall be admitted to the Stockholders Meetings; for all legal effects, said registration shall be closed three days before the date that is set to hold the Meeting.

94

Pg. 97 f 142

In order to attend to the Stockholders Meetings, the stockholders shall have to show the corresponding admission card, which shall only be issued at their request, which shall have to be made at least 24 hours before the hour that is set to hold the Meeting, presenting to the corporate Secretary's office the deposit slip of the corresponding share certificates, issued by a securities deposit institution, by a national or foreign banking institution or by a stock brokerage company, in accordance with applicable provisions of the Securities Law. The shares that are deposited in order to have the right to attend the Meetings shall not be returned until the meetings have been held, and they will be returned through the delivery of the voucher issued to the stockholders or their representative.

### Attendance Quorum and Voting at Stockholders Meetings

In order to consider a General Ordinary Stockholders Meeting legally held by virtue of a first call, at least 50% (fifty per cent) of the shares into which the corporate capital is divided shall have to be represented thereat, and its resolutions shall be valid if they are adopted by the majority vote of the common shares represented thereat.

In case of a second or ulterior call, the General Ordinary Stockholders Meetings may be validly held regardless of the number of common shares represented at the Meeting, and their resolutions shall be valid when they are taken by the majority vote of the common shares represented thereat.

The following rules shall be followed for the Extraordinary and Special Stockholders Meetings:

In order to consider a General Extraordinary Stockholders Meeting legally held by virtue of a first call, at least 75% of the shares into which the corporate capital is divided shall have to be represented, and its resolutions shall be valid if they are adopted by the favorable vote of at least 50% of the shares into which the corporate capital is divided. In case of a second or ulterior call, the General Extraordinary Stockholders Meetings may be validly held if at least 50% of the shares into which the corporate capital is divided are represented thereat, and their resolutions shall be valid if they are taken by the favorable vote of the shares which represent at least 50% of the shares into which the corporate capital is divided.

The same rules set forth in the preceding paragraph shall apply for Special Stockholders Meetings, but referred to the special category of shares involved.

### Administration of NGMEXICO

The administration of NGMEXICO is entrusted to a Board of Directors composed of the number of members, not less than five, determined by the General Ordinary Stockholders Meeting. The Stockholders Meeting may designate alternates up to the number of the regular members, and if it does, it shall have the faculty to determine the way in which the alternates shall substitute the regular members, on the understanding that if the Stockholders Meeting does not make said determination, any alternate may substitute any of the regular members.

The appointment or election of the Board of Directors members shall be made by the General Ordinary Stockholders Meeting, by simple majority vote.

The stockholders representing at least 25% of the corporate capital represented by common shares, shall have the right to designate one regular and one alternate board member, who may only substitute the corresponding regular member, on the understanding that said percentage shall be 10% of the common shares at the time the corporate shares are registered with the BMV (Mexican Stock) or the RNVI (National Securities and Brokers Registry). Once said minority appointments have been made, the Stockholders Meeting shall determine the total number of members that will form the Board of Directors, and it will designate the rest of the Board Members by a simple majority vote, without counting the votes corresponding to the stockholders who exercised the minority right referred to in this paragraph.

The Board of Directors members may or may not be stockholders; they shall remain in office one year. They may be re-elected or their appointments may be revoked at any time, even in the case of members designated by the exercise of minority rights, and they shall receive the emoluments determined by the General Ordinary Stockholders Meeting. Nothwithstanding the above, the Board members shall continue in office, even if the term for which they were appointed has expired, until the new appointments are made and the persons designated as new members assume their positions. Neither the Board of Directors members nor the Statutory Auditor, nor the administrators or managers, shall have to place a bond to guarantee the fulfillment of the responsibilities pertaining to their tenure of office, unless the Stockholders Meeting which designates them determines said obligation.

95

Pg 98 of 142

If it is so resolved by the General Ordinary Stockholders Meeting, the Corporation may constitute an intermediate administration organ; an Executive Committee composed of an odd number of regular and alternate members appointed by the General Ordinary Stockholders Meeting among the regular or alternate members of the Board of Directors, which shall always act as a collegiate body. The Executive Committee members shall remain in office one year, but in any case they shall continue in their positions until the persons designated to substitute them assume their tenure of office; they may be re-elected or their appointments may be revoked at any time, and they shall receive the emoluments determined by the General Ordinary Stockholders Meeting.

### Surveillance of the Corporation

The surveillance of the corporation is exclusively entrusted to a Statutory Auditor, who may have an alternate, both of whom shall be designated by the General Ordinary Stockholders Meeting, and who are not required to be stockholders of the Corporation. The Statutory Auditor and his alternate shall be appointed annually, may be re-elected one or more times, and shall continue in office until the Stockholders Meeting makes new appointments and the persons designated assume their positions. The Statutory Auditor shall have the faculties and obligations enumerated in article 166 of the General Law of Commercial Corporations and in the By-Laws.

### Application of Results

From the net profits of each corporate year, as shown in the Financial Statements duly approved by the General Ordinary Stockholders Meeting, once the necessary amounts are deduced to: (i) make the payments or provisions to cover the corresponding taxes; (ii) set aside the reserves that are mandatory in accordance with law; and (iii) if such is the case, amortize the losses of previous corporate years, the following applications shall be made:

I.     5% (five per cent) of the net profits shall be set aside to constitute, increase or, if such is the case, replace the legal reserve fund, until said fund is equal to 20% (twenty per cent) of the corporate capital.

II.     The amounts determined by the Stockholders Meeting to be applied to the creation or increase of general or special reserves, including, if such is the case, the reserve for acquisition of its own shares, in accordance with Section I of Article 14 Bis of the Securities Law, shall be set aside.

III.     The remainder shall be applied as resolved by the Stockholders Meeting.

IV.     The surplus, if any, shall be placed at the disposal of the Stockholders Meeting, or of the Board of Directors, if it is so authorized by the Stockholders Meeting. The Stockholders Meeting or, if such is the case, the Board of Directors, may apply the surplus as it may deem convenient for the interests of the Corporation and its stockholders.

### Acquisition by NGMEXICO of its own shares

In addition to the possibilities expressly set forth in Articles 134 and 136 of the General Law of Commercial Corporations, NGMEXICO may acquire, with the prior and exclusive resolution of the Board of Directors, through the stock market, the shares that represent its own corporate capital, under the following terms and conditions:

The acquisition or purchase of its own shares shall be made with charging same to its corporate capital and, if such is the case, to a reserve made up of funds from its net profits, which shall be called the reserve for acquisition of its own shares.

It shall be the General Ordinary Stockholders Meeting's decision to determine the amount of the corporate capital which may be assigned for the purchase of the corporation's own shares and the amount of the corresponding reserve created for the purpose by the Stockholders Meeting, with the only limitation being that the total sum of the resources to be used for said purpose does not, in any case, exceed the total balance of the net profits of NGMEXICO.

The acquisition or purchase of the corporation's own shares and their placement at a later time, shall be subject to the provisions of Section I of paragraph 14 Bis of the Securities Law, and it shall appear, be reported and disclosed in the financial information, in the terms and conditions determined by the CNBV in its regulations of a general nature.

As a consequence of its stock purchase, NGMEXICO shall decrease its corporate capital on the same date of the acquisition and, if such is the case, it shall simultaneously make a charge to the reserve for acquisition of its own shares, converting the acquired shares into treasury shares.

Pg. 99 z 142

As long as the NGMEXICO shares belong to the corporation, the corporate or capital raising rights conferred by the same may not be exercised, and said shares shall not be considered outstanding in order to determine the attendance quorum or the voting at the Stockholders Meetings.

The corporate capital decreases or increases resulting from the purchase and placement of shares referred to in this Article, shall not require any kind of resolution by the Stockholders Meeting, nor any decision by the Board of Directors.

