KELLY A. JOHNSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
DAVID L. DAIN
STEVEN A. KELLER, AZ Bar No. 7426
KIM J. SABO
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone: (202) 514-5465

PAUL K. CHARLTON
United States Attorney
SUE KLEIN, AZ Bar No. 11253
Assistant United States Attorney
Two Renaissance Square
40 N. Central Av., Suite 1200
Phoenix, Arizona 85004
Telephone: (602) 514-7740

Attorneys for Plaintiff United States of America

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ASARCO, INC. and SOUTHERN PERU HOLDINGS CORPORATION,<br><br>Defendant. | No. CV 02-2079-PHX-RCB<br><br>CONSENT DECREE |

I. BACKGROUND

A.   The United States filed its Complaint in this action on August 9, 2002, seeking declaratory relief pursuant to 28 U.S.C. § 2201 regarding the rights and obligations of the parties under Section 3304 of the Federal Debt Collection Procedures Act of 1990 ("FDCPA"), 28 U.S.C. § 3304, and the Federal Priorities Act ("FPA"), 31 U.S.C. § 3713, and seeking appropriate injunctive relief.

CONFIDENTIAL                                                                                                                                  GM_BURNS_010135

B.  Defendant ASARCO Incorporated ("ASARCO") is incorporated in the State of New Jersey and maintains its principal place of business at 2575 E. Camelback Rd., Phoenix, Arizona. Defendant Southern Peru Holdings Corporation ("SPHC") is incorporated in the State of Delaware and maintains its principal place of business at 2575 E. Camelback Rd., Phoenix, Arizona. SPHC is a holding company and is a wholly owned subsidiary of ASARCO. ASARCO is a wholly owned subsidiary of Americas Mining Corporation ("AMC"), which is incorporated in the State of Delaware. AMC is a wholly owned subsidiary of Grupo Mexico S.A. de C.V. ("Grupo Mexico"), a Mexican corporation.

C.  ASARCO has established liabilities to the United States. These include, but are not limited to, environmental clean-up and/or payment obligations under the following civil judgments: *United States v. ASARCO* (W.D. Wash.), Civil Action No. C91-5528 B; *United States v. ASARCO* (W.D. Wash.), Civil No. C94-5714RJB; *United States and State of Idaho v. ASARCO, et al.* (D. Idaho), Civil Action No. 94-206-N-EJL; *United States and State of Texas v. Encycle/Texas and ASARCO* (S.D. Texas), Civil Action H-99-1136; *United States v. ASARCO* (D. Mont.), CV 98-3-H-CCL; *United States v. ASARCO* (D. Mont.), CV-90-46-H-CCL; *United States and State of Arizona v. ASARCO* (D. Ariz.), No. CIV 98-0137 PHX ROS; *United States v. ASARCO* (D. Colo.), Civil Action Nos. CV-83-C-2388 and 86-C-1675; *United States v. ASARCO* (D. Utah), Civil Action No. 2:98CV-0415B; *United States v ARCO, et al.* (D. Montana), Civil Action No. 02-35-Bu-RFC; and *United States v. ASARCO, et al.* (D. Kansas), Civil Action No. 99-1399.

D.  ASARCO also has environmental liabilities to the United States under administrative orders on consent issued by the United States Environmental Protection Agency ("EPA") and the United States Department of Agriculture ("USDA") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, including but not limited to the following: *In the Matter of Circle Smelting, Beckemeyer, IL*, EPA Docket No. V-W-97-C-419; *In the Matter of Removal Action - East Helena Superfund Site*, EPA Docket No. CERCLA-VIII-91-17, June 20, 1996; *In the Matter of RI/FS, Vasquez Blvd./Interstate 70 (Denver, CO)*, CERCLA-08-2001-13,

2

CONFIDENTIAL                                                                                    GM_BURNS_010136

September 25, 2001; *In the Matter of Jasper County/Tri-State Mining Area Site*, 91-F-0020, August 2, 1991; *In the Matter of Newton County Mine Tailings Site*, VII-96-F-0022, June 17, 1997; *In the Matter of Federal Mine Tailings Site*, VII-97-F-0009, September 30, 1997; *In the Matter of Big River/St. Francois County Mining Area Site*, VII-97-F-0002, January 29, 1997; *In the Matter of Jack Waite Mine Site* (USDA), Idaho Panhandle National Forest, EPA Docket No. 10-98-00--CERCLA, March 30, 2000; and *In the Matter of Upper Blackfoot Mining Complex, Helena National Forest, Montana* (USDA., Forest Service, Northern Region).

