# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### –BROWNSVILLE DIVISION–

| | | |
|---|---|---|
| ASARCO LLC, SOUTHERN PERU | § | |
| HOLDINGS, LLC, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL NO. B-07-018 |
| | § | |
| AMERICAS MINING CORPORATION, | § | |
|     Defendant. | § | |

# ORDER

ASARCO LLC and Southern Peru Holdings, LLC filed their First Amended Complaint ("Complaint") (Doc. No. 70) on May 4, 2007, adding Southern Peru Holdings, LLC as a party plaintiff. Pending before this Court is Americas Mining Corporation's Motion to Dismiss the First Amended Complaint ("AMC's Motion") (Doc. No. 82), filed on May 18, 2007. Plaintiffs have offered ASARCO, LLC and Southern Peru Holdings, LLC's Response to Americas Mining Corporation's Motion to Dismiss the First Amended Complaint ("ASARCO's Response"). (Doc. No. 100), and Defendant, in turn, filed Americas Mining Corporation's Reply Memorandum of Law in Support of Its Motion to Dismiss the First Amended Complaint ("AMC's Reply") (Doc. No. 112) ASARCO LLC and Southern Peru Holding, LLC's Motion for Leave to File a Reply (Doc. No. 128) is **GRANTED**; and Americas Mining Corporation's Motion to Strike Plaintiffs' Reply Dated August 15, 2007 (Doc. No. 131) is **DENIED**.

After considering all the pertinent pleadings, this Court hereby **DENIES** AMC's Motion to Dismiss pursuant to Rule 12(b)(6). The Court also conditionally **DENIES** AMC's Motion to

1

Dismiss pursuant to Rule 9(b) and **ORDERS** Plaintiffs to amend their Complaint, specifying any statutory basis for their fraudulent transfer claim, within fifteen days from this order, if they intend to base any claim on a statute.

## I. STANDARD OF REVIEW

To qualify for dismissal under Rule 12(b)(6), a complaint must, on its face, show a bar to relief. Fed. R. Civ. P. 12(b)(6); *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986). In deciding a motion to dismiss, the Court must not go outside the pleadings. *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990). Dismissal "can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Frith v. Guardian Life Ins. Co.*, 9 F. Supp. 2d 734, 737-38 (S.D. Tex. 1998).

In considering whether dismissal for failure to state a claim is warranted, "the Court accepts as true all allegations contained in the plaintiff's complaint," and "all reasonable inferences are to be drawn in favor of the plaintiff's claims." *Id.* at 738. However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007)(omitting citations). The factual allegations must be enough to raise a right to relief above the speculative level. *Id.* at 1965.

ASARCO's Complaint seeks relief based upon five causes of action, in addition to a claim for punitive damages. ASARCO alleges the following causes: (1) fraudulent transfer (actual); (2) fraudulent transfer with constructive intent; (3) breach of a fiduciary duty AMC allegedly owed

ASARCO and ASARCO's creditors; (4) aiding and abetting Grupo and ASARCO's directors' breaches of fiduciary duties; and (5) civil conspiracy between AMC and Grupo and/or ASARCO's directors.

AMC's Motion argues that ASARCO has failed to state a claim as to each of its counts as a matter of law. Additionally, AMC argues that it is entitled to dismissal as a matter of law because ASARCO lacks standing since it did not own the SPCC stock, whose transfer is at issue in all of the claims. Finally, AMC argues that ASARCO has failed to plead fraud with particularity in compliance with Rule 9(b). *See* Fed. R. Civ. P. 9(b). To survive AMC's Motion on each of its claims, ASARCO must plead essential factual allegations that could suggest necessary inferences for any cognizable legal theory for each claim it asserts. *See Bell Atlantic*, 127 S.Ct. at 1965.

## II. FACTUAL BACKGROUND[1]

This case involves the transfer of stock among a group of parent and wholly-owned-subsidiary corporations: (1) Grupo Mexico ("Grupo"); (2) Americas Mining Corporation, ("AMC"), a wholly-owned subsidiary of Grupo Mexico; (3) ASARCO, LLC, previously ASARCO, Inc., (referring to both entities as "ASARCO" for purposes of this order), a wholly-owned subsidiary of AMC; (4) Southern Peru Holdings, LLC, previously Southern Peru Holdings Corporation, a wholly-owned subsidiary of ASARCO (for purposes of this Order, the Court will refer to both as "SPH");

---

[1]The following allegations have been presented to the Court through Plaintiffs' First Amended Complaint ("Complaint"). (ASARCO, LLC and Southern Peru Holdings, LLC's First Am. Compl.) Without making any factual findings, the Court considers all assertions of the Plaintiffs' well-pleaded complaint as true for purposes of review at this stage of the pleadings. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 65 n. 1 (1990); *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007); *Frith*, 9 F.Supp.2d at 738. The Court notes that the Defendant has denied most, if not all, of the more pertinent allegations.

and (5) Southern Peru Copper Corporation , now Southern Copper Corporation (this order will refer to both as "SPCC"). (Compl. ¶¶ 2-6; AMC's Motion, at 1.)

ASARCO was previously a wholly-owned subsidiary of Grupo, purchased in a leveraged buyout in 1999. According to the Plaintiffs, Grupo created AMC in October 2000 as a sham to perpetrate a fraud on ASARCO and ASARCO's creditors. (Compl. ¶ 4.) Until Grupo directed the creation of SPH, SPCC was a partially-owned subsidiary of ASARCO, directly. (*Id*. ¶ 6.) Plaintiffs claim SPH was formed as a sham to perpetrate a fraud on ASARCO and ASARCO's creditors as well.[2] SPH had no business other than owning SPCC shares. (*Id*.) Plaintiffs claim that SPH was a mere instrumentality, agent and alter ego of ASARCO and that SPH and ASARCO operated as a single business enterprise. (*Id*.) Plaintiffs allege that all actions relating to the purportedly fraudulent transfer were taken by ASARCO and that the transaction occurred between ASARCO and AMC, not SPH and AMC. (*Id*. ¶ 6.)

Plaintiffs claim that soon after Grupo purchased ASARCO in 1999, Grupo planned to form AMC and transfer ASARCO's interest in SPCC to AMC in order to "remove ASARCO's most valuable asset from the reach of ASARCO's creditors." (*Id*. ¶ 22.) Plaintiffs claim ASARCO was inadequately capitalized early on, as a result of intentional decisions directed by Grupo, including the sale of ASARCO's chemical and aggregate subsidiaries, OMI/Enthone and American Limestone, in order to pay an acquisition debt that Grupo had guaranteed. These changes left ASARCO vulnerable to the cyclical copper markets. (*Id*. ¶ 20.) Plaintiffs describe ASARCO as desperate for cash throughout 2000 and 2001. (*Id*. ¶ 28.) Unable to pay its debts, ASARCO began selling its real estate and equipment, often to Grupo and AMC affiliates. (*Id*.)

---

[2]Defendant, AMC, contests this allegation, explaining that the creation of SPH was supported by strategic financing decisions.

In September 2000, PricewaterhouseCoopers appraised the value of ASARCO's (SPH's) 54.2% ownership interest in SPCC at $978,586,000.00. (*Id.* ¶ 23). AMC[3] directed ASARCO to retain Houlihan Lokey Howard & Zukin to give them another opinion, which they did in June 2001, deeming the valuation of $720 million to be "fair to ASARCO from a financial point of view." (*Id.* ¶ 25.) In late 2001, Grupo and AMC initially proposed having AMC purchase the SPCC shares for $100 million and assumption of $350 million of ASARCO's debt. (*Id.* ¶ 27.) By April 2002, however, "AMC began planning to pay $600 million" for the SPCC shares. (*Id.* ¶ 34.)

Plaintiffs claim that by late 2001, ASARCO "began making plans for a possible chapter 11 bankruptcy." (*Id.* ¶ 31.) ASARCO was in a liquidity crisis in December 2001 when AMC directed ASARCO to redeem $50 million bonds at par. (*Id.* ¶ 32.) AMC provided ASARCO with a $42 million "advance" on its purchase of ASARCO's interest in SPCC, so that it could redeem the bonds. (*Id.*) ASARCO grew more insolvent in 2002, and was in arrears $138 million, according to ASARCO's Vice President of Finance and Administration, James O'Neil. (*Id.* ¶ 33.)

In August 2002, in the interest of pending environmental liabilities, the Department of Justice ("DOJ") sued to enjoin the transfer of the SPCC shares, alleging that ASARCO was insolvent. (*Id.* ¶ 41.) ASARCO settled the suit with the DOJ, at AMC's direction, agreeing to put $100 million from the anticipated SPCC sale into an environmental trust in exchange for a temporary deferral of environmental claims. (*Id.*) That $100 million did not go to ASARCO, and ASARCO was not released from the prospective claims against it.[4] (*Id.*)

---

[3] Although Plaintiffs allege that many of the challenged acts were at the direction of both AMC and Grupo, the Court will focus only on the Defendant in this case, AMC.

[4] AMC has offered a copy of the Consent Decree in that case to support its Motion, but the Court has not considered these separate pleadings and separate arguments – that the Consent Decree's content was a judicial admission barring the claims– as being directly relevant because at this stage such arguments are not controlling and they were not

On the advice of the lawyers at Squire Sanders & Dempsey LLP ("Squire Sanders"), ASARCO appointed independent directors to the restructuring committee to execute the sale of ASARCO's interest in SPCC stock to its parent, AMC. (*Id*. ¶ 37.) Thereafter, Genaro Larrea, who was director of all three—Grupo, AMC and ASARCO— wrote a memorandum to German Larrea, (Chairman and CEO of Grupo, AMC and ASARCO), asking permission to appoint two or three directors, who would be "controlled by Grupo." (*Id*.) Those two independent directors, however, would not approve the transfer of SPCC stock and resigned on March 26, 2003 in opposition to the terms of the transaction. (*Id*. ¶ 62.)

On February 3, 2003, Squire Sanders advised the ASARCO restructuring committee that ASARCO was "within the zone of insolvency, if not actually insolvent." (*Id*. ¶ 53.) Squire Sanders and Ernst &Young Corporate Finance ("EYCF") also advised ASARCO to use its SPCC interest as financing if it went into bankruptcy. (*Id*. ¶ 39.) EYCF warned ASARCO that if the money from the SPCC transaction was used to retire ASARCO's $100 million 7 3/8% bonds due in 2003 ("Yankee Bonds") at par with interest, ASARCO would have a projected negative cash balance of $158 million in December 2003. (*Id*. ¶¶ 43-44.) Despite this advice, and without consent of the restructuring committee, AMC "caused ASARCO to send the Yankee Bondholders a notice on February 20, 2003," promising to use the SPCC sale proceeds to pay the principal and past due interest on the Yankee bonds. (*Id.* ¶ 56.) Plaintiffs explain that the payment of the Yankee Bonds benefitted only Grupo and AMC, because Inbursa, a Mexican bank that was providing financing to Grupo and AMC, required the payment of the bonds as a condition of its loan to AMC. (*Id.* ¶ 47.)

On or about March 31, 2003, ASARCO's 54.2% ownership interest in SPCC, held by its

addressed by either side in the Motion to Dismiss under 12(b)(6) or either sides' responsive pleadings.

wholly-owned subsidiary, SPH, was transferred to AMC.    Plaintiffs claim that at the time of the transfer, "ASARCO was insolvent and unable to pay its debts as they became due."  (*Id.* ¶ 7.) ASARCO was in default on many of its debt obligations. (*Id.* ¶ 69.)  On behalf of creditors, Plaintiffs seek to void the transfer under 11 U.S.C. § 544.  (*Id.* ¶ 8.)

Despite objections by ASARCO's senior management, EYCF's advice to the contrary and the resignation of the independent directors under protest, AMC instructed ASARCO to transfer the SPCC shares to AMC and use the proceeds to retire the Yankee Bonds. (*Id.* ¶¶ 61-64.)  In exchange for the shares, AMC would pay: $450 million to retire the credit facility guaranteed by Grupo as part of the 1999 leveraged buyout; $100 million into the environmental trust; $42 million toward forgiveness of ASARCO's intercompany debt; a $123 million note made payable to ASARCO over seven years with the first payment committed to interest on bonds; and a $50 million note which AMC directed to pay the Yankee Bonds.  (*Id.* ¶ 43; AMC's Response, at 4.)  Plaintiffs allege that AMC did not pay fair consideration or reasonably equivalent value for ASARCO's 54.2% interest in SPCC stock.  (*Id.* ¶ 7.)  ASARCO was "hopelessly insolvent at the time of the sale" and "in default on many of its debt obligations." (*Id.* ¶ 69.)