### Nationality Clause

NGMEXICO's nationality is Mexican. Any foreigner which at the time of incorporation or at any later time may acquire shares of the corporation, undertakes before the Ministry of Foreign Relations to consider him(her)(it)self as Mexican with regard to said shares, corporate interests or rights he(she) (it) may acquire, as well as to any rights, concessions, participations or interests owned by the corporation, or the rights or obligations arising from contracts entered into by the corporation, and it shall be understood that he(she)(it) waives the right to invoke the protection of his (her)(its) Gorvernment, under the penalty, in case of breach, of losing the rights or properties he(she)(it) may have acquired in favor of the Mexican Nation.

### Duration

The duration of NGMEXICO is indefinite.

### Capital Increases and Decreases

The increases in the NGMEXICO fixed minimum corporate capital without right of withdrawal shall be made by resolution of the General Extraordinary Stockholders Meeting. The increases in the variable part of NGMEXICO's corporate capital, within the limitations set forth in Clause Six, shall be made by resolution of the General Ordinary Stockholders Meeting. The minutes in which the capital increases are included shall in all cases be formalized by a Notary Public, without need, in the case of increases in the variable part of the capital, of amending the corporate by-laws, or registering the corresponding notarial deed in the Public Registry of Commerce. Upon the adoption of the corresponding resolution, the Stockholders Meeting that decides to increase the capital, or any ulterior Stockholders Meeting, or in case of omission by the Stockholders, the Board of Directors, shall determine the terms and conditions under which said capital increase shall take place.

The shares that are issued to represent the variable part of the corporate capital or the fixed minimum part of the corporate capital, in accordance, in the latter case, with the provisions of Article 81 of the Securities Law, and which, by resolution of the Stockholders Meeting by which their issuance is decided, must be deposited with NGMEXICO's Treasury, to be delivered at the same time their subscription is made, may be offered by the Board of Directors or, if such is the case, by the Executive Committee of same, for subscription and payment, subject to the conditions determined by the General Stockholders Meeting. In any case, the pre-emptive right shall be granted to the NGMEXICO stockholders, except in the case of: (i) shares issued in favor of all the stockholders as a result of stock subscription capitalization premiums, withheld profits and other capital reserves, (ii) the subscription offer made in accordance with the provisions of Article 81 of the Securities Law, with the prior authorization of the National Banking and Securities Commission, or (iii) shares issued in connection with any merger, (iv) the sale of treasury shares acquired by the Corporation in the Mexican Stock Market, or (v) the issuance of shares deposited with the Treasury for their conversion into debentures, in accordance with the provisions of Article 210 Bis of the General Law of Credit Instruments and Operations.

Capital increases may be carried out in accordance with any of the possibilities set forth in Article 116 of the General Law of Business Corporations, by means of a payment in cash or species, or by the capitalization of liabilities of NGMEXICO or of any other funds of the equity. Since the share certificates of NGMEXICO do not have a par value, it will not be necessary to issue new certificates in the cases of capital increases resulting from a stock premium capitalization, the capitalization of withheld profits or the capitalization of valuation or revaluation reserves. In the case of capital increases with cash or species payments, or by capitalization of NGMEXICO's liabilities, the holders of the existing and outstanding shares of NGMEXICO shall have a preferential right to subscribe to the new shares that are issued or outstanding to represent the increase, in proportion to the number of shares they own, during a term of fifteen days counted from the date of publication of the corresponding notice in the Official Federal Gazette or in the official gazette of NGMEXICO's domicile, or counted from the date on which the Stockholders Meeting was held, if the

97

totality of the shares into which the corporate capital is divided had been represented thereat, with the exception of the provisions of Articles 81 of the Securities Law and 210 bis of the General Law of Credit Instruments and Operations.

In the case of shares that represent the variable part of the corporate capital which, by resolution of the Stockholders Meeting, have been deposited in the NGMEXICO Treasury for their later subscription and payment, the stockholders shall have the pre-emptive right on their subscription same, once they have been offered for subscription and payment, with the exceptions set forth in Article 81 of the Securities Market Law.

No new shares may be issued until the preceding ones have been totally subscribed to and paid for. In case there are any unsubscribed shares after the expiration of the term during which the stockholders are granted a preferential right to subscribe to the same, said shares may be offered to any individual or entity for their subscription and payment, under the conditions and terms determined by the Stockholders Meeting that resolved the corresponding capital increase, or according to the conditions and terms determined by the Board of Directors or by the delegates appointed for said purpose by the Stockholders Meeting, on the understanding that the price at which said shares are to be offered to third parties shall not be less than the one at which they were offered to the stockholders of the Corporation for their subscription and payment.

The corporate capital may be decreased by resolution of the General Stockholders Meeting, in accordance with the rules set forth herein, and: (i) in case any stockholder of the variable part of the corporate capital wishes to exercise the right of withdrawal referrred to in Articles 213 and 220 of the General Law of Business Corporations, or (ii) in the separation cases referred to in Article 206 of said Law, or (iii) as a consequence of the purchase of the Corporation's own shares, in accordance with Section I of Article 14 Bis of the Securities Law. The decreases in the fixed minimum part of the corporate capital shall require a resolution of the General Extraordinary Stockholders Meeting, in which case the provisions of Article 9 of the General Law of Business Corporations shall have to be complied with, unless the capital reduction is made only to absorb losses. The decreases in the variable part of the capital may be made by resolution of the General Ordinary Stockholders Meeting, with the only formality that the corresponding minutes be protocolized before a Notary Public, without need of registration of the respective notarial deed with the Public Registry of Commerce.

Corporate capital decreases may be made to absorb losses, to reimburse the contributions of the stockholders or to release them from payments not made, as well as in the cases set forth in Articles 206 and 220 of the General Law of Business Corporations and in Section I of Article 14 Bis of the Securities Market Law.

In case that, in accordance with Section I of Article 14 Bis of the Securities Market Law, NGMEXICO has acquired in the stock market shares of its own corporate capital, NGMEXICO shall proceed to make the corresponding corporate capital decrease, as prescribed by said Article.

The capital decreases to absorb losses or to reimburse the stockholders shall be made proportionately in the minimum fixed part and the variable part of the capital, in order to maintain an absolute equality among the stockholders, without need for cancellation of share certificates, since same do not have an expression of par value. However, in case that it is alternatively so resolved by the General Stockholders Meeting for the decrease of the corporate capital by reimbursement to the stockholders, the shares to be cancelled shall be designated by raffle before a notary public or public broker, including in said raffle all of the shares of the fixed minimum part and of the variable part of the corporate capital.

No resolution by the General Stockholders Meeting shall be required in the cases of capital decreases which are the result of the desire of a stockholder who/which owns shares of the variable part of the corporate capital to exercise his/her/its right to withdraw totally or partially his/her/its contributions represented by the shares he/she/it may hold, in accordance with the provisions of Articles 220 and 221 of the General Law of Business Corporations. The withdrawal of contributions shall be effective on the date of conclusion of the corresponding corporate year, in case the notice of the decision to exercise the withdrawal right is given before the last quarter of said corporate year, or on the conclusion date of the following corporate year, if said notice is given during the last quarter of the corporate year. The reimbursement of the shares covered by the withdrawal shall be made at the value that is lower than: (i) 95% of the stock market quoting value, obtained from the average of the operations conducted during the thirty days prior to the date on which the withdrawal is to be effective, in which the NGMEXICO shares have been quoted; or (ii) the book value of the shares, in accordance with the financial position statement approved by the General Ordinary Stockholders Meeting corresponding to the corporate year in which the withdrawal became effective.

pg. 101 of 142

The reimbursement payment shall be payable by NGMEXICO as of the next day of the date on which the General Ordinary Stockholders Meeting which approved the financial position statement corresponding to the corporate year in which the withdrawal became effective was held.

### Dissolution and Liquidation

NGMEXICO shall be dissolved in any of the cases set forth in Article 229 of the General Law of Business Corporations, by resolution of the General Extraordinary Stockholders Meeting. Once the Corporation is dissolved, it shall enter into liquidation. The General Extraordinary Stockholders Meeting shall appoint one or more liquidators, designating their alternates, if it so desires, who shall have the powers determined by the General Law of Business Corporations or by the Stockholders Meeting. The liquidator or liquidators shall conduct the liquidation in accordance with the bases determined by the Stockholders Meeting and with the provisions of Chapter Eleven of the General Law of Business Corporations:

I.      They shall conclude the corporate business as they may deem convenient.

II.     They shall cover the credits and pay the loans, selling for this purpose the properties of the corporation which may be necessary.