E.   The United States alleges that ASARCO also has environmental liabilities under EPA unilateral administrative orders as follows: *In the Matter of Commencement Bay Nearshore/Tideflats Site (Sediments/Groundwater OU)*, CERCLA 10-2002-0046; *Silver Bow Creek/Butte Area Site (Mine Flooding OU)*, CERCLA-VIII-96-19, June 11, 1996; *In the Matter of Newton County Mine Tailings Site*, 07-2002-0114, April 15, 2002; *In the Matter of Omaha Lead Site*, CERCLA-7-99-F-0029, August 24, 1999.

F.   ASARCO is a defendant in an ongoing civil action, *United States v ASARCO, et al* (D. Idaho), Civil Action Nos. 96-0122-N-EJL/91-0342-N-EJL (Consolidated Cases), brought under Section 107(a) of CERCLA for recovery of response costs and damages for injury to, destruction of, or loss of natural resources at the Coeur d'Alene River Basin in Idaho, which is part of the Bunker Hill Mining and Metallurgical Complex Superfund Facility Operable Unit 3.

G.   Although not yet subject to formal proceedings, the United States contends that ASARCO is liable under Section 106 and/or 107 of CERCLA, 42 U.S.C. §§ 9606, 9607, for response actions and repayment of response costs incurred or to be incurred at a number of additional sites, including but not limited to the Richardson Flat Site, Park City, UT; the El Paso County Metal Survey Site, El Paso, TX; the Omaha Smelter Site, Omaha, NE; and the Hayden Mine and Smelter Site, Hayden, AZ. Moreover, based on ASARCO's mining and operational history, ASARCO stands exposed to the potential that additional environmental liabilities will arise or be discovered in the future.

3

CONFIDENTIAL                                                                                                                    GM_BURNS_010137

H.  ASARCO has been unable to comply fully with its environmental remediation obligations over at least the last two years.

I.  ASARCO is and has been, and/or the United States claims that ASARCO is and has been, in violation of a number of the various consent decrees, administrative orders on consent and unilateral administrative orders referenced in Paragraphs C, D, and E, as the result of its actual or alleged noncompliance with the requirements, terms and conditions of those consent decrees or orders, including financial assurance requirements. ASARCO stands exposed to claims for stipulated and statutory penalties in excess of $100,000,000 for such noncompliance. Because ASARCO's noncompliance with several outstanding consent decrees and orders continues, ASARCO's exposure to stipulated and statutory penalties increases significantly every day.

J.  ASARCO would have to spend in excess of $150 million in calendar years 2003 through 2005 if required to perform all Environmental Response work that it is obligated to the United States to perform by the end of that calendar year and to reimburse the United States for all of the United States' existing claims for past Environmental Response Costs.

K.  In July 2002, ASARCO informed the United States that ASARCO and SPHC intended to sell their stock holdings and majority ownership interest in the Southern Peru Copper Corp. ("SPCC") to AMC and informed the United States of the proposed terms for this transfer.

L.  The Complaint filed in this action seeks a judgment declaring that the proposed terms of the sale and transfer of ASARCO/SPHC's ownership interest in SPCC, as represented by ASARCO to the United States in July 2002, violate Sections 3304(a)(1), 3304(a)(2), and 3304(b)(1)(B)(ii) of the FDCPA, 28 U.S.C. §§ 3304(a)(1), 3304(a)(2), and 3304(b)(1)(B)(ii), as well as the FPA, 31 U.S.C. § 3713, and seeks preliminary and permanent injunctive relief enjoining this sale and transfer under such proposed terms.

M.  ASARCO represents that: (a) the sale and transfer of the ASARCO/SPHC ownership interest in SPCC is necessary for the financial viability of ASARCO and to

CONFIDENTIAL                                                                    GM_BURNS_010138

eliminate the outstanding secured debt which had originally been due and payable on November 10, 2002; (b) with the approval of this settlement, ASARCO fully intends to continue its operations for at least the next 12 months following approval; and (c) ASARCO fully intends to fulfill all of its environmental obligations to the U.S., States, Tribes, and pursuant to private party civil litigation settlements to the fullest extent of its capabilities.