At the time of the contested transfer, every member of ASARCO's Board of Directors was also affiliated with Grupo and AMC.  (*Id.* ¶ 18.)  Shortly after the transfer, ASARCO's entire Board of Directors resigned from ASARCO.  (*Id.* ¶¶ 18, 67.)

Plaintiffs claim that as a result of the transfer, ASARCO and its creditors have been harmed. (*Id.* ¶¶ 81, 92, 100, 105, 112.)  On August 9, 2005, ASARCO filed its voluntary petition for Bankruptcy under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division.  On December 12, 2006, SPH

filed for bankruptcy. (AMC's Reply, Ex. 2.) This adversary proceeding arises out of ASARCO's

Chapter 11 bankruptcy filing pursuant to 11 U.S.C. §§ 544, 550.

### III. CHOICE OF LAW GENERALLY

In *Klaxon*, the Supreme Court of the United States held that a court must apply the choice-of-

law rules of the forum in which it sits over state-law claims when the court has jurisdiction based

on diversity of citizenship. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). However,

this Court has jurisdiction of the adversary proceeding arising out of ASARCO's bankruptcy filing

pursuant to 28 U.S.C. § 1334(b), not by virtue of diversity of citizenship of the parties under 28

U.S.C. § 1332. Even though not explicitly bound by *Klaxon*, bankruptcy courts also apply choice-

of-law rules of the forum in which they sit over state-law claims that do not implicate federal policy.

*Woods-Tucker Leasing Corp of Ga. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir.

1981); *In re Gaston & Snow*, 243 F.3d 599, 605 (2d Cir. 2001); *In re Merritt Dredging Co., Inc.*,

839 F.2d 203, 206 (4th Cir. 1988); *In re Southwest Equip. Rental, Inc. v. Fuller*, No. Civ. 1-90-62,

1992 WL 684872, at *9 (E.D. Tenn. July 9, 1992); *see also Warfield v. Carnie*, No. 3:04-cv-633-R,

2007 WL 1112591, at *7 (N.D.Tex. Apr. 13, 2007)(rejecting an argument to apply federal choice-of-

law rules to a fraudulent transfer claim where jurisdiction was pendent jurisdiction based on 28

U.S.C. § 1367). Thus, this Court could follow Texas choice-of-law rules as it would in a diversity

action.

Addressing whether bankruptcy cases should apply the *Klaxon* rule to decide choice-of-law

issues, the Fourth Circuit Court of Appeals considered the interests of uniformity, predictability, and

a federal interest to avoid forum shopping. *Merritt*, 839 F.2d at 206. That court concluded that in

most cases it would apply the choice of law of the forum state, unless some federal interest required a different result. *Id.*

While one could conceive an argument that a fraudulent transfer of a debtor's largest asset could implicate federal bankruptcy policy, all parties agree that this is an appropriate case for this Court to abide by the decision in *Klaxon* that the choice-of-law rules of the forum state, Texas, should apply. No party raises a "compelling federal interest" to dictate that federal common law choice-of-law rules should govern instead of Texas choice-of-law rules. *See id.*; *see also Gaston*, 243 F.3d at 606. While cloaked under numerous labels, at the heart of each claim in this matter is the ownership of the SPCC stock, which is, in effect, a dispute over a property interest. A property interest does not require the analysis of any federal interest "simply because an interested party is involved in a bankruptcy proceeding." *Merritt*, 839 F.2d at 206; *see also Gaston*, 243 F.3d at 606 (finding the interest in uniformity in bankruptcy insufficient to constitute a significant federal policy interest).

## IV. STANDING

### A. Standing Choice of Law

Defendant only challenges ASARCO's fraudulent transfer claim under Rule 12(b)(6) as a standing challenge, arguing as a matter of law that ASARCO cannot pierce the corporate veil of SPH, which actually owned the stock. The parties both agree that Delaware law should govern whether ASARCO can pierce the corporate veil in order to assert its standing. (Transcript of Mot. Hr'g. at 6:17-18; 33:1-2, July 13, 2007); (*see* Compendium of Additional Cases Supporting ASARCO and SPH's Resp. to AMC's Mot. To Dismiss the First Am. Compl. Vols. 1, 2; AMC's Memo. In Resp. to Supp. Materials; ASARCO and SPH's Reply to AMC's Memorandum Dated

August 9, 2007.)  The issue of whether ASARCO is the proper party to assert these claims involves the intersection of two legal issues that the Court must decide: (1) the substantive fraudulent transfer claim and (2) the veil piercing claim.  Texas choice-of-law rules are distinct and separate regarding how to determine the appropriate substantive law to determine these two issues.  This Court first addresses which substantive law should govern the fraudulent transfer claim as a whole and then examines which substantive law governs the veil piercing issue.

**1. Fraudulent Transfer Choice-of-law Rules**

Defendant contests ASARCO's standing to assert a fraudulent transfer claim.  A claim for fraudulent transfer arises in tort. *In re Tex. Am. Express, Inc.*, 190 S.W.3d 720, 725 (Tex.App. –Dallas 2005, no pet.)(citing TEX. BUS & COM. CODE ANN. §24.005 (Vernon 2002)); *Blackthorne v. Bellush*, 61 S.W.3d 439, 443-444 (Tex.App. –San Antonio 2001, no pet.); *Warfield*, 2007 WL 1112591, at *7 (resolving the issue for purposes of Texas choice-of-law rules).  Texas choice-of-law rules for causes of action in tort apply section 145 of the Restatement (Second) Conflict of Laws, also described as the "most significant relationship test."  *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420-21 (Tex. 1984); *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 674 (5th Cir. 2003). According to section 145, the local law of the state which has the "most significant relationship to the occurrence and the parties" will govern the claim.  *Duncan*, 665 S.W.2d at 421 (adopting RESTATEMENT (SECOND) CONFLICT OF LAWS § 145(1) (1971)).

In applying the Restatement's "most significant relationship test", this Court considers the following factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties is centered.

*Enigma Holdings, Inc. v. Gemplus Int'l S.A.*, No.3: 05-cv-1168-B, 2006 WL 2859369, at *7 (N.D. Tex. Oct. 6, 2006); *Warfield*, 2007 WL 1112591, at *7; RESTATEMENT (SECOND) CONFLICT OF LAWS § 145 (1971). When weighing these four factors, it is not the number of contacts, but the qualitative nature of those particular contacts that determines which state has the most significant relationship to the occurrence and the parties. *Duncan*, 665 S.W.2d at 421; *Ford Motor Co. v. Aguiniga*, 9 S.W.3d 252, 260 (Tex.App. –San Antonio 1999, pet. denied).

The choice-of-law analysis under Texas law, must be specifically tailored to the issue to be decided. The test requires that the Court consider which state's law has the most significant relationship "*to the particular substantive issue to be resolved.*" *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) (emphasis in original). "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, *with respect to that issue*, has the most significant relationship to the occurrence and the parties." *Id.* (quoting RESTATEMENT, § 145(1))(emphasis in original).

Although Texas courts have not definitively addressed the application of Texas choice-of-law rules to a fraudulent transfer claim, a few federal courts in this Circuit have. *Warfield*, 2007 WL 1112591, at *7 (stating that under Texas choice-of-law rules, section 145 governs the choice-of-law determination in a fraudulent transfer claim); *Amoco Chem. Co. v. Tex Tin Corp.*, 925 F.Supp. 1192, 1202 FN9 (S.D. Tex. 1996) (looking to the most significant relationship test when applying Texas choice-of-law rules to determine which State's law governs the fraudulent transfer claim); *In re Consolidated Capital Equities Corp.*, 143 B.R. 80, 85 (Bankr. N.D. Tex. 1992)(citing *Gutierrez v. Collins*, 583 S.W.2d 312 (Tex. 1979))(applying the most significant relationship test as in any tort action)).

11

Under the first factor, this Court considers the place where the injury occurred. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984). In this particular type of tort, it is especially hard to discern where the injury occurred. Neither party has pinpointed a location as the place where the injury occurred, and it is probable that there are allegedly injured creditors spread across many jurisdictions. Arguably, the stock value of ASARCO was injured by the fraudulent transfer, which affected its sole shareholder AMC. Clearly, SPH's main, if not only, asset was the subject matter of the alleged fraudulent transfer. Since AMC and SPH are incorporated in Delaware, the injury is possibly connected with Delaware. The headquarters, however, for all three—AMC, ASARCO, and SPH—are located in Arizona. Since the main asset of SPH, a Delaware corporation, is at the heart of the present dispute, this factor leads one to consider Delaware; however, this prong does not seem quantitatively significant in the present context.

The second factor, the place where the conduct causing the injury occurred, is similarly elusive. *See id.* This aspect of the relationship of the parties is hard to pinpoint. Plausibly, the corporate headquarters for AMC, ASARCO, and SPH in Phoenix may have been the location for some injury-causing conduct, which points to applying Arizona law. However, neither party has provided information which would lead the Court to this determination. Although the headquarters of the corporations were in Phoenix, the Court has not been presented with any facts indicating that this was the location of the alleged fraudulent transfer. ASARCO also raised New York as a possibility, given that it is the locale of the financing for all the transactions. Due to the lack of any clear argument regarding where the conduct surrounding the transfer took place, the Court does not weigh this factor heavily in the choice-of-law decision.

In a case where the parties are corporate entities, the third factor focuses on the states of incorporation and place of business. *Bridas Corp. v. Unocal Corp.*, 16 S.W.3d 893, 898-99 (Tex.App. –Houston [14th Dist.] 2000). If one considers the place of business to be the corporate headquarters, then as discussed in the second factor above, this third factor points vaguely to Arizona. ASARCO, however, had business interests in multiple places around the United States. The states of incorporation of the parties are more clearly identified in the context of this fraudulent transfer. Defendant, AMC, and Plaintiff, SPH, have always been Delaware corporations. Also, the other Plaintiff, ASARCO, is now a Delaware corporation, but was a New Jersey corporation at the time of the contended fraudulent transfer. Additionally, SPCC and SPHC II, which now holds the SPCC stock, are both Delaware corporation. This third factor points clearly to significant contact with the state of Delaware, where SPH and AMC were incorporated and where SPHC II is currently incorporated. While the Court recognizes that this factor also raises the possibility of looking to New Jersey law, given ASARCO's past relationship with that state, the three parties in this case have all chosen to subject themselves to Delaware law by incorporating in Delaware at some point in time. Both the direct owner of the disputed asset and the alleged perpetrator of the fraudulent transfer were incorporated in Delaware at all pertinent times. Since two of the three parties have maintained a relationship with Delaware (and ASARCO later voluntarily reincorporated itself in Delaware), the Court finds that this factor favors the application of Delaware law.

The fourth and last factor, the place where the relationship between the parties is centered, implicates significant relationships with various jurisdictions. *See Duncan*, 665 S.W.2d at 421. The Phoenix headquarters make Arizona a potential candidate for the center of the relationship of AMC, ASARCO, and SPH. Also, a key consideration is that the copper mine at the heart of the

parties' claims is in Peru. Along these same lines, the current owner of the SPCC stock, SPHC II, is a Delaware corporation.[5] However, given the national and international scope of the relationship among the many parties involved, this factor does not weigh strongly in any particular direction.

Overall, Texas law suggests that a court focus on the factors which capture the parties' more qualitative relationship in the context of a fraudulent transfer dispute. *See Ford Motor*, 9 S.W.3d at 260; *Duncan*, 665 S.W.2d at 421. In considering each of the four factors, Delaware is a common theme. Both the Defendant and one of the Plaintiffs, SPH, were incorporated in Delaware during the conduct that gave rise to this case. The stock that was transferred was that of a Delaware corporation, and the company now holding the stock, SPHC II, is also a Delaware corporation. Additionally, the parties have asked the Court to utilize Delaware law. After considering the relationship of the parties with various jurisdictions including Delaware, New Jersey, Arizona, New York, Peru, and even Mexico, the Court finds the most significant relationship among the parties, considering the particular nature of this tort, is the parties' relationship with Delaware. The Texas choice-of-law rules for addressing veil piercing issues, discussed below, further confirms that Delaware law should govern the fraudulent transfer claim.