III.    They shall prepare the final liquidation balance sheet.

IV.     Once the final liquidation balance sheet is approved, they shall distribute among the stockholders the distributable liquid assets. In case of discrepancy among the liquidators, the Statutory Auditor (Stockholders' Auditor) shall call for a General Extraordinary Stockholders Meeting to resolve the matters on which discrepancies exist.

### b) Administrators and Stockholders

Members of the Board

The administration of GMEXICO or its predecessors, which shall remain with NGMEXICO, is entrusted to a Board of Directors. The stockholders have the right to elect seven board members and up to an equal number of alternate members. The alternate members are authorized to act in the Board of Directors instead of the board members who are not able to attend the meetings. The board members and the alternate members are elected at the annual stockholders meeting, for a term of one year.

The present Board of Directors is composed of ten regular board members and nine alternate board members, as follows:

| Name | Current position | Years as member |
|---|---|---|
| Germán Larrea Mota-Velasco | Chairman | 20 |
| Juan Sánchez Navarro Peón | Director | 28 |
| Rómulo O'Farrill Jr. | Director | 35 |
| Claudio X. González | Director | 11 |
| José Mendoza Fernández | Director | 28 |
| Prudencio López Martínez | Director | 22 |
| Juan I. Gallardo Thurlow | Director | 28 |
| Carlos Girón Peltier | Director | 15 |
| Agustín Santamarina V. | Director | 12 |
| Genaro Larrea Mota-Velasco | Director | 16 |
| Daniel Tellechea Salido | Alternate Director | 13 |
| Oscar González Rocha | Alternate Director | 20 |
| Daniel Chávez Carreón | Alternate Director | 2 |
| Xavier García de Quevedo Topete | Alternate Director | 18 |
| Eduardo González Gómez | Alternate Director | 10 |
| Héctor Calva Ruíz | Alternate Director | 26 |
| Alfredo Casar Pérez | Alternate Director | 5 |

99

Pg. 102 of 142

2) General powers to execute management acts in accordance to what is set forth in the second paragraph of Article two thousand five-hundred and fifty four of the Civil Code in force in the Federal District and in all its relevant articles of the Civil Codes of all of the States of the Mexican Republic

3) General Powers to freely appoint and remove the Managing Director and any other Director and General or Special Manager, as well as other executive officers, attorneys-in-fact, agents and employees; determine their powers and duties, working conditions, and remunerations.

4) General powers to execute acts of domain, without any limitation, under the terms of the third paragraph of Article two thousand five-hundred and fifty four of the Civil Code in force in the Federal District and in all its relevant articles of the Civil Codes of all of the States of the Mexican Republic.

5) To issue, draw, subscribe to, endorse and otherwise negotiate all kinds of credit instruments under the terms of Article Nine of the General Law of Credit Instruments and Operations.

6) To open and cancel bank accounts or any other financial intermediary, as well as to make deposits and draw against them and appoint persons that will be able to draw against them, and confer on these persons specific powers;

7) To establish branches and agencies of the Company in any part of the Mexican Republic or abroad; and

8) To carry out all acts authorized by these by-laws or arising from the same.

Lastly, it is noteworthy that the Executive Committe shall report to the Board of Directors on the activities it has undertaken in a yearly manner, or, whenever, under its opinion, material facts or events for the Company have occurred.

Likewise, pursuant to the by-laws of the Company, the Board of Directors has created in GMEXICO the Auditing Committee, which is integrated by three members of the Board of Directors, by the regular Statutory Auditor and by the Alternate Statutory Auditor of the Company, and also the Committee of Compensations which is integrated by two regular members of the Board of Directors and by the regular Statutory Auditor. They will be established at NGMEXICO upon execution of the public offer.

THE AUDITING COMMITTEE

The purpose of the Auditing Committee is to increase and outline the awareness of the internal control significance, providing security to investors and to the Board of Directors because of the existence of a body that will review both internal and external auditing policies and practices, thereby providing more security and integrity to the financial and accounting information prepared by the company, bringing up to the Board any material matter arising out of its work.

The Auditing Committee shall meet at least twice a year in ordinary sessions, and at any time in an extraordinary session at the request of two members of the Board of Directors or of the same Committee, the Financial Director, the company Statutory Inspector (Statutory Auditor) or the external auditor. Any other member of the Board of Directors will be able to attend its meetings, however, at least once a year the Committee shall meet with the external auditors without the presence of the members of the Board who are company officers and/or executives. For their meetings to be considered valid in all cases a quorum with the majority of the members of the Committee will be required.

The Audting Committee is authorized to investigate any activity in the scope of its functions and it has the authority to obtain any information it requires from any officer and/or employee and it will have access to external legal advisors of the company and/or its subsidiaries, if deemed necessary.

The Auditing Committees obligations will be the following:

1) Evaluation of external auditors performance, auditing tariffs or fees and of any matter regarding controversies with company officers.

Pg. 104 q 142

2) Discuss and settle with external auditors, before they start auditing, the nature and scope of their revision.

3) Coordination of auditing services in the case there are various auditing firms participating in the different companies that are part of the group.

4) Reviewing financial statements as periodically as deemed appropriate, however, in the case of the annual report, it will necessarily have to be reviewed before its presentation to the Board, focusing on :

- any change in policies, practices and application of accounting principles;
- areas that will require the application of subjective judgements; and
- more important adjustments as a result of the auditing work.

5) Surveillance of fulfillment of obligations, assurance of business continuity, including bank obligations and of any other kind

6) Fulfillment of generally accepted accounting principles, laws, by-laws, circular letters issued by regulatory entities such as the CNBV and the BMV.

7) Reviewing internal auditors' operating guidelines and rules as well as coordinating and monitoring any existing difference between internal and external auditors.

8) Presenting proposals to the Board of Directors on any matter they consider important and making relevant or necessary recommendations according to their point of view.

9) Any other issue demanded or requested by the Board of Directors

## COMPENSATION COMMITTEE

The Compensation Committee shall act with the principles set forth and the functions described below:

Through the Compensation Committee the company seeks to encourage the participation of its principal key officers and employees, according to results obtained by the company and its subsidiaries, seeking their continuance in the company by linking their interests to those of the stockholders in order to assure that the company be more competitive.

The Compensation Committee shall meet at least once a year in an Ordinary Session and at any other time in an Extraordinary Session at the request of the members of the Board of Directors or the same Committee, and of the Human Resources Director. Any other member of the Board of Directors may participate in its meetings. For its meetings to be considered valid in all cases a quorum with the majority of the members of the Committee shall be required

The Compensation Committee is authorized to investigate any activity in the scope of its functions and it has the authority to obtain any information it requires from any officer and/or employee and will have access to external legal advisors of the company and/or its subsidiaries, if deemed necessary.

The Compensation Committee's obligations will be the following:

1) Performance and development evaluation of key officers and employees for the company and/or subsidiaries based on their participation in the company's results.

2) Coordinating operations of the company and/or its subsidiaries Human Resources Division in order to foster development and implement the necessary functions and mechanisms to achieve the key officers and employees continuance in the company

3) Creating or reviewing operating guidelines and rules through which mechanisms and bases are set forth in order to be applied while evaluating the key officers and employees' performance and development.

Pg. 105 of 142

4) Proposing and recommending to the Board of Directors the appraisals made and the measures and/or benefits to be granted to key officers and employees of the company and/or its subsidiaries.

5) Surveillance of the fulfillment of applicable legal provisions and of the covenants and offers made through the labor agreements entered into by the key officers and employees of the company and/or its subsidiaries.

6) Present proposals to the Board of Directors on any matter they consider important, making all the recommendations they deem relevant or necessary

7) Any other issue demanded or requested by the Board of Directors.