N. ASARCO and SPHC represent that they believe the sale and transfer of their stock and ownership interest in SPCC as structured under the terms of this Consent Decree provides reasonably equivalent value for their interest in SPCC. ASARCO and SPHC provide support for that representation in Appendix I.

O. In consideration of the covenants of the United States as set forth in Section X of this Consent Decree, ASARCO agrees to the creation of an Environmental Trust under the terms and conditions set forth in this Consent Decree and in the Trust Agreement.

P. In creating the Environmental Trust provided for as part of this Consent Decree, it is the intent of the Parties that ASARCO have no beneficial, equitable or legal interest in the Environmental Trust. The beneficiary of the Environmental Trust shall be the United States in its capacity as enactor and enforcer of laws protecting the environment and the health and welfare of its citizens.

Q. By entering into this Consent Decree the Defendants do not admit any liability arising out of the transactions or occurrences alleged in the complaint, nor do they admit to the truth of any of the allegations contained in the complaint. Moreover, by entering into this Consent Decree, the Defendants do not admit any liability under CERCLA or any other environmental statute regarding any Site.

R. The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith; implementation of this Consent Decree will avoid prolonged and complicated litigation between the Parties; and this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

CONFIDENTIAL                                                    GM_BURNS_010139

## II. JURISDICTION

1. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1345, 2201, 3004, and 3306. This Court also has personal jurisdiction over the Defendants. The Defendants waive all objections and defenses that they may have to the jurisdiction of the Court over all matters relating to or arising out of this Consent Decree or the Complaint in this action, or to the personal jurisdiction of the Court over the Defendants in all matters relating to or arising out of this Consent Decree or the Complaint in this action, or to venue in this District. Defendants shall not challenge the terms of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

## III. PARTIES BOUND

2. This Consent Decree applies to and is binding upon the United States and upon ASARCO and SPHC and their successors and assigns. Any change in ownership or corporate status of ASARCO or SPHC, including, but not limited to, any transfer of assets or real or personal property, shall in no way alter ASARCO's or SPHC's responsibilities under this Consent Decree.

3. AMC is a signatory to this Consent Decree, and AMC and its successors and assigns are bound solely with respect to its obligations set forth in Appendix A and Appendix B; this Paragraph; and Paragraphs 6.b, 6.c, 9, 10, 39 and 40. Grupo Mexico is a signatory to this Consent Decree, and Grupo Mexico and its successors and assigns are bound solely with respect to its obligations set forth in Appendix D; this Paragraph; and Paragraphs 6.d, 9, 10, 39, and 40. Any change in ownership or corporate status of AMC or Grupo Mexico, including, but not limited to, any transfer of assets or real or personal property, shall in no way alter AMC's or Grupo Mexico's obligations under this Consent Decree and the related Notes and Guaranty. AMC and Grupo Mexico consent to the jurisdiction of this Court, and agree that they will not challenge, in any action brought by the United States to enforce the terms and conditions of this Consent Decree, the jurisdiction of this Court to enter this Consent Decree or the personal jurisdiction of this Court to enforce the specific obligations, conditions, or requirements to which they are subject pursuant to this Consent Decree.

CONFIDENTIAL   GM_BURNS_010140

## IV. DEFINITIONS

4. Unless otherwise expressly provided herein, terms used in this Consent Decree which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. All dollar amounts specified in this Consent Decree refer to United States dollars. Whenever terms listed below are used in this Consent Decree or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

"Annual Budget" shall have the meaning defined in Section VIII of this Consent Decree, and includes any amended Annual Budget accepted by the Trustee pursuant to Paragraph 25.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq.*

"Circle Smelting Non-Time Critical Removal Site" shall mean that facility located in Beckemeyer, Illinois that has been subject to a non-time critical removal action.

"Closing Date" shall mean the date on which the documents contained in Appendices A through H are fully executed and exchanged by all necessary signatories to those documents.

"Commencement Bay Nearshore/Tideflats Superfund Site - Relevant Operable Units" shall mean three of the seven operable units that are part of the Commencement Bay/Tideflats Superfund Site in Tacoma Washington. The three relevant operable units are (a) the ASARCO Tacoma Smelter and Slag Peninsula Operable Unit; (b) the ASARCO Off-Property (Ruston/ North Tacoma Study Area) Operable Unit; and (c) the ASARCO Sediments/Groundwater Operable Unit.