## 2. Veil Piercing Choice-of-Law Rules

Courts applying Texas choice-of-law rules have applied various state laws to veil piercing arguments in different contexts. *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201 (5th Cir. 1995); *In re Kilroy*, 357 B.R. 411, 425 (Bankr. S.D. Tex. 2006); *Amoco Chem. Corp. v. Tex Tin Corp.*, 925

---

[5]While no party advocates for Mexican law to govern, in light of the suggestions raised by the pleadings that the ultimate parent corporation Grupo Mexico is headquartered in Mexico City and that Grupo's representatives were present on the board of both AMC and ASARCO at the time of the disputed transfer decisions, an argument could be made that Mexico is the center of the parties' relationship.

F.Supp. 1192, 1202 (S.D. Tex. 1996); *Weaver v. Kellogg*, 216 B.R. 563, 585 (S.D. Tex. 1997); *cf. Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138 (5th Cir. 2004).

Instead of looking to the Restatement factors, some courts have looked solely to the state of incorporation of the corporation whose form is being pierced. *Alberto*, 55 F.3d at 203; *Weaver*, 216 B.R. at 585; *Amoco*, 925 F.Supp. at 1201; *Kilroy*, 357 B.R. at 425. In the case of *Alberto v. Diversified Group, Inc.*, the Fifth Circuit applied a Texas choice-of-law statute[6] to decide that the wholly-owned subsidiary's state of incorporation, not the parent's state of incorporation, governed the veil piercing issue. 55 F.3d at 203; TEX. BUS. CORP. ACT ANN. art 8.02 (Vernon 2003). In *Alberto*, the choice-of-law issue was contested by the parties on appeal and analyzed by the appellate court. 55 F.3d at 203-204. In that case, the defendant purchased its interest in the wholly-owned subsidiary from another parent company. *Id.* at 202-03. The Court applied Delaware law to find that the wholly-owned subsidiary and the defendant were alter egos. *Id.* at 205. In that case, creditors of a subsidiary sought to hold the parent corporation liable for the subsidiary's debt. *Id.* at 202-03. The District Court chose to apply the state law of the subsidiary to determine the veil piercing issue, rather than the state law under which the defendant parent had been incorporated. *Id.* at 203-04. The Fifth Circuit Court of Appeals affirmed, finding that a Texas statute codified the rule which the

---

[6]The applicable Texas choice-of-law statute dictates that "only the laws of the jurisdiction of incorporation of a foreign corporation shall govern (1) the internal affairs of the foreign corporation, including but not limited to the rights, powers , and duties of its board of directors and shareholders and matters relating to its shares, and (2) the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement." TEX. BUS. CORP. ACT ANN. art. 8.02 (Vernon 2003).

parties in this case describe as the "internal affairs doctrine." *See* TEX. BUS. CORP. ACT ANN. art 8.02 (Vernon 2003).[7]

This Court must decide whether Texas choice-of-law rules direct us to look to the state of incorporation of the parent, ASARCO, which is New Jersey, or the state of incorporation of the subsidiary, SPH, which is Delaware. *See Weaver v. Kellogg*, 216 B.R. 563, 585 (S.D. Tex. 1997) (incorporation at time of conduct matters). Other federal courts faced with alter ego issues have also "look[ed] to the law of the State of incorporation for each [corporation] to determine *whether its corporate entity should be disregarded*." *Amoco Chem. Corp. v. Tex Tin Corp.*, 925 F.Supp. 1192, 1202 (S.D. Tex. 1996)(emphasis added); *see also In re Kilroy*, 357 B.R. 411, 425(S.D. Tex. 2006); *Weaver*, 216 B.R. at 585. In this case, like in *Alberto*, the correct choice of law is the substantive law of the state of incorporation of the subsidiary (SPH), which is Delaware. *See Alberto*, 55 F.3d at 203-04. Thus, the Court will apply Delaware law to the veil-piercing issue, consistent with the controlling Texas statute and *Alberto*.

**3. Consensus on Delaware Law**

Although, as discussed above, there are two Texas choice-of-law analyses which apply to these intertwined issues, each leads the Court to apply Delaware law to the question of whether ASARCO has standing to assert its fraudulent transfer claim. *See* TEX. BUS. CORP. ACT ANN. art 8.02 (Vernon 2003); RESTATEMENT (SECOND) CONFLICT OF LAWS § 145(1) (1971); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984). Further, the "parties can, within broad

---

[7]In another case the Fifth Circuit Court of Appeals, without discussion on the issue, and seemingly without objection of the parties, applied the law of the state of the Defendant's principal place of business (Texas) to decide a veil piercing issue even when the corporation was incorporated in another state (Tennessee). *Rimade Ltd.*, 388 F.3d at 140. In that case, however, the court did not analyze Texas choice-of-law rules.

limits, stipulate the substantive law to be applied to their dispute and can, by not objecting to the [court's] application of the substantive law to their dispute, be deemed to have so stipulated to its application." *Holloway v. HECI Exploration Co. Employees' Profit Sharing Plan*, 76 B.R. 563, 572 (Bankr. N.D. Tex. 1987). In the instant case, the parties have not only "not objected," but both sides have gone further to affirmatively tell this Court that Delaware law governs this issue. Although this Court is not bound to follow the parties' stipulation in deciding a question of law, it may consider both sides' conclusion that the relevant facts support the application of Delaware law. *See Ezell v. Hayes Oilfield Const. Co., Inc.*, 693 F.2d 489 (5th Cir. 1982).

## B. Standing Discussion

Defendant claims that since ASARCO did not own the SPCC shares, but only owned SPH, ASARCO does not have standing as a matter of law.[8] Plaintiffs respond that since SPH, the wholly-owned subsidiary, was a "mere instrumentality, agent and alter ego of ASARCO," the court may pierce the corporate veil to recognize ASARCO's eligibility to seek relief from the fraudulent transfer under 11 U.S.C. §§ 544(b), 550(a). (*See* Compl. ¶ 6.) Plaintiff explicitly claims that it had an ownership interest in the SPCC stock. (*Id.* ¶ 4.)

To show a claim for an avoidable fraudulent conveyance, the Court must identify "a transfer of an interest of the debtor in property." 11 U.S.C. §§ 544, 548; *see also In re Brajkovic*, 151 B.R. 402, 405 (Bankr. W.D. Tex. 1993). The definition of "an interest of the debtor in property" is not defined by the Bankruptcy Code, but left to state law. *Butner v. United States*, 440 U.S. 48, 54

---

[8]Constitutional standing requirements are governed by federal law. *New Orleans Pub. Serv. Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 467 n. 29 (5th Cir. 1984). For a party to have standing to sue, it must present a case or controversy under Article III, by showing injury, causation, and redressability. *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003).

(1979); *Brajkovic*, 151 B.R. at 405; *Matter of Gervich*, 570 F.2d 247, 251 (8th Cir. 1978). Plaintiffs must show that the SPCC stock was an interest of ASARCO in property under state law to fall under the Bankruptcy Code's protection against fraudulent transfers. *See* 11 U.S.C. § 544.

Delaware law recognizes that corporate entities, such as a parent and subsidiary, may be disregarded, and "the ultimate party in interest, the parent, [may] be regarded in law and fact as the sole party in a particular transaction . . . only in the interest of justice, when such matters as fraud, contravention of law or contract, . . . or where equitable consideration . . . require it . . . ." *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. Ch. 1968). "To state a veil-piercing claim, the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003). Federal courts applying Delaware law have held that a party may pierce the veil on an alter ego theory when there is a misuse of the corporate form or an overall element of injustice or unfairness. *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir. 1995); *see also Harper v. Del. Valley Broad., Inc.*, 743 F.Supp. 1076, 1085 (D. Del. 1990). Delaware permits exercise of this "broad" equitable power only where equity demands. *Alberto*, 55 F.3d at 205.

ASARCO alleges facts to support a reverse veil piercing argument to disregard the separate entity of SPH. Plaintiffs pled that SPH was formed as "a sham to perpetrate a fraud on ASARCO's creditors, namely, the transfer of ASARCO's 54.2% ownership interest in SPCC to AMC." (Compl. ¶ 6.) According to its Complaint, "ASARCO received less than fair consideration or reasonably equivalent value in exchange for making said transfer. ASARCO did not receive fair consideration or reasonably equivalent value for the SPCC shares." (*Id.* ¶ 91.) "At the direction of its owners,

18

Grupo Mexico and AMC, ASARCO transferred the SPCC shares with the actual intent to hinder, delay, and /or defraud its creditors." (*Id.* ¶ 68.) "Said transfer was of an interest of ASARCO in property." (*Id.* ¶ 87.) Plaintiffs have pled sufficient facts to support their claim that SPH was only an alter ego of ASARCO. These facts, if proven, would support a claim that the equitable remedy of piercing the corporate veil is necessary to avoid injustice to ASARCO's creditors. *See Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. Ch. 1968).

## C. Availability of the Reverse Veil Piercing Argument

Defendant in this case has presented some Texas, not Delaware, case law to support its standing argument that reverse veil piercing is not a cognizable legal theory, but it has not argued that Texas veil-piercing law would govern the issue of piercing the veil of a Delaware corporation. *See Alberto*, 55 F.3d at 203; TEX. BUS. CORP. ACT ANN. art. 8.02 (Vernon 2003).

Defendant does present case law establishing that a trustee has exclusive standing to assert a claim. *In re Educators Group Health Trust*, 25 F.3d 1281, 1283 (5th Cir. 1994). That case, however, only holds that a trustee has authority over the first opportunity to pursue a debtor's cause of action when contested by competing individual creditors. *Id.* "Whether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case." *Id.* at 1284. *In re Educators* does not address the issue nor foreclose a parent corporation from pursuing, as part of its own estate, a cause of action alongside its wholly-owned subsidiary, as long as it could have raised its claim at the time of the commencement of the case. The Fifth Circuit Court of Appeals applied Texas law in *In re Educators* to conclude "that an action based upon alter ego properly belongs to the estate, where (1) the debtor could have pierced its own corporate veil . . . and (2) the debtor is stripped of assets,

19

causing a derivative injury to the individual creditor." *Id.* (citing *Matter of S.I Acquisition, Inc.*, 817 F.2d 1142, 1153-54 (5th Cir. 1987)).  Even the Fifth Circuit case that Defendant cites, *S.I Acquisiton, Inc.*, supports the availability of a veil-piercing argument to enlarge the potential estate of the corporation whose veil is being pierced. *See* 817 F.2d at 1152; *see also In re Schimmelpenninck*, 183 F.3d 347, 358 (5th Cir. 1999).[9]  Plaintiffs pled that they could have pierced their own veil because SPH was a "mere instrumentality, agent and alter ego of ASARCO." (Compl. ¶ 6.)  Plaintiffs have also pled facts supporting a conclusion that ASARCO was stripped of assets and that its creditors were injured.  (*Id.* ¶¶ 28, 29.)  This lawsuit, in effect, seeks to enlarge not only the state being pierced, but also the estate of the corporation doing the piercing.

Also, in this case, unlike in *In re Educators*, there are no third-party creditors competing for standing to protect ASARCO's interest in the fraudulent transfer claim.[10]  *See In re Educators*, 25 F.3d at 1285.  In that case, there were averments in the complaint which alleged direct injury to third parties and not to the estate.  In contrast, Plaintiffs in the Complaint presently before the Court allege direct injury only to ASARCO, SPH and their creditors.  (Compl. ¶¶ 81-82.)

Defendant also argues that Plaintiffs should not be granted standing on their alter ego theory because it would be similar to a grant of substantive consolidation under bankruptcy law.  *See In re Owens Corning*, 419 F.3d 195, 202 (3rd Cir. 2005).  In *Owens Corning*, the grant of substantive

---

[9]The Court is not persuaded that it should follow the non-precedential holding of *Southmark*, even in considering Texas law, since it is in direct tension with *S.I. Acquisition*. *See S. I. Acquisition*, 817 F.2d at 1152; (AMC's Reply, Ex. 29.); *but see Southmark Corp. v. Crescent Heights VI*, Inc., No. 95-10849, 95 F.3d 53 (5th Cir. July 26, 1996) (not precedential pursuant to Fed. R. App. P. 47.5.4).