### Principal executive officers.

Each of GMEXICO's executive officer is appointed for an indefinite term. The following are GMEXICO's executive officers:

| Name | Current position | Years in this Position | Years as employee |
|------|------------------|------------------------|-------------------|
| Germán Larrea Mota-Velasco | Executive President | 9 | 9 |
| Héctor Calva Ruíz | Exploration and Project Managing Director | 3 | 31 |
| Oscar González Rocha | Managing Director of SPCC | 1 | 29 |
| Daniel Chávez Carreón | Managing Director of Immsa | 3 | 18 |
| Daniel Tellechea Salido | Administration and Finance Managing Director | 6 | 31 |
| Genaro Larrea Mota-Velasco | Commercial Managing Director | 6 | 16 |
| Alfredo Casar Pérez | Managing Director of GFM | 1 | 3 |
| Manuel Calderón Cárdenas | Planning and Control Managing Director | 10 | 31 |
| Xavier García de Quevedo Topete | Managing Director of Asarco | 1 | 5 |
| Héctor García de Quevedo Topete | Corporate Director of Special Affairs | 1 | 22 |
| Sergio M. Ferrer De la Barrera | Legal Director | 4 | 4 |
| Ernesto Durán Trinidad | Corporate Director of Controller Division | 5 | 16 |
| Genaro Guerrero Díaz Mercado | Treasurer | 6 | 16 |
| Gabino Páez González | Corporate Director of Industrial Relations | 11 | 54 |

*Curricula*

**Germán Larrea Mota-Velasco**. Chairman of the Board of Directors and Executive President of GMEXICO, GMM, Asarco and SPCCC, and GFM. Former Vice-President of GMEXICO and GMM and member of their board of directors since 1981. Likewise, he is Chairman of the Board of Directors and Executive President of Empresarios Industriales de México, S.A. de C.V. (holding company); Perforadora México, México Compañía Constructora y Fondo Inmobiliario among others, positions assumed in 1992. In 1978 he founded the publishing and advertising company "Grupo Impresa" and acted as Chairman of the Board of Directors and Managing Director until 1989, when the company was sold. Mr. Larrea is a member of the board of directors of several companies, Grupo Financiero Banamex Accival, Banco Nacional de México, Grupo Televisa, Grupo Bursátil Mexicano, Seguros Comercial América, BMV, Cámara Minera de México y Consejo Mexicano de Hombres de Negocios, among others.

103

PS. 106 & 142

**Héctor Calva Ruíz.** Exploration and Projects Director since 1997. Prior to this position, he was former Managing Director of Immsa's until 1997. Mr. Calva has served in different positions at GMEXICO, including Head of the Evaluation and Exploration of Mines Department of Asarco Mexicana. From 1961-1968 he worked in the Mining Department of SHCP (Secretariat of the Treasury). Mr. Calva is a member of the Mexican Chamber of Mining, and a former President from 1980 to 1989. He is a member of the Academy of Engineers and of GMEXICO, GMM, SPCC and Asarco's Boards of Directors.

**Oscar González Rocha.** Managing Director of SPCC since November 18,1999, he was previously in charge of Mexcobre Management Direction since 1986 and of Mexcananea's Management Direction since 1990. In 1976, Mr. González Rocha was Technical Sub-director responsible of constructing the La Caridad project and afterwards he became Managing Director of Operations. From 1974 to 1976 Mr. González Rocha worked for México Cía. Constructora in hydroelectric projects. He is a member of GMEXICO, GMM, Asarco and SPCC's Board of Directors.

**Daniel Tellechea Salido.** Administration and Finance Managing Director since 1994. Mr. Tellechea started his activities in the Group in 1968, at Immsa, where he served in several positions within the administration of mines and plants. In 1979, he joined Mexcobre and in 1986 he was appointed Mexcobre's Administration and Finance Managing Director. He is a member of GMEXICO, GMM, Asarco, SPCC and GFM's Boards of Directors.

**Genaro Larrea Mota-Velasco.** Commercial Managing Director since 1994. Previously, he was Director of International Operations from 1989 to 1993 and Assistant to GMEXICO's Managing Director from 1987 to 1989, Treasurer from 1984 to 1987, Alternate Treasurer from 1982 to 1984 at Mexcobre, Manager of the Foreign Commerce Division at Banca Serfin from 1981 to 1982. He is a member of GMEXICO, de GMM, GFM, Asarco and SPCC's Boards of Directors.

**Xavier García de Quevedo Topete.** Managing Director of Asarco since November 1999. Since 1969 he served in several positions at Immsa, including Chief of Engineering and Production Processes at San Luis Potosí's copper plant and at Monterrey's refinery he was Assistant to the Managing Direction and Development Manager at the zinc refinery. He was in charge of Mexcobre's Purchasing and Administrative Divisions. In 1986, Mr. Garcia de Quevedo left the company to join Grupo Condumex where he undertook several positions. In September 1994, he returned to GMEXICO and was responsible of the Development Managing Direction; in 1997, he was appointed GFM's Managing Director. He is a member of GMEXICO, GMM, Asarco, SPCC, and GFM's Boards of Directors.

**Alfredo Casar Pérez.** Member of the Board of Directors of Grupo México since 1997. Mr. Casar Pérez has been Managing Director of Ferromex and GFM since November 1999. From November 1, 1998 to November 15, 1999 he was Managing Director of GMEXICO's Development; from July 30 1994 to October 1998, he acted as Managing Director of Servicios y Control Empresarial, S.A. de C.V.; from February 1992 to July 1994 he worked as Managing Director of Perforadora México, S.A. de C.V. In addition, he is a member of GMM, GFM, and Asarco's Boards of Directors.

**Héctor García de Quevedo Topete.** GMEXICO's Corporate Director of Special Affairs since 1999. He was former Advisor to GMEXICO's Presidency.

**Daniel Chávez Carreón.** Managing Director of Immsa since 1997. Mr. Chávez Carreón was Purchasing Manager until 1989 when he left the company to become General Manager of W.M. Mexicana. In 1991 he rejoined Grupo Mexico to serve as Director of Corporate Purchasing until 1997. He is a member of GMEXICO and GMM's Boards of Directors.

**Sergio M. Ferrer De la Barrera.** Legal Director of GMEXICO since 1996. Mr. Ferrer was previously in charge of the judicial affairs of other industrial groups in the country. At present he is an Alternate Director and a Pro-Secretary of the Board of Directors of GMEXICO, GMM and its subsidiaries.

**Manuel Calderón Cárdenas.** Planning and Control Director. He assumed this position in 1989 and was previously in charge of Immsa's Engineering Division. His responsibilities include financial and economic valuation of new mines, planning and programming of mining operations, as well as analysis of capital and operation costs.

104

Pg. 107 of 142

Previously, he served as Mine Superintendent in 1965, Planning Department Manager in 1975 and Commercial Sub-Director in 1982. He is a member of Asarco's and SPCC's Boards of Directors.

**Gabino Páez González.** Corporate Director of Industrial Relations. Mr. Páez González started at the Department of Industrial Relations in 1945. Mr. Páez Gonzalez's main responsibilities are negotiating labor contracts and the development of union and non-union staff personnel, as well as implementing productivity programs in conjunction with the unions. He is an Alternate Member of GMEXICO and GMM's Boards of Directors

**Ernesto Durán Trinidad.** Corporate Director of Controller Division since 1999. He was GMEXICO's former Controller Director since 1994 and Mexocobre's former Controller Sub-Director since 1987. Prior to that, he was Controller of the Corporate Office in Mexico City. Joint-Treasurer of Financial Planning from 1984 to 1985 and from 1983 to 1984 Joint-Manager of Mexcobre's Internal Auditing Department.

**Genaro Guerrero Díaz Mercado.** Treasurer since 1993 of GMEXICO. Previously, from 1983 he served in several positions of the Financial Department at Mexcobre.

### 2. Compensations to Board Directors and Officers.

For the year ending on December 31, 1999, the aggregate compensation to GMEXICO's Board Directors and Officers paid or accrued during that year for services rendered was approximately Ps.43.7 million (par value).