"Consent Decree" shall mean the text of this Decree and all appendices attached hereto (listed in Paragraph 50). In the event of conflict between the text of this Decree and any appendix, the text of this Decree shall control.

"Day" shall mean a calendar day unless expressly stated to be a working day. "Working day" shall mean a day other than a Saturday, Sunday, or Federal holiday. In

CONFIDENTIAL                                                        GM_BURNS_010141

computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

"Defendants" shall mean ASARCO and SPHC.

"Environmental Response" shall mean (1) a response within the meaning of Section 101 of CERCLA, 42 U.S.C. § 9601, at any Site, (2) a corrective action or imminent hazard abatement action required or performed pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq*, or a state hazardous waste program authorized pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, at any Site, and (3) the planning and implementation of measures to restore, replace or acquire the equivalent of natural resources that have been injured by releases of hazardous substances at the Bunker Hill Mining and Metallurgical Complex Superfund Facility.

"Environmental Response Costs" shall mean all costs incurred in connection with the performance of any Environmental Response. However, this definition does not include (1) any costs incurred prior to February 1, 2003; (2) any attorneys' fees incurred by ASARCO; (3) any internal costs of ASARCO associated with ASARCO's employees or operations, except where (i) sampling and analytical laboratory costs are incurred in lieu of retaining an outside contractor for performance of the same sampling and analytical laboratory work, (ii) such costs were the low bid out of at least three bids, and (iii) such costs are included on a Annual Budget; (4) any costs incurred by other potentially responsible parties who may have a claim for recovery of such costs against ASARCO, other than costs incurred pursuant to a Annual Budget under this Consent Decree; or (5) any costs associated with compliance under environmental laws other than CERCLA or RCRA.

"Environmental Trust" shall mean the trust created pursuant to Section VII below and the Trust Agreement.

"Force majeure" shall mean any event arising from causes beyond the control of the Defendants, of any entity controlled by the Defendants, or of the Defendants' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite the

CONFIDENTIAL                                                                                              GM_BURNS_010142

Defendants' best efforts to fulfill the obligation. The requirement that the Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (1) as it is occurring and (2) following the potential force majeure event, such that the delay is minimized to the greatest extent possible. "Force Majeure" does not include financial inability to complete Environmental Response work, subject to the limits prescribed in Paragraph 33.

"Globe Plant" shall mean that 89 acre parcel of land owned by ASARCO and located in Adams and Denver counties with an office address of 495 East 51st Avenue, Denver, Colorado 80216-2098.

"Guaranty" shall mean Grupo Mexico's written guaranty regarding exclusively Note B that is attached as Appendix D to this Consent Decree.

"Murray Smelter Consent Decree - Relevant Section" shall mean the Consent Decree for remedial action entered in the United States District Court for the District of Utah captioned: United States v. ASARCO Inc. et al., Civil Action No. 2:98CV0451B. Specifically this definition includes only those costs required to be paid pursuant to Section XVI, Paragraph 67a and 67b, of that consent decree.

"Note A" shall mean that $123.25 million promissory note issued by AMC to SPHC that is attached as Appendix A to this Consent Decree.

"Note B" shall mean that $100 million promissory note issued by AMC to SPHC that is attached as Appendix B to this Consent Decree.

"Paragraph" shall mean a portion of this Consent Decree identified by an arabic numeral or upper case letter.

"Parties" shall mean the United States, ASARCO and SPHC.

"Performing Entity" shall mean any person or entity, including but not limited to the United States and ASARCO, designated in a Proposed Annual Budget or Annual Budget as having the right to seek reimbursement for the performance of specified work projects under such Annual Budget, as provided in Paragraphs 21, 23, and 25.

CONFIDENTIAL       GM_BURNS_010143

"Proposed Annual Budget" shall have the meaning given in Section VIII of this Consent Decree.

"Revolver Notes" shall mean the $450 million indebtedness owed by ASARCO to a consortium of lenders as of the date of this Consent Decree that is secured by ASARCO/SPHC's stock and ownership interest in SPCC.

"Section" shall mean a portion of this Consent Decree identified by a roman numeral.