[10] In this matter, various creditor committees have sought to intervene and the Court has allowed the intervention on a stream-lined basis, which was agreed to by the creditors and the plaintiffs.  In very recent filings with this Court, it has been suggested that a somewhat similar claim has been filed in bankruptcy court by certain creditors, but this Court has not been supplied with copies nor is it apparent that there is any intention for that claim to compete with this lawsuit.

consolidation would have harmed the subsidiary by eliminating contractual guarantees creditors of the subsidiary had secured.  *Id.* at 205.  Those guarantees applied to the subsidiary, but not necessarily the parent.  In this case, however, Defendant has not argued that any injustice would result to SPH's creditors by allowing ASARCO to pursue the claim as co-party plaintiffs.  There is no evidence of other SPH interests that were harmed by the transaction in a way that ASARCO creditors were not.  The *Owens Corning* decision recognized subtle differences between the remedy of "substantive consolidation" and piercing the corporate veil.  *Id.* at 207.  Since no facts in this case present a risk of inequity resulting to the subsidiary creditors if the claim is pursued by ASARCO, the Court is not bound by the result in *Owens Corning*.  Furthermore, the Court need not define the extent to which the legal standards for the two remedies overlap.

The Defendant has not offered any case law excluding the availability of a reverse veil piercing claim under Delaware law.  Defendant has not shown that, as a matter of law, a parent corporation cannot enlarge its estate by pursuing its wholly-owned subsidiary's cause of action where the wholly-owned subsidiary acts as a mere instrumentality or alter ego of the parent.  To the contrary, Delaware law supports the availability of veil piercing, although only in exceptional cases, as equitable relief to avoid injustice. *See Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. Ch. 1968); *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir. 1995).

Plaintiffs have alleged the necessary element of injustice.  They have alleged facts supporting equitable relief in order to protect ASARCO's creditors, not to reward ASARCO for its abuse of the corporate form.   Plaintiffs' factual allegations sufficiently state a claim for equitable relief by describing the creation of the subsidiary, SPH, as a sham that acted as a single-business enterprise

21

with ASARCO, as part of an orchestrated plan to distance ASARCO creditors from ASARCO's main assets, the SPCC shares.  (*See* Compl. ¶¶ 6, 22.)

## D. SPH's Standing

Defendant has not challenged the standing of SPH, the second-added party plaintiff in this case.  SPH is a party plaintiff in this case since they were added to the First Amended Complaint filed on May 4, 2007.  In oral argument, AMC, while not agreeing to the allegations, has basically conceded that SPH is a rightful Plaintiff in this case.  The Plaintiffs have alleged the necessary injury to SPH to support SPH's standing at this stage of the pleadings as well.

## V. BREACH OF FIDUCIARY DUTY

Plaintiffs allege that as a result of ASARCO's insolvency, AMC owed fiduciary duties to ASARCO and its creditors. (Compl. ¶ 103.)  Plaintiffs aver that AMC breached its fiduciary duties, in part, by its involvement in the transfer of the SPCC stock to AMC.  (*Id.* ¶ 104.)  Defendant argues that, as a matter of law, parent corporations do not owe fiduciary duties to their wholly-owned subsidiaries. (AMC's Motion, at 11.)

Plaintiffs also allege that AMC aided and abetted Grupo and/or one or more of ASARCO's directors' breaches of fiduciary duties.  (Compl. ¶ 110.)  Plaintiffs claim that Grupo and ASARCO's directors owed fiduciary duties to ASARCO and its creditors because ASARCO was insolvent and that AMC knowingly and intentionally assisted Grupo and ASARCO's directors in breaching these duties.  (*Id.* ¶ 108, 110.) Defendant seeks to dismiss this claim, arguing that there cannot have been an underlying breach of fiduciary duty by Grupo and that the Complaint fails to allege sufficient facts to support an inference that ASARCO's directors had a fiduciary duty to ASARCO or its

creditors. (AMC's Motion, at 16).  In short, AMC argues that neither Grupo nor ASARCO's directors owed a fiduciary duty; thus it is impossible for AMC to have aided and abetted the breach of a duty that did not exist.

**A. Fiduciary Duty Choice of Law**

Federal courts sitting in Texas must apply the law of the state of incorporation when a corporation's internal affairs are implicated.  *Sommers Drug Stores Co. Employee Profit Sharing v. Corrigan*, 883 F.2d 345, 353-354 (5th Cir. 1989)(relying on TEX. BUS. CORP. ACT ANN. art 8.02 (Vernon 2003)); *see also American Realty Trust Inc. v. Matisse Capital Partners*, LLC, No.02-11148, 2003 WL 22965577, at *6 (5th Cir. Dec. 17, 2003); *Enigma Holdings*, 2006 WL 2859369, at *7 (both in context of fiduciary duty claims).[11]  Plaintiffs conclude that New Jersey law should apply to this claim.  Transcript Mot. Hr'g 72:5-7.  Defendant agrees that New Jersey or Delaware law could control the breach of fiduciary duty and aiding and abetting the breach of fiduciary duty claims. Transcript Mot. Hr'g 52:12-23.

In the context of a shareholder suit alleging a breach of fiduciary duty, a District Court has held that "each challenged act must be evaluated under the law of the state of [] incorporation at the time of the act."  *Weaver v. Kellogg*, 216 B.R. 563, 585 (S.D. Tex. 1997)(applying Delaware law to a corporation that was originally a Texas corporation, but reincorporated in Delaware before challenged acts).  Since ASARCO was incorporated in the state of New Jersey at the time of the acts challenged as breaches of fiduciary duty, New Jersey law will apply to establish both the duties of

---

[11]The Texas choice-of-law statute dictates that "only the laws of the jurisdiction of incorporation of a foreign corporation shall govern (1) the internal affairs of the foreign corporation, including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares, and (2) the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement." TEX. BUS. CORP. ACT ANN. art. 8.02 (Vernon 2003).

ASARCO's directors and the rights of ASARCO and its creditors. *See* TEX. BUS. CORP. ACT ANN. art 8.02 (Vernon 2003).

## B. AMC's Duty to ASARCO and ASARCO's Creditors

Generally, a fiduciary duty claim is not necessary to protect shareholders of a wholly-owned subsidiary from its parent corporation. *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3rd Cir. 2007)(citing *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988)). "Directors must act in the best interest of a corporation's shareholders, but a wholly owned subsidiary has only one shareholder: the parent." *Id.* "There is only one substantive interest to be protected, and hence no divided loyalty of the subsidiary's directors and no need for special scrutiny of their actions." *Id.* (citing *Bresnick v. Franklin Capital Corp.*, 77 A.2d 53, 56 (N.J. Super.Ct.App. Div. 1951)).

Under the Third Circuit's forecast of New Jersey law, a duty of loyalty against the parent would only arise if its subsidiary was insolvent. *See id.* "[W]hen the corporation becomes insolvent the creditors' investments are at risk, and the directors should manage the corporation in their interests as well as that of the shareholders." *Id.* Applying New Jersey law, the Third Circuit reviewed the claims of VFI, the wholly-owned subsidiary, against Campbell Soup Co., the parent. The claims in that case were very similar to those alleged by ASARCO—a subsidiary's claim against a parent for breach of fiduciary duty. VFI, the subsidiary, sued Campbell, the parent, for its spin-off transaction decision that harmed creditors, arguing constructive fraudulent transfer and aiding and abetting a breach of fiduciary duty.

The Third Circuit recognized the subsidiary's potential fiduciary duty claim, but granted summary judgment because there was no evidence that the subsidiary was insolvent. *Id.*

24

(considering subsidiary's substantial capitalization). The court held that corporate/fiduciary duties to the creditors would have arisen in the case of "equitable insolvency." *Id.* at 636. New Jersey has defined "equitable insolvency" as "the general inability of the corporate debtor to meet its pecuniary liabilities as they mature, by means of either available assets or an honest use of credit." *Id.*(citing *Whitfield v. Kern*, 192 A. 48, 55 (N.J. 1937)).

While there is clear Third Circuit precedent, the Supreme Court of New Jersey has not explicitly ruled on whether a parent owes its wholly-owned subsidiary a fiduciary duty at all. Defendant argues that the Supreme Court of New Jersey would look to Delaware law for guidance. *See Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 397-98 (5th Cir. 1984)(ruling that if the law is undecided, a federal court should predict what the highest state court would decide if it were presiding over the case). New Jersey courts have observed that Delaware law is instructive since the jurisdiction is highly regarded in corporate law. *In the Matter of Prudential Ins. Co. Derivative Litig.*, 659 A.2d 961, 969 (N.J. Super. Ct. Ch. Div. 1995).

Defendant argues that a fiduciary duty would not exist under Delaware law. *See Trenwick Amer. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 191 (Del. Ch. 2006). In *Trenwick*, the Delaware court ruled that a parent corporation did not owe a fiduciary duty to its wholly-owned subsidiaries or its subsidiaries' creditors. *Id.* The court, however, did not absolutely rule that a cause of action was barred as a matter of law. *Id.* On the contrary, the court left open the possibility of a fiduciary duty where minority shareholders were harmed. *Id.* Other courts have also recognized this potential cause of action under Delaware law. *See In re Scott Acquisition Corp.*, 344 B.R. 283, 288 (Bankr. Del. 2006); *Cantor v. Perelman*, 414 F.3d 430, 435-37 (3rd Cir. 2005). In *Trenwick*, the Delaware court found that as a result of "imprudent strategy," the parent, which was a holding

25

company, and its subsidiary "were eventually rendered insolvent." *Trenwick*, 906 A.2d at 172.  The

Delaware court resisted holding the parent liable for a breach of fiduciary duty merely because it

"caused its wholly-owned subsidiary to take on more debt to support the holding corporation's

overall business strategy."  *Id.* at 173.  The court found no facts pled to "suggest any plausible

motive" on the part of the parent to cause the "subsidiary to become insolvent or to dishonor the

rights of their creditors."  *Id.*  In the case at hand, Plaintiffs pled that ASARCO was insolvent at the

time AMC directed ASARCO to make the transfer, unlike the plaintiffs in *Trenwick* who only pled

facts that showed a "later-arising" insolvency.  *See id.*

The Supreme Court of Delaware, however, has made a distinction when a corporation is

already bankrupt.  *Bovay v. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944).[12]  The court held that

the "defendants were in the position of fiduciaries, and as such, under a duty to exercise the utmost

good faith in their transactions with the bankrupt."  *Id.* at 813.  That court permitted bankruptcy

litigation "to compel defendants to account for and refund large sums of money which they

unlawfully and fraudulently took from the bankrupt corporation through the agency of its officers

and directors who were named and controlled by the defendants."  *Id.* at 809.

A bankruptcy court, also applying Delaware law, found that directors of a wholly-owned

insolvent subsidiary owe fiduciary duties to both the subsidiary corporation and the subsidiary's

creditors.  *In re Scott Acquisition Corp.*, 344 B.R. at 288.  As a matter of Delaware law, there is "no

. . . principle . . that the directors of an insolvent subsidiary can, with impunity, permit it to be

plundered for the benefit of its parent corporation." *Id.*  Thus, this Court is not convinced that New

---

[12]"An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors.  The fact which creates the trust is the insolvency, and when the fact is established, the trust arises, and the legality of the acts thereafter performed will be decided by very different principles than in the case of solvency."  Id.

Jersey's highest court would be persuaded that *Trenwick* foreclosed a fiduciary duty between a parent and its subsidiary as a matter of Delaware law, or that New Jersey law would foreclose a cause of action in this case. This Court finds that even if New Jersey law were to look for guidance to Delaware law, Delaware law would not preclude a claim for breach of fiduciary duty brought on behalf of the creditors of an insolvent subsidiary against the subsidiary's directors and/or the parent corporation.

ASARCO pled that at the time of the transfer, ASARCO was "insolvent and unable to pay its debts as they became due." (Compl. ¶ 7.) Although Defendant argues that Plaintiffs were not owed a duty if they were merely in the "zone of insolvency," Plaintiffs have pled that they were actually insolvent, and offered facts that, if true, could support that claim. (*Id*. ¶¶ 7, 69.); *see VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 636 (3rd Cir. 2007)(defining insolvency). Treating all well-pleaded allegations as true on a review under Rule 12(b)(6), this Court finds that the fiduciary duty claims can survive dismissal because the pleadings claim that ASARCO was insolvent at the time of the purported breach.