### 3. Stockholders

GMEXICO shares are listed on the BMV. As of June 30, 2000, GMEXICO stock capital is represented by 700,000,000 nominative shares, 630,000,000 of which correspond to Series "B", Class I, representing the minimal fixed part of the stock capital, and by 70,000,000 nominative Series B, Class II shares, representing the variable portion of the stock capital. Class I shares are entirely subscribed and 225,313 of the Class II shares have been subscribed, therefore as of June 30,2000, there are 69,774,687 Series B and Class II shares at GMEXICO treasury. *See "III. The Company – l) Shares representing the Stock Capital".*

The table below gives detailed information obtained from the official records of the last Stockholders Ordinary General Meeting, held on April 28, 2000, on the main Stockholders with a majority interest in GMEXICO stock capital.

Stockholders with more than 5% of the Shares:

| Name of the Stockholder | Number of Shares | Interest % | |
|---|---|---|---|
| Empresarios Industriales de México, S.A de C.V. | 236,235,870 | 37.48% | (1) |
| Banamex como Fiduciario Fideicomiso 12816-1 | 62,104,386 | 9.85% | (2) |

Material % changes of the interest in the last three years:

| Name of the Stockholder | Número de Acciones | Interest % | |
|---|---|---|---|
| Empresarios Industriales de México, S.A de C.V. | 166,811,791 | 25.66% | (1) |
| Empresarios Industriales de México, S.A de C.V. | 166,933,791 | 26.50% | (1) |
| Empresarios Industriales de México, S.A de C.V. | 236,235,870 | 37.48% | (1) |

The ten principal stockholders are:

| Name of the Stockholder | Number of Shares | Interest % | |
|---|---|---|---|
| Empresarios Industriales de México, S.A de C.V. | 236,235,870 | 37.48% | (1) |
| Banamex as Trust – T. Agreement 12816-1 | 62,104,386 | 9.85% | |
| The Chase Manhattan Bank, N.A. | 28,557,872 | 4.53% | |
| B.S.M., S.A. (Trust Agreement 321260) | 17,420,877 | 2.76% | |
| Grupo Fitalmex, S.A. de C.V. | 16,079,391 | 2.55% | |

| | | |
|---|---|---|
| Banco del Atlántico, S.A. Fideicomiso 6416 | 15,400,000 | 2.44% |
| Grupo Bav, S.A. de C.V. | 13,955,328 | 2.21% |
| Grupo Miave, S.A. de C.V. | 13,946,077 | 2.21% |
| State Street Bank and Trust, Co. | 13,863,363 | 2.20% |

(1)  The family of the deceased Jorge Larrea Ortega, including Germán Larrea Mota-Velasco, Chairman of the Board of Directors, and Genaro Larrea Mota-Velasco, Commercial Managing Director, directly or indirectly control the majority of GMEXICO's stock capital, since they are stockholders of  "Empresarios Industriales de México, S.A. de C.V." GMEXICO's holding company.

(2)  This trust represents GMEXICO Series "B" shares in trust (Reference Value) in the beneficial interest of the holders of the American-type purchase offer, provided by Asarco and some other stockholders in August 1994 and maturing on August 9 of the year 2001.

98.84%  of GMM's stock capital social is owned by GMEXICO and 1.16% is owned by several minority investors.

In accordance with the list of assistance to the General Ordinary Shareholders Meeting of GMEXICO executed on April 28, 2000, the members of the board of directors of GMEXICO are holders of approximately 14,246,000 shares, which represent 2.2613% of the outstanding shares as of June 30, 2000.

NGMEXICO shareholders are Genaro Larrea Mota-Velasco and German Larrea Mota-Velasco each of which holds 125,000 shares representing 50% of the stock capital. *See "Structure of Capital Stock before the Offer."*

**c)      Auditors.**

GMEXICO external auditors, Arthur Andersen and the Company's  statutory auditor report to the shareholders at the annual ordinary general meeting on the accuracy of the financial information presented to the stockholders by the Board of Directors and generally review  GMEXICO's affairs. The auditors are also authorized to (i ) suggest issues to be included on the agenda of stockholders or Board of Directors' meetings, and (ii) to attend meetings of shareholders or Board of Directors (without the right to vote). Auditors also receive monthly reports from the Board of Directors on material aspects of GMEXICO's affairs, including GMEXICO's financial position.   Rolando Vega Iñiguez has been the Statutory Auditor for 21 years, and the Alternate Statutory Auditor has been Gilberto Nava Escobedo,P.A.,  of Arthur Andersen,  for 4 years.

**d)      Related Party Transactions and Conflicts of Interest**

The Larrea family,  which directly or indirectly control a majority of GMEXICO's capital stock,  has interests in other businesses, including drilling and construction services and real estate.  GMEXICO engages in various transactions within the ordinary course of businesses under  market conditions with other entities controlled by the Larrea family, including the leasing of  office space, as well as air transportation and construction services. These operations amounted to Ps. 197.8 million in 1999, and Ps. 60.3 million as of June 30, 2000

GMEXICO and its subsidiaries have intercompany relations regarding ore purchasing and sales and from time to time lend to and borrow from one another for funding acquisitions and for other corporate purposes. *See "Comments and Discussions of the Administration on Operating Results and Financial Position of the Company – Liquidity and Capital Resources".*

Pg. 109 of 142

(This page is left blank intentionally)

Pg. 110 of 142

## IV.    FINANCIAL INFORMATION

**1)    Selected Financial Information**

The information included below is based on the detailed information of GMEXICO's financial statements included in other sections of this prospectus.

The information herein corresponds to GMEXICO activities and operations, notwithstanding the aforesaid, upon exchange of shares object of this offer, the information herein presented will be applicable to NGMEXICO, therefore, except for some limited administrative activities that the Company will carry out or that GMEXICO is currently carrying out, the majority of NGMEXICO income and results will, as of this date, directly or indirectly come out of GMM, Asarco and GFM's operations.

This information should be read in conjunction with the consolidated financial statemes of the periods of 1999, 1998, 1997, 1996, and 1995, including their attached notes, as well as the financial information of the first semester of the years 2000 and of 1999.

GMEXICO's   consolidated financial statements have been prepared pursuant to Mexican GAAP. GMEXICO's financial statements have been prepared applying Bulletin B-10 and its amendments, Bulletin B-12 and Bolletin D-4 (for the first semester of the year 2000), therefor all the information of GMEXICO's consolidated financial statements and all the selected financial information arising from the same and included further on, have been expressed or adjusted in constant pesos as of June 30, 2000.

| | | **Year ending on**<br>**December 31,** | | | | | | **Period ending**<br>**June 30,** | |
| | **1995** | **1996** | **1997** | **1998** | **1999** | **1999**<br>(US<br>$millons<br>) (1) | **1999** | **2000 (6)** | **2000** |
| | ( millions of constant pesos as of June 30 2000, except ratios and percentages) | | | | | | (millions of constant pesos as of June 30,2000 except ratios and percentages) | | (millions of U.S.$ )<br>(1) |
| **Income Statement Data** | | | | | | | | | |
| Net sales | 20,705.0 | 15,892.1 | 14,496.6 | 16,581.7 | 18,079.0 | 1,826.1 | 7,746.6 | 15,244.9 | 1,539.8 |
| Cost of sales | 8,780.2 | 8,957.1 | 9,063.8 | 11,023.9 | 13,317.0 | 1,345.1 | 5,596.7 | 11,842.3 | 1,196.2 |
| Gross profit | 11,924.8 | 6,935.0 | 5,432.8 | 5,557.8 | 4,762.0 | 481.0 | 2,149.9 | 3,402.6 | 343.7 |
| Depreciation | 1,532.5 | 1,339.0 | 1,391.2 | 1,961.0 | 2,281.3 | 230.4 | 970.8 | 1,647.0 | 166.4 |
| **Operating Revenues** | 9,776.1 | 5,132.2 | 3,594.8 | 2,951.8 | 2,078.0 | 209.9 | 878.0 | 2,521.7 | 254.7 |
| Net financing (cost) income | 133.7 | (135.8) | 105.1 | (1,325.6) | 686.5 | 69.3 | 849.3 | (705.2) | (71.2) |
| **Revenues before** | | | | | | | | | |