"Site" shall mean (1) any facility addressed in an existing or future judicial consent decree to which the United States and ASARCO are parties, or in an existing or future administrative order on consent or unilateral administrative order issued to ASARCO by a federal agency or department, which requires site investigation or other response action under Sections 104(a) or 106 of CERCLA or Sections 3008(h) or 7003 of RCRA; or (2) any facility at which ASARCO is identified by EPA as a potentially responsible party ("PRP") under CERCLA and which either now or in the future (a) is listed or proposed for listing on the National Priorities List pursuant to Section 105 of CERCLA or (b) is determined by EPA to have a Hazard Ranking System score of at least 28.5 and at which a CERCLA response action is being performed or overseen by EPA, the U.S. Department of the Interior ("DOI"), or the U.S. Department of Agriculture ("USDA"), or by a state agency that has been formally designated as the lead response agency by EPA pursuant to 40 C.F.R. Part 35, Subpart O; or (3) any facility that the United States and ASARCO agree, in an Annual Budget prepared pursuant to the Consent Decree, should receive funding for Environmental Response work from the Environmental Trust.

"Stipulation" shall mean the Amended Stipulation among the Parties lodged with the Court on October 11, 2002, and entered on the docket October 16, 2002, and all prior stipulations among the Parties in this matter.

"Subparagraph" shall mean a portion of this Consent Decree identified by a lower case letter.

"Trust Agreement" shall mean the agreement establishing the Environmental Trust, which is attached as Appendix F to this Consent Decree.

CONFIDENTIAL                                              GM_BURNS_010144

"Trustee" shall mean the trustee of the Environmental Trust.

"United States" shall mean the United States of America, including its departments, agencies, and instrumentalities.

## V. TERMS AND CONDITION OF SPCC STOCK TRANSFER

5. The Parties agree that Defendants shall not assign, sell or transfer any stock or ownership interest in SPCC except under the specific terms and conditions set forth in the Agreement of Sale (attached hereto as Appendix C).

6. The Agreement of Sale shall include the following terms and conditions:

   a. The following events shall occur on the Closing Date:

   i. SPHC shall transfer its entire ownership interest in SPCC stock to AMC;

   ii. AMC shall pay to ASARCO/SPHC the sum of $500 million, $450 million of which shall be used exclusively to satisfy in full ASARCO's indebtedness under the Revolver Notes;

   iii. ASARCO/SPHC shall satisfy in full its indebtedness under the Revolver Notes;

   iv. AMC and/or its affiliates shall cancel the $41.75 million claim of debt they have against ASARCO and/or SPHC, and, if the contingency in Paragraph 8 occurs, the $50 million debt described in Paragraph 8;

   v. AMC shall execute and deliver to SPHC a promissory note in the amount of $123.25 million, the terms of which shall provide for payments in seven equal principal installments of $17,607,143.00, each installment due and payable on October 31 of each year beginning October 31, 2003, plus accumulated interest on the principal balance at the rate of 7% per annum (Note A, attached hereto as Appendix A);

   vi. AMC shall execute and deliver to SPHC a promissory note in the amount of $100 million, the terms of which shall provide for payments in eight equal principal installments of $12.5 million, each installment

11

CONFIDENTIAL                                                          GM_BURNS_010145

due and payable on May 31 of each year beginning May 31, 2003, plus accumulated interest on the principal balance at the rate of 7% per annum (Note B, attached hereto as Appendix B);

vii. Grupo Mexico shall execute a guaranty agreement guaranteeing AMC's performance under Note B (Guaranty, attached hereto as Appendix D);

viii. SPHC shall irrevocably assign any and all interest it has in Note B and the Guaranty to ASARCO. The document creating that assignment is attached hereto as Appendix E;

ix. ASARCO shall execute the Trust Agreement, attached hereto as Appendix F, creating the Environmental Trust prescribed pursuant to Section VII;

x. ASARCO shall execute a Security Agreement, attached hereto as Appendix G, in favor of the United States which provides the United States a security interest in Note B and the Guaranty and any proceeds thereof to secure the performance of Environmental Response or the reimbursement of Environmental Response Costs at any or all of the Sites. The collateral for this security interest shall be Note B and the Guaranty and any proceeds thereof. The Security Agreement may be modified by agreement of the United States and ASARCO before execution, provided that the terms and conditions of the Security Agreement as modified are substantially equivalent to the original terms and conditions as set forth in Appendix G and in this Paragraph; and

xi. ASARCO shall irrevocably assign any and all interest it has in Note B and the Guaranty to the Environmental Trust. The document creating that assignment is attached hereto as Appendix H.