### C. Aiding and Abetting ASARCO's Directors Breach

New Jersey law has recognized a claim for aiding and abetting the breach of an agent's fiduciary duty of loyalty to a principal. *New Jersey v. Qwest Commc'ns Int'l, Inc.*, 904 A.2d 775, 782 (N.J. Super. Ct. App. Div. 2006) (citing *Judson v. Peoples Bank & Trust Co.*, 134 A.2d 761, 767 (N.J. 1957); *Franklin Med. Assocs v. Newark Pub. Sch.*, 828 A.2d 966 (N.J. Super. Ct. App. Div. 2003); *Jaclyn, Inc. v. Edison Bros. Stores, Inc.*, 406 A.2d 474 (N.J. Super.Ct. Law Div. 1979)). Plaintiffs have a claim under New Jersey law if they have sufficiently alleged that AMC knowingly

aided and abetted the breach of fiduciary duty of a third party, and that AMC knew the third party's conduct constituted a breach of a fiduciary duty. *See Qwest Commc'ns Int'l*, 904 A.2d at 782.

The Court will first determine whether, under New Jersey law, a claim for the underlying breach of fiduciary duty exists, i.e., whether the applicable law recognizes fiduciary duties between a parent and its subsidiary or directors and their corporation. The Court will then determine whether Plaintiffs have sufficiently alleged that AMC knew of a breach of fiduciary duty by Grupo or ASARCO's directors. Finally, the Court will consider whether Plaintiffs properly pled that AMC substantially assisted and encouraged the alleged breaches.

### 1. Underlying Breach of Fiduciary Duty

Under New Jersey law, if a fiduciary duty exists, a parent corporation may be guilty of aiding and abetting its directors' breach of that fiduciary duty when those directors are also the directors of its subsidiary. *See Campbell Soup*, 482 F.3d at 634(where directors were simultaneously serving on board of parent and subsidiary). "When a director acts while under an incentive to disregard the corporation's interests, she must show her utmost good faith and the most scrupulous inherent fairness of the bargain." *See id.* at 635 (applying New Jersey law); *accord In re High Strength Steel, Inc. v. Lozinski*, 269 B.R. 560, 569 (Bankr. D. Del. 2001)(under Delaware law).

Defendant argues that New Jersey law, following Delaware precedent, would not recognize the underlying fiduciary duty of directors. (*See* AMC's Motion, at 17) *See generally North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, No. 521,2006, 2007 WL 1453705 (Del. May 18, 2007). In *Gheewalla*, a creditor, NACEPF, sued the directors of Clearwire, an unrelated corporation that owed them money. *Id.* 2007 WL 1453705, at *1. NACEPF was not a shareholder, but a creditor. *Id.*

28

ASARCO alleges that the underlying, breaching third party was "Grupo Mexico and/or one or more of ASARCO's directors, including without limitation German Larrea, Genaro Larrea, Xavier Garcia, Oscar Gonzalez, and Alfredo Casar." (Compl. ¶ 108.) The directors of ASARCO did have a fiduciary duty requiring "utmost good faith and the most scrupulous inherent fairness of the bargain." *See Campbell Soup*, 482 F.3d at 635. Since a recognizable claim for an underlying breach by the directors exists under at least one legal theory, the Court next considers whether Plaintiffs' Complaint sufficiently alleges that AMC aided and abetted a breach of these duties.[13]

## 2. AMC's Knowledge

A cause of action for aiding and abetting is recognized where "one party knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *Qwest Commc'ns Int'l, Inc.*, 904 A.2d at 782; *see also Judson v. Peoples Bank & Trust Co.*, 34 A.2d 761, 767 (N.J. 1957). To prove the aiding and abetting claim, Plaintiffs must allege that AMC knew that ASARCO's directors' conduct would constitute a breach of fiduciary duty. Defendant argues that Plaintiffs have not pled that AMC knew ASARCO was insolvent, so they could not know that ASARCO's directors' actions would constitute a breach. Transcript, Mot. Hr'g 67:12-17; *see id.*

Plaintiffs' Complaint explicitly accuses AMC of "knowingly and intentionally provid[ing] substantial assistance to . . . ASARCO's directors' breaches of fiduciary duties by, among other things, orchestrating, authorizing, and carrying out the transfer of ASARCO's 54.2% ownership in SPCC to AMC." (Compl. ¶ 110.) Viewing the Complaint in the light most favorable to Plaintiffs,

---

[13] Given the fact that the Court finds that ASARCO's directors owed it the loyalty of a fiduciary and that AMC could be held liable for aiding and abetting their breach of that duty, the Court need not decide, at this juncture, the more tenuous question of whether Grupo owed ASARCO any fiduciary duty.

the key decisions involved in considering and executing the transaction were done at the direction of AMC and Grupo. (*Id.* ¶¶ 24,28, 32, 34, 35, 40, 43, 44, 56, 64.) On March 25, 2003, two members of ASARCO's senior management met with Genaro Larrea (AMC's Director, President, and Chief Commercial Officer) specifically objecting to the payment of Yankee Bonds, and expressing concern about ASARCO's future. (*Id.* ¶ 61.) This is sufficient to allege facts that could support a claim that AMC knew it would be aiding and abetting ASARCO's directors' breach of fiduciary duties in the March 31, 2003 sale. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007). Furthermore, the Complaint clearly sets out that various individuals sat on both AMC and ASARCO's boards and thus would have complete knowledge of the situation; therefore, it is clearly alleged that at least some of AMC's board members knew about the potential breach.

### 3. AMC's Aiding

Finally, Plaintiffs must allege facts to support the participation of AMC by "substantial assistance or encouragement." *Judson v. Peoples Bank & Trust Co.*, 134 A.2d 761, 767 (N.J. 1957). Plaintiffs have accused AMC of directly orchestrating the breach of fiduciary duty. (Compl. ¶ 7.) According to their account, ASARCO was "insolvent and subject to AMC and Grupo Mexico's complete control." (*Id.*) The factual allegations describe AMC's direction to hire multiple consultants to obtain a favorable valuation of SPCC stock, AMC's direction to redeem bonds in the face of numerous objections, and its direction in the actual transfer with terms regarding the use of the proceeds. (*Id.* ¶¶ 32, 35, 36.) Together, these allegations support the claim that AMC provided "substantial assistance or encouragement." *See Judson*, 134 A.2d at 767.

## VI. CONSPIRACY

Plaintiffs' Complaint alleges that Grupo conspired with its wholly-owned subsidiary, AMC, to fraudulently transfer the SPCC stock, breach fiduciary duties owed to ASARCO and its creditors, and commit other wrongful acts. (Compl. ¶ 97.) The Complaint also avers that AMC conspired with one or more of ASARCO's directors, including German Larrea, Genaro Larrea, Xavier Garcia, Oscar Gonzalez, and Alfredo Cesar. (*Id.*) AMC argues that a parent cannot conspire with its totally-owned subsidiary nor can a parent conspire with the directors of its wholly-owned subsidiary when those individuals are also on the parent's board of directors. (AMC's Motion, at 9-11.) Whether Plaintiffs' claims can withstand AMC's Motion to Dismiss turns on whether these cause of actions are recognized by the controlling law.

### A. Choice of Law

The law of the forum state controls the characterization of the form of the action. *Fahs v. Martin*, 224 F.2d 387, 396-97 (5th Cir. 1955)(citing Goodrich on Conflicts of Laws (3d Ed.) § 9). Under Texas law, a civil conspiracy is treated as a derivative tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996); *Bridas Corp. v. Unocal Corp.,* 16 S.W.3d 893, 898 (Tex.App.–Houston [14th Dist.] 2000)(treating civil conspiracy as a tort (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971)); *Lexxus Intern'l, Inc. v. Loghry*, Nos. 3:04-CV-1039-L, 3:06-CV-0561-L, 3:06-CV-554-L, 2007 WL 959030, at *20 (N.D. Tex. Mar. 30, 2007). For tort issues, in the absence of a statutory directive,[14] Texas courts look to section 145 of the Restatement (Second) of Conflict of

---

[14] In the context of the veil piercing issue and the breach of fiduciary claim, this Court found that Texas' internal affairs statute, TEX. BUS. CORP. ACT ANN. art. 8.02, controlled the choice-of-law analysis. This statute dictates that the jurisdiction of incorporation governs the internal affairs of a foreign corporation. Thus, this Court, following this statutory directive, determined that Delaware law applied to the veil piercing issue and New Jersey law applied to the breach of fiduciary duty question. After considering whether this conspiracy claim is an "internal affair," as the term

Laws to determine the jurisdiction that has the most significant relationship to the particular issue. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420-21 (Tex. 1984). As stated previously, the Court considers the following contacts in determining the applicable law: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties is centered. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145 (1971).

The place where the injury occurred is unclear from the parties' pleadings and subsequent motions. The alleged injury likely occurred wherever ASARCO's creditors are located; however, their locations are varied, and specific information has not been presented to the Court.

The second factor looks to the place where the conduct causing the injury occurred. This is more than likely in Arizona, since the headquarters of AMC and ASARCO are both in Phoenix, Arizona, and any conspiracy formed would likely originate there. New York is another possibility because Plaintiffs claim that some of the financing transactions occurred in New York.

The third factor requires the Court to look at both the state(s) of incorporation and the principal places of business. AMC was incorporated in Delaware at the time of the alleged conspiracy. Additionally, SPH was incorporated in Delaware as is SPHC II, which now possesses the SPCC stock. Also, ASARCO is now a Delaware corporation, but at the time of the events in question, it was incorporated in New Jersey. ASARCO, AMC and SPH each had their principal

---

is used in article 8.02, the Court concludes that it is not. Unlike the issues of veil piercing and breach of fiduciary duty, a claim for conspiracy presupposes two different persons and/or entities and therefore, by definition, would not be limited solely to the internal affairs of one corporation (in this case ASARCO). Thus, the Court concludes that article 8.02 is not an applicable statutory directive in the choice-of-law inquiry regarding Plaintiffs' conspiracy cause of action.

places of business in Arizona at all relevant times.  Presumably, Grupo was and is a Mexican corporation with its principal place of business in Mexico.

Lastly, this Court considers the place where the relationship between the parties is centered. The parties have not presented this information to the Court in any detail.  Arizona is the state in which the parties to this action were headquartered.  In all probability, any alleged conspiracy would have occurred in Phoenix, Arizona, where the parties had their principal places of business. Delaware is the state in which the alleged wrongdoers were incorporated, and it is also SPH and SPHC II's state of incorporation.  Despite Delaware's many connections, the Court finds that this factor points towards Arizona as being the location where the alleged conspiratorial relationships were centered.

The Court evaluates these contacts according to their relative importance with respect to the particular issue.  RESTATEMENT, § 145.  For the fraudulent transfer claim, this Court found that Delaware had the most significant relationship to that claim.  As noted previously, however, the choice-of-law analysis must be specifically tailored to the issue to be decided.  *Hughes Wood Prods., Inc. v. Wagner*, 8 S.W.3d 202, 205 (Tex. 2000).[15]  Considering the nature of the conspiracy claim,

---

[15] While at first blush one may be perplexed that a court could utilize the same test— the "most significant relationship test"—in the same lawsuit with the same parties and reach different results, but that is the nature of the test. In focusing on the question of the fraudulent transfer, the nature of the relationship centered on the corporations and the asset in question, leading this Court to determine that Delaware was the state with the most significant relationship to that issue.  Yet, when the cause of action is conspiracy, the Court must necessarily focus on the location of the alleged conspirators, the alleged agreement to conspire, and the location of the overt acts in furtherance of the alleged conspiracy. While one could certainly make a case for applying Delaware law, it seems inescapable that  the location of each of the elements comprising the alleged conspiracy had to have occurred in Arizona, making Arizona the state with the most significant relationship to the conspiracy cause of action.

with the guidance of the comments to section 145, the Court finds that the state with the most significant relationship to the conspiracy claim is Arizona.[16]

The parties all proposed that Arizona law applies, but none offer the Court sufficient authority for this Court to determine what that law is, or might be, regarding these particular conspiracy claims.[17]  After its own examination of Arizona law regarding this issue, this Court concludes that the law in Arizona on these types of conspiracy claims is nonexistent.  If an issue of controlling state law is undecided, a federal court should make an "Erie guess," that is try to predict the course of the highest court in Arizona.  *Turbo Trucking Co., Inc. v. Those Underwriters at Lloyd's London,* 776 F.2d 527, 529 (5th Cir. 1985).