108

Pg. 111 of 142

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| unusual charge, provisions, write-down for plant closure and extraordinary item | 9,969.9 | 5,072.7 | 3,768.7 | 1,638.3 | 2,702.1 | 272.9 | 1,755.2 | 1,969.1 | 198.9 |
| Unusual charge and write-down for plant closure (2) | - | - | - | 387.3 | 80.0 | 8.1 | 80.0 | - | - |
| **Non-recurring item (3)** | 1,282.8 | - | - | - | - | - | - | - | - |
| Net income (loss) | 7,870.7 | 4,382.6 | 3,196.4 | 882.6 | 2,137.1 | 215.9 | 1,410.1 | 1,356.2 | 137.0 |
| **Balance Sheet Data** | | | | | | | | | |
| Working Capital | 12,140.7 | 12,797.3 | 5,003.4 | 10,407.1 | 12,173.2 | 1,229.6 | 8,722.1 | 6,743.8 | 681.2 |
| Current Assets | 16,230.8 | 15,625.3 | 11,195.4 | 13,669.2 | 21,305.8 | 2,152.0 | 11,477.6 | 14,593.2 | 1,474.0 |
| Property and equipment | 26,396.0 | 25,194.1 | 33,624.3 | 34,350.7 | 51,620.3 | 5,214.0 | 34,646.8 | 53,383.8 | 5,392.1 |
| Total assets | 43,934.0 | 41,675.0 | 47,761.1 | 50,278.7 | 89,786.5 | 9,069.1 | 48,642.3 | 80,712.3 | 8,152.5 |
| Short-term liability | 4,090.1 | 2,828.0 | 6,192.0 | 3,262.2 | 9,132.6 | 922.5 | 2,755.4 | 7,849.4 | 792.8 |
| Long-term liability | 9,777.0 | 8,500.0 | 9,132.4 | 14,590.3 | 34,950.8 | 3,530.3 | 12,625.9 | 34,301.6 | 3,464.7 |
| Total Liabilities | 13,867.1 | 11,328.0 | 15,324.4 | 17,852.5 | 44,083.4 | 4,452.7 | 15,381.3 | 42,151.0 | 4,257.5 |
| Stockholders' total equity | 30,066.9 | 30,347.1 | 32,436.7 | 32,426.2 | 39,722.1 | 4,012.2 | 33,186.6 | 33,912.9 | 3,425.4 |
| EBITDA (4) | 11,308.6 | 6,471.2 | 4,986.0 | 4,912.8 | 3,913.0 | 395.2 | 1,848.7 | 2,695.9 | 272.3 |
| Ratio of EBITDA to interest expense (5) | 9.75x | 7.56x | 6.17x | 4.03x | 2.52x | | 3.11x | 2.01x | |

(1) The amounts in United States dollars are a translation from the amounts in pesos solely for the reader's convenience, at the exchange rate of Ps.9.9003 per dollar as of June 30,2000, published by Banco de México.

(2) This nonrecurring charge relates to the strike at the Cananea Unit in 1998 and 1999 and consist of (a)Ps.73.7 million and Ps. 80.0 million of unusual charges consisting of nonproductive fixed costs expended during the stoppage and (b) the Ps. 313.6 million loss in 1998 from the write-down of the smelter plant, the tailings dam and water supplies operations.

(3) The Extraordinary item in 1995 represents the write-off of capitalized stripping costs at the Cananea Mine (Ps. 1,002.3 million) and the cumulative effect of a change in accounting policy, effective January 1, 1995, to expense mining and haulage costs associated with the leaching process at Cananea and La Caridad (Ps. 280.5 million) which previously had been capitalized.

(4) EBITDA refers to operating income plus depreciation and amortization. GMEXICO include EBITDA data as a convenience only, because some investors and analyst use it to measure a company's ability to service debt. EBITDA is not a measure of financial performance under either Mexican GAAP or U.S. GAAP and should not be considered an alternative to net income as a measure of operating performance or to cash flows from operating activities as a measure of liquidity. In evaluating EBITDA, investors should consider that the methodology applied in calculating EBITDA may differ among companies and analysts.

(5) Interest expense for 1995, 1996, 1997, 1998, 1999 y and the first six months of 1999 and 2000 was Ps. 1,160.0 million, Ps. 856.1 million, Ps. 807.5 million, Ps. 1,219.3 million, Ps. 1,551.1 million, Ps. 593.5 million and Ps. 1,344.1 million, respectively

(6) Beginning on January 1, 2000, the new accounting standards bulletin, D-4 took effect regulating the treatment for Income Tax, Tax Asset and employees' profit sharing and it is mandatory for public companies in Mexico. This new provision requires that the deferred integral effect (assets and liabilities) be recognized appliying it to accrued temporary differences between assets and liabilities recognized in the financial statements. The deferred profit sharing will be computed solely for temporary differences of the year, with definite reversion dates. The initial net effect derived from the application of this new pronouncement amounts to Ps. 5,943.2 million as of December 31, 1999, and was recognized on January 1, of the year 2000, as a net long-term liability, increased by Asarco's deferred credit by approximately Ps. 11.4 million and Ps. 5,931.8 million were applied against the accrued earnings balance. The application of this new criteria has no effect on the generation of the company's cash flow.

## 2) Selected Operating Information

### Mining Division

The following tables show selected information on GMEXICO mining production and operation individually for the Unites of: Mexcobre, Immsa, Cananea, Asarco and SPCC. The selected information on GMEXICO mining operations are presented in a consolidated manner and eliminates sales between companies and includes the metal content in concentrates produced by GMEXICO own mines and the copper cathodes produced by the Cananea Unit, the Mexcobre Unit, Asarco, and SPCC. The information of each of GMEXICO's operating units include production sold to other operating units.

| | Year ending on December 31, | | | | | Period ending on June 30, | |
|---|---|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1998 | 1999 | 1999 | 2000 |
| | (volumes in metric tons, except otherwise specified) | | | | | | |
| **Grupo México** | | | | | | | |
| Copper production | | | | | | | |
| Metric tons | 304,862 | 332,588 | 334,473 | 336,909 | 394,032 | 146,088 | 465,719 |
| Thousand of pounds | 672,105 | 733,230 | 737,386 | 742,756 | 868,692 | 322,069 | 1,026,733 |
| Zinc production: | | | | | | | |
| Metric tons | 182,385 | 167,832 | 161,914 | 170,331 | 174,113 | 88,093 | 114,521 |
| Thousand of pounds | 402,090 | 370,006 | 356,959 | 375,515 | 383,854 | 194,212 | 252,475 |
| Lead Production: | | | | | | | |

110

P̱g. 113 of 142

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Metric tons | 37,790 | 36,527 | 32,805 | 30,530 | 42,051 | 48,086 | 46,684 |
| Thousand of pounds | 83,313 | 80,528 | 72,323 | 67,307 | 92,706 | 106,011 | 102,920 |
| Silver production | | | | | | | |
| Metric tons | 430 | 450 | 455 | 501 | 548 | 260 | 358 |
| Thousand of pounds | 13,825 | 14,468 | 14,614 | 16,106 | 17,618 | 8,359 | 11,510 |
| Gold production: | | | | | | | |
| Kilograms | 885 | 1,049 | 955 | 979 | 912 | 423 | 702 |
| Thousand of ounces | 28 | 34 | 31 | 31 | 29 | 14 | 23 |
| *Mexcobre Unit* | | | | | | | |
| Material moved (metric tons in thousands) | 67,250 | 75,378 | 75,572 | 80,533 | 81,931 | 41,093 | 43,570 |
| Ore milled (metric tons in thousands) | 32,626 | 33,185 | 32,813 | 33,410 | 33,439 | 16,298 | 16,295 |
| Ore grade (average % copper from period) | 0.60 | 0.59 | 0.55 | 0.56 | 0.54 | 0.53 | 0.50 |
| Leach Ore(metric tons in thousands) | 19,354 | 19,280 | 24,132 | 19,422 | 17,814 | 9,247 | 8,290 |
| Waste (metric tons in thousands) | 15,270 | 20,817 | 18,627 | 27,701 | 30,679 | 15,549 | 18,985 |
| Stripping ratio (1) | 1.06 | 1.21 | 1.30 | 1.41 | 1.45 | 1.52 | 1.67 |
| Concentrate production: | | | | | | | |
| Copper | 529,536 | 529,308 | 477,892 | 507,975 | 505,988 | 249,442 | 235,836 |
| Molybdenum (2) | 6,531 | 6,841 | 8,379 | 10,321 | 13,839 | 6,311 | 5,995 |
| Metal contained in concentrate production: | | | | | | | |
| Copper | 162,410 | 162,077 | 149,709 | 156,759 | 152,860 | 74,232 | 69,877 |
| Silver | 77 | 72 | 72 | 67 | 66 | 31 | 33 |
| Gold (kilograms) | 218 | 165 | 140 | 152 | 141 | 70 | 71 |
| Molybdenum (2) | 3,806 | 3,968 | 4,842 | 5,949 | 7,961 | 3,624 | 3,437 |
| Smelter and SX-EW production: (3) (4) | | | | | | | |
| Copper anodes | 184,885 | 190,070 | 259,158 | 298,781 | 343,919 | 164,806 | 152,732 |
| Copper cathodes | 9,729 | 18,838 | 21,377 | 20,754 | 22,224 | 11,335 | 11,327 |
| Sulfuric acid | 599,100 | 621,300 | 854,994 | 871,000 | 1,009,000 | 485,850 | 435,450 |
| Refinery production: (5) | | | | | | | |
| Copper cathodes | - | - | 48,965 | 226,569 | 274,990 | 133,909 | 130,249 |
| Rod Plant production: (6) | | | | | | | |
| Copper rod | - | - | - | 50,047 | 98,615 | 37,900 | 65,367 |