12

CONFIDENTIAL                                                                                                   GM_BURNS_010146

b.  ASARCO/SPHC and AMC agree that the dividend share based on ownership of the SPCC stock arising from SPCC operations during the Fourth Quarter of 2002 shall be paid to ASARCO regardless of which party is the actual shareholder of record on the date the right to the dividend vests.

c.  AMC shall make all payments required under the terms of Note B directly to the Trustee of the Environmental Trust.

d.  Grupo Mexico shall make all payments, if any, required under the terms of the Guaranty directly to the Trustee of the Environmental Trust.

7.  Upon the occurrence of all events required to occur as of the Closing Date in conformity with all terms and conditions specified in this Section, and not before such time, the Stipulation shall be deemed terminated.

8.  In the event that the Stipulation is not terminated on or before January 31, 2003, AMC has represented that it may choose to loan ASARCO $50 million solely for the purpose of satisfying, in part, the payment due to the holders of the "Yankee" bonds that mature on February 3, 2003. If such loan is made, AMC shall pay to ASARCO/SPHC the sum of $450 million instead of $500 million pursuant to Paragraph 6.a.ii.

## VI. ENFORCEABILITY OF NOTES AND GUARANTY

9.  The Parties, AMC, and Grupo Mexico agree that Note B and the Guaranty shall be directly enforceable by the United States under the terms of this Consent Decree, both on its own behalf and, as beneficiary, on behalf of the Environmental Trust.

10. The Parties, AMC, and Grupo Mexico agree that this Court has full jurisdiction and legal authority to enforce Notes A and B and the Guaranty, and to enter any appropriate relief otherwise available under applicable law in the event of nonperformance or default.

11. Nothing in this Consent Decree shall limit or abridge any other remedy available to the United States, the Trustee, or any other person to enforce the terms of Notes A and B and the Guaranty.

## VII. ENVIRONMENTAL TRUST

CONFIDENTIAL                                                    GM_BURNS_010147

12. An Environmental Trust shall be established for the sole purpose of funding Environmental Response Costs at any or all of the Sites, under the terms and conditions of the Trust Agreement, attached hereto as Appendix F. The Trust Agreement may be modified according to its terms. If the Trust Agreement is modified, it must be reexecuted and promptly filed with the Court.

13. The Environmental Trust shall be administered by an independent Trustee appointed pursuant to the Trust Agreement.

14. The Environmental Trust shall initially be funded by the assignment of Note B and the Guaranty to the Trust, as prescribed under Paragraph 6.a.xi of this Consent Decree. All payments on Note B and/or the Guaranty shall be made directly to the Trustee on behalf of the Trust.

15. The assets of the Environmental Trust shall be used for no purpose other than to pay Environmental Response Costs at any or all of the Sites, or for administration of the Environmental Trust consistent with the Trust Agreement.

16. In structuring and administering the Environmental Trust under this Consent Decree, the Trustee may seek to minimize any tax liability to which the assets of the Environmental Trust might be subject.

## VIII. ANNUAL BUDGET AND WORK SCHEDULES

17. On an annual basis, for so long as there are funds of the Environmental Trust, a budget and work schedule shall be finalized in accordance with the provisions of the Trust Agreement and this Section.

18. Within thirty (30) days of the date of entry of the Consent Decree, ASARCO and the United States shall meet in good faith to establish an initial annual budget and work schedule consistent with this Section for the remainder of the calendar year 2003. If agreement is reached, and after any consultation with any State or Tribe the United States deems appropriate, this budget and schedule shall be deemed the Annual Budget for calendar year 2003. The United States shall promptly deliver the Annual Budget to the Trustee. If ASARCO and the United States are unable to reach agreement, the United States shall

CONFIDENTIAL

GM_BURNS_010148

determine the Annual Budget for calendar year 2003 after any consultation with any State or Tribe the United States deems appropriate, and the United States shall promptly deliver such budget to the Trustee. The decisions of the United States made pursuant to this Paragraph shall be in its sole and unreviewable discretion and shall not be subject to further dispute resolution or challenge, nor shall they constitute final agency action giving rise to judicial review.