When an Arizona court is confronted with a legal issue that no other Arizona court has addressed, it looks for guidance from other jurisdictions that have addressed the issue.  *Hull v. DaimlerChrysler Corp.*, 99 P.3d 1026, 1028 (Ariz. Ct. App. 1994). When specifically addressing the issue of intracorporate conspiracy, Arizona has looked to American Law Reports and the Supreme Court of Connecticut.[18]  The Arizona courts of appeals have also looked to California and

---

[16] The Court realizes that, in applying the choice-of-law rules, it has relied primarily on the parties' pleadings, as is required by Rule 12(b)(6); however, the Court has been forced to make assumptions as to where the conspiracy actually formed.  Nevertheless, the Court finds it difficult to imagine that the conspiracy was not formed and carried out in Phoenix, Arizona, where all of the entities involved were headquartered, and, presumably, had their principal places of business.  This Court acknowledges that subsequent proceedings and/or discovery could eventually lead this Court to a different conclusion regarding which state has the most significant relationship to the conspiracy claims.

[17] AMC cites Texas, Arizona, and Delaware law in its argument to dismiss the conspiracy cause of action. (AMC's Motion, at 10).  ASARCO also cites Texas, Arizona, and Delaware authority in its response to AMC's motion to dismiss the conspiracy claim.  (ASARCO's Response, at 10-14).

[18] *See Dawson v. Withycombe,* 163 P.3d 1034, 1055 n. 19 (Ariz. Ct. App. 2007)(citing Robin Miller, Annotation *Construction and Application of "Intracorporate Conspiracy Doctrine" as Applied to Corporation and its Employees-State Cases,* 2 A.L.R.6th 387, §§ 5, 8 (2005)); *Harp v. King,* 835 A.2d 953 (Conn. 2003)) (mentioning, in a footnote, that the conspiracy claim against two members of a board of directors may not be legally possible).

Illinois for guidance.[19]  The law on this issue in Arizona appears to be completely undecided, and there is no trend in Arizona to indicate what course the Arizona Supreme Court would take. As a result, this Court is to presume that Arizona would adopt the prevailing rule if called upon to do so. *See Turbo Trucking Co., Inc.*, 776 F.2d at 529.

The Court first addresses the prevailing view regarding whether a parent corporation and its wholly-owned subsidiary can conspire and then examines whether a parent can conspire with the directors of its subsidiary when the directors sit on the board of both corporations.

## B.  Conspiracy Between AMC and Grupo

This Court must first uncover the prevailing rule as to whether a parent and its wholly-owned subsidiary can be "two or more persons" as is required to state a cause of action for civil conspiracy. Plaintiffs allege that Grupo conspired with its wholly-owned subsidiary, AMC, to fraudulently transfer the stock and breach fiduciary duties owed to ASARCO and its creditors.  (Compl. ¶¶ 97-100.)  Defendant argues that a parent corporation and its wholly-owned subsidiary cannot form a conspiracy as a matter of law. (AMC's Motion, at 9-10).  This Court undertook a survey of all fifty states' laws to determine the prevailing rule on this question.[20]

The Supreme Court of the United States, in *Copperweld*, held that a parent and its wholly-owned subsidiary cannot, as a matter of law, form a conspiracy under the Sherman Act. *Copperweld*

---

[19]  *See Petroni v. Board of Regents*, 566 P.2d 1038, 1043 (Ariz. Ct. App. 1977)(citing *Wise v. Southern Pac. Co.*, 223 Cal App.2d 50 (1963))(noting that other courts have held that employees of a corporation cannot conspire with their principal or employer when acting in their official capacities and not as individuals for their own advantage); *see also Savard v. Selby*, 508 P.2d 773, 775 (Ariz. Ct. App. 1973)(citing *Unruh v. Truck Ins. Exchange*, 498 P.2d 1063 (Cal. 1972)); *De L'Ogier Park Dev. Corp. v. First Fed. S&L Ass'n*, 286 N.E.2d 583 (Ill.App. 1972))(discussing whether a plaintiff's complaint stated a claim for conspiracy, the court dismissed the claim because of plaintiff's failure to allege the requisite unlawful act or means).

[20]  While this Court is not constrained or controlled by a tally of the various states' approaches to this question, it felt such a survey was necessary to ascertain what the prevailing rule is, or if one exists.

*Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-72 (1984). Most courts have not faced the issue of whether this holding extends beyond the antitrust context to bar conspiracy claims against parents and wholly-owned subsidiaries in common-law conspiracy actions as well. Those states which have dealt with this question are split on the result.

Courts in Nebraska, Kansas, Florida, Virginia, and Tennessee explicitly state that the Court's holding in *Copperweld* extends to common-law conspiracy claims, thus adopting a *per se* rule that a corporation cannot conspire with its wholly-owned subsidiary.[21]

Arkansas, Pennsylvania and California, on the other hand, have expressly declined to disregard the legal corporate form in the common-law conspiracy context, and thus recognize such a cause of action against a parent and wholly-owned subsidiary.[22] Nevertheless, even those jurisdictions which recognize that such a cause of action could exist seem to look at the relationship

---

[21] *See Nebraska Sec. Bank v. Dain Bosworth, Inc.*, 838 F. Supp. 1362, 1371-72 (D.Neb 1993)(relying on *Copperweld* in holding that a parent and its wholly-owned subsidiary cannot be found to have conspired for RICO purposes); *Pizza Mgmt, Inc. v. Pizza Hut, Inc.*, 737 F.Supp. 1154, 1165-66 (D. Kan. 1990)(extending *Copperweld* to bar a civil conspiracy claim against a parent and its subsidiary); *Highland Restaurants v. Judy's Foods*, No. 83-4030, 1990 WL 92484, at *15 (D. Kan. June 26, 1990)(noting that *Copperweld* is purely a Sherman Act case, but nevertheless using the *Copperweld* rationale to bar a common-law conspiracy claim); *Bryant Heating and Air Cond. Corp.*, 597 F.Supp. 1045, 1054 (S.D..Fla. 1984)(stating that Florida law does not recognize a conspiracy between members of a single economic unit, such as a parent and its wholly-owned subsidiary); *In re Ray Dobbins Lincoln-Mercury, Inc.*, 604 F.Supp. 203, 204-05 (W.D.Va. 1984)(finding that *Copperweld* is not limited to Sherman Act cases); *Trau-Med of America Inc v. Allstate*, 71 S.W.3d 691 (Tenn. 2002)(citing *Copperweld* in acknowledging that wholly intracorporate conduct does not satisfy the plurality requirement to allege conspiracy).

[22] *See generally SEEKO, Inc. v. Hales*, 22 S.W.3d 157, 172 (Ark. 2000)(stating that *Copperweld* applies primarily in the area of antitrust litigation, and declining to extend the holding to common-law conspiracy claim); *Shared Communications Services of 1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties*, Inc., 692 A.2d 570, 572-74 (Pa. 1997)(refusing to extend *Copperweld* and disregard the corporate form in the common-law civil conspiracy context); *MGW, Inc. v. Fredricks Development Corp.*, No. G006654, 1990 WL 272149, at *4 (Cal. App. Apr. 30, 1990)(distinguishing *Copperweld* from civil conspiracy actions, noting that in the latter situation, the focus is on whether an individual has joined with another to perpetuate a wrong as opposed to the focus on whether there is a combination of economic power), *rev'd on other grounds, Pacific Lighting Corp. v. MGW, Inc.*, 111 S.Ct. 1299.

of the parent and subsidiary on a case-by-case basis to determine whether such a claim can exist in that particular situation.[23]

The law on this issue is somewhat unclear in Delaware, New Jersey, and New York. Courts applying the laws of each of these states have been presented with the issue and have declined to adopt a *per se* rule that a parent cannot conspire with its wholly-owned subsidiary.

A Delaware court, in *TransAmerica,* refused to allow the plaintiff to amend its pleadings to allege a conspiracy claim because it would be futile as a matter of law, considering that "nothing in the complaint allege[d] that TransAmerica [the parent corporation] acted other than in its role as the 100-percent owner of TransAir." *In re TransAmerica Airlines, Inc.*, No. Civ.A. 1039-N, 2006 WL 587846, at *7 (Del. Ch. February 28, 2006). In a later case, another Delaware court recognized a parent corporation and its subsidiary as two separate entities because the parent used the subsidiary in bad faith. *Allied Capital Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1036 (Del.Ch. 2007). Thus, Delaware has declined to adopt a bright-line rule barring conspiracy claims against a parent and its wholly-owned subsidiary and seems to be taking a case-by-case approach. *See id.*; *see also infra* note 28.

New Jersey case law also does not foreclose the availability of a conspiracy cause of action between parent and subsidiary corporations. The state courts of New Jersey have not yet had the opportunity to address the question, but a District Court, applying New Jersey state law, granted a

---

[23] *See Shared Communications Services of 1800-80 JFK Blvd. Inc., 692 A.2d 570, 574 (Pa. 1997)(recognizing parent and subsidiary as two separate entities where the enterprise wanted to claim that its corporations were separate in some contexts, but then, when accused of conspiracy, argued that the corporate forms were merely fictions); Academy Plaza L.L.C.1 v. Bryant Asset Management, No. 2774, 2006 WL 1652687 (Pa. Comm. Pl. June 9, 2006)(looking at the closeness of the relationship between the parent and subsidiary in determining whether the two corporations are sufficiently separate to form a conspiracy); SEEKO, Inc., 22 S.W.3d at 157 (reasoning that if the parent and subsidiary were separate enough to contract with each, they were certainly separate enough to form a conspiracy).*

motion for summary judgment, dismissing a claim for conspiracy between a parent and a subsidiary for the plaintiff's failure to present any evidence of an agreement. *Diaz v. Johnson Matthey, Inc.*, 869 F.Supp. 1155, 1168 (D.N.J. 1994). In that case, an employee sued his employer and employer's parent corporation for a number of claims, including conspiracy to defraud. *Id.* at 1158. The federal court, looking beyond the pleadings, found that the employee failed to present evidence of an agreement between the employer and the employer's parent corporation. *Id.* at 1168. The court implicitly recognized that the cause of action existed, suggesting that the plaintiff could have proven its conspiracy claim if it could show evidence of an agreement. *Id.* Furthermore, as discussed previously, New Jersey often looks to Delaware for guidance when faced with unsettled issues in corporate law. *See In the Matter of Prudential Ins. Co. Derivative Litig.*, 659 A.2d 961, 969 (N.J. Super. Ct. Ch. Div. 1995). Thus, this Court predicts that New Jersey would recognize this type of conspiracy cause of action, at least in limited situations.