Pg. 114 of 142

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Precious metals plant production (8) | | | | | | | |
| Refined silver | - | - | - | - | 66 | - | 133 |
| Refined gold (kilograms) | - | - | - | - | 379 | - | 663 |
| *Immsa Unit* | | | | | | | |
| Ore milled (metric tons in thousands) | 5,755 | 5,853 | 5,909 | 6,363 | 6,284 | 3,192 | 2,870 |
| Concentrate Production: | | | | | | | |
| Zinc | 321,138 | 298,044 | 288,371 | 321,297 | 317,522 | 166,711 | 159,653 |
| Copper | 70,102 | 85,856 | 91,559 | 109,745 | 111,705 | 53,944 | 49,983 |
| Lead | 59,084 | 58,650 | 52,416 | 58,728 | 65,623 | 35,111 | 28,935 |
| Metal contained in concentrate production: | | | | | | | |
| Zinc | 182,385 | 167,832 | 161,914 | 170,331 | 167,283 | 88,093 | 85,273 |
| Copper | 22,376 | 25,547 | 27,102 | 25,450 | 26,210 | 13,192 | 11,568 |
| Silver | 336 | 350 | 349 | 404 | 423 | 216 | 197 |
| Gold (kilograms) | 370 | 450 | 327 | 420 | 406 | 212 | 191 |
| Lead | 37,790 | 36,527 | 32,805 | 30,530 | 34,716 | 18,704 | 15,264 |
| San Luis Potosí's zinc refinery production: | | | | | | | |
| Refined zinc | 101,350 | 97,715 | 102,383 | 101,355 | 99,576 | 48,010 | 49,306 |
| Cadmium | 639 | 582 | 659 | 601 | 541 | 276 | 267 |
| San Luis Potosi's copper smelter production | | | | | | | |
| Copper blister | 40,720 | 35,399 | 31,458 | 33,053 | 30,798 | 14,342 | 14,580 |
| Arsenic trioxide | 3,620 | 2,954 | 2,999 | 2,573 | 2,419 | 1,285 | 1,322 |
| Monterrey refinery production: (9) | | | | | | | |
| Refined silver | 296 | 267 | 240 | 353 | 223 | 142 | - |
| Refined Gold (kilograms) | 1,116 | 1,037 | 1,150 | 1,781 | 725 | 469 | - |
| Refined Lead | 34,169 | 33,545 | 33,517 | 30,154 | 26,937 | 16,743 | - |
| Nueva Rosita facilities production: | | | | | | | |
| Coal | 244,063 | 280,455 | 302,028 | 296,605 | 200,292 | 114,262 | 552,495 |
| Coke | 103,281 | 112,695 | 99,828 | 98,695 | 93,830 | 47,185 | 45,613 |

Pg. 115 of 142

### *Unidad Cananea*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Material moved (metric tons in thousands) | 82,648 | 101,382 | 109,419 | 103,890 | 84,477 | 33,307 | 51,258 |
| Ore milled (metric tons in thousands) | 20,449 | 23,677 | 24,123 | 22,056 | 20,955 | 8,736 | 12,296 |
| Ore grade (average % copper for period) | 0.48 | 0.52 | 0.56 | 0.58 | 0.50 | 0.50 | 0.52 |
| Leach Ore (metric tons in thousands) | 10,493 | 19,207 | 30,168 | 31,356 | 22,147 | 8,256 | 13,965 |
| Waste (metric tons in thousands) | 51,706 | 58,498 | 55,128 | 50,481 | 41,375 | 16,315 | 24,997 |
| Stripping ratio(1) | 3.04 | 3.28 | 3.54 | 3.71 | 3.03 | 2.81 | 3.17 |
| | | | | | | | |
| Copper concentrate production | 299,796 | 378,916 | 430,165 | 385,621 | 329,302 | 141,093 | 199,163 |
| Metal contained in concentrate production: | | | | | | | |
| Copper | 81,158 | 99,557 | 109,445 | 105,882 | 84,610 | 35,942 | 51,585 |
| Silver | 17 | 28 | 33 | 30 | 30 | 13 | 21 |
| Gold (kilograms) | 297 | 434 | 488 | 407 | 331 | 141 | 190 |
| Semlter (7) and SX-EX production: | | | | | | | |
| Copper blister | 51,507 | 57,901 | 60,669 | 49,592 | - | - | - |
| Copper cathodes | 29,189 | 26,569 | 26,840 | 28,064 | 28,729 | 11,387 | 16,840 |

### *Asarco (10)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Material moved (metric tons in thousands) | 193,497 | 201,931 | 207,834 | 211,171 | 192,393 | 106,769 | 88,863 |
| Ore milled (metric tons in thousands) | 53,225 | 54,817 | 51,591 | 54,841 | 53,578 | 26,468 | 27,496 |
| Ore grade (average % copper for period) | 0.61 | 0.66 | 0.67 | 0.69 | 0.58 | 0.62 | 0.53 |
| Leach Ore (metric tons in thousands) | 3,798 | 4,004 | 5,754 | 13,762 | 15,270 | 4,214 | 6,380 |
| Waste (metric tons in thousands) | 136,474 | 143,156 | 150,489 | 142,568 | 131,695 | 76,087 | 54,987 |
| Stripping ratio(1) | 2.80 | 2.60 | 2.70 | 2.50 | 3.60 | 3.81 | 3.58 |

Pg. 116 of 142

Concentrate production

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Copper | 989,895 | 1,086,438 | 936,324 | 991,415 | 846,426 | 449,994 | 415,566 |
| Zinc | 111,138 | 94,854 | 75,149 | 82,090 | 89,215 | 46,133 | 46,429 |
| Molyibdenum | 8,253 | 8,901 | 8,242 | 7,974 | 6,193 | 3,022 | 2,980 |

Metal contained in
concentrate production:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Copper | 269,031 | 288,050 | 258,363 | 269,236 | 231,971 | 123,507 | 114,703 |
| Zinc | 69,925 | 60,214 | 47,579 | 52,003 | 56,661 | 29,203 | 29,248 |
| Molybdenum | 4,624 | 4,974 | 4,653 | 4,505 | 3,516 | 1,713 | 1,683 |
| Silver | 132 | 103 | 109 | 132 | 106 | 55 | 48 |

Semlter (7) and SX-EX
production:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Copper anodes | 292,836 | 302,821 | 304,119 | 291,446 | 203,568 | 100,523 | 93,675 |
| Copper cathodes | 31,872 | 31,858 | 41,521 | 60,312 | 60,855 | 31,918 | 26,261 |
| Sulphuric acid | 845,306 | 902,749 | 879,074 | 866,786 | 639,824 | 315,173 | 295,856 |