  19. Thereafter, no later than the first day of November of each calendar year that the Environmental Trust is in existence, ASARCO shall submit to the United States an Environmental Response Report. This report shall include the following:

  a. A description of all Environmental Response work performed by ASARCO at each Site during the current calendar year and the actual cost of such performance to ASARCO;

  b. A Site by Site description of all Environmental Response work which ASARCO is responsible for performing during the upcoming calendar year under existing consent decrees or administrative orders, and general cost estimates for such work.

  c. An Environmental Response work proposal for the upcoming calendar year, which shall include

    i. a description of the Environmental Response work that ASARCO proposes be funded by the Environmental Trust Fund during the upcoming calendar year (and additional years if warranted by the nature of the work);

    ii. a description of the portion of the work identified in Paragraph 19.c.i that ASARCO proposes to undertake;

    iii. a cost estimate for this proposed work; and

    iv. a detailed justification for ASARCO's selection of proposed work as opposed to the other potential Environmental Response work for which ASARCO is responsible, or for which the United States has

15

CONFIDENTIAL

deemed ASARCO a Potentially Responsible Party, during the upcoming calendar year (and additional years if warranted by the nature of the work); and

  v. a list of continuing multi-year allocations provided in prior Annual Budgets, if any.

20. Should ASARCO not timely submit an Environmental Response Report, the United States shall proceed to develop a Proposed Annual Budget in accordance with the procedures set forth in Paragraph 21.

21. After any consultation with any State or Tribe the United States deems appropriate, but no later than 45 days after the due date for submission of the Environmental Response Report as prescribed in Paragraph 19, the United States shall serve upon ASARCO a Proposed Annual Budget of Environmental Response work to be completed within the upcoming calendar year. The Proposed Annual Budget shall include a description of the Environmental Response work to be performed, a designation of ASARCO, the United States, and/or some other Performing Entity as having the right to seek reimbursement for the performance of each specified work project under the budget and schedule, and a budget allocating Environmental Trust monies to fund performance of the response work described in the Proposed Annual Budget and to reimburse the United States and/or a State for their Environmental Response Costs.

22. Following ASARCO's receipt of the United States' Proposed Annual Budget, ASARCO and the United States shall engage in a period of consultation not to exceed thirty (30) days to expeditiously and informally discuss the Proposed Annual Budget and to consider any suggested modifications. Within fifteen days of the conclusion of the period of consultation, the United States shall determine the Annual Budget and provide the budget to ASARCO and the Trustee. The decisions of the United States made pursuant to this Paragraph shall be in its sole and unreviewable discretion and shall not be subject to further dispute resolution or challenge, nor shall they constitute final agency action giving rise to judicial review.

CONFIDENTIAL GM_BURNS_010150

23. Within twenty (20) days of receipt of an Annual Budget pursuant to Paragraph 18 or 22, the Trustee shall notify the United States and ASARCO in writing that the Trustee either accepts or rejects such Annual Budget. The Trustee is obligated to accept and administer any Annual Budget submitted by the United States unless the Trustee concludes that such budget and schedule would be inconsistent with the stated purpose of the Environmental Trust or any conditions or limitations set forth in the Environmental Trust Agreement. A notice of rejection under this Paragraph shall contain an explanation of the Trustee's rejection of the Annual Budget. In the event of a rejection determination by the Trustee under this Paragraph, the United States may either submit a new budget and schedule in accordance with the provisions of Paragraphs 21 and 22 of this Consent Decree, or may seek review by this Court of the Trustee's decision to reject the Final Budget.

24. All Annual Budgets must be established in light of the anticipated availability of funds in the Environmental Trust and shall not require the Trust to pay more money than it is reasonably anticipated will be available from the Trust Fund for any calendar year. Annual Budgets shall provide only for the payment of Environmental Response Costs at Sites; however, not every Site is required to be addressed in any given Annual Budget. Annual Budgets shall not be in conflict with ASARCO's existing work obligations specifically set forth in any consent decree or order except where a modification of such other consent decree or order may be sought pursuant to Section XIII. In such cases, the requirements of any Annual Budget that conflicts with ASARCO's existing work obligations under any consent decree or administrative order shall be expressly conditioned upon obtaining a modification pursuant to Section XIII. Where warranted by the nature of the planned Environmental Response work, an Annual Budget may include a planned allocation of projected Environmental Trust funds over a multi-year period.