New York state courts have not yet faced this issue; however, a District Court, applying New York law, stated that it was "not convinced that *Copperweld's* reasoning should be extended to the . . . common law conspiracy claims at bar." *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 828 F.Supp. 216, 223 (S.D.N.Y. 1993). Since there were third parties involved in the alleged conspiracy in that case, the court did not have to make a definitive ruling on whether such a claim could exist under New York law. *Id.*

Like many jurisdictions, the law in Texas on this issue is not settled. The Supreme Court of Texas has not yet addressed this question; although, it has cited *Copperweld* as authoritative in other contexts. *See infra* note 26. Nevertheless, a number of the Texas courts of appeals have discussed the particular issue at hand. The majority of the Texas courts' opinions have distinguished

*Copperweld*, interpreting that case as being limited to the Sherman Act.[24]  The 14th District Court of Appeals in Houston is the only Texas court to apply the *Copperweld* holding to a common-law conspiracy claim.  *Atl. Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 420 (Tex.App.–Houston [14th Dist.] 1991, writ denied) (stating that a parent cannot conspire with its wholly-owned subsidiary as a matter of law); *see also Bank One, Tex., N.A. v. Steward*, 967 S.W.2d 419, 446 FN26 (Tex.App. –Houston [14th Dist.] 1998, pet. denied). In an unpublished opinion, a District Court in the Northern District of Texas has predicted that the Supreme Court of Texas would adopt the minority view, extending *Copperweld* to common-law conspiracy actions.  *Block v. Alpharma, Inc.*, No. Civ.A. 3:02-CV-1077, 2004 WL 555480 at *2-3 (N.D.Tex. March 17, 2004).  This Court disagrees with that forecast, at least in the face of allegations of bad faith or fraud being committed on third parties.[25]  Based on the weight of authority in Texas, which leans towards recognizing a conspiracy claim between a parent and its wholly-owned subsidiary,  this Court believes that the Supreme Court of Texas, in this context, would recognize a common-law conspiracy claim against a parent corporation and its subsidiary.[26]

---

[24] *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771-72 (1984); *Grizzle v. Tex. Commerce Bank, N.A.*, 38 S.W.3d 265 , 284 (Tex. App.–Dallas 2001, pet. granted), *rev'd in part on other grounds,* 96 S.W.3d 240 (Tex. 2002); *Atl. Richfield Co. v. Long Trusts*, 869 S.W.2d 439, 447 (Tex.App. –Texarkana 1993, writ denied)(criticizing one other sister court for "ignor[ing] the antitrust distinctions"); *Metro. Life Ins. Co. v. La Mansion Hotels*, 762 S.W.2d 646, 651-52 (Tex.App. –San Antonio 1988, writ dism'd as moot); *Valores Corporativos, S.A. de C.V. v. McLane Company, Inc.,* 945 S.W.2d 160 (Tex. App. – San Antonio 1997); *Holloway v. Atl. Richfield Co.*, 970 S.W.2d 641, 644 (Tex.App. –Tyler 1998, no writ)(all distinguishing *Copperweld* as limited to the Sherman Act).

[25] The court in the Northern District relied upon the Supreme Court of Texas opinion, *Holloway v. Skinner*, 898 S.W.2d 793 (Tex. 1995).  That case cited *Copperweld* favorably and without necessarily limiting its application to the antitrust context.  *Holloway* was a case dealing with tortious interference in which the court held that the plaintiff must show that the defendant acted in a fashion ". . . so contrary to the corporation's best interest that his actions could only have been motivated by personal interest."  *Id.* at 796.  This is analogous to the allegations in this case.  *See also*, *Maxey v. Citizens National Bank,* 507 S.W.3d 722 (Tex. 1974).

[26] This Court, in doing so, recognizes that this ruling is not critical to the resolution of the issue, but makes this ruling because both parties raised Texas as a possible alternative.

Although there is not a consensus among the nation's courts on this issue, it appears that the prevailing view allows claims for common-law conspiracy between a parent corporation and its wholly-owned subsidiary, at least in certain circumstances. Thus, this court presumes that Arizona would adopt this view as well.[27]  *See Turbo Trucking Co., Inc. v. Those Underwriters at Lloyd's London* 776 F.2d 527, 529 (5th Cir. 1985).

Among those courts that recognize such a cause of action, some require that the plaintiff allege that the parent was acting outside of its role as simply a 100-percent owner of its subsidiary. *See Akande v. TransAmerica Airlines, Inc.*, No.Civ.A. 1039-N, 2006 WL 587846, at *7 (Del. Ch. Feb. 28, 2006). Other courts will recognize such a claim upon a showing of bad faith. *See Allied Capital Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1036 (Del. 2007). Most jurisdictions look at the relationship between the parent and its subsidiary on a case-by-case basis to determine whether a conspiracy claim can stand in that particular case. *See Shared Communications Services of 1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties, Inc.,* 692 A.2d 570 (Pa.Super.1997); *Academy Plaza LLC 1 v. Bryant Asset Management,* No. 2774, 2006 WL 1652687 (Pa. Comm. Pl. June 9, 2006); *SEEKO, Inc. v. Hales*, 22 S.W.3d 157 (Ark. 2000).

In the present case, Plaintiffs have sufficiently alleged a claim for conspiracy between AMC and Grupo. (Compl. ¶¶ 97-100, 110.) Plaintiffs have alleged facts that support a claim that AMC acted intentionally to conspire with Grupo. (*Id.*) According to the Complaint, "AMC joined and

---

[27] Under the most significant relationship test, this Court determined that Arizona is the state with the most significant relationship to the conspiracy issue. The Court also recognizes that the State with the next most significant relationship to this issue is Delaware. In making an "Erie guess" concerning the course the Arizona Supreme Court would take, as is evident, the Court analyzed the law in a number of jurisdictions and discovered that the prevailing rule on this matter is in line with Delaware's treatment of this question. Thus, even if the Court were to apply Delaware, or even Texas or New Jersey, law, rather than Arizona law, Plaintiffs' conspiracy allegations would still withstand Defendant's Motion to Dismiss.

conspired with Grupo Mexico . . ." to perpetuate and facilitate the other wrongful acts. (*Id.* ¶ 97.)
The allegations further specify that "AMC knowingly and intentionally provided substantial
assistance to Grupo Mexico" in its breach of fiduciary duty. (*Id.* ¶ 110.) Thus, even with the higher
pleading requirements recognized in some states, this Court finds that Plaintiffs have met those
requirements so as to withstand Defendant's Motion to Dismiss.

### C. Conspiracy between AMC and ASARCO's Directors

This Court must also determine the prevailing law on whether a parent corporation can
conspire with the directors of its wholly-owned subsidiary where the directors involved in the
alleged conspiracy were also directors of the parent corporation.

Plaintiffs allege that AMC conspired with ASARCO's directors to breach fiduciary duties
owed the creditors and to fraudulently transfer the stock in question. (Compl. ¶¶ 96-100.)
Defendant argues that because ASARCO's directors were also AMC's directors and because a
corporation cannot conspire with its own employees and agents, Plaintiffs' conspiracy claim must
fail. (AMC's Motion, at 9-11.) Plaintiffs' argument is essentially that the directors of ASARCO
were acting in their role as ASARCO's directors, not AMC's directors, when they conspired with
AMC.

Plaintiffs' argument has two potential barriers. The first turns on whether there is a cause
of action for conspiracy between a parent corporation and the directors of its wholly-owned
subsidiary. The analysis of this issue parallels the discussion above regarding the alleged conspiracy
between Grupo and AMC because if a parent and wholly-owned subsidiary can conspire, so too can
a parent and the directors of its wholly-owned subsidiary, since a corporation acts through its

directors and officers.  *See* 2 Fletcher Cyc. Corp. § 275 (2007).  As this issue was discussed in depth above, it is not necessary to repeat the same analysis here.

The second issue is whether ASARCO's directors could conspire with AMC since these same individuals also sat on AMC's board of directors.  If these directors are treated as AMC's agents, then the intracorporate conspiracy doctrine would bar Plaintiffs' conspiracy claim.

With regard to this issue, the Court is faced with two policies, each of which has been recognized by the courts and each of which would dictate an opposite result.  Underlying ASARCO's argument is the premise that, regardless of how many other corporate boards its directors sit on and regardless of whether those entities are related, each of its directors owes an uncompromised fiduciary duty to ASARCO.  This (with certain exceptions) is straight-forward black letter law.  *See* 19 C.J.S. *Corporations* § 609 (2007).  AMC, on the other hand, points out that the individuals in question were also directors of AMC and that, especially if one assumes that they approved the sale in question solely to benefit AMC, a corporation cannot conspire with its own directors who are acting to benefit that corporation.  Since the directors in question were also AMC directors acting to benefit AMC, AMC cannot conspire with itself.  (AMC's Motion, at 9-11).  Again, with certain exceptions, this is black letter law. *See* Robin Miller, Annotation, *Construction and Application of "Intracorporate Conspiracy Doctrine" as Applied to Corporation and its Employees–State Cases*, 2 A.L.R. 6th 387 (2005).

The intracorporate conspiracy doctrine states that a corporation cannot conspire with its own employees, directors, or agents.  The rationale of this rule is that acts of the corporation's agents are deemed to be acts of the corporation itself. *See id.*; *see also Fojtik v. First National Bank of Beeville*, 752 S.W.2d 669, 673 (Tex.App.–Corpus Christi 1988, writ denied).  As a result, an accusation of

conspiracy between a corporation and its agent is essentially an allegation that the corporation conspired with itself—a legal impossibility. *See id*. The key to this doctrine is that a conspiracy cannot exist between a corporation and its employees or directors who are *acting as agents* of the corporation. Thus, it is implicit in the intracorporate conspiracy doctrine that employees, directors, and agents of a corporation, who are not acting within the scope of their employment, can conspire with that corporation. This has been expressly recognized in a number of jurisdictions and is clearly the prevailing view on the issue.[28]

Plaintiffs' Complaint avers that "AMC joined and conspired with . . . one or more of ASARCO's directors . . . ." (Compl. ¶ 97.) Although the individuals who were allegedly involved in the conspiracy were directors of both AMC and ASARCO, Plaintiffs specifically state that their claim is that AMC conspired with these individuals in their capacity as ASARCO's directors. *Id*. This is not a claim against AMC for conspiring with its own directors because the allegations make clear that these individuals were acting outside the scope of their corporate capacity at AMC and in their capacity as agents for ASARCO, a different corporate entity. *Id*. As a result, ASARCO

---

[28] *See e.g., Faulkner v. Arkansas Children's Hospital*, 69 S.W.3d 393, 407 (Ark. 2002) (stating, "in order to sustain a claim for a civil conspiracy where agents of a corporation are involved, it is necessary to show that one or more of the agents acted outside of the scope of their employment, to render them a separate 'person' for purposes of the conspiracy."); *Harp v. King*, 835 A.2d 953, 974 (Conn. 2003) (stating that for a claim of intracorporate conspiracy to be actionable, the plaintiff must allege that employees or agents were acting outside the scope of their employment); *Renner v. Wurdeman*, 434 N.W.2d 536, 542 (Neb. 1989)(requiring that plaintiff allege that the corporate employees or agents are acting outside the scope of their authority or other than in the normal course of their corporate duties in order to allege intracorporate conspiracy); *Marjac, LLC v. Trenk*, No. 06-1440(JAG), 2006 WL 3751395 at *16 (D.N.J. Dec. 19, 2006)(leaving open the possibility of a conspiracy findings if the agents are not acting exclusively within the scope of their employment.); *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 704 (Tenn. 2002)(recognizing the "scope of employment" exception to the intracorporate conspiracy doctrine) *Texas-Ohio Gas, Inc. v. Mecom*, 28 S.W.3d 129, 138 (Tex App.–Texarkana 2000, no pet.)(citing *Fojtik v. First National Bank of Beeville*, 752 S.W.2d 669, 673 (Tex. App.–Corpus Christi 1988, writ denied)(noting that although agents cannot conspire with the corporation while acting in their corporate capacity, a conspiracy can be formed if the agent acts outside his corporate capacity; *Roberts v. Parker*, Ch. No. 125512, 1992 WL 885025, at * 2 (Va. Cir. Ct. November 19, 1992)(stating that the intracorporate immunity defense is not available to agents acting outside the scope of their employment).

contends that the intracorporate conspiracy doctrine does not bar Plaintiffs' claim that AMC conspired with its directors.

Defendant, while not conceding that the directors committed any breach of fiduciary duty, argues that if the directors were acting at the behest and for the benefit of AMC in their actions, then the intracorporate conspiracy doctrine should apply because both AMC and the directors were acting to benefit AMC. Stated another way, while the directors may have been allegedly breaching their own duty to act as a fiduciary to ASARCO (and conceivably could be held liable for that) and while AMC could have allegedly been aiding and abetting that breach (and conceivably could be held liable for that), neither could be held liable for conspiracy because both AMC and the directors were acting to benefit AMC and in its best interest.

The problem with this analysis is twofold. First, a director of a corporation owes a fiduciary duty to each and every corporation on whose board he or she sits. *See Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 599 (1921). One cannot pick one corporation to be loyal to while discarding one's duties to another.[29] *Id.* Second, the act(s) about which ASARCO seemingly complains are the alleged actions whereby the directors in question directed and approved the sale of the SPCC stock. In doing this, they would have had to have been acting as ASARCO directors—not AMC directors—and, especially given the allegation of insolvency, should have been acting for ASARCO's best interest. While this Court is not willing at this stage to hold as a matter of law that the directors were acting on, or should have been acting on, ASARCO's behalf, it is not

---

[29] The Court realizes the individuals were acting solely to benefit the parent to which the doctrine of intracorporate immunity might apply. If that situation creates an inequitable result to the subsidiary corporation, a cause of action may still be barred because there is truly only one entity at interest. It is the use of this phenomena to create an insolvency, or deepen an already existing insolvency, which injures third parties, such as creditors, that lifts the shield of the intracorporate conspiracy doctrine.

willing to dismiss the claim given that possibility.[30]  That being the case, the Court **DENIES** the

Motion to Dismiss the conspiracy claim between AMC and ASARCO's directors.