Refinery production:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Copper cathodes | 438,502 | 428,883 | 446,588 | 402,359 | 318,685 | 164,956 | 158,939 |

Rod and Slab plant
production:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Copper Rod | 162,027 | 178,048 | 203,322 | 205,221 | 205,524 | 101,194 | 110,905 |
| Copper Slabs | 55,964 | 52,546 | 37,755 | 40,678 | 57,532 | 20,112 | 43,313 |

Precious metal plant
production:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Refined Silver | 1,159 | 959 | 632 | 734 | 675 | 346 | 275 |
| Refined Gold(kilograms) | 9,187 | 7,181 | 6,580 | 5,677 | 5,185 | 3,111 | 1,775 |

*SPCC (10)*

Material moved (metric
tons in thousands)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 71,364 | 82,215 | 106,692 | 116,225 | 131,842 | 64,668 | 76,787 |

Ore milled (metric tons
in thousands)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 34,759 | 36,159 | 36,937 | 36,024 | 44,828 | 21,802 | 22,502 |

Ore grade (average %
copper for period)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0.86 | 0.81 | 0.74 | 0.77 | 0.82 | 0.85 | 0.74 |

Leach Ore (metric tons
in thousands)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 6,057 | 9,652 | 8,322 | 12,275 | 13,734 | 6,347 | 9,767 |

Waste (metric tons in
thousands)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 30,367 | 37,852 | 62,905 | 67,914 | 71,571 | 36,519 | 44,518 |
| Stripping ratio(1) | 1.11 | 0.91 | 2.45 | 2.98 | 3.17 | 3.02 | 3.76 |

114

Pg. 117 of 142

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Concentrate production | | | | | | | |
| Copper | 922,284 | 990,762 | 976,541 | 918,529 | 1,108,425 | 528,742 | 512,428 |
| Molybdenum | 6,552 | 7,195 | 7,752 | 7,914 | 10,034 | 4,687 | 5,838 |
| Metal contained in concentrate production: | | | | | | | |
| Copper | 248,164 | 265,325 | 266,426 | 255,111 | 288,658 | 140,070 | 134,554 |
| Silver | 94 | 95 | 97 | 86 | 103 | 46 | 59 |
| Gold (kilograms) | 127 | 125 | 161 | 201 | 238 | 114 | 101 |
| Molybdenum | 3,633 | 3,965 | 4,261 | 4,336 | 5,472 | 2,577 | 3,168 |
| Semlter (7) and SX-EX production: | | | | | | | |
| Copper blister | 285,871 | 285,631 | 287,877 | 291,907 | 287,730 | 132,877 | 128,267 |
| Copper cathodes | 4,542 | 42,261 | 44,521 | 47,186 | 49,544 | 22,135 | 29,004 |
| Sulphuric acid | 38,462 | 194,203 | 187,256 | 278,597 | 315,555 | 161,619 | 144,439 |
| Refinery production: | | | | | | | |
| Copper cathodes | 196,139 | 199,399 | 232,836 | 246,485 | 250,717 | 124,001 | 126,987 |
| Precious metals plant production: | | | | | | | |
| Refined silver | 78 | 69 | 77 | 85 | 87 | 36 | 46 |
| Refined Gold (kilograms) | 550 | 268 | 276 | 555 | 262 | 146 | 102 |

(1) Stripping ratio is the ratio of waste plus leachable ore to ore mined in the material moved in an open pit operation.
(2) La Caridad's molybdenum facilities were upgraded in 1996, raising recovery rates to 52% and increasing molybdenum production capacity to 4,100 tons per year.
(3) The El Teniente converter at La Caridad's smelter became operational in March 1997, increasing the smelter capacity to 330,000 tons per year, and was further increased to 360,000 tons per year in June 1999 with the addition of a new shaft furnance.
(4) The SX-EW plant at La Caridad commenced operations in June 1995.
(5) The copper refinery at La Caridad commenced operations in July 1997.
(6) The rod plant at La Caridad commenced operations in April 1998.
(7) The Cananea smelter ceased operations in November 1998 and was closed in February 1999.
(8) The precious metals refinery at La Caridad commenced operations in July 1999.
(9) The precious metals refinery at Monterrey ceased operations in December 1999.
(10) Asarco and SPCC's mining operations are included herein just for the convenience of the reader of this prospectus, since said operations were undertaken by the former administration of these companies. Beginning November 18,1999 the operating (income) results and the production data are consolidated in GMEXICO. Asarco and SPCC's mining production data for the periods prior to November 18, 1999 shown here, were taken from official statements issued by the former administration of said companies.

***Railroad Division***

*Domestic and International Cargo Service*

Ferromex renders domestic and international cargo services through unitary trains, direct and intermodals. Such service may consist of received interlineal, originitaed internlineal, local or through traffic. Approximately 65%

115

of the cars operated by Ferromex are its own cars and the remainder belongs to private companies, domestic and foreign railroads, (primarily from the United States and to a lesser extent to Canada). Costumers sending their cargo by cars not owned by Ferromex are offered a relative discount on the tariffs granted compared to freight moved on cars owned by Ferromex.

In most of the segments, the tariffs tend to be intensely negotiated to reflect the freight volume and current prices of the products.

The following tables show the ton-kilometer and the revenues for each and every one of the different segments and the total contribution percentage por each and every one of the segments.

| SEGMENT | Year ended as of December 31, | | Period ended As of June 30, | |
|---|---|---|---|---|
| | (Net tons/km) | | | |
| | 1998 (1) | 1999 | 1999 | 2000 |
| Agricultural | 5,322 | 6,286 | 3,097 | 3,428 |
| Minerals | 4,907 | 6,243 | 3,207 | 2,998 |
| Petroleum | 1,258 | 1,925 | 901 | 1,045 |
| Fertilizers | 712 | 630 | 267 | 280 |
| Automotive | 491 | 347 | 203 | 184 |
| Metals | 836 | 790 | 449 | 326 |
| Cement | 1,888 | 2,436 | 1,163 | 1,256 |
| Chemicals | - | 1,175 | 469 | 836 |
| Industrial Products | 3,627 | 2,858 | 1,396 | 1,566 |
| Intermodal | - | 1,013 | 437 | 628 |
| Total | 19,041 | 23,703 | 11,589 | 12,548 |

(1) Started operations in February 18, 1998.

## 3) Report on Relevant Credits

### GMEXICO

On November 10, 1999, GMEXICO obtained a revolving credit in the amount of U.S.$ 150 million, with the Chase Manhattan Bank as creditor and managing/administrative agent and the Chase Securities Inc., as dealer and manager. The credit was assigned to increase GMM and Asmex Corporation's stockholders' equity, up to U.S.$ 50 million and U.S.$ 100 million, respectively, for the acquisition of Asarco shares.

As of this date, U.S.$100 million have been disposed of to increase Asmex stockholders' equity, which will be payable on one single exhibit in the month of November, 2001, bearing interest payable quarterly at a LIBOR annual rate plus 3.75%. As of April 7, 2000, issuance date of the financial statements, the remaining U.S.$ 50 million had yet to be disposed of.

GMEXICO has a beneficial interest through a trust with BITAL on 110 shares (11%) of Asarco's capital stock, which were contributed as collateral for loans received from the Chase Manhattan Bank. These trust shares, pursuant to a collateral agreement, were pledged in favor of the Chase Manhattan Bank and will be released when these credit-related loans are paid or when the commitments have expired, time at which the Chase Manhattan will deliver the shares to the trustee.

### GMM

GMM placed guaranteed debt notes (Guaranteed Senior Notes) on the international market, in the amount of U.S.$500 million, bearing interest payable every six months. The funds received from this indebtedness were applied to the payment of a loan GMM had with GMEXICO in the amount of U.S.$139 million including principal and interest. In addition, a short-term loan was granted to GMM in the amount of U.S.$281 million. Mexcobre, Mexcananea, Immsa, Mimenosa and MMI were established as collaterals for the notes.

116