25. An Annual Budget accepted by the Trustee may be amended only by written agreement of ASARCO and the United States, subject to review by the Trustee. Either ASARCO or the United States may propose amendments to the current Annual Budget by service of the proposal on the other party. If ASARCO and the United States reach

17

CONFIDENTIAL

GM_BURNS_010151

agreement on the amendment, the United States shall promptly provide the amended Annual Budget to the Trustee. Any amended Annual Budget shall be subject to the conditions and limitations set forth in Paragraph 24. The procedures prescribed in Paragraph 23 governing acceptance or rejection of Annual Budgets shall apply to acceptance or rejection of amended Annual Budgets submitted to the Trustee under this Paragraph.

26. ASARCO shall have the right to seek review by this Court of the Trustee's acceptance of an Annual Budget solely on the following limited grounds:

   a. the Annual Budget would require the Trust to pay monies at a facility that is not a Site as that term is defined in this Decree;

   b. the Annual Budget conflicts with ASARCO's existing work obligations specifically set forth in an existing consent decree or order and the conflicting provision or provisions are not expressly conditioned upon obtaining a modification of the existing consent decree or order pursuant to Section XIII;

   c. the Annual Budget would require the Trust to pay monies for costs that are not Environmental Response Costs as that term is defined in this Decree;

   d. the Annual Budget would require the Trust to pay more money than it is reasonably anticipated will be available from the Trust Fund for any calendar year; or

   e. the Annual Budget does not adequately fund the performance of Environmental Response work for which ASARCO has been designated as responsible under such Annual Budget.

Review sought pursuant to this Paragraph shall be by petition to this Court. Such petition must be filed no later than ten days after the date of receipt of a notice of the Trustee's acceptance of an Annual Budget pursuant to Paragraph 23. As provided in the Trust Agreement, the Trustee shall, and the United States may, file a memorandum in support of the Annual Budget being challenged within 30 days of service of a petition under this Paragraph. The Court shall affirm the Trustee's decision unless there is clear and convincing evidence that one of the four grounds for challenge set forth in this Paragraph exists. This

18

CONFIDENTIAL                                                                                          GM_BURNS_010152

Paragraph constitutes the exclusive mechanism by which the Defendants may challenge or dispute an Annual Budget, and the Defendants agree not to invoke any other dispute resolution mechanism, including any dispute resolution mechanism provided for in any existing consent decree or administrative order.

27.  ASARCO shall perform all Environmental Response work for which it has been designated as responsible under any Annual Budget during the current calendar year for such Annual Budget, provided, however, that ASARCO shall not be responsible for performing or completing such Environmental Response work (a) in the event of a Force Majeure, or (b) to the extent, and only to the extent, that ASARCO is unable to perform or complete such Environmental Response work because insufficient funds were allocated in such Annual Budget for reimbursement of the cost of such Environmental Response work, and such insufficiency in funding (i) could not reasonably have been anticipated as of the deadline for submitting a petition for review of an Annual Budget under the terms of Paragraph 26, or (ii) was anticipated by ASARCO and was communicated to the Trustee prior to the Trustee's acceptance of an Annual Budget. Nothing in this Paragraph shall affect the right of the United States to direct ASARCO to perform or complete Environmental Response work subject to the limits specified in Paragraph 33.

## IX. ENVIRONMENTAL TRUST PAYMENTS

28.  A Performing Entity may submit reimbursement requests ("Claims") to the Trustee, with a copy to the United States and ASARCO, for any Environmental Response work for which the claimant was designated as Performing Entity in any Annual Budget. Such Claims must include a full description of all work performed, itemized contractor invoices, and other supporting documentation required under the Trust Agreement. Except as provided in Paragraphs 29 and 30, the Trustee shall be authorized to reimburse a Performing Party only to the extent a Performing Party submits receipts or other proof showing that it has already paid its contractors directly for work that was authorized under the Annual Budget, or, in the case of ASARCO's internal sampling and analytical laboratory costs incurred in lieu of retaining an outside contractor for performance of the same sampling

CONFIDENTIAL                                                                                           GM_BURNS_010153