## VII. PUNITIVE DAMAGES

Punitive damages are available only if there is an underlying cause of action pled and proved

by plaintiff which will permit recovery of punitive damages against the defendant.  The Bankruptcy

Code does not provide for punitive damages; however, they may be available by application of state

law.  *Smith v. Lounsbury (In re Amberjack Interests, Inc.)*, 326 B.R. 379, 391 (Bankr. S.D. Tex.

2005); *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989); *cf. In re Fill*, 82 B.R. 200, 227-

28 (Bankr. S.D.N.Y. 1987)(not available under New York fraudulent transfer based claim); *In re

Maxted*, 107 B.R. 289, 290 (Bankr. D. Mont. 1988).  Plaintiffs do not seek punitive damages under

the Bankruptcy Code, but rather based on their state-law claims for breach of fiduciary duty and

aiding and abetting a breach of fiduciary duty.

As in the prior analyses, it is necessary to first determine which state's law the Court must

look to in determining whether a claim for punitive damages is available.  *See* Cabaniss, *Availability

of Punitive Damages: Dépecage*, 27 Trial 51 (Dec. 1991) (noting that the availability of punitive

damages is a matter of substantive law and thus presents a choice-of-law question). This Court

previously determined that New Jersey substantive law controlled the underlying claims for breach

---

[30] It is also conceivable that the directors were acting for their own personal benefit, rather than on AMC's behalf, which might also state an actionable claim. *See e.g., Akande v. TransAmerica Airlines, Inc.*, No.Civ.A. 1039-N, 2006 WL 587846, at *7 (Del. Ch. Feb. 28, 2006)(stating that the intracorporate conspiracy doctrine does not apply "when the officer or agent of the corporation steps out of his corporate role and acts pursuant to personal motives); *Findell v. Koos*, No. CV010510859S, 2002 WL 532409 (Conn. Super. Ct. 2002)(recognizing the personal stake exception to the intracorporate conspiracy doctrine); *Richard Bertram, Inc v. Sterling Bank & Trust,* 820 So. 2d 963 (Fla. Dist. Ct. App. 4th Dist. 2002)(acknowledging an exception where the agent has a personal stake separate from the principal's interest); *see also* Robin Miller, Annotation, *Construction and Application of "Intracorporate Conspiracy Doctrine" as Applied to Corporation and its Employees–State Cases*, 2 A.L.R. 6th 387, §§ 7-8, 12 (2005).

of fiduciary duty and aiding and abetting a breach of fiduciary duty.  Plaintiffs urge that New Jersey

law governs the punitive damage issue as well. (ASARCO's Response, at 20). The Court does not

find, and neither party has suggested, that any other state's law should control whether punitive

damages are an available form of relief for these claims, thus the Court will apply New Jersey law.[31]

The requirements for the recovery of punitive damages have been codified in New Jersey:

> Punitive damages may be awarded to the plaintiff only if the plaintiff
> proves, by clear and convincing evidence, that the harm suffered was
> the result of the defendant's acts or omissions, and such acts or
> omissions were actuated by actual malice or accompanied by a
> wanton and willful disregard of persons who foreseeably might be
> harmed by those acts or omissions. This burden of proof may not be
> satisfied by proof of any degree of negligence including gross
> negligence.

N.J. Stat. An.. § 2A:15 - 5.12(a) (West 2000 & Supp 2002).  The case law in New Jersey reiterates

that punitive damages are appropriate where "the wrongdoer's conduct is especially egregious," not

merely negligent.  *Jaclyn, Inc. v. Edison Bros. Stores, Inc.*, 406 A.2d 474, 492 (N.J. Super. Ct. App.

Div. 1986); *Albright v. Burns*, 503 A.2d 386, 391 (N.J. Super.Ct. App. Div. 1986).

Plaintiffs' Complaint tracks the language of the New Jersey statute, alleging that "the harm

suffered by ASARCO and its creditors was the result of AMC's acts or omissions" (Compl. ¶ 115.)

---

[31] Even if New Jersey is not the state with the most significant relationship to the breach of fiduciary duty claim
and/or the punitive damages allegation, the result would be the same because each of the other possible jurisdictions,
Arizona, Delaware, and New York, allow recovery of punitive damages for a breach of fiduciary duty claim as well.
*See generally Rhue v. Dawson*, 841 P.2d 215 (Ariz. 1992); *Standard Chlorine of Delaware, Inc. v. Sinibaldi*, 821 F.Supp.
232 (D. Del. 1992); *Westinghouse Elec. Supply Co. v. Pyramid Champlain Co.*, 597 N.Y.S.2d 811 (App. Div. 3d Dep't
1993).  Furthermore the standards of recovery in other states are analogous to the standard in New Jersey. *See Jerman
v. O'Leary*, 701 P.2d 1205, 1210 (Ariz. 1985)(stating that punitive damages are based on "gross wanton, malicious and
oppressive conduct or on conduct which shows spite, ill will or reckless indifference to the interests of others"); *Jardel
Co., Inc. v. Hughes*, 523 A.2d 518, 529 (Del. 1987)(acknowledging that under Delaware law, defendant's conduct need
not be intentional but it must be particularly reprehensible, that is reckless or motivated by malice or fraud);
*Westinghouse Elec. Supply*, 597 N.Y.S.2d at 932 (recognizing that in order to recover punitive damages plaintiff allege
that defendant acted in a "wanton, willful, or malicious manner" and that plaintiff seeks to vindicate a public right or
morally culpable conduct).

and that these "acts or omissions by AMC were actuated by actual malice or accompanied by a wanton and willful disregard of the interests of ASARCO and its creditors, which foreseeably might have been harmed by those acts or omissions." (*Id*. ¶ 116.)  Plaintiffs further aver that AMC's wrongful conduct "was aggravated by the kind of willfulness, wantonness, and malice for which the law allows the imposition of punitive damages." (*Id*. ¶ 114.)  This Court finds that under the deferential standard of Rule 12(b)(6), punitive damages would be available if Plaintiffs prevail on their breach of fiduciary duty claims and prove the facts necessary to merit punitive damages.

## VIII.  FRAUD PLEADING

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b); *see also United States v. Dow Chem. Co.*, 343 F.3d 325, 328 (5th Cir. 2003).   The purpose of Rule 9(b) is to "place the defendants on notice of the precise misconduct with which they are charged." *In re APF Co.*, 308 B.R. 183, 188 (Bankr. D. Del. 2004)(describing the standard as higher and more strict than notice pleading).

Defendant argues that Plaintiffs' claims for fraudulent transfer should be dismissed because Plaintiffs failed to indicate the specific state-law statute on which they seek relief. AMC's Motion, at 8-9). There is some authority to support Defendant's argument that a claim can be dismissed under Rule 9(b) where the plaintiff has not specifically alleged the state-law basis of its fraud claim. *See Chrysler Capital Corp. v. Century Power* Corp., 778 F.Supp. 1260, 1270 (S.D.N.Y. 1991)(dismissing plaintiffs' claims of fraud under "applicable state securities laws" for failure to indicate the state statutes under which they sought relief); *In re Verestar, Inc.*, 343 B.R. 444 (Bkrtcy

47

S.D.N.Y. 2006)(finding that plaintiffs' fraud claim failed to meet the standard of Rule 9(b) because they did not  specify the state statute on which they relied)

The Complaint specifies only that Plaintiffs base their fraudulent transfer claim on 11 U.S.C. §§ 544(b) and 550(a).  (Compl. ¶ 82.)  Section 544(b) of the Bankruptcy code provides that the trustee may avoid "any transfer . . . that is voidable *under applicable law* . . . ."  11 U.S.C. § 544 (emphasis added).  Plaintiffs fail to specify the applicable law on which their fraud claims rest. (*See* Compl. ¶¶ 77-84.)  As a result, Plaintiffs have not met the requirements of Rule 9(b).

Rather than dismiss this claim, the Court grants Plaintiffs leave to amend their Complaint so as to conform their pleadings to the requirements of Rule 9(b).[32] However, if Plaintiffs plan on asserting a fraudulent transfer claim based on state law, the Court hereby **ORDERS** that within 15 days of the issuance of this order, Plaintiffs file an amended complaint, specifying the state statute on which they base their claim.

## VIII. CONCLUSION

Defendant has not shown that any of  Plaintiffs' claims must be dismissed as a matter of law. *See* Fed. R. Civ. P. 12(b)(6).

ASARCO has standing to sue for its own interests in the SPCC stock by asserting that it was injured by the fraudulent transfer of March 31, 2003.  Although this is not the traditional context for a veil-piercing claim, the alter ego claim is available where equitable relief is required to prevent injustice.  In the context of fraud – the fraudulent transfer– Plaintiffs have asserted facts that support the necessity to pierce the corporate veil of SPH, so the court recognizes that ASARCO has standing

---

[32] "[A] party may amend the party's pleading ... by leave of court ... and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

to advocate alongside SPH and claim its property interest under 11 U.S.C. § 544. Thus, Defendant's motion to dismiss based on ASARCO's lack of standing is **DENIED**.

The Court also **DENIES** the motion to dismiss Plaintiffs' claims for breach of fiduciary duty and aiding and abetting the breach of fiduciary duty. Since Plaintiffs have pled that ASARCO was actually insolvent at the time of the fraudulent transfer, they have alleged sufficient facts to establish that Defendant did owe them a fiduciary duty. *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3rd Cir. 2007); *Whitfield* v. Kern, 192 A. 48, 55 (N.J. 1937); *In re Scott Acquisition Corp.*, 344 B.R. 283, 288 (Bankr. Del. 2006). Plaintiffs may also hold AMC liable if it aided and abetted the breach of fiduciary duty owed by ASARCO's directors. Plaintiffs have pled sufficient facts to pursue their breach of fiduciary duty claims to the discovery stage of litigation.

The conspiracy claim also survives dismissal under the standard of review dictated by Rule 12(b)(6). Although the availability of this cause of action between a parent and wholly-owned subsidiary is less settled, Plaintiffs have pled facts which may support the claim that AMC and Grupo acted as two persons to intentionally conspire, knowing it would injure ASARCO and, more importantly, its creditors. *Allied Capital Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1036 (Del.Ch. 2007); *Akande v. TransAmerica Airlines, Inc.*, No.Civ.A. 1039-N, 2006 WL 587846, at *7 (Del. Ch. Feb. 28, 2006); *Atl. Richfield Co. v. Long Trusts*, 869 S.W.2d 439, 447 (Tex.App. –Texarkana 1993, writ denied). Furthermore, the Court finds that Plaintiffs could put forth evidence, consistent with their pleadings, to prevail on their claim of conspiracy between ASARCO's directors and AMC. Thus, Defendant's motion to dismiss these conspiracy claims is **DENIED**.

This Court emphasizes that the foregoing rulings were based solely on the standards set out for evaluating motions to dismiss.  *See* Fed. R. Civ. P. 12(b)(6).  Later developments, factual discovery, and additional briefing could lead this court to a different conclusion on either the issue of choice of law or any of the substantive questions currently before the Court.

Rule 9(b) requires plaintiffs to plead fraud with particularity.  Fed. R. Civ. P. 9(b). This includes specifying any state statute upon which the claim is based.  The Court, pursuant to Rule 9(b),  **ORDERS** that Plaintiffs give Defendant notice of any state-law statutory basis for their fraudulent transfer claim.  If Plaintiffs amend their complaint within 15 days from the issuance of this order, the Court will not dismiss the claims for failure to comply with Rule 9(b).  *See* Fed. R. Civ. P. 9(b).  Defendant, AMC, will have 30 days from this order to file any responsive pleadings it deems necessary.

Signed this 12th day of October, 2007.

Andrew S. Hanen
United States District Judge

50